Hearing Date and Time:  **April 30, 2014, at 9:45 a.m. (Eastern Time)**
Objection Deadline:  **April 14, 2014, at 4:00 p.m. (Eastern Time)**

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
Allan S. Brilliant
Shmuel Vasser
Jeffrey T. Mispagel

*Proposed Attorneys for the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| -------------------------------------------------------- | X | |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| LEGEND PARENT, INC., *et al.*, | : | Case No. 14-10701 (REG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| -------------------------------------------------------- | X | |

**NOTICE OF DEBTORS' MOTION FOR ORDER AUTHORIZING THE
DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT
AGREEMENT WITH HOLDERS OF THE MAJORITY OF CLAIMS
UNDER THE DEBTORS' FIRST LIEN CREDIT AGREEMENT AND
THE MAJORITY OF CLAIMS UNDER THE INDENTURE**

**PLEASE TAKE NOTICE** that, a hearing on the *Debtors' Motion for Order*

*Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement With the*

*Holders of the Majority of Claims Under the Debtors' First Lien Credit Agreement and the*

*Majority of the Claims Under the Indenture* (the "**Motion**") will be held before the Honorable

Robert E. Gerber, United States Bankruptcy Judge, United States Bankruptcy Court for the

Southern District of New York (the "**Court**"), One Bowling Green, Courtroom No. 523, New

York, New York 10004, on **April 30, 2014, at 9:45 a.m., prevailing Eastern Time**.

19165860

**PLEASE TAKE FURTHER NOTICE** that, any responses or objections to the

relief requested in the Motion shall conform to the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), all General Orders and Local Bankruptcy Rules of the Court, and the

*Case Management Order* [Docket No. 26] issued by the Court; shall be set forth in writing

describing the basis therefore; shall be filed electronically with the Court on the docket of *In re*

*Legend Parent, Inc.*, Case No. 14-10701 (REG), pursuant to the Court's General Order M-399

(which can be found at www.nysb.uscourts.gov) by registered users of the Court's case filing

system and by all parties in interest on a 3.5 inch disk or flash drive, preferably in portable

document format ("**PDF**"), Microsoft Word, or any other Windows-based word processing

format (with a hard copy delivered directly to Chambers) and served in accordance with General

Order M-399 or otherwise so as to be actually received no later than **4:00 p.m. (prevailing**

**Eastern Time) on April 14, 2014** by (i) the Chambers of the Honorable Robert E. Gerber, One

Bowling Green, New York, New York, 10004; (ii) Dechert LLP, Proposed Attorneys for the

Debtors, 1095 Avenue of the Americas, New York, New York, Attn: Allan S. Brilliant, Shmuel

Vasser and Jeffrey T. Mispagel; (iii) William K. Harrington, United States Trustee, U.S.

Department of Justice, Office of the U.S. Trustee, U.S. Federal Office Building, 201 Varick

Street, Rm 1006, New York, NY 10014, Attn: Andrea Schwartz and Richard Morrissey;

(iv) counsel to the Official Committee of Unsecured Creditors, Stroock & Stroock & Lavan LLP,

180 Maiden Lane, New York, New York 10038, Attn: Kristopher M. Hansen, Frank A. Merola,

and Matthew G. Garofalo; (v) counsel to the Administrative Agent under the Credit Facility,

Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, IL  60606, Attn:

Richard A. Levy; (vi)  counsel to the holders of the majority of the Notes under the Indenture,

Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York,

New York 10036-6745, Attn: Michael S. Stamer and James Savin, and (vii) all other parties who
have filed a notice of appearance and request for service of documents.

      **PLEASE TAKE FURTHER NOTICE** that, only those responses that are timely
filed, served, and received will be considered at the hearing.  Failure to file a timely objection
may result in entry of an order granting the Motion as requested by the Debtors.

      **PLEASE TAKE FURTHER NOTICE** that, the hearing may be adjourned from
time to time without notice except for notice posted on the Court's calendar or announced in
open court.

Dated: New York, New York
      April 2, 2014          DECHERT LLP

          */s/  Shmuel Vasser*
          Allan S. Brilliant
          Shmuel Vasser
          Jeffrey T. Mispagel
          1095 Avenue of the Americas
          New York, New York  10036
          Telephone:  (212) 698-3500
          Facsimile:  (212) 698-3599
          Email:  allan.brilliant@dechert.com
              shmuel.vasser@dechert.com
              jeffrey.mispagel@dechert.com

          *Proposed Attorneys for the Debtors and
Debtors in Possession*

**Hearing Date and Time: April 30, 2014 at 9:45 a.m. (Eastern Time)**
**Objection Deadline:  April 14, 2014 at 4:00 p.m. (Eastern Time)**

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
Allan S. Brilliant
Shmuel Vasser
Jeffrey T. Mispagel

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X
                                                         :
In re:                                                   :    Chapter 11
                                                         :
LEGEND PARENT, INC., *et al.*,                           :    Case No. 14-10701 (REG)
                                                         :
        Debtors.                                         :    Jointly Administered
                                                         :
---------------------------------------------------------- X

**DEBTORS' MOTION FOR ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER A PLAN SUPPORT AGREEMENT WITH HOLDERS OF THE MAJORITY OF CLAIMS UNDER THE DEBTORS' FIRST LIEN CREDIT AGREEMENT AND THE MAJORITY OF CLAIMS UNDER THE INDENTURE**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

PRELIMINARY STATEMENT ......................................................................................... 1

JURISDICTION .................................................................................................................. 3

BACKGROUND ................................................................................................................. 3

      Description of the Plan.................................................................................................... 4

      Material Terms of the Plan Support Agreement ............................................................ 5

RELIEF REQUESTED...................................................................................................... 10

BASIS FOR RELIEF REQUESTED ............................................................................... 10

      A.     Entry Into the Plan Support Agreement Is A Sound Exercise of Business
            Judgment ........................................................................................................... 10

      B.     The Plan Support Agreement Complies With Section 1125 of the
            Bankruptcy Code ............................................................................................... 13

NOTICE ............................................................................................................................ 14

NO PRIOR RELIEF ......................................................................................................... 15

CONCLUSION ................................................................................................................. 15

19137178

## TABLE OF AUTHORITIES

ASARCO, Inc. v. Elliott Management
    650 F.3d 593 (5th Cir. 2011) ............................................................................................12

In re AMR Corp.
    Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012)...................................12

In re Adelphia Communications Corp.,
    345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) ................................................................13

In re Calpine Corp.
    356 B.R. 585, 593-94 (Bankr. S.D.N.Y. 2007) .......................................................12

In re Heritage Organization, L.L.C.
    376 B.R. 783 (Bankr. N.D. Tex. 2007) ...................................................................13

In re Indianapolis Downs, LLC
    486 B.R. 286 (Bankr. D. Del. 2013) ........................................................................13

In re Ionosphere Clubs, Inc.
    98 B.R. 174 (Bankr. S.D.N.Y. 1989) ..................................................................3, 13

In re Lehman's Holdings, Inc.
    Case No. 10-16077 (REG) (Bankr. S.D.N.Y. Dec. 15, 2010) ................................12

Mgmt. Tech. Corp. v. Pardo
    56 B.R. 337 (Bankr. D.N.J. 1985) ...........................................................................13

Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco)
    81 B.R. 813 (Bankr. S.D.N.Y. 1988) ................................................................10, 13

U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)
    2003 WL 21738964 (S.D.N.Y. July 28, 2003) .......................................................12

### STATUTES/RULES/CODES

11 U.S.C. § 105(a) ....................................................................................................3, 10

11 U.S.C. § 363...........................................................................................................3, 10

11 U.S.C. § 1125.............................................................................................................13

28 U.S.C. § 157.................................................................................................................3

ii

28 U.S.C. § 1334.................................................................................................3

28 U.S.C. § 1408.................................................................................................3

28 U.S.C. § 1409.................................................................................................3

Fed. R. Bankr. P. 6003........................................................................................3

Fed. R. Bankr. P. 6004........................................................................................3

OTHER AUTHORITIES

2 Collier on Bankruptcy, ¶ 105.01 (16th ed. 2009) .......................................12

The above-captioned debtors and debtors in possession (collectively, the **"Debtors"**), by and through their undersigned attorneys, hereby move (the **"Motion"**) for entry of an order authorizing the Debtors to enter into and perform under the Plan Support Agreement, dated as of April 1, 2014 (the **"Plan Support Agreement"** or the **"PSA"**),[1] a copy of which is attached hereto as Exhibit A, by and among the Debtors, each of the Consenting Lenders (as defined below), and each of the Consenting Noteholders (as defined below). In support thereof, the Debtors respectfully set forth and represent as follows:

## INTRODUCTION

1.      On March 20, 2014 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing is contained in the *Declaration of David Woodworth in Accordance With Local Rule 1007-2 in Support of First Day Motions* [Docket No. 3] (the "**First Day Declaration**"), filed on the Petition Date and incorporated herein by reference.

## PRELIMINARY STATEMENT

2.      The Debtors' most valuable asset is their large and loyal customer base. Maintaining the loyalty of these customers and their commitment to utilizing the Debtors for their clinical documentation solutions is necessary for the Debtors to reorganize successfully. The Debtors believe that only through fast emergence from Chapter 11 will the Debtors' customers be assured that they will continue to receive the quality services to which they have become accustomed. The Debtors, therefore, believe that a successful restructuring must be

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan Support Agreement, or the term sheet (the "**Plan Term Sheet**") annexed to the PSA as Exhibit A.

accomplished by consensus among the Debtors' significant creditor constituencies in order to minimize any disruption to the business.

3.      While the Debtors were unable to achieve an agreement among their lenders and noteholders prior to the filing of these bankruptcy cases, negotiations continued post petition, eventually concluding with the Plan Support Agreement. The Debtors, Consenting Lenders and Consenting Noteholders believe that the Plan Support Agreement, and approval thereof by this Court, will pave the way for an expeditious and successful reorganization of the Debtors and will go a long way to assure the Debtors' customers that a successful conclusion to these cases is at hand.

4.      The Plan Support Agreement will permit the Debtors to proceed with solicitation of a plan of reorganization (subject to the Court's approval of a disclosure statement) with the assurance that they will have the support of their major creditor constituencies. The Debtors anticipate that their entry into and performance under the PSA will expedite and enhance creditor recoveries, and will enable the Debtors to emerge from chapter 11 quickly. For these reasons, the Debtors believe that entry into and performance under the Plan Support Agreement is an appropriate exercise of their business judgment and that the Motion should be granted.

5.      Last, but certainly not least, as an integral part of the PSA, the Debtors' secured lenders have agreed to provide the Debtors with a $30 million DIP Facility[2] and the consensual use of cash collateral. The enhanced liquidity resulting from the DIP Facility and the resulting ability to use cash collateral without a protracted, expensive, and ultimately uncertain contested legal proceedings, in and of themselves constitute significant considerations that enhance the estates and the Debtors' going concern value.

---

[2]      A motion to approve the DIP Facility will be filed and be scheduled for a hearing on April 30, 2014.

2

## JURISDICTION

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (O).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are sections 105(a) and 363 of title 11 of the United States Code (the "**Bankruptcy Code**") and Fed. R. Bankr. P. 6003 and 6004.

## BACKGROUND

7.      Prior to the Petition Date, the Debtors commenced negotiations regarding a potential restructuring of the Debtors' funded debt obligations with holders of claims under the First Lien Credit Agreement (the "**Consenting Lenders**") and holders of a majority of Notes issued under the Indenture (the "**Consenting Noteholders**," and together with the Debtors and the Consenting Lenders, the "**Parties**").  Those negotiations have continued since the Petition Date, and have culminated in the Plan Support Agreement, through which each of the Parties has agreed to support a plan of reorganization that comports with the terms of the Plan Term Sheet (the "**Plan**").

8.      The resolution embodied in the Plan Support Agreement has support from the Debtors' key creditor constituencies.  The Plan Support Agreement has been agreed to by holders of more than 66% of claims under the Credit Agreement and holders of more than 66% of claims under the Indenture.

3

### Description of the Plan[3]

9.        The Plan Term Sheet provides for the Plan treatment of unclassified

claims and nine (9) classes of creditors and equityholders.   A chart describing the treatment

contemplated by the Plan can be found on pages 10-13 of the Plan Term Sheet.

10.        Administrative expense claims and priority tax claims are unclassified.

Administrative expense claims will be paid in full and in cash unless otherwise agreed to.

Priority tax claims will either be paid in cash on the Effective Date, as required by section

1129(a)(C), or as otherwise agreed upon.

11.        As to classified claims, the Plan will leave priority claims and secured

claims, other than the claims under the First Lien Credit Agreement, unimpaired.  Claims under

the First Lien Credit Agreement are impaired and will receive, in full satisfaction of such claims,

their pro rata share of (i) the New Term Loan,[4] (ii) 93% of the stock (the "**Reorganized**

**Holdings Equity Interests**") of reorganized MModal Holdings, Inc., or one of its affiliate

Debtors due to tax efficiency concerns ("**Reorganized Holdings**"), before dilution for certain

stock warrants to be issued in connection with the Plan on such terms set forth in the Plan Term

Sheet (the "**Warrants**") and a management stock option plan to be established in connection

with the Plan (the "**MIP**"), and (iii) $8,197,801 in cash.

12.        Holders of General Unsecured Claims, including claims under the

Indenture, will receive, in full satisfaction of such claims, their pro rata share of (i) 7% of

Reorganized Holdings Equity Interests, before dilution for the Warrants and the MIP, (ii) the

Warrants, and (iii) $617,039 in cash, *provided*, *however*, that holders of General Unsecured

---

[3]        This summary is qualified in its entirety by the terms contained in the PSA and Plan Term Sheet.

[4]        The New Term Loan is a $320 million post Effective Date secured term loan to be made to the
Debtors.

Claims other than a Noteholder Claim may elect to receive, in lieu of the foregoing

consideration, cash in an amount equal to a percentage of such creditor's General Unsecured

Claim to be set forth in the Plan, which percentage shall reflect the recovery percentage of the

holders of Noteholder Claims and shall be acceptable to the Required Consenting Holders in

their good faith discretion.

13.    The Plan will establish a Convenience Class for general unsecured claims

up to and including $100,000, which claims will be paid in full and in cash on the Effective Date.

Claims that are subject to subordination under section 510(b) or (c) of the Bankruptcy Code shall

receive no distribution, except to the extent that the Court declines to subordinate them, in which

case, they will receive the treatment provided for general unsecured claims or Convenience Class

Claims, depending on the size of the claims.

14.    Existing equity in MModal Holdings, Inc. will be cancelled and not

receive any distributions under the Plan.  Intercompany equity interests will be reinstated solely

to preserve the corporate structure of the Debtors.  Intercompany claims will, at the Debtors'

option, either be cancelled or reinstated.

### *Material Terms of the Plan Support Agreement*[5]

15.    As detailed below, the Plan Support Agreement contains customary terms,

including an agreement among the Parties to support a plan that is consistent with the Plan

Support Agreement, to negotiate in good faith regarding necessary documentation (including a

disclosure statement, an order approving the disclosure statement, an order confirming the Plan,

and exit credit facility documents), and to refrain from supporting any alternative plans.

---

[5]     The description of the PSA and the Plan Term Sheet in the Motion is qualified in its entirety by
reference to the actual provisions of the PSA and the Plan Term Sheet..

16.     The Plan Support Agreement provides for the secured lenders to provide the Debtors with a debtor in possession financing facility (the **"DIP Facility"**) on terms and conditions described in Exhibit B to the Plan Support Agreement (the **"DIP Term Sheet"**) and for specified Milestones for these cases.  The Plan Support Agreement and the DIP Term Sheet require the Debtors to use commercially reasonable efforts to timely comply with each of the following Milestones:

(i)     file a motion to approve the Plan Support  Agreement and obtain entry of an order, in form and substance reasonably acceptable to the Required Consenting Holders, approving it (the "**PSA Approval Order**") on or before April 30, 2014;

(ii)     file a motion to approve the DIP Facility and obtain entry of the DIP Order on or before April 30, 2014;

(iii)     file the Plan and the Disclosure Statement on or before April 20, 2014;

(iv)     obtain entry of the Disclosure Statement Order on or before May, 28, 2014;

(v)     obtain entry of the Confirmation Order on or before July 15, 2014; and

(vi)     cause the effective date of the Plan (the "**Plan Effective Date**") to occur on or before August 15, 2014;

*provided*, *however*, that the Milestones may be extended, if at all, with the prior written consent of the Required Consenting Lenders and the Required Consenting Noteholders.

6

17.     The Plan Support Agreement also requires the Debtors, upon the Court approval of the PSA, to pay prepetition and postpetition fees and expenses incurred by the advisors to the Secured Lenders Agent and the Consenting Noteholders, prepetition fees and expenses incurred by counsel to the Secured Lenders, and postpetition fees and expenses incurred by counsel to each Consenting Lender (other than the Secured Lenders Agent), subject to a cap of $25,000 for each Consenting Lender.

18.     The Secured lenders Agent retained Latham & Watkins LLP ("**Latham**") as its counsel and Houlihan Lokey ("**Houlihan**") as its financial advisor.  The Consenting Noteholders retained Akin Gump Strauss Hauer & Feld LLP ("**Akin**") as their counsel and Blackstone Advisory Partners L.P. ("**Blackstone**") as their financial advisor.  Latham's and Akin's  billing arrangements for this engagement are based on their hourly rates.  Blackstone's fee arrangement consists of a $125,000 monthly fee, a restructuring fee of $2 million[6] (which may be increased by $250,000 at the election of Consenting Noteholders upon notice to the Debtors), with 50% of the monthly fee beginning with the monthly fee due on May 25, 2014 credited against the restructuring fee and reimbursement of all reasonable out of pocket expenses.   Houlihan's fee arrangement consists of a $125,000 monthly fee, a deferred fee of $2 million payable upon consummation of a Transaction,[7] a discretionary deferred fee of up to $500,000 and reimbursement of its reasonable out of pocket expenses.

---

[6]     The restructuring fee is earned upon consummation of a "Restructuring," which is defined as "(a) the binding execution and effectiveness of all necessary waivers, consents, amendments or restructuring agreements by which the obligations of the Company to the Holders under the Credit Agreement and/or Indenture have been restructured or refinanced; or (b) the execution, confirmation and consummation of a Plan of Reorganization…."

[7]     "Transaction" is defined as merger, consolidation, reorganization, recapitalization or other business combination, the acquisition of a substantial portion of the Debtors wither via a stock or asset purchase transaction, a sale or transfer of substantially all of the assets or operations of the Debtors and a financial restructuring or reorganization whether or not pursuant to Chapter 11.

19.    The Plan Support Agreement's key terms are summarized below:[8]

| PSA Term | Summary |
|---|---|
| Parties' Support for the Plan (PSA § 1) | • Each Party will negotiate in good faith the agreements and forms of proposed orders contemplated by the Restructuring;<br>• Each Consenting Lender and Consenting Noteholder will, subject to entry of an order approving the Disclosure Statement, vote all of its Claims to accept the Plan;<br>• Each Party will use commercially reasonable efforts to support entry of the DIP Order and Disclosure Statement Order, and confirmation and consummation of the Plan; and<br>• Each Party will not directly or indirectly support any Alternative Plan. |
| Transfer Restrictions (PSA § 5) | • Each Consenting Lender and Consenting Noteholder agrees not to transfer its claim, except to a party that agrees in writing to assume and be bound by all of the terms of the Plan Support Agreement with respect to the relevant Claim being transferred. |
| Termination (PSA §§ 9, 10, 11) | The Plan Support Agreement provides customary termination rights by the Parties, including the following:<br><br>*Termination by Required Consenting Lenders or Required Consenting Noteholders*<br>• A Milestone is not met, or extended by mutual agreement;<br>• A material breach by the Debtors under the Plan Support Agreement;<br>• A material breach by the Consenting Noteholders under the Plan Support Agreement, such that the non-breaching Consenting Noteholders hold or control less than 66.66% of the principal amount of the Notes;<br>• A material breach by the Consenting Lenders under the Plan Support Agreement, such that the non-breaching Consenting Lenders hold or control less than 66.66% of the obligations under the Credit Agreement;<br>• The Debtors file or publicly announce their intention to file a plan inconsistent with the Restructuring Term Sheet, or the agreements and proposed orders contemplated by the Plan Support Agreement are not consistent with the Restructuring Term Sheet;<br>• The entry of an order appointing an examiner with enlarged |

---

[8]    The following summary is provided for illustrative purposes only and is qualified in its entirety by reference to the PSA.  In the event of any inconsistency between this summary and the PSA, the PSA shall control in all respects.

| PSA Term | Summary |
|---|---|
| | powers, or a trustee;<br>• The entry of an order converting any of the Debtors' cases to cases under Chapter 7;<br>• The entry of an order declaring the Plan Support Agreement or any material portion thereof to be unenforceable;<br>• The entry of an order dismissing any of the Debtors' cases; or<br>• The occurrence of a Material Adverse Effect (as defined in the Plan Support Agreement).<br><br>*Termination by the Debtors*<br>• A material breach by the Consenting Noteholders under the Plan Support Agreement, such that the non-breaching Consenting Noteholders hold or control less than 66.66% of the principal amount of the Notes;<br>• A material breach by the Consenting Lenders under the Plan Support Agreement, such that the non-breaching Consenting Lenders hold or control less than 66.66% of the obligations under the Credit Agreement;<br>• The entry of an order converting any of the Debtors' cases to cases under Chapter 7;<br>• The entry of an order declaring the Plan Support Agreement or any material portion thereof to be unenforceable;<br>• Pursuant to section 14 of the Plan Support Agreement, if the Debtors or their Board of Directors reasonably determine that the conditions to effectiveness of the Plan cannot be satisfied, or if they receive an alternative offer that maximizes the value of the Debtors' estates; or<br>• The entry of an order dismissing any of the Debtors' cases.<br><br>Consensual Termination<br>• Upon written agreement of the Debtors, the Required Consenting Lenders, and the Required Consenting Noteholders. |
| Fiduciary Duties (PSA § 14) | • The Debtors may terminate the Plan Support Agreement without liability to any Party if the Debtors or their Board of Directors reasonably determine that the conditions to effectiveness of the Plan cannot be satisfied, or if they receive an alternative offer that maximizes the value of the Debtors' estates. |
| Key Employee Incentive Plan (PSA § 15) | • The Parties will negotiate in good faith with respect to a Key Employee Incentive Program. |
| Payment of Fees and Expenses (PSA § 36) | • Upon Court's approval of the PSA, the Debtors shall pay prepetition and postpetition fees and expenses incurred by the advisors to the Secured Lenders Agent and the Consenting |

| PSA Term | Summary |
|---|---|
| | Noteholders, prepetition fees and expenses incurred by counsel to the Secured Lenders, and postpetition fees and expenses incurred by counsel to each Consenting Lender, subject to a cap of $25,000 for each Consenting Lender. |

### RELIEF REQUESTED

20.    The Debtors seek entry of an order, substantially in the form attached hereto as Exhibit B, authorizing them to enter into and perform under the Plan Support Agreement.

### BASIS FOR RELIEF REQUESTED

**A.    Entry Into the Plan Support Agreement Is A Sound Exercise of Business Judgment**

21.    A debtor's entry into a plan support agreement does not necessarily require approval under section 363(b) of the Bankruptcy Code.  See Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco), 81 B.R. 813, 818 (Bankr. S.D.N.Y. 1988).  The Debtors, however, seek authorization to enter into the Plan Support Agreement under sections 363 and 105 of the Bankruptcy Code for two independent reasons.  First, the Plan Support Agreement requires approval of this Court by April 30, 2014.  Second, approval of the Plan Support Agreement will assist the Debtors in allaying their customers' concerns and as such, will serve an important role in preserving the going concern value of the estates.

22.    Section 363(b) provides, in relevant part, that a debtor "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Courts authorize use of property under section 363(b) if such use is within the debtor's sound business judgment.  See In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989)

23.    The Debtors' entry into the Plan Support Agreement is an appropriate exercise of their business judgment that should be approved under section 363(b)(1).  The Plan

Support Agreement reflects substantial arms'-length, good-faith negotiations among the Debtors, the Consenting Lenders, and the Consenting Noteholders—each of whom was represented by experienced professionals and advisors.

24.     The Plan Support Agreement will permit the Debtors to proceed with solicitation of the Plan (subject to the Court's approval of a disclosure statement) having ensured the support of their major creditor constituencies. The Debtors believe that it is imperative to their overall confirmation and restructuring efforts to consensually resolve issues with their key creditors, and secure support from the Consenting Lenders and Consenting Noteholders at the present time. Entering into and performing under the PSA will facilitate expeditious confirmation and consummation of the Plan, and will enable the Debtors to quickly emerge from chapter 11. For these reasons, the entry into the Plan Support Agreement is an appropriate exercise of the Debtors' business judgment.

25.     The Debtors do not currently seek Court approval for the substantive treatment of claims under the Plan, although this treatment is now supported by holders of more than two thirds of claims under the Credit Agreement and holders of more than two thirds of claims under the Indenture. Questions of Plan treatment remain confirmation issues, and all other parties in interest retain their rights to object to (or support) the Plan at the appropriate time.

26.     While the Debtors recognize that the fees and expenses that they are required to pay upon approval of the PSA are significant, the benefits obtained as a result of approval of the PSA far outweigh these costs. First, as stated above, approval of the PSA is expected to have enormous positive effect on the Debtors' ability to maintain their going concern value. Second, the savings associated with a consensual case likely equal if not exceed these

costs.  Finally, the Debtors will obtain a $30 million DIP Facility and are set to secure an Exit

Facility to facilitate emergence from bankruptcy with the liquidity necessary for their post-

emergence business.  Weighing the costs associated with the payment of professional fees

against the enormous benefits flowing from approval of the PSA, the Debtors, in the exercise of

their business judgment, concluded that the benefits far outweigh the associated costs.

      27.     Many courts approved, under section 363(b) of the Bankruptcy Code,

payment of professional fees incurred by parties integral to success of the reorganization case.

See ASARCO, Inc. v. Elliott Management, 650 F.3d 593, 601-03 (5th Cir. 2011) (approving

reimbursement of fees to parties whose work "was designed to maximize the value of

ASARCO's estate."); U.S. Trustee v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.), 2003

WL 21738964, at *10 (S.D.N.Y. July 28, 2003) (approving payment of fees of creditor's counsel

when such payment "would help develop a reorganization plan."); In re AMR Corp., Case No.

11-15463 (SHL) (Bankr. S.D.N.Y. Sept. 21, 2012) (approving payment of fees and expenses of

professionals employed by an ad hoc group of creditors)[9]; In re Lehmann's Holdings, Inc., Case

No. 10-16077 (REG) (Bankr. S.D.N.Y. Dec. 15, 2010) (approving restructuring support

agreement providing for payment of fees and expenses incurred by secured noteholders).[10]

      28.     In addition, Bankruptcy Code section 105(a) empowers a court to issue

"any order, process, or judgment that is necessary or appropriate to carry out the provisions of"

the Bankruptcy Code.  The purpose of Bankruptcy Code section 105(a) is to ensure a bankruptcy

court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its]

jurisdiction."  2 Collier on Bankruptcy, ¶ 105.01 (16th ed. 2009); see also In re Calpine Corp.,

---

[9]      Copies of the motion and the order are attached hereto as Exhibits C and D, respectively.

[10]    Copies of the restructuring support agreement and the order are attached hereto as Exhibits E and F, respectively.

356 B.R. 585, 593-94 (Bankr. S.D.N.Y. 2007) ("[I]t is axiomatic that bankruptcy courts are

courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the

reorganization process") (internal citations and quotations omitted); In re Adelphia

Communications Corp., 345 B.R. 69, 85 (Bankr. S.D.N.Y. 2006) ("Section 105(a) provides

broad equitable power for a Bankruptcy Court to maintain its own jurisdiction and to facilitate

the reorganization process"); In re Ionosphere Clubs, Inc., 98 B.R. 174, 175 (Bankr. S.D.N.Y.

1989) (court's equitable powers derive from section 105); Mgmt. Tech. Corp. v. Pardo, 56 B.R.

337, 339 (Bankr. D.N.J. 1985) (same).  For the reasons set forth above, the Debtors submit that

granting the relief requested herein is in the best interests of the Debtors' estates, their creditors,

and other parties in interest.

**B.      The Plan Support Agreement Complies With Section 1125 of the Bankruptcy Code**

29.     Section 1125(b) provides that "[a]n acceptance or rejection of a plan may

not be solicited after the commencement of the case under this title . . . unless, at the time of or

before such solicitation, there is transmitted . . . a written disclosure statement approved, after

notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b).

30.     Courts have held that postpetition plan support agreements are not

"solicitations" if they, among other things, simply require the parties to use their best efforts to

pursue confirmation of a plan and not to support any other plans.  See, e.g., In re Texaco, 81 B.R.

at 816 (holding that, in connection with a settlement embodied in the proposed plan, the parties'

agreement not to support any other plans in the future did not violate 11 U.S.C. § 1125(b)); see

also In re Indianapolis Downs, LLC, 486 B.R. 286, 296–97 (Bankr. D. Del. 2013) (finding that a

commitment to vote for a plan that conformed to a restructuring support agreement was not an

improper solicitation); In re Heritage Organization, L.L.C., 376 B.R. 783, 789–95 (Bankr. N.D.

13

Tex. 2007) (finding that an agreement to vote for a plan set forth in a term sheet did not constitute a solicitation for an official vote).

31.     Here, the Plan Support Agreement provides that the commitment to vote for the Plan is subject to entry of an order approving a disclosure statement. PSA § 1(c).  Therefore, Consenting Lenders and Consenting Noteholders will not be solicited unless and until a Court-approved disclosure statement is sent to the parties, in compliance with section 1125 of the Bankruptcy Code.   The Plan Support Agreement also provides sufficient flexibility for Parties to withdraw their support for the Plan or otherwise terminate the Plan Support Agreement under certain circumstances.  See PSA §§ 9, 10, 11.

32.     Significantly, the Plan Support Agreement contains a "fiduciary out" provision whereby the Debtors may terminate the Plan Support Agreement if they or their boards of directors "reasonably determine, consistent with their fiduciary obligations and in consultation with their legal advisors, that the conditions to effectiveness of the Plan cannot be satisfied, or if they receive an alternative offer that maximizes value of the Debtors' estates."  Given the flexibility set forth in these provisions, entry into the Plan Support Agreement does not constitute an improper solicitation of any creditor's vote, and the Plan Support agreement complies with section 1125 of the Bankruptcy Code.

## NOTICE

33.     Notice of this Motion has been provided to: (i) the United States Trustee for Region 2 for the Southern District of New York, (ii) the Administrative Agent under the Credit Facility; (iii) counsel to the Administrative Agent under the Credit Facility; (iv) the Trustee under the Indenture; (v) counsel to the Trustee under the Indenture; (vi) counsel to the holders of the majority of the Notes under the Indenture; (vii) counsel to the Committee; (viii) the Internal Revenue Service; (ix) the New York State Department of Taxation and

14

Finance; (x) the New York State Department of Health; (xi) the Securities and Exchange

Commission; (xii) the United States Attorney's Office; (xiii) the United States Attorney General;

and (xiv) all parties who have filed a notice of appearance in these cases.  In light of the nature of

the relief requested, the Debtors submit that no further notice is required or needed under the

circumstances.

<div align="center">

**NO PRIOR RELIEF**

</div>

34.     No previous motion for the relief sought herein has been made to this or

any other Court.

<div align="center">

**CONCLUSION**

</div>

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit B, granting the Debtors the relief requested

herein and such other and further relief to the Debtors as may be just and proper.

Dated:  New York, New York
      April 2, 2014                                            DECHERT LLP

                                            */s/  Shmuel Vasser*
                                            Allan S. Brilliant
                                            Shmuel Vasser
                                            Jeffrey T. Mispagel
                                            1095 Avenue of the Americas
                                            New York, New York  10036
                                            Telephone:  (212) 698-3500
                                            Facsimile:  (212) 698-3599
                                            Email:  allan.brilliant@dechert.com
                                                    shmuel.vasser@dechert.com
                                                    jeffrey.mispagel@dechert.com

                                            *Proposed Attorneys for the Debtors and*
                                            *Debtors in Possession*

**<u>EXHIBIT A</u>**

**PLAN SUPPORT AGREEMENT**

**EXECUTION VERSION**

## PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT is made and entered into as of April 1, 2014 (including all exhibits and other attachments hereto, the "**Agreement**") by and among (a) MModal Holdings, Inc. and each of its subsidiaries that are debtors and debtors in possession (collectively, the "**Company**" or the "**Debtors**"), (b) each of the undersigned holders (each, a "**Consenting Lender**" and, collectively, the "**Consenting Lenders**") of Secured Lender Claims (as defined herein) under the Credit Agreement, dated as of August 17, 2012 (as amended, the "**Secured Credit Agreement**"), among the Debtors, as obligors, the lenders party thereto (the "**Secured Lenders**"), Royal Bank of Canada, as Administrative Agent (including in its capacity as DIP Agent (as defined herein), the "**Secured Lender Agent**"), and (c) each of the undersigned holders (each, a "**Consenting Noteholder**" and collectively, the "**Consenting Noteholders**" and, together with the Consenting Lenders, the "**Consenting Holders**") of Claims under the 10.75% Senior Notes due 2020 (the "**Notes**") issued pursuant to the Indenture, dated as of August 17, 2012 (as amended and supplemented from time to time, the "**Indenture**"), among the Debtors, as issuer and other obligors, and U.S. Bank National Association, as trustee (the "**Indenture Trustee**").  The Debtors, the Consenting Lenders, the Consenting Noteholders and any subsequent person that becomes a party hereto in accordance with the terms hereof are each referred to herein as a "**Party**" and collectively as the "**Parties**."

<p style="text-align:center;">W̲ I̲ T̲ N̲ E̲ S̲ S̲ E̲ T̲ H̲:</p>

WHEREAS, on March 20, 2014 (the "**Petition Date**"), the Debtors commenced voluntary chapter 11 cases (each such case a "**Chapter 11 Case**" and, collectively, the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, each Consenting Lender and Consenting Noteholder is the holder of one or more Claims, as defined in section 101(5) of title 11 of the United States Code (the "**Bankruptcy Code**") against the respective Debtors (each, a "**Claim**"), including Claims arising out of, or related to, the Secured Credit Agreement and/or the Indenture, as applicable;

WHEREAS, as of the Petition Date, approximately $507.8 million of Claims (primarily comprising principal and accrued unpaid interest) were outstanding under the Secured Credit Agreement (the "**Secured Lender Claims**" and the loans outstanding under the Secured Credit Agreement, the "**Loans**");

WHEREAS, as of the Petition Date, $266 million of Claims (primarily comprising principal and accrued unpaid interest) were outstanding under the Notes and Indenture (the "**Noteholder Claims**");

WHEREAS, Latham & Watkins LLP ("**Latham**") is legal counsel to the Secured Lender Agent and has retained Houlihan Lokey as financial advisor to assist in its representation of the Secured Lender Agent ("**HL**" and, together with Latham, and any other advisors to the Secured Lender Agent and/or Consenting Lenders as permitted under the Secured Credit Agreement or DIP Credit Agreement (as defined herein) as applicable, the "**Consenting Lenders Professionals**");

WHEREAS, the Consenting Noteholders have retained Akin Gump Strauss Hauer & Feld LLP ("**Akin**") as legal counsel and Blackstone Advisory Partners L.P. as financial advisor ("**Blackstone**" and, together with Akin and any other advisor agreed by the Debtors, the "**Consenting Noteholders Professionals**" and, together with the Consenting Lenders Professionals, the "**Holder Advisors**"));

WHEREAS, as a result of extensive good faith negotiations, the Parties have reached agreement on the principal terms and conditions of a comprehensive restructuring of the Debtors, as set forth in the term sheet attached as <u>Exhibit A</u> hereto (the "**Restructuring Term Sheet**"), to be effectuated through a plan of reorganization consistent with the Restructuring Term Sheet (the "**Restructuring**"));

WHEREAS, in furtherance of the Restructuring, and subject to the terms and conditions contained herein, the Debtors (i) shall file, and use commercially reasonable efforts to obtain approval by the Bankruptcy Court (and any other court of competent jurisdiction, if applicable) of, postpetition debtor in possession financing on terms and conditions consistent with those set forth in <u>Exhibit B</u> hereto (the "**DIP Term Sheet**," and the DIP financing facility described therein, the "**DIP Facility**"), (ii) shall file, and use commercially reasonable efforts to obtain approval by the Bankruptcy Court (and any other court of competent jurisdiction, if applicable) of, a disclosure statement with respect to the Plan (as defined below), which shall be in form and substance reasonably satisfactory to (a) the Debtors, (b) the Secured Lender Agent and those Consenting Lenders, other than Brigade and Fidelity (each as defined in the Restructuring Term Sheet) and their respective affiliates, who together with their affiliates hold (either directly or as the nominee, investment manager or advisor for beneficial holders thereof) in the aggregate at least 35% in amount of Secured Lender Claims and each such Consenting Lender (together with its affiliates) holds less than 7% in amount of Noteholder Claims; <u>provided</u>, that any Noteholder Claims held by Consenting Lenders and their affiliates (either directly or as the nominee, investment manager or advisor for beneficial holders thereof) that are managed by individuals separated from those who manage the Secured Lender Claims of such Consenting Lender and its affiliates by a customary internal wall shall not be counted toward such 7% threshold hereunder (collectively with the Secured Lender Agent, the "**Required Consenting Lenders**"), and, notwithstanding the foregoing, CS Loan Funding and its affiliates shall be deemed to be eligible to be included as part of the calculation of the Required Consenting Lenders hereunder regardless of whether CS Loan Fund and its affiliates collectively hold more than 7% in amount of Noteholder Claims at any time, and (c) those Consenting Noteholders who hold at least 50.1% in amount of the aggregate Noteholders Claims held by the Consenting Noteholders (the "**Required Consenting Noteholders**" and, together with the Required Consenting Lenders, the "**Required Consenting Holders**") (as may be modified in accordance with this Agreement, the "**Disclosure Statement**"), and (iv) shall file, and use commercially reasonable efforts to obtain confirmation by the Bankruptcy Court (and any other court of competent jurisdiction, if applicable) of, a plan of reorganization in the Chapter 11 Cases that implements the terms of the Restructuring in accordance with the terms and conditions set forth in the Restructuring Term Sheet and is otherwise in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders and the Required Consenting Noteholders (such plan of reorganization, as may be modified in accordance with this Agreement, the "**Plan**"));

WHEREAS, each of the Debtors, Consenting Lenders and Consenting Noteholders has reviewed, or has had the opportunity to review, this Agreement, including the Restructuring Term

Sheet and the DIP Term Sheet, with the assistance of legal and financial advisors of its own choosing; and

WHEREAS, each Consenting Lender and Consenting Noteholder desires to support and, subject to the requirements of section 1125 of the Bankruptcy Code, including and only following the approval by the Bankruptcy Court of the Disclosure Statement relating to the Plan, and its transmittal to creditors and other parties in interest, timely vote to accept the Plan, in each case consistent with and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the promises and mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto hereby agree as follows:

Section 1.    <u>Support</u>.  Until the Termination Date, each of the Parties severally, but not jointly, agrees and covenants as provided below, subject to the terms and conditions set forth in this Agreement:

(a)    Each Party will negotiate in good faith the definitive agreements, motions, pleadings and forms of orders contemplated by, or reasonably necessary or desirable to effectuate, the Restructuring, each of which shall be consistent with and incorporate as applicable, the terms of the DIP Term Sheet and the Restructuring Term Sheet and otherwise be in form and substance reasonably acceptable to the Debtors, the Required Consenting Lenders and the Required Consenting Noteholders, including but not limited to, a final order of the Bankruptcy Court approving the terms of, and authorizing the Debtors to enter into, and perform under, the DIP Facility (together with any amendments and extensions thereof in accordance with this Agreement and the DIP Term Sheet, the "**DIP Order**"), this Agreement, the Disclosure Statement, the Plan, the Plan Supplement (as defined in the Restructuring Term Sheet), any amendments and modifications to the Restructuring Term Sheet, the Disclosure Statement and the Plan, an order of the Bankruptcy Court approving the Disclosure Statement and authorizing the Debtors to solicit acceptances for the Plan (the "**Disclosure Statement Order**"), an order of the Bankruptcy Court confirming the Plan (the "**Confirmation Order**"), the PSA Approval Order (as defined below), the exit credit facility and related collateral documents, and other documents and agreements (including exhibits, annexes and schedules), including any amendments or modifications contemplated hereby and thereby (collectively, as amended, modified or supplemented, the "**Restructuring Definitive Documentation**");

(b)    Each Party will (i) take any and all commercially reasonable and appropriate actions in furtherance of the Restructuring contemplated under this Agreement; and (iii) not take any action that would interfere with, delay, or postpone the effectuation of the Restructuring contemplated by this Agreement, including the approval of the Disclosure Statement and the confirmation and consummation of the Plan;

(c)    The Debtors shall use commercially reasonable efforts to timely comply with each of the following milestones (the "**Milestones**"):

   (1) file a motion to approve this Agreement and obtain entry of an order, in form and substance reasonably acceptable to the Required Consenting Holders approving this Agreement (the "**PSA Approval Order**") on or before April 30, 2014;

   (2) file a motion to approve the DIP Facility and obtain entry of the DIP Order on or before April 30, 2014;

   (3) file the Plan and the Disclosure Statement on or before April 20, 2014;

   (4) obtain entry of the Disclosure Statement Order on or before May, 28, 2014;

   (5) obtain entry of the Confirmation Order on or before July 15, 2014; and

   (6) cause the effective date of the Plan (the "**Plan Effective Date**") to occur on or before August 15, 2014;

*provided*, *however*, that the Milestones may be extended, if at all, with the prior written consent of the Required Consenting Lenders and the Required Consenting Noteholders;

   (d) Each Consenting Lender and Consenting Noteholder shall, after entry of the Disclosure Statement Order and the solicitation of votes on the Plan in accordance therewith, timely vote all Claims now or hereafter beneficially owned by such Party or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, to accept the Plan and in favor of any releases and exculpation provided under the Plan, in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying solicitation materials, and timely return a duly-executed ballot in connection therewith, *provided*, that the Plan and Disclosure Statement, including any amendments, supplements, changes and modifications thereto, shall be in form and substance reasonably satisfactory to the Debtors, the Required Consenting Lenders and the Required Consenting Noteholders;

   (e) Each Party agrees to not withdraw, change or revoke (or seek to withdraw, change or revoke) its tender, consent or vote with respect to the Plan;

   (f) Each Party shall use commercially reasonable efforts (including, (i) with respect to each Consenting Lender, directing the Secured Lender Agent, as necessary, and (ii) with respect to each Consenting Noteholder, directing the Indenture Trustee, as necessary) to support entry of the DIP Order and Disclosure Statement Order, and confirmation and consummation of the Plan; *provided*, *however*, that the Consenting Noteholders shall not be required to direct the Indenture Trustee to the extent that such direction will require the Consenting Noteholders to provide the Indenture Trustee with any indemnity;

   (g) Each Party shall use commercially reasonable efforts to support extension of the interim cash collateral order entered by the Bankruptcy Court until the earlier of (i) entry of the DIP Order, and (ii) May 1, 2014;

(h)      Each Party shall not directly or indirectly, seek, solicit, support, or vote in favor of, any sale, disposition, proposal, offer or plan of dissolution, winding up, liquidation, reorganization, merger, or restructuring of any of the Debtors and/or their assets other than the Plan (each, an "**Alternative Plan**");

(i)      Each Party shall not, directly or indirectly, (i) engage in, continue, or otherwise participate in any negotiations regarding any Alternative Plan; provided that, subject to obligations under any confidentiality agreements in favor of the Debtors, the Consenting Secured Lenders and the Secured Lender Agent are permitted to have such discussions with other Secured Lenders and the Secured Lender Agent, and Consenting Noteholders are permitted to have such discussions with other Consenting Noteholders and the Indenture Trustee, (ii) enter into a letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any Alternative Plan or (iii) withhold, withdraw, qualify, or modify its approval or acceptance of this Agreement, the Restructuring, the Plan, or the Disclosure Statement;

(j)      Each Party shall not directly or indirectly(A) object to or otherwise commence any proceeding or take any other action opposing, or support any other person's efforts to oppose or object to any of the terms of the DIP Facility and the terms of the DIP Order, the Plan or the Disclosure Statement or (B) object to the final relief sought in any "first day" motions and other motions consistent with this Agreement filed by the Debtors in furtherance of the Restructuring, including motions to preserve or extend exclusivity, if applicable, to the extent that the foregoing are acceptable to the Required Consenting Holders;

(k)      Each Party shall not, directly or indirectly take any action that is inconsistent with this Agreement; and

(l)      Each Party shall use good faith efforts to structure the Restructuring and the other transactions contemplated herein and thereby to the maximum extent possible in a tax-efficient and cost-effective manner for the Debtors, the Secured Lenders and the holders of Notes.

Notwithstanding the foregoing, nothing in this Agreement (other than the DIP Term Sheet, as applicable) shall limit any of the rights and remedies of the DIP Agent (as defined in the DIP Term Sheet) and the other DIP Secured Parties (as defined in the DIP Term Sheet) with respect to the DIP Facility, including, without limitation, under the DIP Order.

Section 2.      Representations and Warranties.

(a)      Each of the Parties severally, but not jointly, represents and warrants to each of the other Parties that the following statements are true and correct as of the date hereof (except as explicitly noted below):

(1)      Power and Authority. It (i) is duly organized, validly existing, and in good standing under the laws of the state of its organization and (ii) subject to approval of this Agreement by the Bankruptcy Court in the case of the Debtors, has all requisite power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement.

(2)    <u>Authorization</u>.    Subject to approval of this Agreement by the Bankruptcy Court in the case of the Debtors, the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or limited liability company action on its part.

(3)    <u>Governmental Authorization; Consents</u>. The execution, delivery and performance by, or enforcement against, it of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any Federal, state or other governmental authority or regulatory body or any other person, except for Bankruptcy Court approval in the case of the Debtors and any applicable filing under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

(4)    <u>No Conflicts</u>.  The execution, delivery, and performance by it of this Agreement do not and shall not (i) subject to approval of this Agreement by the Bankruptcy Court in the case of the Debtors, violate any provision of law, rule, or regulation applicable to it or its certificate of incorporation or by-laws (or other organizational documents) or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both and exclusive of defaults relating to solvency and bankruptcy) a default under any material contractual obligation to which it is a Party or under its certificate of incorporation or by-laws (or other organizational documents). Each Party is not aware, as of the date hereof, of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Agreement; <u>provided</u> that the Parties acknowledge that the Debtors require, and shall promptly seek, the approval to enter into this Agreement by the Bankruptcy Court.

(5)    <u>Recitals</u>.  The recitals set forth in this Agreement with respect to it are true and correct in all material respects.

(6)    <u>Binding Obligation</u>.  Subject to approval of this Agreement by the Bankruptcy Court in the case of the Debtors, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(7)    <u>No Litigation</u>.  No litigation or proceeding before any court, arbitrator, or administrative or governmental body is pending against it that would adversely affect its ability to enter into this Agreement or perform its obligations hereunder.

(8)    <u>Legal Representation</u>.  It has either (i) been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement or (ii) has had the contents hereof fully explained by counsel (or has had the opportunity to so consult counsel) and is fully aware of such contents and legal effect.

(b)    Each of the Consenting Lenders and Consenting Noteholders, respectively, represents and warrants, severally and not jointly, to each of the other Parties that the following statements are true, correct, and complete as of the date hereof:

(1)    <u>Ownership</u>. It (i) either, (A) is the sole beneficial owner and/or the investment advisor or manager for the beneficial owners of the principal amount of Loans, Notes

and/or Claims disclosed in writing to the Debtors and Latham (in the case of the Consenting Noteholders) or the Debtors and Akin (in the case of the Consenting Lenders) and set forth on **Schedule 1** annexed hereto (which schedule shall not be publicly disclosed or filed) and all related claims, rights and causes of action arising out of or in connection with or otherwise relating thereto, having the power to vote and dispose of such Loans, Notes and/or Claims on behalf of such beneficial owners, or (B) has sole investment or voting discretion with respect to the Loans, Notes and/or Claims disclosed in writing to the Debtors and Latham (in the case of the Consenting Noteholders) or the Debtors and Akin (in the case of the Consenting Lenders) and set forth on **Schedule 1** annexed hereto (which schedule shall not be publicly disclosed or filed) and all related claims, rights and causes of action arising out of or in connection with or otherwise relating thereto, and has the power and authority to vote and bind the beneficial owner(s) of such Loans, Notes and/or Claims to the terms of this Agreement and has full and sole power and authority to vote on and consent to matters concerning such Loans, Notes and/or Claims with respect to the Restructuring; (ii) is entitled (for its own account or for the account of other persons claiming through it) to all of the rights and economic benefits of such Loans, Notes and/or Claims; (iii) holds no Secured Lender Claims or Noteholder Claims described in the immediately preceding clauses (i) and/or (ii) that have not otherwise been disclosed to the Secured Lender Agent and the Consenting Lender Professionals or the Consenting Noteholder Professionals, as applicable; and (iv) confirms that, other than pursuant to this Agreement, its Claim is not subject to any other lien, claim, encumbrance, interest, pledge, option, proxy, voting restriction, right of first refusal or other limitation on disposition or encumbrance of any kind, that would adversely affect in any way such Party's performance of its obligations contained in this Agreement at the time such obligations are required to be performed of any other party.

(2)     Securities Laws.    Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation and acceptance of the Plan, each Consenting Holder, on a several and not joint and several basis, acknowledges and agrees that, regardless of whether its Loans and/or Notes constitute a "security" within the meaning of the Securities Act of 1933 (as amended), such Consenting Holder is (i) a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in any securities that may be issued in connection with the Restructuring, making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, (ii) an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act of 1933 (as amended) or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act of 1933 (as amended), or, if a foreign investor, of such similar sophistication; and (iii) acquiring any securities that may be issued in connection with the Restructuring for its own account and not with a view to the distribution thereof. Each Party hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient.

Section 3.     Further Documentation/Cooperation. The Holder Advisors are hereby authorized by each Consenting Holder to continue to pursue and negotiate the terms of the Restructuring Definitive Documentation with the Company and its advisors. The Company will negotiate in good faith with the Holder Advisors with respect to the Restructuring Definitive Documentation.    It shall not be necessary for the Company to negotiate directly with any

Consenting Holder unless it has been advised in writing by the Consenting Holder that its interests are no longer being represented by the Holder Advisors.  For the avoidance of doubt, there is no prohibition against direct communications between any Consenting Holder and the Company with respect to the Restructuring Definitive Documentation or any other matter.  For the avoidance of doubt, nothing in this Section 3 shall constitute a delegation by any Consenting Holder to any Holder Advisor of any rights such Consenting Holder has under this Agreement, all of which are hereby preserved for such Consenting Holder.

Section 4.    Public Announcements.    The Company shall not use the name of any Consenting Holder (or any of its controlled affiliates, officers, directors, trustees, managers, stockholders, members, employees, partners, representatives or agents other than the Holder Advisors, in such capacity) in any press release without such Consenting Holder's prior written consent; provided, however, that the Company shall be permitted to disclose in its press release the aggregate principal amount and aggregate percentage of Claims held by the Consenting Holders in the aggregate.  The Company shall submit to the Holder Advisors all press releases, public filings, public announcements or other communications with any news media in each case to be made by the Company relating to this Agreement or the transactions contemplated hereby and any amendments thereof for review and potential suggestions.  Nothing in this Section 4 shall be deemed to waive, amend or modify the terms of any Consenting Noteholders' confidentiality agreement and, for the avoidance of doubt and notwithstanding anything to the contrary herein, the rights and obligations under each Consenting Noteholders' confidentiality agreement (including the disclosure rights and obligations set forth in section 10(b) of the Consenting Noteholders' confidentiality agreements) shall govern the disclosure of the Disclosure Information (as defined in the Consenting Noteholders' confidentiality agreements).

Section 5.    Assignment; Transfer Restrictions.

(a)    Each Consenting Lender and Consenting Noteholder severally, but not jointly, covenants that, from the date hereof until the termination of this Agreement, such Party shall not, directly or indirectly, sell, pledge, hypothecate, encumber or otherwise transfer any Claims, or any option, right to acquire, or voting, participation, or other interest therein, except to a purchaser or other entity who executes and delivers to the Debtors and the Secured Lender Agent (with respect to any Secured Lender) or the Debtors and counsel to the Consenting Noteholders (with respect to any Noteholder), within three (3) business days of settlement of such trade or transfer, an agreement in writing (in a form substantially similar to Exhibit C hereto, a "**Joinder**") to assume and be bound by all the terms of this Agreement with respect to the relevant Claims being transferred to such purchaser (which agreement shall include the representations and warranties set forth in Section 2 hereof).  Upon execution and delivery of a Joinder, such transferee shall be deemed to be a Party and a Consenting Lender or Consenting Noteholder, as applicable, for purposes of this Agreement.  No selling Consenting Lender or Consenting Noteholder shall have any liability under this Agreement arising from or related to the failure of its purchaser to comply with the terms of this Agreement, *provided*, that such purchaser shall have executed a Joinder and such purchase, trade, or transfer shall have been consummated.  This Agreement shall in no way be construed to preclude a Party from acquiring additional Claims against the Debtors; provided, however, that any such additional Claims shall automatically be deemed to be subject to all the terms of this Agreement.

(b)    Notwithstanding the foregoing Section 5(a), (i) a Consenting Lender or Consenting Noteholder may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in its Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Party; provided that if, at the time of the proposed transfer of such Claim to the Qualified Marketmaker, the Claim (x) may be voted in accordance with the terms of the Plan in accordance with the requirements of Section 1(d), such proposed transferor must first vote such Claim in accordance with the requirements of Section 1(d), or (y) has not yet been and may not yet be voted in accordance with the terms of the Plan in accordance with the requirements of Section 1(d) and such Qualified Marketmaker does not transfer such Claims to a subsequent transferee within the earlier of the 10th Business Day following the trade date with respect to the acquisition thereof or the 5th Business Day prior to the expiration of the voting deadline (such earlier date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall) on the first Business Day immediately following the Qualifed Marketmaker Joinder Date become a Party with respect to such Claims in accordance with the terms hereof (provided that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Party with respect to such Claims at such time that the transferee of such Claims becomes a Party with respect to such Claims); provided, further, that any subsequent transfer (by purchase, sale, assignment, participation or otherwise) by such Qualified Marketmaker of the right, title or interest in such Claims is to a transferee that is or becomes a Party with respect to such Claims in accordance with the terms hereof; and (ii) to the extent that a Consenting Lender or Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in such Claims that the Qualified Marketmaker acquires from a holder of the Claims who is not a Party without the requirement that the transferee be or become a Party.  For these purposes, a "**Qualified Marketmaker**" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in Claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

Section 6.    Confidential Treatment of Holdings of Consenting Holders.  The Company and each Consenting Holder agrees to keep confidential the amount of Claims held (beneficially or otherwise) by any Consenting Holder, except to the extent (a) disclosed to any legal, accounting, financial and other advisors to the Company or Consenting Holder, (b) such information becomes publicly available other than as a result of a breach of this Agreement, (c) required by applicable law or regulation, or the rules of any applicable regulatory body, or in filings to be made with the Bankruptcy Court, (d) necessary to obtain any regulatory consents to the Restructuring and the transactions contemplated by the Restructuring Term Sheet, or (e) agreed to in writing with a Consenting Holder (and then, only with respect to such agreeing Consenting Holder's holdings); provided that if disclosure is required by applicable law, advance notice of the intent to disclose (unless it shall not be practicable to give such advance notice) shall be given by the disclosing Party to such Consenting Holder who shall have the right to seek a protective order prior to disclosure; provided, further that no notice shall be required regarding any disclosure to a regulator having jurisdiction over a Consenting Holder or any of its representatives in the course of such regulator's

general examination or inspection.  If the Company determines that it is required to attach a copy of this Agreement to any Restructuring Definitive Documentation, it will redact any reference to a Consenting Holder's holdings.  Notwithstanding the foregoing, the Company shall not be required to keep confidential the aggregate holdings of all Consenting Holders.

Section 7.    No Waiver of Participation and Reservation of Rights.  This Agreement and the Plan are part of a proposed settlement of disputes among the Parties.  Except as expressly provided in this Agreement, nothing herein is intended to, does, or shall be deemed in any manner to waive, limit, impair, or restrict the ability of each of the Parties to protect and preserve its respective rights, remedies and interests, including without limitation, the Consenting Lenders' or Consenting Noteholders' Claims against any of the Debtors, any liens or security interests that the Consenting Lenders or Consenting Noteholders may have in any assets of any of the Debtors, or the Consenting Lenders' or Consenting Noteholders' full participation in the Chapter 11 Cases, in each case so long as such action taken to protect and preserve such rights, remedies and interests is consistent with the Consenting Lenders' or Consenting Noteholders' obligations under this Agreement.  Without limiting the foregoing sentence in any way, if this Agreement is properly terminated in accordance with its terms, the Parties each fully reserve any and all rights, remedies and interests.

Section 8.    Cooperation and Access.  The Debtors hereby covenant and agree that, subject to the Parties' prior entry into a reasonably acceptable confidentiality agreement, it shall permit and facilitate any and all due diligence reasonably necessary to consummate the Restructuring and also to enable the Consenting Lenders and the Consenting Noteholders and their respective advisors to take those steps that are reasonably necessary or appropriate to facilitate the consummation of the Restructuring, including, but not limited to, (i) reasonably cooperating with the Secured Lender Agent, the Consenting Lenders, the Consenting Noteholders and their respective advisors, and causing their officers, directors, senior management employees, and advisors to reasonably cooperate, in furnishing non-privileged information as and when reasonably requested by reasonable prior notice by the Secured Lender Agent, any Consenting Lender, any Consenting Noteholder or any of their respective advisors, including with respect to the Debtors' financial affairs, finances, financial condition, business, and operations, including, but not limited to, a rolling 13-week cash flow forecast, weekly receipts and disbursements variance report, accruals schedule, capital expenditures schedule, and payables and receivables aging schedules, (ii) authorizing the Secured Lender Agent, any Consenting Lender, any Consenting Noteholder or any of their respective advisors to meet and/or have discussions during normal business hours with any of their officers, directors, senior management employees, and advisors from time to time as reasonably requested by reasonable prior notice by the Secured Lender Agent, any Consenting Lender or any Consenting Noteholder to discuss any non-privileged matters regarding the Debtors' financial affairs, finances, financial condition, business, and operations, including, but not limited to, a rolling 13-week cash flow forecast, weekly receipts and disbursements variance report, accruals schedule, capital expenditures schedule, and payables and receivables aging schedules, (iii) directing and authorizing all such persons and entities to fully disclose to the Secured Lender Agent, any Consenting Lender, any Consenting Noteholder and their respective advisors all non-privileged information reasonably requested by reasonable prior notice by the Secured Lender Agent, any Consenting Lender or any Consenting Noteholder regarding the foregoing, (iv) providing the Secured Lender Agent, Required Consenting Lenders, Required Consenting Noteholders and their respective advisors with reasonable access, during normal business hours and

upon reasonable prior notice, to the Debtors' assets, premises, operations and senior management employees and (v) allowing the Secured Lender Agent, Required Consenting Lenders, Required Consenting Noteholders and their respective advisors to interview, during normal business hours and upon reasonable prior notice, the Debtors' current and potential future officers, directors and senior management employees in connection with potential employment following the consummation of the Restructuring; provided, however, that the foregoing shall not require the Debtors to permit any access or disclose any information that, in the reasonable judgment of the applicable Debtor, would result in the disclosure of any trade secret or violate any of its obligations with respect to confidentiality or violate applicable laws.

Section 9.    Termination by the Required Consenting Lenders or Required Consenting Noteholders.  This Agreement may be terminated following the occurrence of any of the following events (each a "**Claimant Termination Event**") by the applicable Parties listed below, by delivering written notice of the occurrence of such event to the Debtors, the Consenting Lenders Professionals and the Consenting Noteholders Professionals (and the Debtors shall promptly notify all other Parties thereof) in accordance with Section 20 below, *provided*, that (x) upon a Claimant Termination Event under subsections (f), (g), (h), (i), (j), (k), or (m), of this Section of this Agreement, this Agreement shall terminate immediately upon written notice thereof; and (y) upon any other Claimant Termination Event, this Agreement shall terminate three (3) business days after receipt of written notice by the Parties thereof if the breach or other matter giving rise to the right to so terminate this Agreement shall not have been cured during such three (3) business day period after receipt of such notice (the date of termination under clause (x) or (y) hereof, the "**Claimant Termination Date**");

(a)    By the Required Consenting Lenders or the Required Consenting Noteholders, if any Milestone has not been met (or extended by written agreement of the applicable Parties as provided in Section 1(c) hereof) regardless of whether or not the Debtors used commercially reasonable efforts to comply with such Milestone in accordance with Section 1(a) hereof;

(b)    By the Required Consenting Lenders or the Required Consenting Noteholders, if the Debtors materially breach any of their undertakings, representations, warranties, covenants or other agreements under this Agreement (to the extent not otherwise cured or waived in accordance with the terms hereof);

(c)    By the Required Consenting Lenders, if one or more Consenting Noteholders materially breach this Agreement, such that the non-breaching Consenting Noteholders, in the aggregate, hold or control less than 66.66% of the Noteholder Claims;

(d)    By the Required Consenting Noteholders, if one or more Consenting Lenders materially breach this Agreement such that the non-breaching Consenting Lenders, in the aggregate, hold or control less than 66.66% of the obligations under the Secured Credit Agreement;

(e)    By the Required Consenting Lenders or the Required Consenting Noteholders, if (i) the Debtors file or support a plan of reorganization that is inconsistent with the Restructuring Term Sheet or (ii) the Restructuring Definitive Documentation is not consistent with this Agreement or is not otherwise in form and substance reasonably acceptable to the Required

Consenting Lenders and the Required Consenting Noteholders, including but not limited to, the DIP Order, the Disclosure Statement, the Plan, the Plan Supplement, the Disclosure Statement Order, the Confirmation Order, the PSA Approval Order, the exit credit facility and related collateral documents, and other documents and agreements contemplated hereby and thereby;

        (f)    By the Required Consenting Lenders or the Required Consenting Noteholders, if the Debtors file or support, or publicly announce their intention to file or support, an Alternative Plan;

        (g)    By the Required Consenting Lenders or the Required Consenting Noteholders, upon the entry of an order by the Bankruptcy Court appointing an examiner with enlarged powers relating to the operation of the material part of the business of the Debtors (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code, or the entry of an order by the Bankruptcy Court appointing a trustee under section 1104 of the Bankruptcy Code;

        (h)    By the Required Consenting Lenders or the Required Consenting Noteholders, if an order converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is entered by the Bankruptcy Court;

        (i)    By the Required Consenting Lenders or the Required Consenting Noteholders, if any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable;

        (j)    By the Required Consenting Lenders or the Required Consenting Noteholders, upon the entry of an order dismissing any of the Chapter 11 Cases;

        (k)    By the Required Consenting Lenders or the Required Consenting Noteholders, if any debtor-in-possession financing order or cash collateral order (other than the interim cash collateral order previously entered) other than the DIP Order, or any debtor-in-possession financing or cash collateral use (other than pursuant to the interim cash collateral order previously entered) other than the DIP Facility, shall have been entered or approved, or if the Debtors shall seek or otherwise support any such relief, or if the terms of the DIP Facility and the DIP Order are amended or otherwise modified in any material respect without the prior written consent of the Required Consenting Holders, not to be unreasonably withheld;

        (l)    By the Required Consenting Lenders and the Requiring Consenting Noteholders upon the occurrence of an Event of Default under the DIP Credit Agreement (as defined in the DIP Term Sheet) or the DIP Order and delivery of written notice of such Event of Default to the Debtors, if any, in accordance with the terms of the DIP Credit Agreement or the DIP Order, as applicable;

        (m)    By the Required Consenting Lenders or the Required Consenting Noteholders if the board of directors of the Company determines, in consultation with its legal advisors, that proceeding with the Restructuring, or the confirmation or consummation of the Plan, would be inconsistent with the exercise of its fiduciary duties;

(n)     By the Required Consenting Lenders or the Required Consenting Noteholders if the Company fails to pay the reasonable, documented and invoiced out-of-pocket expenses of such Consenting Holder and the fees and expenses of the Holder Advisors in accordance with the terms of their respective engagement letters, as provided in Section 36 of this Agreement; <u>provided</u>, that the Company is authorized to make such payments by the Bankruptcy Court;

(o)     By the Required Consenting Lenders or the Required Consenting Noteholders upon the issuance by any governmental authority of any permanent and final ruling or order, including any final order of the Bankruptcy Court or any other court with appropriate jurisdiction, denying any requisite approval of, or enjoining, the consummation of a material portion of the Restructuring or the confirmation or consummation of the Plan;

(p)     By the Required Consenting Lenders or the Required Consenting Noteholders, if the Bankruptcy Court enters any order terminating, annulling, or modifying the automatic stay (as set forth in Section 362 of the Bankruptcy Code) with regard to any material assets of the Debtors, without the written consent of the Required Consenting Lenders and Required Consenting Noteholders;

(q)     By the Required Consenting Lenders or the Required Consenting Noteholders upon the date of entry of any order by the Bankruptcy Court or any other court with appropriate jurisdiction invalidating, subordinating, disallowing, recharacterizing or limiting in any respect, as applicable, either (i) the enforceability, extent, priority, characterization, perfection, validity or non-avoidability of any of the liens securing the Secured Lender Claims or DIP Obligations (as defined in the DIP Term Sheet), (ii) validity, enforceability, characterization or non-avoidability of any of the Secured Lender Claims or DIP Obligations (as defined in the DIP Term Sheet), or (iii) the validity, enforceability, characterization or non-avoidability of any of the Noteholders Claims outstanding under the Indenture; or

(r)     By the Required Consenting Lenders or the Required Consenting Noteholders, if there shall have been a Material Adverse Effect.  For these purposes, a "**Material Adverse Effect**" means (x) after the date hereof, the terms of MModal Holdings, Inc.'s and/or its subsidiaries' engagement with any single customer contractually changes adversely (including due to an amendment of the pricing or volume (including, to the extent permitted by such contract, by notice in writing from such customer to MModal Holdings, Inc. or any of its subsidiaries of the exercise of its right to reduce volume under such contract) or termination of all or a portion of such customer relationship) such that, if such amended terms or termination with respect to only such customer had been effective during fiscal 2013, the aggregate fiscal 2013 TOS revenue of MModal Holdings, Inc. and its subsidiaries on a consolidated basis would have declined by more than six percent (6%) from the actual TOS revenue of MModal Holdings, Inc. and its subsidiaries on a consolidated basis during such period, or (y) commencing with the month of March 2014, any month's consolidated TOS volume for MModal Holdings, Inc. and its subsidiaries is more than twenty percent (20%) below the actual consolidated TOS volume of MModal Holdings, Inc. and its subsidiaries on a consolidated basis in February 2014 (the last full month prior to the Petition Date) normalized to take into account the business day equivalents of each respective month, as applicable.  The Debtors shall provide to counsel and financial advisors of the Consenting Lenders and Consenting Noteholders (in accordance with Section 20 hereof) (i) written notice of the

occurrence of a Material Adverse Effect set forth in clause (x) of such definition within two (2) business days after the occurrence of such event; and (ii) a report certified by the Chief Financial Officer of the Debtors setting forth the TOS volume for MModal Holdings, Inc. and its subsidiaries on a consolidated basis for the calendar month being tested within eight (8) business days following the last day of such calendar month.

Notwithstanding the foregoing, no Party in any capacity hereunder may seek to terminate this Agreement based upon a material breach or a failure of a condition in this Agreement arising out of its own actions or omissions.

Notwithstanding anything to the contrary herein, any right to terminate this Agreement as to the Consenting Lenders or the Consenting Noteholders may be exercised only by the Required Consenting Lenders or the Required Consenting Noteholders as a group, and may not be exercised by one or more individual Consenting Lenders or Consenting Noteholders, as applicable, not constituting the Required Consenting Lenders or the Required Consenting Noteholders, as applicable.

Section 10.    Termination by the Debtors.    This Agreement may be terminated by the Debtors following the occurrence of any of the following events (each a "**Company Termination Event**") by delivering written notice of the occurrence of such event in accordance with Section 20 below to the other Parties, *provided*, that (x) upon a Company Termination Event under subsections (c) or (d) of this Section of this Agreement, this Agreement shall terminate immediately upon written notice thereof; and (y) upon any other Company Termination Event, this Agreement shall terminate three (3) business days after written notice to the Parties thereof if the breach or other matter giving rise to the right to so terminate this Agreement shall not have been cured during the three (3) business day period after receipt of such notice (the date of termination under clause (x) or (y) hereof, the "**Company Termination Date**" and, together with the Claimant Termination Date, the "**Termination Date**"):

(a)    In the event that one or more Consenting Noteholders materially breach this Agreement, such that the non-breaching Consenting Noteholders, in the aggregate, hold or control less than 66.66% of Noteholder Claims;

(b)    In the event that one or more Consenting Lenders materially breach this Agreement, such that the non-breaching Consenting Lenders, in the aggregate, hold or control less than 66.66% of the obligations under the Secured Credit Agreement;

(c)    An order converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code is entered by the Bankruptcy Court;

(d)    Any court has entered a final, non-appealable judgment or order declaring this Agreement or any material portion hereof to be unenforceable;

(e)    Pursuant to Section 14 hereof;

(f)    The entry of an order dismissing all of the Debtors' Chapter 11 Cases;

(g)    If the Required Consenting Lenders or the Required Consenting Noteholders materially breach any of their undertakings, representations, warranties, covenants or other agreements under this Agreement (to the extent not otherwise cured or waived in accordance with the terms hereof);

(h)    Upon the issuance by any governmental authority of any permanent and final ruling or order, including any final order of the Bankruptcy Court or any other court with appropriate jurisdiction, denying any requisite approval of, or enjoining, the consummation of a material portion of the Restructuring or the confirmation or consummation of the Plan;

(i)    If (i) the Required Consenting Holders file or support, or publicly announce their intention to file or support, a plan of reorganization that is inconsistent with the Restructuring Term Sheet, or (ii) the Restructuring Definitive Documentation is not consistent with this Agreement or is not otherwise in form and substance reasonably acceptable to the Debtors provided for herein, including but not limited to, the DIP Order, the Disclosure Statement, the Plan, the Disclosure Statement Order, the Confirmation Order, the PSA Approval Order, the exit credit facility and related collateral documents, and other documents and agreements contemplated hereby and thereby; or

(j)    If the Plan cannot be confirmed due to the failure of the class of First Lien Lenders' claims and/or the Noteholders' claims to meet the requirements set in Section 1126(c) of the Bankruptcy Code.

Section 11.    Consensual Termination.

In addition to the Claimant Termination Events and Company Termination Events (collectively, "**Termination Events**") set forth in Sections 9 and 10 of this Agreement, this Agreement shall be terminable immediately upon written agreement of the Debtors, the Required Consenting Lenders, and the Required Consenting Noteholders.

Section 12.    Automatic Termination.    This Agreement shall terminate automatically without any further action required by any Party hereto, unless extended in writing by the Debtors and the Required Consenting Holders, upon the earlier of (i) the Bankruptcy Court entering an order declining to approve the Debtors' entry into this Agreement or determining that this Agreement is invalid, illegal, or constitutes an improper solicitation for purposes of Sections 1125 and 1126 of the Bankruptcy Code or (ii) consummation of the Restructuring.

Section 13.    Effect of Termination and of Waiver of Termination Event.    Upon the termination of this Agreement pursuant to Sections 9, 10, 11 or 12, as applicable, the obligations of the Parties hereunder shall terminate and be of no further force and effect.  Upon termination of this Agreement, no Party (or any other Party) shall have any continuing liability or obligation to the other Parties hereunder; provided, however, that no such termination shall relieve any Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  The Parties hereby waive any requirement under section 362 of the Bankruptcy Code, if any, to lift the automatic stay thereunder (the "**Automatic Stay**") solely in connection with giving any notice after the occurrence of a Termination Event as provided herein.  Upon termination, unless otherwise agreed to in writing by such Consenting Lender or Consenting Noteholder, any

and all votes, approvals, or consents delivered by a Consenting Lender or Consenting Noteholder and, as applicable, its affiliates, subsidiaries, managed funds, representatives, agents, and employees to support or approve the Restructuring contemplated under this Agreement prior to such termination date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors following the event of termination.

Section 14.    Fiduciary Obligations. Notwithstanding anything to the contrary herein, (i) nothing herein requires the Debtors or their respective boards of directors to breach any fiduciary obligations they have under applicable law; and (ii) in the event the Debtors or their respective boards of directors reasonably determine, consistent with their fiduciary obligations and in consultation with their legal advisors, that the conditions to effectiveness of the Plan cannot be satisfied, or if they receive an alternative offer and reasonably determine, in consultation with their legal advisors, that failure to accept such alternative offer would, or would reasonably likely to, be inconsistent with their fiduciary duties, they may terminate this Agreement without incurring any liability to any Party under this Agreement.  In the event that the Debtors or their respective boards of directors terminate this Agreement pursuant to the preceding sentence, the Debtors shall provide at least five (5) days advance written notice prior to the date of such termination (such five (5) day period, the **"Termination Period"**) to counsel to the Consenting Lenders and Consenting Noteholders; provided, for the avoidance of doubt, that, during the Termination Period, any failure of the Debtors to comply with the provisions of Section 1 of this Agreement shall not constitute a breach of this Agreement.  All Parties reserve all rights, including the right to challenge, any exercise or lack of exercise of the fiduciary out set forth in this Section 14.

Section 15.    Key Employee Incentive Plan. The Parties shall negotiate in good faith with respect to the terms and conditions of a Key Employee Incentive Program as soon as reasonably practicable, and shall affirmatively support the adoption by the Debtors and approval by the Bankruptcy Court of any Key Employee Incentive Program to which the Required Consenting Lenders and Required Consenting Noteholders agree, if any, as soon as practicable thereafter.

Section 16.    Effectiveness of the Agreement. This Agreement shall become effective on the date on which each of the following conditions have been satisfied (the "**Agreement Effective Date**"): (a) receipt by the Debtors of counterparts hereof duly executed and delivered by (i) Secured Lenders holding or controlling the rights to at least two-thirds in dollar amount of the outstanding principal amount of Loans under, and as defined in, the Secured Credit Agreement; and (ii) the holders of (or those controlling) at least two-thirds in dollar amount of the outstanding principal amount of the Notes; provided, however, that the Debtors, the Consenting Lenders, and the Consenting Noteholders shall continue to use commercially reasonable efforts to secure counterparts from additional Secured Lenders and holders of the Notes after the Agreement Effective Date and (b) the entry of the PSA Approval Order.

Section 17.    Amendments.    Except for the Milestones, this Agreement and the Restructuring Term Sheet may not be modified, amended, or supplemented except in writing signed by the Debtors, the Required Consenting Lenders and the Required Consenting Noteholders. Milestones may be amended or extended in accordance with Section 1(c) hereof by written confirmation (including e-mail) by each of Latham, Akin, and Dechert LLP.

Section 18.    <u>Governing Law; Jurisdiction</u>.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflict of laws.    By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought exclusively in the Bankruptcy Court, and in the event the Bankruptcy Court declines jurisdiction or abstains, a federal court of competent jurisdiction in the State, County and City of New York.    By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits to the nonexclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding.

Section 19.    <u>Waiver of Jury Trial</u>.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE EXHIBITS ATTACHED HERETO.

Section 20.    <u>Notices</u>.    All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if delivered personally or by courier service, messenger, facsimile, telecopy, email or if duly deposited in the mails, by certified or registered mail, postage prepaid-return receipt requested, and shall be deemed to have been duly given or made:  (i) upon delivery, if delivered personally or by courier service, or messenger, in each case with record of receipt; (ii) upon transmission with confirmed delivery, if sent by email, facsimile or telecopy; or (iii) two business days after being sent by certified or registered mail, postage pre-paid, return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to the Debtors, to:

| Counsel to the Debtors | Financial advisors to the Debtors |
|---|---|
| Dechert LLP<br>Attn:  Allan Brilliant and Shmuel Vasser<br>1095 Ave. of the Americas<br>New York, NY  10036<br>Fax:  (212) 698-3599<br>allan.brilliant@dechert.com<br>svasser@dechert.com | Lazard Freres & Co. LLC<br>Attn:  Brandon Aebersold<br>30 Rockefeller Plaza<br>New York, NY  10020<br>Fax:  (212) 332-1757<br>brandon.aebersold @lazard.com |

If to a Consenting Noteholder or a transferee thereof, to the addresses, facsimile numbers or electronic mail addresses set forth below following the Consenting Noteholder's signature (or as directed by any transferee thereof), with a copy (which shall not constitute notice) to the following Consenting Noteholders Professionals:

| Counsel to the Consenting Noteholders | Financial advisors to the Consenting |
|---|---|

| | Noteholders |
|---|---|
| Akin Gump Strauss Hauer & Feld LLP<br>Attn: Michael Stamer & James Savin<br>One Bryant Park<br>New York, New York 10036-6745<br>Fax: (212) 872-1002<br>mstamer@akingump.com<br>jsavin@akingump.com | Blackstone Advisory Partners L.P.<br>Attn: Michael J. Genereux & John Wander<br>345 Park Avenue<br>New York, New York 10154<br>Fax: (212) 583-5707<br>genereux@blackstone.com<br>john.wander@blackstone.com |

If to a Consenting Lender or a transferee thereof, to the addresses or telecopier numbers set forth below following the Consenting Lender's signature (or as directed by any transferee thereof), with a copy (which shall not constitute notice) to:

| Counsel to the Consenting Lenders | Financial advisors to the Consenting Lenders |
|---|---|
| Latham & Watkins LLP<br>Attn:  Richard A. Levy<br>Sears Tower, Suite 5800<br>233 S. Wacker Drive<br>Chicago, IL  60606<br>Fax:  (312) 993-9767<br>richard.levy@lw.com | Houlihan Lokey<br>Attn: Chris DiMauro<br>10250 Constellation Blvd., 5th Floor<br>Los Angeles, CA 90067<br>Cdimauro@hl.com |

Section 21.    Entire Agreement.  This Agreement, including exhibits, constitutes the full and entire understanding and agreement among the Parties with regard to the subject matter hereof, and supersedes all prior agreements, whether written or oral, among the Parties with respect to the subject matter of this Agreement; provided, however, that the Parties shall, to the extent provided in this Agreement, enter into various Restructuring Definitive Documentation to give effect to the transactions contemplated in this Agreement.

Section 22.    Headings.    The headings of the paragraphs and subparagraphs of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

Section 23.    Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors and assigns provided, however, that nothing contained in this paragraph shall be deemed to permit sales, assignments, or transfers other than in accordance with Section 5 hereof.

Section 24.    Specific Performance as Sole Remedy.  Subject to the Parties' termination rights provided herein, each Party hereto recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Agreement will cause other parties to sustain damages for which such parties would not have an adequate remedy at law for money damages, and therefore each Party hereto agrees that in the event of any such breach, such non-breaching parties shall be entitled to the sole remedy of specific performance of such covenants and agreements, including

without limitation, the covenant and agreement to vote in favor of the Plan, including, without limitation, seeking an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

Section 25.    Several, Not Joint, Obligations.    The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint. Furthermore, it is understood and agreed that no Consenting Holder has any duty of trust or confidence or fiduciary obligation in any form with any other Consenting Holder, and there are no commitments among or between them other than as and to the extent set forth in this Agreement.  In this regard, it is understood and agreed that any Consenting Holder may trade in the debt or equity securities of the Company without the consent of the Company or any other Consenting Holder, subject to applicable securities laws, any confidentiality agreement with the Company and the terms and conditions of this Agreement.  No Consenting Holder shall have any responsibility for any such trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between Consenting Holders shall in any way affect or negate this understanding and agreement.

Section 26.    Remedies Cumulative.  All rights, powers, and remedies provided under this Agreement shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

Section 27.    No Waiver.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such compliance.

Section 28.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by telecopier or email in portable document format (.pdf) shall be as effective as delivery of a manually executed signature page of this Agreement.

Section 29.    Severability.    Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 30.    No Third-Party Beneficiaries.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third Party beneficiary hereof.

Section 31.    Additional Parties.  Without in any way limiting the provisions hereof, additional Secured Lenders and Noteholders may elect to become Parties by executing and

delivering to the Debtors a counterpart hereof.  Such additional holder shall become a Party to this Agreement in accordance with the terms of this Agreement.

Section 32.    No Solicitation.  This Agreement is not intended to be, and each signatory to this Agreement acknowledges that this Agreement is not, whether for the purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise, a solicitation for the acceptance or rejection of a plan of reorganization for any of the Debtors.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.  The Debtors will not solicit acceptances of the Plan from any Consenting Lender or Consenting Noteholder until such Consenting Lender or Consenting Noteholder has been sent copies of a Disclosure Statement approved by the Bankruptcy Court.

Section 33.    Settlement Discussions.  This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement or to seek remedy relating to any breaches thereof.

Section 34.    Time Periods.    If any time period or other deadline provided in this Agreement expires on a day that is not a business day, then such time period or other deadline, as applicable, shall be deemed extended to the next succeeding business day.

Section 35.    Interpretation.  For purposes of this Agreement, unless otherwise specified: (i) each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (ii) all references herein to "paragraphs" or "Exhibits" are references to paragraphs or exhibits of this Agreement; and (iii) the words ''herein,'' "hereof," "hereunder" and ''hereto'' refer to this Agreement in its entirety rather than to a particular portion of this Agreement.

Section 36.    Fees and Expenses.

(a)    Prepetition Fees and Expenses.  Regardless of whether the Restructuring is consummated, upon approval of this Agreement by the Bankruptcy Court, the Debtors shall promptly pay in cash all accrued unpaid reasonable, documented and invoiced fees and out-of-pocket expenses incurred by the Holder Advisors and any other legal counsel to Secured Lenders (other than Latham) in their respective capacities prior to the commencement of the Chapter 11 Cases in accordance with the terms of their respective engagement letters, or as otherwise may be agreed to by the Debtors, Required Consenting Lenders and Required Consenting Noteholders, and the Parties shall support such payments.

(b)    Postpetition Fees and Expenses.  Regardless of whether the Restructuring is consummated, upon approval of this Agreement by the Bankruptcy Court, and as long as no Termination Date has occurred and this Agreement remains in full force and effect the Debtors agree that they shall continue to promptly pay the reasonable, documented and invoiced fees and

out-of-pocket expenses incurred by the Holder Advisors in their respective capacities from and after the commencement of the Chapter 11 Cases and through the earlier of (x) the Plan Effective Date or (y) the Termination Date in cash in accordance with the terms of their respective engagement letters, or as otherwise may be agreed to by the Required Consenting Lenders and Required Consenting Noteholders, and the Parties shall support such payments. In the event that the Restructuring is consummated, all fees and out-of-pocket expenses incurred by the Holder Advisors postpetition shall be paid no later than the Plan Effective Date. Regardless of whether the Restructuring is consummated, upon approval of this Agreement by the Bankruptcy Court, and as long as no Termination Date has occurred and this Agreement remains in full force and effect, the Debtors shall promptly pay any reasonable, documented and invoiced fees and out-of-pocket expenses, up to an aggregate maximum amount of $25,000, for legal counsel of each Consenting Lender (other than Latham) incurred from and after the commencement of the Chapter 11 Cases and through the earlier of (x) the Plan Effective Date or (y) the Termination Date, in cash in accordance with the terms of their respective engagement letters, or as otherwise may be agreed to by the Required Consenting Lenders and Required Consenting Noteholders, and the Parties shall support such payments.

(c)    DIP Facility Fees and Expenses. Notwithstanding anything to the contrary in this Section 36, the payment and/or reimbursement, as applicable, of fees, costs and expenses of the DIP Agent and DIP Lenders (each as defined in the DIP Term Sheet) shall be as provided in the DIP Term Sheet.

Section 37.    Direction of the Agent; Expenses; Indemnity; Damage Waiver.

(a)    Each Consenting Lender hereby authorizes and directs the Secured Lender Agent, and, subject to Sections 37(b) and 37(c) below, the Secured Lender Agent hereby accepts such authorization and direction, to (i) execute and deliver, perform all its obligations under, and take all other actions contemplated by or permitted under the Restructuring, the Plan, the Restructuring Term Sheet, the DIP Term Sheet and this Agreement and (ii) take all actions necessary to amend, waive, supplement or otherwise modify the Restructuring, the Plan, the Restructuring Term Sheet and the DIP Term Sheet and this Agreement in any manner that either (x) has been approved in writing by the requisite Secured Lenders (as required under the Secured Credit Agreement) or (y) does not constitute a material adverse change in respect of the treatment of the Claims held by such Consenting Lenders or the Restructuring contemplated by this Agreement as they affect such Consenting Lenders. The Secured Lender Agent may execute documents on behalf of Consenting Lenders pursuant to the authority granted to the Secured Lender Agent pursuant to this Section 37(a) and not in its individual capacity.

(b)    Anything contained in this Agreement, the Plan, the Restructuring Term Sheet, the DIP Term Sheet or any other related documents to the contrary notwithstanding, the Debtors and each such Consenting Lender agree and acknowledge that the Secured Lender Agent shall have all rights, powers and privileges granted to the Secured Lender Agent in the Secured Credit Agreement and the other Loan Documents (as defined in the Secured Credit Agreement).

(c)    The Debtors and each Consenting Lender further agree and acknowledge that, subject to Section 36 and without duplication, (i) with respect to any and all actions (including, without limitation, any and all actions contemplated hereunder) taken or not taken by the Secured

Lender Agent under this Agreement, the Secured Lender Agent shall retain its rights to be compensated, reimbursed and indemnified pursuant to the terms of the Secured Credit Agreement and the other Loan Documents (as defined in the Secured Credit Agreement), including, without limitation, pursuant to Section 11.04 of the Secured Credit Agreement and (ii) all reasonable, documented and invoiced out-of-pocket expenses incurred by the Secured Lender Agent and its Affiliates (as defined in the Secured Credit Agreement) (including the reasonable fees, charges and disbursements of counsel and financial advisors for the Secured Lender Agent) in connection with the preparation and negotiation of the Restructuring, the Plan, the Restructuring Term Sheet, the DIP Term Sheet and this Agreement, the transactions contemplated thereby and the actions taken by the Secured Lender Agent and its Affiliates thereunder shall be deemed "Obligations" under the Secured Credit Agreement.

Notwithstanding anything to the contrary provided in this Agreement, the rights, powers, protections and privileges granted to the Secured Lender Agent as described in Sections 37(b) and 37(c) shall survive the termination of this Agreement.

Section 38.    <u>Consideration</u>.  It is hereby acknowledged by the Parties hereto that, other than the agreements, covenants, representations, and warranties set forth in this Agreement, no consideration shall be due or paid to the Secured Lenders or Noteholders for their agreement to vote to accept the Plan in accordance with the terms and conditions of this Agreement.

Section 39.    <u>Receipt of Adequate Information; Representation by Counsel</u>.  Each Party acknowledges that it has received adequate information to enter into this Agreement and that it has been represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party shall have no application and is expressly waived.  The provisions of the Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties.

Section 40.    <u>Cooperation</u>.  During the Chapter 11 Cases, the Debtors shall provide to Latham and Akin drafts of all motions or applications, including proposed orders, and other documents that the Debtors intend to file with the Bankruptcy Court not less than three (3) Business Days before the date when the Debtors intend to file any such motion, application or document; <u>provided</u>, <u>however</u>, that in the event that three (3) business' days' notice is impossible or impracticable under the circumstances, the Debtors shall provide draft copies of any motions, applications, including proposed orders and any other documents the Debtors intend to file with the Bankruptcy Court to Latham and Akin within one (1) Business Day, or as soon as otherwise practicable, before the date when the Debtors intend to file any such motion, application or document.  The Debtors shall notify telephonically or by electronic mail counsel to the Secured Lender Agent, the DIP Agent (as defined in the DIP Term Sheet) and the Consenting Noteholders to advise them of the documents to be filed and the facts that make the provision of advance copies not less than three (3) Business Days before submission impossible or impracticable.

Section 41.    <u>No Commitment</u>.  No Party shall be obligated to fund or otherwise be committed to provide any new loans or other financial accommodations in connection with the DIP Facility or the Plan (including any exit financing related thereto other than as expressly contemplated in the Restructuring Term Sheet) regardless of the terms and conditions set forth in

this Agreement, except in accordance with a commitment letter or definitive documentation that has been (i) executed by such Party for the DIP Facility or any exit financing, as applicable, and (ii) approved by the Bankruptcy Court, as necessary, along with the satisfaction of any conditions precedent to such funding requirements.

Section 42.    <u>Signatures</u>.  Each party that is a signatory hereunder agrees to (i) disclose its Secured Lender Claims to the Secured Lender Agent and the Consenting Lender Professionals and its Noteholder Claims to the Consenting Noteholder Professionals, as applicable, and (ii) be bound by the terms of this Agreement in all of its capacities under the Secured Credit Agreement, the Notes, the Indenture and the DIP Credit Agreement (as defined in the DIP Term Sheet), as applicable.

<div align="center">[Signature Page Follows]</div>

IN WITNESS WHEREOF, MModal Holdings, Inc. and each of the Consenting Holders have executed this Agreement as of the date first written above.


MMODAL HOLDINGS, INC.


By: _____
      Name: Duncan James
      Title:  CEO

The undersigned agree to this Plan Support Agreement.

LEGEND PARENT, INC.

By: _____
    Name: Greg Belinfanti
    Title:  President

MMODAL INC.

By: _____
    Name: Duncan James
    Title:  CEO

MMODAL CB, INC.

By: _____
    Name: Duncan James
    Title:  President

MULTIMODAL TECHNOLOGIES, LLC

By: _____
    Name: Michael Finke
    Title:  President

MMODAL MQ INC.

By: _____
    Name: Duncan James
    Title:  President

MMODAL SYSTEMS AND SERVICES, INC.


By: _____
    Name: Duncan James
    Title:  President



MIRRUS SYSTEMS, INC.


By: _____
    Name: Duncan James
    Title:  President



POIESIS INFORMATICS, INC.


By: _____
    Name: Michael Finke
    Title:  President



MEDQUIST OF DELAWARE, INC.


By: _____
    Name: Duncan James
    Title:  President



MMODAL IP LLC


By: _____
    Name: Duncan James
    Title:  President

MMODAL SERVICES, LTD.


By: _____
    Name: Duncan James
    Title:  President



MEDQUIST CM LLC


By: _____
    Name: Duncan James
    Title:  President



ALL TYPE MEDICAL TRANSCRIPTION SERVICES, INC.


By: _____
    Name: Duncan James
    Title:  President

The undersigned agrees to this Plan Support Agreement and to become a Consenting Holder.

CONSENTING HOLDER:

_____

Name of Consenting Holder

By:   _____

Signature of Authorized Signatory of Consenting Holder

_____

Name of Authorized Signatory

_____

Title of Authorized Signatory

Address of Consenting Holder:

_____

_____

_____

Attn:_____

Telephone Number:_____

Facsimile Number:_____

Email:_____

Address:_____

**Exhibit A**

<u>Restructuring Term Sheet</u>

[*See attached*]

**TERM SHEET FOR PLAN OF REORGANIZATION OF MMODAL HOLDINGS, INC.
AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

**April 1, 2014**

**PRELIMINARY STATEMENT**

This term sheet (the "**Term Sheet**") contains proposed terms for a joint chapter 11 plan of reorganization (the "**Plan**") for MModal Holdings, Inc. ("**Holdings**") and its affiliated debtors and debtors in possession (collectively, the "**Debtors**"), in bankruptcy cases titled *In re Legend Parent, Inc.*, Case No. 14-10701 (REG) (Jointly Administered) (the "**Bankruptcy Case**"). This Term Sheet is being provided as part of settlement discussions and, as a result, shall be treated as such pursuant to Federal Rule of Evidence 408 and all bankruptcy and state law equivalents.

**THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION TO PURCHASE OR SELL ANY SECURITIES OF THE DEBTORS OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, IF ANY, AND/OR PROVISIONS OF THE BANKRUPTCY CODE. THIS TERM SHEET MAY NOT BE DISTRIBUTED WITHOUT THE EXPRESS WRITTEN CONSENT OF THE DEBTORS, THE REQUIRED CONSENTING FIRST LIEN LENDERS AND THE REQUIRED CONSENTING NOTEHOLDERS.**

**DEFINITIONS**

"Administrative Claim" means a Claim against a Debtor or its Estate arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration in the Chapter 11 Cases that is entitled to priority or superpriority under sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code.

"Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as now in effect or hereafter amended, as applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

"Brigade" means Brigade Capital Management, LLC.

"Chapter 11 Cases" means the Bankruptcy Case.

"Claim" means a claim (as defined in section 101(5) of the Bankruptcy Code) against a Debtor, including an Administrative Claim.

"Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"Consenting Lenders" shall have the meaning assigned to it in the PSA.

"Consenting Noteholders" shall have the meaning assigned to it in the PSA.

"Convenience Class Claim" means a Claim for up to and including $100,000.

"Deferred Acquisition Claims" means Claims by the sellers under the agreements listed as items 1 through and including 4 on Schedule A hereto.

"Definitive Documents" means the Disclosure Statement, the Plan, documents related to the New Corporate Governance Documents, the New Exit Facility, the New Term Loan Agreement, the New Warrant Agreements, the Shareholders Agreement, the Plan Supplement, the Confirmation Order and all related implementing documents, agreements, exhibits, annexes and schedules (as such documents may be amended, modified or supplemented from time to time in accordance with the terms hereof), reflecting the transactions embodied herein and otherwise (1) with respect to all such Definitive Documents (other than the New Warrant Agreements and the Shareholders Agreement) in form and substance reasonably acceptable to the Debtors and the Required Consenting Holders, and (2) notwithstanding anything to the contrary in this Term Sheet, with respect to the New Warrant Agreements and the Shareholders Agreement, in form and substance acceptable to the Required Consenting Holders in their respective good faith discretion.

"DIP Facility" means the debtor in possession financing facility approved by the Bankruptcy Court in the Bankruptcy Case, if any, which debtor in possession financing facility shall be on the terms and conditions set forth in Exhibit B to the PSA (the "**DIP Term Sheet**") or otherwise reasonably acceptable to the Debtors, First Lien Agent, the Required Consenting First Lien Lenders and the Required Consenting Noteholders.

"DIP Agent" means the agent under the DIP Facility.

"DIP Lenders" means the lenders under the DIP Facility.

"Disclosure Statement" means the written disclosure statement that relates to the Plan, as approved by the Bankruptcy Court under section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified, or supplemented from time to time.

"Distribution Record Date" means 5:00 p.m. (New York City Time) on the date to be agreed among the Debtors and the Required Consenting Holders that is no later than two (2) business days before the Effective Date.

"Effective Date" means a day, as determined by the Debtors with the consent of the First Lien Agent, the Required Consenting First Lien Lenders and the Required Consenting Noteholders, that is the first business day on or after all conditions to the Effective Date have been satisfied, or waived by the Debtors, First Lien Agent, the Required Consenting First Lien

Lenders and the Required Consenting Noteholders, as applicable, on the terms provided for herein and in the Plan.

"Estate" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

"Exit Distribution" means the cash distribution of $8,814,840 in the aggregate to be paid in cash on the Effective Date to holders of Claims in classes 2 and 4.

"Final Order" means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing sought shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; provided, however, that a motion under Rule 59 or Rule 60 of the Federal Rules of civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable law, may be filed with respect to such order shall not cause such order not to be a Final Order.

"First Lien Agent" means Royal Bank of Canada, in its capacity as administrative agent and/or collateral agent under the First Lien Facility.

"First Lien Claim" means any Claim under, or evidenced by, the First Lien Facility, including, without limitation, any Claim in respect of any "Obligations" as defined in the First Lien Credit Agreement.

"First Lien Credit Agreement" means that certain Credit Agreement dated as of August 17, 2012, among the Debtors, the First Lien Agent, and the other First Lien Lenders party thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"First Lien Facility" means collectively the First Lien Credit Agreement together with all other "Loan Documents" (as defined in the First Lien Credit Agreement).

"First Lien Lenders" means, collectively, the "Lenders" (as defined in the First Lien Credit Agreement).

"First Lien Secured Parties" means the "Secured Parties" (as defined in the First Lien Credit Agreement).

"General Unsecured Claim" means any Claim that is not an Administrative Claim, Priority Claim, Priority Tax Claim, First Lien Claim, Other Secured Claim, Intercompany Claim, Subordinated Claim, or Convenience Class Claim but includes a Noteholder Claim.

"Holdings Equity Interests" means the Interests in Holdings.

"Indenture" means that certain Indenture, dated as of August 17, 2012, among the Debtors, the Indenture Trustee, and the Noteholders party thereto (as further amended, restated, amended and restated, supplemented or otherwise modified from time to time).

"Indenture Trustee" means U.S. Bank National Association, in its capacity as trustee under the Indenture.

"Intercompany Claim" means any Claim of any Debtor against another Debtor.

"Intercompany Interest" means an Interest in a Debtor held by another Debtor.

"Interest" means the rights of any holder of the Stock of any Debtor and the rights of any entity to purchase or demand the issuance of any of the Stock of any Debtor, including: (a) redemption, conversion, exchange, voting, participation and dividend rights; (b) liquidation preferences; and (c) stock options and warrants.

"Liabilities" means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 544, 545, 546. 547, 548, 549, 550 and 553 of the Bankruptcy Code and other similar state law claims and causes of action, causes of action and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

"Management Stock Option Plan" means a management stock option plan that shall be adopted and implemented by the Board of Directors of Reorganized Holdings and a portion of the Reorganized Holdings Equity Interests shall be reserved for such plan in an aggregate amount of Interests to be agreed upon by the Reorganized Debtors, the First Lien Agent, the Required Consenting First Lien Lenders and the Required Consenting Noteholders.

"New Corporate Governance Documents" means an amended and restated certificate of incorporation and bylaws of Reorganized Holdings.

"New Exit Facility" means that certain new revolving line of credit in an amount reasonably acceptable to the Debtors and the Required Consenting Holders to be provided to the Reorganized Debtors on the Effective Date, which may be provided under the terms of the New Term Loan Agreement (or, if not in the New Term Loan Agreement, other definitive agreement reasonably acceptable to the Required Consenting Holders) and shall be senior to the New Term Loan. Each of the First Lien Lenders shall be permitted to participate in the New Exit Facility on a pro rata basis. For the avoidance of doubt, the Consenting Noteholders shall have the right to subscribe on a pro rata basis (calculated with respect to such Consenting Noteholder's holdings of First Lien Claims) for any portion of the New Exit Facility not subscribed to by any First Lien Lender and participate in the backstop of the New Exit Facility on a pro rata basis (calculated with respect to such Consenting Noteholder's holdings of First Lien Claims), including sharing in all fees and other economics associated therewith on a pro rata basis.

"New Term Loan" means that certain $320 million post-Effective Date first priority secured term loan to be made pursuant to the New Term Loan Agreement, subordinated only to

the New Exit Facility, with a non-default interest rate of LIBOR + 775 bps (with a 125bps
LIBOR floor), call protection at 101/101/100, 2.5% annual amortization and a 75% excess cash
flow sweep (sweep counts toward the 2.5% amortization). The other economic terms of the New
Term Loan shall be reasonably acceptable to the Debtors, the First Lien Agent, the Required
Consenting First Lien Lenders and the Required Consenting Noteholders.

"New Term Loan Agreement" means that certain credit agreement (a substantially final
form of which shall be included in the Plan Supplement) to be entered into on the Effective Date
by and among MModal Inc. or any of the other Debtors, as borrower, as agreed upon by the
Debtors, the Required Consenting Lenders and the Required Consenting Noteholders and certain
of the post-Effective Date direct and indirect subsidiaries of Holdings, collectively as guarantors,
the First Lien Agent, as administrative and collateral agent, and the applicable First Lien Secured
Parties or their nominees, as lenders, together with all amendments, supplements, ancillary
agreements, notes, pledges, collateral agreements and other documents related thereto, which
shall be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent, the
Required Consenting First Lien Lenders and the Required Consenting Noteholders and shall
provide for the New Term Loan.

"New Warrant Agreements" means the New A Warrant Agreement and the New B
Warrant Agreement.

"New Warrants" means the New A Warrants and the New B Warrants.

"New A Warrant Agreement" means the warrant agreement substantially in the form set
forth in the Plan Supplement for the issuance of the New A Warrants.

"New B Warrant Agreement" means the warrant agreement substantially in the form set
forth in the Plan Supplement for the issuance of the New B Warrants.

"New A Warrants" means the new three (3) year A warrants to be issued in accordance
with the New A Warrant Agreement, entitling their holders to convert the New A Warrants to
32.5% (subject to dilution by the issuance of equity under the Management Stock Option Plan
and the New B Warrants) of the common equity of Reorganized Holdings, at a time or times of
each holder's choosing without pre-condition, at a strike price (either through a cash or cashless
exercise) equal to a total equity value of Reorganized Holdings of $180 million, subject to the
Warrant Adjustment, and such Warrants shall be subject to anti-dilution protection in favor of
their holders on terms set forth herein and otherwise (notwithstanding anything to the contrary
contained herein) acceptable to the Required Consenting Holders in their respective good faith
discretion; provided that the New A Warrants will expire if not exercised upon consummation of
a sale of all or substantially all of the assets of the Reorganized Debtors or a merger or other
corporate combination, in each case where (i) the acquirer is a true third party and not an affiliate
of the Reorganized Debtors or any shareholder and (ii) all of the equity held by equity holders of
the Reorganized Debtors (other than existing management) is extinguished or replaced by equity
in a different entity (except where the equity interests in the Reorganized Debtors are replaced in
a merger or other corporate combination with equity in the surviving company that represents
more than fifty percent of the total equity in the surviving company, in which case the New A
Warrants shall not expire upon consummation of such transaction). For the avoidance of doubt,

annexed hereto as <u>Schedule B</u> is an illustrative table setting forth the strike price and number of shares issuable upon exercise of the New Warrants based on sample amounts of the Warrant Adjustment.

"New B Warrants" means the new three (3) year B warrants to be issued in accordance with the New B Warrant Agreement, entitling their holders to convert the New B Warrants to 30% (subject to dilution by the issuance of equity under the Management Stock Option Plan) of the common equity of Reorganized Holdings, at a time or times of each holder's choosing without pre-condition, at a strike price (either through a cash or cashless exercise) equal to a total equity value of Reorganized Holdings of $230 million (with the strike price of the New B Warrants, on a per share basis, and the number of shares issuable upon exercise of the New B Warrants, calculated as if the New A Warrants are exercised, which requires taking into account both the cash proceeds received by, and the shares issued by, Reorganized Holdings in connection with the exercise of the New A Warrants), subject to the Warrant Adjustment and such Warrants shall be subject to anti-dilution protection in favor of their holders on terms set forth herein and otherwise (notwithstanding anything to the contrary contained herein) acceptable to the Required Consenting Holders in their respective good faith discretion; <u>provided</u> that the New B Warrants will expire if not exercised upon consummation of a sale of all or substantially all of the assets of the Reorganized Debtors or a merger or other corporate combination, in each case where (i) the acquirer is a true third party and not an affiliate of the Reorganized Debtors or any shareholder and (ii) all of the equity held by equity holders of the Reorganized Debtors (other than existing management) is extinguished or replaced by equity in a different entity (except where the equity interests in the Reorganized Debtors are replaced in a merger or other corporate combination with equity in the surviving company that represents more than fifty percent of the total equity in the surviving company, in which case the New B Warrants shall not expire upon consummation of such transaction).  For the avoidance of doubt, annexed hereto as <u>Schedule B</u> is an illustrative table setting forth the strike price and number of shares issuable upon exercise of the New Warrants based on sample amounts of the Warrant Adjustment.

"Notes" or "Note" means the 10.75% Senior Notes due 2020 issued under the Indenture.

"Noteholder" means, collectively, the Person in whose name a Note is registered on the registrar's books.

"Noteholder Claim" means any Claim under, or evidenced by, the Indenture.

"Other Secured Claim" means a secured Claim other than a First Lien Claim.

"Petition Date" means March 20, 2014.

"Plan Supplement" means the compilation(s) of documents, including any exhibits to the Plan not included herewith, that the Debtors may file with the Bankruptcy Court, including, without limitation, the following: (a) the identity of the members of the new board of directors of Reorganized Holdings and the nature and amount of compensation for any member of the new board who is an "insider" under section 101(31) of the Bankruptcy Code; (b) a list of Executory Contracts and Unexpired Leases to be rejected (if any); (c) the New Corporate Governance Documents; (d) the New Term Loan Agreement (which may include the New Exit Facility); (e)

Shareholders Agreement; (f) the New Warrant Agreements; (g) amount of equity reserve with respect to the Management Stock Option Plan; and (h) if not the New Term Loan Agreement, the definitive agreement providing the New Exit Facility.  Unless a different approval standard or threshold is expressly provided for herein, the documents contained in the Plan Supplement shall be in form and substance reasonably acceptable to the Debtors, the First Lien Agent, the Required Consenting First Lien Lenders and the Required Consenting Noteholders.

"Priority Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code that is not an Administrative Claim or a Priority Tax Claim.

"Priority Tax Claim" means a Claim that is entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code.

"PSA" means the Plan Support Agreement, dated as of April 1, 2014, among the Debtors, the First Lien Agent, the other First Lien Lenders party thereto, and the Consenting Noteholders, as the same may be amended or otherwise modified in accordance with its terms.

"Reinstated" means rendering a Claim unimpaired within the meaning of section 1124 of the Bankruptcy Code in the manner chosen by the Debtors.

"Released Parties" means, collectively and individually, the Debtors, any past or present Representatives or equityholders of any of the Debtors, the Reorganized Debtors, the creditors' committee (if any) and its members (solely in their capacity as such), the Consenting Lenders, the Indenture Trustee, the Consenting Noteholders, and the Representatives of each of the foregoing (solely in their capacities as such).

"Required Consenting First Lien Lenders" shall mean "Required Consenting Lenders" as defined in the PSA.

"Required Consenting Holders" means the Required Consenting First Lien Lenders and the Required Consenting Noteholders.

"Required Consenting Noteholders" shall have the meaning assigned to it in the PSA.

"Reorganized Debtors" means the Debtors on and after the Effective Date.

"Reorganized Holdings" means Holdings or one of its affiliates on and after the Effective Date.

"Reorganized Holdings Equity Interests" means the common stock of Reorganized Holdings on and after the Effective Date.

"Representatives" means, with respect to any entity, any officer, director, employee, affiliate, subsidiary, member, partner, manager, attorney, advisor, investment banker, financial advisor, accountant or other professional of such entity, in each case in such capacity.

"Shareholders' Agreement" means an agreement among all holders of the Reorganized Holdings Equity Interests as of the Effective Date, which agreement shall contain or provide for such terms, rights and obligations as set forth herein and otherwise (notwithstanding anything to the contrary contained herein) acceptable to the Required Consenting Holders in their respective good faith discretion.  The Plan shall obligate each holder of Reorganized Holdings Equity Interests to sign the Shareholders' Agreement, but each such holder shall in any event be deemed to be bound to the terms of the Shareholders' Agreement from and after the Effective Date even if not signatory thereto.[1]

"Stock" means, when used with reference to a particular Debtor, the common stock, preferred stock, membership interests or partnership interests or similar ownership interests of such Debtor, including options, warrants or rights to acquire or convert any such interests, issued by such Debtor and outstanding immediately prior to the Petition Date.

"Subordinated Claim" means a Claim that is subject to subordination under sections 510(b) or 510(c) of the Bankruptcy Code, including Deferred Acquisition Claims arising under the agreements listed as items 3 and 4 on Schedule A hereto.

"Subsidiary Debtor Equity Interests" means, as to a particular subsidiary Debtor, any Interests in such Debtor.

"Total Liquidity" means, as of any date of determination, the sum of (i) on a consolidated basis, all cash and cash equivalents of any kind of any of the Debtors as of such date of determination plus $3.0 million (excluding, for the avoidance of doubt, any cash and cash equivalents of the foreign subsidiaries of the Debtors) and (ii) undrawn principal amount of the New Exit Facility as of such date of determination.

"Warrant Adjustment" means the downward adjustment of the strike price of the New Warrants on a dollar for dollar basis that equals the amount by which the Total Liquidity is less than the aggregate commitment under the New Exit Facility, but not exceeding an aggregate maximum amount of $8,814,840. The Warrant Adjustment shall be calculated as of the Effective Date based on the sources and uses as of such date; provided that any uses shall be at emergence and shall include all payments contemplated under the Plan made on or, to the extent provided in the Plan, after the Effective Date), including but not limited to all Administrative Claims, Priority Claims, all professional fees and expenses relating to the Debtors' bankruptcy cases or the transactions contemplated by the Plan (including any professional fee or expense holdbacks and/or restructuring, completion or other similar fees), all distributions (including, for the avoidance of doubt, the Exit Distribution) to First Lien Secured Parties, Noteholders, General Unsecured Claims and Convenience Class Claims, payments under Key Employee Incentive Plan, New Exit Facility fees and related expenses, and repayment of the DIP Facility, but notwithstanding anything to the contrary in the foregoing, shall not include in any event payments with respect to any post-petition ordinary course trade payables outstanding as of the Effective Date.

---

[1] In lieu of, or in addition to, the Shareholders Agreement, certain of these provisions may be included in the amended and restated certificate of incorporation and bylaws to be adopted by the Reorganized Debtors, on the Effective Date.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## UNCLASSIFIED CLAIMS

| CLAIM | PROPOSED TREATMENT |
|---|---|
| **Administrative Claims** | **U.S. Trustee Fees**<br><br>Paid in full in cash on or before the Effective Date, and thereafter, paid in accordance with 28 U.S.C. §1930(a)(6), and accrued interest, if any, under 31 U.S.C. § 3717.<br><br>**DIP Facility Claims** (if any)<br><br>Paid in full and in cash on the Effective Date, or as otherwise agreed among the Debtors, the DIP Agent, the required DIP Lenders under the DIP Facility and the Required Consenting Holders.<br><br>**Postpetition Professional, Trade and Other Ordinary Course Liabilities**<br><br>Subject to any applicable compensation procedures order of the Bankruptcy Court, paid in full in cash (a) on the later of the Effective Date or the date the administrative expense is allowed under § 503 of the Bankruptcy Code, (b) in the ordinary course of business after the Effective Date for business administrative expenses, or (c) upon such other terms, less favorable to the holder of such Claim, as the Reorganized Debtors and the holder of such Claim may agree. |
| **Priority Tax Claims** | Paid in full in cash (a) on the later of the Effective Date or the date such Claim is allowed, (b) after the Effective Date, over a period not to exceed five years from the date of assessment of the subject tax, together with interest thereon at the applicable statutory rate or such other rate as may be required by the Bankruptcy Code, or (c) upon such other terms, less favorable to the holder of such Claim, as the Reorganized Debtors and the holder of such Claim may agree. |

9

## CLASSIFIED CLAIMS AND INTERESTS

| CLASS | PROPOSED TREATMENT |
|---|---|
| **Class 1:**<br><br>**Priority Claims (Unimpaired)** | Paid in full in cash (a) on the later of the Effective Date or the date such Claim is allowed in accordance with § 502 of the Bankruptcy Code, or (b) upon such other terms, less favorable to the holder of such Claim, as the Reorganized Debtors and the holder of such Claim may agree. |
| **Class 2:**<br><br>**First Lien Claims (Impaired)** | On the Effective Date, each holder of a First Lien Claim shall receive in full satisfaction and release of such holder's First Lien Claim, such holder's pro rata share of: (i) the New Term Loan; (ii) 93 percent of Reorganized Holdings Equity Interests, before dilution for the New Warrants and Management Stock Option Plan; and (iii) $8,197,801 in cash. The recharacterization as principal or otherwise of any cash payments (including made as adequate protection) made to the holders of First Lien Claims will not affect any distributions made under the Plan. |
| **Class 3: Other Secured Claims (Unimpaired)** | Unless a holder of an Other Secured Claim agrees to a less favorable treatment, each Other Secured Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Other Secured Claim, on the Effective Date, shall (i) be Reinstated, or, at the option of the Debtors or the Reorganized Debtors (ii) each holder of an Other Secured Claim shall receive, either (w) cash in the full amount of such Other Secured Claim, including any postpetition interest allowed pursuant to section 506(b) of the Bankruptcy Code, (x) the net proceeds of the sale or disposition of the collateral securing such Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (y) the collateral securing such Other Secured Claim, or (z) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code. |
| **Class 4:**<br><br>**General Unsecured Claims (including** | On the Effective Date, each creditor holding a General Unsecured Claim shall receive in full satisfaction and release of such Claim, such |

| CLASS | PROPOSED TREATMENT |
|---|---|
| Noteholder Claims) (Impaired) | holder's pro rata share of: (i) 7 percent of Reorganized Holdings Equity Interests, before dilution for the New Warrants and Management Stock Option Plan; (ii) the New A Warrants and New B Warrants; and (iii) $617,039 in cash; provided, however, that holders of General Unsecured Claims other than a Noteholder Claim may elect to receive, in lieu of the foregoing consideration, cash in an amount equal to a percentage of such creditor's General Unsecured Claim to be set forth in the Plan, which percentage shall reflect the recovery percentage of the holders of Noteholder Claims and shall be acceptable to the Required Consenting Holders in their good faith discretion.<br><br>Each holder of a Class 4 Claim that is not a Noteholder shall be permitted to reduce its Claim to $100,000 and receive distribution as if the Claim is a Class 6 Claim.<br><br>To the extent that aggregate amount of Claims in Class 4 includes, in addition to Noteholder Claims, General Unsecured Claims that are not Convenience Class Claims and/or Class 5 Claims that have been reclassified as Class 4 Claims (such reclassified Class 5 Claims and claims that are not Convenience Class Claims, "**Excess Claims**"), the aggregate available distribution to Class 4 Claims shall be increased by a cash amount such that the distribution to holders of Class 4 Claims (calculated without giving effect to the inclusion in Class 4 of Excess Claims) shall not be diluted by the inclusion of the Excess Claims in Class 4. |
| **Class 5:  Subordinated Claims (Impaired)** | Each holder of a Subordinated Claim will receive no distribution.  To the extent that the Bankruptcy Court holds that any Subordinated Claim included by the Debtors in this Class is not subject to mandatory subordination under sections 510(b) or 510(c) of the Bankruptcy Code, such Claim shall automatically be deemed a Class 4 or Class 6 Claim, depending on its amount, and shall receive distribution as such. |

| CLASS | PROPOSED TREATMENT |
|---|---|
| **Class 6:**<br><br>**Convenience Class (Unimpaired)** | Each holder of a Convenience Class Claim will receive payment in full and in cash on or as soon as reasonably practicable after the Effective Date. |
| **Class 7:**<br><br>**Intercompany Claims (Impaired)** | On the Effective Date, at the Debtors' option, but in each case subject to the prior written consent of the First Lien Agent and the Required Consenting Holders, each Intercompany Claim shall either be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) Reinstated. |
| **Class 8:**<br><br>**Intercompany Interests (Unimpaired)** | On the Effective Date, Class 8 Interests will be Reinstated. |
| **Class 9:**<br><br>**Holdings Equity Interests (Impaired)** | On the Effective Date, Class 9 Interests will be cancelled. |

## ADMINISTRATIVE CONSOLIDATION

To the extent necessary or appropriate, the classification and manner of satisfying all Claims and Interests under the Plan may take into consideration the rights of holders of Claims and Interests, whether arising under contract, law or equity, that a holder of a Claim or Interest may have against each of the Debtors. Holders of Claims or Interests against more than one Debtor are classified in consolidated classes of Claims against and Interests in all Debtors for administrative convenience with respect to voting and the making of distributions on account of Claims and Interests pursuant to the Plan. The Confirmation Order shall approve this administrative consolidation.

Such administrative consolidation shall not affect: (1) the legal and corporate structures of the Debtors; (2) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (a) in connection with contracts or leases that were entered into during the Chapter 11 Cases or executory contracts and unexpired leases that have been or will be assumed by the Debtors or (b) pursuant to the Plan (including with respect to Reinstated Claims and the First Lien Claims); (3) Intercompany Interests; (4) distributions from any insurance policies or proceeds of such policies; or (5) the revesting of assets in the separate Reorganized Debtors. In addition, such administrative consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

## CONDITIONS TO THE EFFECTIVE DATE

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived by the Debtors, the First Lien Agent, the Required Consenting First Lien Lenders and the Required Consenting Noteholders:

1.     The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Debtors, the First Lien Agent, the Required Consenting First Lien Lenders and the Required Consenting Noteholders, and the Confirmation Order shall be a Final Order.

2.     All conditions precedent to the effectiveness of, and the initial borrowings under the New Exit Facility shall be satisfied or waived, in each case in accordance with the terms and conditions of the New Exit Facility.

3.     One Equity Partners V. L.P., OEP II Partners Co-Invest, L.P. and any other controlled affiliates of OEP Holding Corporation that hold equity interests in any Debtor (the "**Equityholders**") shall each provide a waiver and release, effective as of the Effective Date, substantially similar in all respects to the waiver and release of all Claims against the Debtors and their affiliates set forth in paragraph 2 under the "Releases" section below.   For the avoidance of doubt, the Equityholders shall not be entitled to any distribution under the Plan.

4.     All Definitive Documents shall be in form and substance in accordance with the terms and conditions set forth in this Term Sheet and otherwise reasonably acceptable to the Debtors, the First Lien Agent, and the Required Consenting Holders.

5.     Other customary and reasonable conditions to be negotiated in good faith among the Debtors, the First Lien Agent, the Required Consenting First Lien Lenders and the Required Consenting Noteholders.

## MEANS FOR IMPLEMENTATION OF THE PLAN

The Plan shall include customary provisions utilized for implementations of chapter 11 plans as applicable to the terms contained in this Term Sheet, including, by way of example, for effectuating the issuance of Reorganized Holdings Equity Interests and the New Warrants, funding of the New Exit Facility, authorization of corporate actions necessary for the implementation of the Plan, continued corporate existence of the Debtors as Reorganized Debtors, cancellation of agreements and securities (as appropriate), corporate governance, and indemnity of officers and directors.

## Corporate Governance

On the Effective Date, Reorganized Holdings shall adopt the New Corporate Governance Documents in form and substance in accordance with the terms and conditions set forth in this Term Sheet and otherwise reasonably acceptable to the Required Consenting Holders including, *inter alia*, provisions governing the access each holder of Reorganized Holdings Equity Interests shall have to information with respect to Reorganized Holdings and the ability to transfer such holder's Reorganized Holdings Equity Interests and shall set forth director voting provisions.

The Required Consenting Holders, in their reasonable discretion, may determine to set forth certain rights and obligations concerning the Reorganized Holdings Equity Interests in the Shareholders Agreement in lieu of providing such rights and obligations in the New Corporate Governance Documents, in which case such Shareholders Agreement, if any, shall be adopted by Reorganized Holdings as of the Effective Date and be binding on all holders of Reorganized Holdings Equity Interests; provided that each recipient of Reorganized Holdings Equity Interests must sign the Shareholders Agreement prior to receiving any Reorganized Holdings Equity Interests. Each certificate representing share(s) of Reorganized Holdings Equity Interests shall bear a legend indicating that the Reorganized Holdings Equity Interests are subject to the terms and conditions of the New Corporate Governance Documents and/or the Shareholders Agreement, as applicable. The certificates of incorporation and bylaws or other organizational documents of the subsidiaries of Reorganized Holdings, as of the Effective Date, shall be amended and restated or otherwise modified to be consistent in substance with the New Corporate Governance Documents and otherwise reasonably acceptable to the Required Consenting Holders.

## 1.     Directors and Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial officers of each of the Reorganized Debtors will consist of the officers of such Debtor immediately prior to the Effective Date and the initial board of directors of each of the Reorganized Debtors will consist of Reorganized Holdings' Chief Executive Officer, three (3) members selected by the "Required Lenders" (as defined in the First Lien Credit Agreement) (and a simple majority of the Reorganized Holdings' shareholders shall select these directors at any election occurring after the Effective Date or to fill any vacancy in these director positions) and one (1) member selected by Brigade (the "**Brigade Director**"). The Consenting Noteholders, in their capacity as First Lien Lenders, shall be entitled to full participation in the process of selecting the three (3) members of the initial boards of each of the Reorganized Debtors to be chosen by the First Lien Lenders including, the right to nominate candidates for such board positions. For purposes of subsequent board elections following the Effective Date, the Parties will agree in the Shareholders' Agreement or a voting agreement to vote their shares of Reorganized Holdings Equity Interests to ensure that (a) the Brigade Director (or a replacement proposed by Brigade) is re-elected to the boards and (b) the Chief Executive Officer of Reorganized Holdings is re-elected to the boards of directors. Brigade's right to select the Brigade Director shall not be assignable. If, at any time after the Effective Date, funds affiliated with, managed or controlled by Brigade hold less than twenty percent (20%) of the Reorganized Holdings Equity Interests, Brigade shall no longer have the right to select the Brigade Director, and the Brigade Director shall be selected by a simple majority of Reorganized Holdings' shareholders. Approval for sale, merger or other combination of the Reorganized Debtors shall require approval of a simple majority of Reorganized Holdings' shareholders. Reorganized Debtors' boards of directors shall act by a simple majority vote; provided that any action of any Reorganized Debtor's board of directors to approve certain material matters (such material matters will be subject to agreement by the Required Consenting Holders, negotiating in good faith, in the applicable Definitive Documents, and will include, at a minimum, a sale of all or substantially all the assets of the Reorganized Debtors) shall require a majority vote of all directors of such board of directors, which majority shall include at least two directors selected by either (i) the "Required Lenders" (as defined in the First Lien Credit Agreement) or (ii) a

simple majority of Reorganized Holdings' shareholders, as applicable.  Each such director and officer will serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the terms of the certificate of incorporation and bylaws (or comparable constituent documents) of the respective Reorganized Debtor and state law.

**2.      Obligations to Insure and Indemnify Directors, Officers and Employees**

a.      Any and all directors and officers liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date shall be reinstated and continued in accordance with their terms and, to the extent applicable, shall be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to section 365 of the Bankruptcy Code and the Plan.  Each insurance carrier under such policies shall continue to honor and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors prior to the Effective Date.

b.      The obligations of each Debtor or Reorganized Debtor to indemnify any person who is serving or served as one of its directors, officers or employees on or as of the Petition Date by reason of such person's prior or future service in such a capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before on or after the Petition Date.

**Bar Dates**

Except as expressly provided for in the Plan (for instance, with respect to holders of rejection damage claims, if applicable), holders of Claims shall not be required to file a proof of Claim, and no parties should file a proof of Claim.  The Debtors do not intend to object to the allowance of such filed Claims, although they reserve the right to do so.  The Debtors intend to make distributions to holders of Claims entitled to a distribution of property under the Plan as provided in the Plan, or as otherwise agreed by the Debtors and the applicable holders of such Claims.  Although the Debtors intend to resolve any disputes regarding the amount of all Claims consensually or through judicial means outside the Bankruptcy Court, the Debtors nevertheless may, in their reasonable discretion, file with the Bankruptcy Court any motion or adversary proceeding to determine the amount of any Claim.

**Releases**

**1.      General Releases by Debtors and Reorganized Debtors**

The Debtors and the Reorganized Debtors, on behalf of themselves and their affiliates, the Estates and their respective successors, assigns and any and all entities who may purport to

claim by, through, for or because of them will forever release, waive and discharge all Liabilities that they have, or had against any Released Party except with respect to any obligations arising under the Plan, the Definitive Documents that by their terms survive the Effective Date and any applicable orders of the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases; provided, however, that the foregoing provisions will have no effect on the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, theft or willful misconduct.

2.        **General Releases by Holders of Claims or Interests**

As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the cash, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim (solely in its capacity as such) that so elects on the voting ballot for the Plan will be deemed to forever release, waive and discharge all Liabilities in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan, the Disclosure Statement, the First Lien Facility, or the Indenture that such entity has, had or may have against any Released Party or any employees, agents or partners of the Debtors (which release will be in addition to the discharge of Claims provided herein and under the Confirmation Order and the Bankruptcy Code), except with respect to any obligations arising under the Plan, the New Term Loan Agreement, or any of the Definitive Documents that by their terms survive the Effective Date, or any act, event, injury, omission, transaction, or agreement arising after the Effective Date (other than Liabilities relating to such act, event, injury, omission, transaction or agreement first arising or occurring prior to the Effective Date); provided, however, that the foregoing provisions will have no effect on the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, theft or willful misconduct.

**Exculpation**

From and after the Effective Date, the Released Parties, will neither have nor incur any liability to any entity, and no holder of a Claim or Interest, no other party in interest and none of their respective Representatives, shall have any right of action against any Released Party, for any act taken or omitted to be taken in connection with, related to or arising out of the Chapter 11 Cases or the consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the exhibits to the Plan, the Disclosure Statement, any transaction proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions will have no effect on: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

**Executory Contracts**

The Debtors will assume substantially all of their executory contracts and unexpired leases.  The Plan shall contain an exhibit of any specific contracts or unexpired leases that the Debtors will reject, if any, and such exhibit shall be in form and substance acceptable to the Debtors, the First Lien Agent, the Required Consenting First Lien Lenders and the Required Consenting Noteholders, and for avoidance of doubt, shall include all specific contracts or unexpired leases set forth on Schedule A hereto. Upon confirmation of the Plan, and after payment of any necessary cure amounts owing to contract or lease counterparties pursuant to section 365 of the Bankruptcy Code, all contract and lease counterparties shall be forever barred and estopped from asserting or claiming against the Debtors that any additional amounts are due or other defaults exist, that conditions to assumption and/or assignment must be satisfied under such contracts or leases, or that there is any objection or defense to assumption and/or assignment of such contracts and leases.

Any provision in any executory contract or unexpired lease to be assumed under the Plan that purports to declare a breach, default or right to payment as a result of an assignment or change of control in respect of the Debtors or Reorganized Debtors is unenforceable, and all executory contracts and unexpired leases to be assumed under the Plan shall remain in full force and effect, subject only to payment of the appropriate cure amount, if any.  No sections or provisions of any executory contract or unexpired lease that purport to provide for additional payments, penalties, charges, rent acceleration, or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect with respect to the transactions contemplated by the Plan, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

The Plan shall provide for the assumption by the Debtors of their agreements with the respective professionals retained by the First Lien Agent and the Consenting Noteholders.

**Management and Employee Plans**

On the Effective Date, the Reorganized Debtors shall adopt an employee severance program, in form and substance reasonably acceptable to the Required Consenting Holders, which shall be filed with the Plan Supplement.

The total equity reserve for issuance to management pursuant to the Management Stock Option Plan shall be provided in the Plan Supplement.  The Reorganized Holdings' board of directors shall be responsible for adopting and implementing the Management Stock Option Plan, and shall determine individual equity awards thereunder at such times and on such terms as it shall determine in its discretion.

**Tax**

Each Party shall use good faith efforts to structure the Plan and the other transactions contemplated herein and thereby to the maximum extent possible in a tax-efficient and cost-effective manner for the Debtors, the Secured Lenders and the Noteholders.  All decisions regarding structure shall be reasonably acceptable to the Required Consenting Holders.

**Other**

On the Effective Date or as soon thereafter as agreed to by the Debtors and the First Lien Agent, the Debtors shall reimburse the First Lien Agent of all reasonable professional fees incurred by the First Lien Agent and not otherwise satisfied.

On the Effective Date the Debtors will pay all fees and expenses of the professionals retained by the First Lien Agent and the Consenting Noteholders, including the fees and expenses of Blackstone Advisory Partners LP, Akin Gump Strauss Hauer & Feld LLP, Latham & Watkins LLP and Houlihan Lokey as set forth in their respective engagement agreements (including any restructuring fees included therein).

On the Effective Date or as soon thereafter as agreed to by the Debtors and the Indenture Trustee, the Debtors shall reimburse the Indenture Trustee in accordance with the Indenture of all reasonable fees and expenses incurred by the Indenture Trustee, including fees and expenses of counsel to the Indenture Trustee, and not otherwise satisfied prepetition.

Without limiting the foregoing, all other expense reimbursement provisions set forth in the PSA shall be incorporated into the Plan as necessary to effectuate the parties' agreements with respect to such matters.

Consummation of the Plan is not intended to and shall not constitute a change in ownership or change in control, as defined in any employment or other agreement or plan in effect on the Effective Date to which a Debtor is a party.  In addition, notwithstanding anything to the contrary in the Plan, no provision in any contract, agreement or other document with the Debtors that is rendered unenforceable against the Debtors or the Reorganized Debtors pursuant to sections 541(c), 363(l) or 365(e)(1) of the Bankruptcy Code, or any analogous decisional law, shall be enforceable against the Debtors or Reorganized Debtors as a result of this Plan.

During the pendency of the Chapter 11 Cases, the Debtors shall use their commercially reasonable efforts to operate their business in the Ordinary Course, subject to the requirements of the Bankruptcy Code.  "**Ordinary Course**" operations shall mean, for purposes of this paragraph, operating the Debtors' business consistent with past practice, including with respect to (a) the timing of (i) payment of all payables and operating expenses, (ii) collection of all receivables and (iii) the funding of capital expenditures and (b) maintenance of normal course operational cash on hand balances.  Capital expenditures shall be made by the Debtors on as-planned basis during the pendency of the Chapter 11 Cases, but in no event later than the Effective Date, including funding of any capital expenditures that were deferred before the Petition Date or that are deferred during the Chapter 11 Cases.

**Plan Exhibits**

| | |
|---|---|
| Exhibit I | New Exit Facility |
| Exhibit II | New Term Loan Agreement |
| Exhibit III | New A Warrant Agreement |
| Exhibit IV | New B Warrant Agreement |
| Exhibit V | Shareholders' Agreement |
| Exhibit VI | Reorganized Debtors Management Incentive Plan or Term Sheet |
| Exhibit VII | Reorganized Debtors Severance Program or Term Sheet |
| Exhibit VIII | Certificate of Incorporation (or Comparable Constituent Documents) of Reorganized Holdings and Form for Reorganized Subsidiary Debtors |
| Exhibit IX | Bylaws (or Comparable Constituent Documents) of Reorganized Holdings and Form for Reorganized Subsidiary Debtors |
| Exhibit X | Initial Directors and Officers of Reorganized Holdings and Each Reorganized Subsidiary Debtor |
| Exhibit XI | Executory Contracts and Unexpired Leases to Be Rejected |
| Exhibit XII | Management Stock Option Plan |

## Schedule A

**Certain Executory Contracts and Unexpired Leases**

1.      Asset Purchase Agreement, dated as of November 1, 2011, by and among MModal
Services, Ltd. (formerly known as MedQuist Transcriptions, Ltd.), Healthcare Contract
Resources, Inc., S. Patrick King Jr., and Gayle F. Keith.

2.      Asset Purchase Agreement, dated as of December 27, 2012, by and among MModal
Services, Ltd., Meridian Healthcare Solutions, LLC, Eric von Grimmenstein, David
Moore, Tim Mullen and Mike Wolanin.

3.      Agreement and Plan of Merger and Reorganization, dated as of July 11, 2011, by and
among MModal Inc. (formerly known as MedQuist Holdings Inc.), Miami Acquisition
Corporation, Miami Acquisition LLC, Multimodal Technologies, Inc. and Michael Finke,
as Securityholder Representative.

4.      Stock Purchase Agreement, dated as of November 23, 2011, by and among Multimodal
Technologies, LLC, Poiesis Informatics, Inc., Claudine Martin, Jeremy Richardson and
David Lionetti.

## Schedule B

**Illustrative Warrant Calculations**

[*See attached*]

# Illustrative Warrant Calculations[1]

($ in millions, except per share figures)

| | | | | | Warrant Adjustment | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | – | $1.0 | $2.0 | $3.0 | $4.0 | $5.0 | $6.0 | $7.0 | $8.0 | $8.8 [2] |
| **Warrant Tranche A - 32.5% Equity @ $180mm Equity Value** | | | | | | | | | | |
| Equity Value | $180.0 | $180.0 | $180.0 | $180.0 | $180.0 | $180.0 | $180.0 | $180.0 | $180.0 | $180.0 |
| Less: Warrant Adjustment | – | (1.0) | (2.0) | (3.0) | (4.0) | (5.0) | (6.0) | (7.0) | (8.0) | (8.8) |
| Adjusted Equity Value | $180.0 | $179.0 | $178.0 | $177.0 | $176.0 | $175.0 | $174.0 | $173.0 | $172.0 | $171.2 |
| / Shares | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Strike Price | $1.80 | $1.79 | $1.78 | $1.77 | $1.76 | $1.75 | $1.74 | $1.73 | $1.72 | $1.71 |
| | | | | | | | | | | |
| Shares Issued | 48.1 | 48.1 | 48.1 | 48.1 | 48.1 | 48.1 | 48.1 | 48.1 | 48.1 | 48.1 |
| | | | | | | | | | | |
| **Warrant Tranche B - 30.0% Equity @ $230mm Equity Value** | | | | | | | | | | |
| Equity Value | $230.0 | $230.0 | $230.0 | $230.0 | $230.0 | $230.0 | $230.0 | $230.0 | $230.0 | $230.0 |
| Plus: Cash Proceeds from Warrant Tranche A | 86.7 | 86.2 | 85.7 | 85.2 | 84.7 | 84.3 | 83.8 | 83.3 | 82.8 | 82.4 |
| Less: Warrant Adjustment | – | (1.0) | (2.0) | (3.0) | (4.0) | (5.0) | (6.0) | (7.0) | (8.0) | (8.8) |
| Adjusted Equity Value | $316.7 | $315.2 | $313.7 | $312.2 | $310.7 | $309.3 | $307.8 | $306.3 | $304.8 | $303.6 |
| / Shares | 148.1 | 148.1 | 148.1 | 148.1 | 148.1 | 148.1 | 148.1 | 148.1 | 148.1 | 148.1 |
| Strike Price | $2.14 | $2.13 | $2.12 | $2.11 | $2.10 | $2.09 | $2.08 | $2.07 | $2.06 | $2.05 |
| | | | | | | | | | | |
| Shares Issued | 63.5 | 63.5 | 63.5 | 63.5 | 63.5 | 63.5 | 63.5 | 63.5 | 63.5 | 63.5 |

[1]   Based on an illustrative initial share count of 100 million shares. Strike prices / shares issued in connection with Warrant Tranche A and Warrant Tranche B will be adjusted based on actual primary shares issued. Excludes any dilution from Management Stock Option Plan.

[2]   Represents amount of Exit Distribution ($8,814,840).

**Exhibit B**

DIP Term Sheet


[*See attached*]

## SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

### $30,000,000 Debtor-in-Possession Credit Facility

#### for

#### MModal Inc. and Certain of its Affiliates

#### April 1, 2014

This Summary of Principal Terms and Conditions (this "Term Sheet") outlines certain key terms of the proposed DIP Facility by and among the Borrower, the Guarantors, the DIP Lenders and the DIP Agent (in each case, as defined herein). The outlined terms are subject to change or modification. This Term Sheet shall not constitute a waiver of any existing defaults or events of default under the Pre-Petition Credit Agreement (as defined herein), or an agreement or offer to forbear with respect to any rights or remedies under, or to otherwise amend, the Pre-Petition Credit Agreement. This Term Sheet is neither a proposal nor a commitment. Any DIP Facility will be subject to all approvals required by each DIP Lender, and the DIP Agent cannot guarantee that any such approvals will be sought or obtained by the proposed DIP Lenders on these terms.

| | |
|---|---|
| <u>BORROWER AND GUARANTORS</u>: | MModal Inc. (the "<u>Borrower</u>"), as debtor and debtor-in-possession under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, <u>et seq</u>. (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), in cases jointly administered under Case No. 14-10701 (REG) (collectively, the "<u>Cases</u>"). |
| | Legend Parent, Inc. ("<u>Holdings</u>") and its direct and indirect domestic subsidiaries which are guarantors of the obligations under the Pre-Prepetition Credit Agreement (as defined below), in each case as a debtor and debtor-in-possession in the Cases (each a "<u>Guarantor</u>," collectively, the "<u>Guarantors</u>," and, together with the Borrower, the "<u>Debtors</u>"). The Guarantors shall unconditionally guarantee the obligations of the Borrower under the DIP Facility, and such guarantees shall be secured by all of the Collateral (as defined herein) of each such Guarantor upon entry of a final order authorizing the transactions contemplated by this Term Sheet, which shall be in form and substance satisfactory to each of the DIP Agent and Required DIP Lenders in their respective sole discretion and also in form and substance reasonably satisfactory to the Debtors (such order, the "<u>Final Order</u>"). |
| <u>DIP AGENT</u>: | Royal Bank of Canada (individually, "<u>RBC</u>," and in such capacity, the "<u>DIP Agent</u>"). |
| <u>COLLATERAL AGENT</u>: | RBC |
| <u>DIP LENDERS; BACKSTOP DIP LENDERS</u>: | Each "Lender" under, and as defined in, the Pre-Petition Credit Agreement (collectively, the "<u>Pre-Petition Lenders</u>") will be afforded the opportunity to subscribe, directly or through one or more affiliated funds (or funds or accounts advised or sub-advised by such Pre-Petition Lender), to a commitment under the DIP Facility in an amount up to its Eligible Share (as defined herein) of the total commitment thereunder (the "<u>Initial DIP Solicitation</u>"). The Pre-Petition Lenders (and to the extent applicable, their affiliated funds) that subscribe to commitments under the DIP Facility in accordance with the mechanics set forth in this section are referred to herein as the "<u>DIP Lenders</u>" and the commitments of such DIP Lenders under the DIP Facility are referred to herein as the "<u>DIP Commitments</u>." |

To the extent that the aggregate amount of DIP Commitments received by the DIP Agent as a result of the Initial DIP Solicitation is less than the Total DIP Commitment Amount (such difference, the "DIP Commitment Shortfall"), RBC, Ares Management LLC ("Ares"), Credit Suisse Loan Funding LLC ("CS"), ING Capital LLC ("ING"), GSO Capital Partners ("GSO"), Fidelity Management and Research Company ("Fidelity"), and Brigade Capital Management, LLC ("Brigade," and together with RBC, Ares, CS, ING, GSO, Fidelity and any affiliated funds (or funds or accounts advised or sub-advised by such person) making Backstop DIP Commitments (as defined below), the "Backstop DIP Lenders") will, either directly or through one or more affiliated funds (or funds or accounts advised or sub-advised by such person), subscribe to further DIP Commitments in an aggregate amount of the DIP Commitment Shortfall, allocated among such Backstop DIP Lenders according to their respective Backstop DIP Shares (such additional DIP Commitments, the "Backstop DIP Commitments").

Notwithstanding the foregoing, (a) Brigade and its affiliates (and funds and accounts advised or sub-advised by such person), (b) Fidelity and its affiliates (and funds and accounts advised or sub-advised by such person), and (c) all other DIP Lenders that directly or indirectly through one or more affiliates or as an investment manager or advisor for a fund, individually hold at least 7% of the principal amount of 10.75% Senior Notes due 2020 (the "Senior Notes") issued pursuant to the Indenture, dated as of August 17, 2012, as supplemented or otherwise amended; provided that (x) such other holders of Senior Notes that are managed by individuals separated from those who manage the Pre-Petition Credit Obligations of such holders and their affiliates by a customary internal wall shall not be counted toward such 7% threshold, and (y) for avoidance of doubt, CS Loan Funding and its affiliates shall be deemed not to fall within this clause (c) (all such Pre-Petition Lenders in clauses (a), (b) and (c), the "Crossholder Pre-Petition Lenders"), shall not, as a group, be permitted to (i) vote on any matter relating to the DIP Facility (no matter the amount of their actual DIP Commitments) in excess of a percentage of DIP Commitments for all Crossholder Pre-Petition Lenders equal to the total percentage of outstanding principal of Pre-Petition Credit Obligations (as defined below) owed to all such Crossholder Pre-Petition Lenders as of the Petition Date (as defined below)[1], or (ii) directly or indirectly obtain or control through any means in excess of 49% of all DIP Commitments. To the extent that the Crossholder Pre-Petition Lenders are prohibited from subscribing to any portion of the Backstop DIP Commitments pursuant to this section, such unsubscribed Backstop DIP Commitments shall be allocated ratably among the other Backstop DIP Lenders.  As consideration for their respective Backstop DIP Commitments, each Backstop DIP Lender will receive a backstop fee equal to 2.5% of its Backstop DIP Commitments.

---

[1] In the event that the Crossholder Pre-Petition Lenders have aggregate DIP Commitments in excess of this threshold level (the "Excess Crossholder DIP Commitments"), then solely for purposes of voting on any matter relating to the DIP Facility, each DIP Lender other than a Crossholder Pre-Petition Lender shall be treated as holding DIP Commitments that are grossed up ratably by the amount of such Excess Crossholder DIP Commitments.

CH\1781623.16

"Eligible Share" for any Pre-Petition Lender is a fraction (x) the numerator of which is the principal amount of its loans outstanding and unfunded commitments under the Pre-Petition Credit Facilities (including unfunded commitments in respect of L/C Obligations) and (y) the denominator of which is the aggregate principal amount of all loans outstanding and unfunded commitments under the Pre-Petition Credit Facilities (including unfunded commitments in respect of L/C Obligations), in each case measured as of the Effective Date (as defined herein).

"Backstop DIP Share" for any Backstop DIP Lender is a fraction (x) the numerator of which is the principal amount of its loans outstanding and unfunded commitments under the Pre-Petition Credit Facilities (including unfunded commitments in respect of L/C Obligations) and (y) the denominator of which is the aggregate principal amount of all loans outstanding and unfunded commitments under the Pre-Petition Credit Facilities (including unfunded commitments in respect of L/C Obligations) held by all Backstop DIP Lenders.

"Pro Rata Share" for any subscribing Pre-Petition Lender is a fraction (x) the numerator of which is the amount of DIP Commitments to which it shall have subscribed and (y) the denominator of which is the aggregate amount of all DIP Commitments to which all Pre-Petition Lenders shall have subscribed.

| | |
|---|---|
| PRE-PETITION SECURED FACILITIES: | Senior secured credit facilities (the "Pre-Petition Credit Facilities") provided pursuant to the Credit Agreement, dated as of August 17, 2012, by and among MModal Inc., Holdings, certain of Holdings' subsidiaries, as guarantors, RBC, as administrative agent and collateral agent (the "Pre-Petition Agent"), and the other Pre-Petition Lenders as parties thereto (as amended or otherwise modified prior to the petition date, the "Pre-Petition Credit Agreement"), which includes a letter of credit subfacility and a swing line subfacility.  All loans and other "Obligations" under, and as defined in, the Pre-Petition Credit Agreement shall be referred to herein as the "Pre-Petition Credit Obligations."  All Pre-Petition Credit Obligations are secured by first priority liens and security interests on all or substantially all of the Debtors' assets ("Pre-Petition Collateral"), such liens and security interests (the "Pre-Petition First Priority Liens") subject, solely with respect to priority, to the Pre-Petition Permitted Encumbrances (as defined herein), if any. |
| DIP FACILITY: | A senior secured super-priority debtor-in-possession dual draw term loan facility in an aggregate principal amount not to exceed $30,000,000 (such amount, the "Total DIP Commitment Amount," and such facility, the "DIP Facility").  All outstanding letters of credit under the Pre-Petition Credit Facilities shall be deemed to have been issued under the DIP Facility.[2]

As used herein, "DIP Obligations" means the loans and other obligations under the DIP Facility. |
| AVAILABILITY AND USE OF DIP PROCEEDS: | Subject to satisfaction of the conditions for the initial draw and, if applicable, subsequent draws, including the Borrower's delivery of a |

---

[2] To the extent the Debtors need any post-petition letters of credit, they can obtain such letters of credit in accordance with the budget and use proceeds of the DIP Facility to cash-collateralize.

CH\1781623.16

borrowing request to DIP Agent at least three Business Days prior to the borrowing request, then at any time after the entry of the Final Order the Borrower shall be entitled to borrow under the DIP Facility in up to two separate drawings of up to $15 million each.  The proceeds of each borrowing shall be deposited in the Controlled Account (as defined herein) and shall be used by the Debtors (a) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Facility and (b) for working capital and general corporate purposes of the Debtors, including cash collateralization of letters of credit and payment of allowed administrative expenses incurred during the Cases, subject to and in accordance with the Budget (as defined herein) (including the agreed upon variances thereto) and the Final Order.

COLLATERAL ACCOUNT; USE OF PROCEEDS:

All proceeds of the DIP Facility shall be wired directly to a deposit account subject to a control agreement reasonably satisfactory to DIP Agent and Pre-Petition Agent (the "Controlled Account").  Amounts will be disbursed from the Controlled Account from time to time by DIP Agent solely to fund the Cases and the business of the Debtors, subject to and in accordance with the Budget (including the agreed upon variances thereto) and the Final Order. The Borrower shall only be permitted to withdraw funds from the Controlled Account to make payments pursuant to the Budget (including the agreed upon variances thereto) and use the proceeds as described therein so long as no Default or Event of Default has occurred and is continuing under the DIP Facility.

EFFECTIVE DATE:

Closing to occur upon satisfaction or waiver by the DIP Agent and Required DIP Lenders of the conditions specified below under "Conditions to Effective Date" (the "Effective Date").

TERM:

The term of the DIP Facility shall be that period commencing on the Effective Date and ending on the earliest of (such ending date, the "Commitment Termination Date"): (a) 120 days following the Effective Date, which may be extended by an additional 60 days with the prior written consent of the DIP Agent and Required DIP Lenders; (b) the effective date of any plan of reorganization for the Debtors; (c) the occurrence of any Termination Declaration Date (as defined herein); (d) the date on which a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code is consummated; and (e) the date on which the DIP Obligations shall have been indefeasibly repaid in cash (or in the case of contingent DIP Obligations, indefeasibly cash collateralized in accordance with the terms of the DIP Credit Agreement) and all commitments thereunder shall have been terminated ("Repaid in Full" or "Repayment in Full").

All amounts outstanding under the DIP Facility shall automatically be due and payable in full in cash on the Commitment Termination Date.

BUDGET AND VARIANCE REPORTS:

As used herein, "Budget" means (a) a cash flow budget, in form and substance acceptable to the DIP Agent, Pre-Petition Agent, the Required Consenting Holders (as defined in the Plan Support Agreement) and the Debtors, setting forth, on a line item basis for stated term of the DIP Facility (i) projected cash receipts, (ii) projected disbursements (including ordinary course operating expenses and capital expenditures, bankruptcy-related

CH\1781623.16

expenses under the Cases, fees and expenses of the DIP Agent, DIP Lenders, Pre-Petition Agent, Prepetition Lenders and the Consenting Noteholders (as defined in the Plan Support Agreement) (including counsel, financial advisors and other professionals therefor) and any other fees and expenses relating to the DIP Facility) and (iii) unrestricted cash on hand.

As used herein, "Variance Report" means a variance report certified by the chief financial officer of the Borrower and setting forth (i) the actual cash receipts and disbursements for the immediately preceding calendar week on a line-item basis as of the end of such calendar week and on a cumulative basis for the period from and including the Monday of the week in which the Petition Date occurred (the "Applicable Cumulative Period"), and (ii) the variance in dollar amounts of the actual receipts and disbursements for the preceding weekly period and the Applicable Cumulative Period from those reflected for the corresponding periods in the Budget, together with a reasonably detailed explanation for each line-item variance.

| | |
|---|---|
| INTEREST RATE: | All amounts outstanding under the DIP Facility will bear interest at LIBOR plus 7.95% with a LIBOR floor of 1.5%. |

After the occurrence and during the continuance of an Event of Default, interest on all amounts then outstanding under the DIP Facility will accrue at a rate equal to the rate on loans bearing interest at the rate determined by reference to the Base Rate plus an additional two percentage points (2.00%) per annum and will be payable on demand of the DIP Agent.

FEES:    The fees payable to the DIP Agent and the DIP Lenders shall be as follows:

To induce the Lenders to enter into this Agreement, the Borrower shall pay on the Effective Date to DIP Agent, for the ratable benefit of such Lenders that have signed this Agreement on or before the date hereof, a closing fee (the "Closing Fee") equal to 1.0% of each such Lender's Commitment.

Borrower shall pay to DIP Agent an arrangement fee (the "Arrangement Fee"), for its own account, in the amount of $75,000, payable in cash on the Effective Date.

The Borrower agrees to pay to each Lender a commitment fee on the actual daily amount by which the Commitment of such Lender exceeds its Pro Rata Share of the aggregate outstanding principal amount of Loans (the "Unused Commitment Fee") from the date of the DIP Credit Agreement at a rate per annum equal to 4%, payable in arrears (x) on the last Business Day of each calendar month, and (y) on the Commitment Termination Date.

The Loans will be issued at a price of 99% of the principal amount thereof.

All fees will be calculated using a 360-day year and actual days elapsed. All fees shall be non-refundable once paid.

AMORTIZATION    All outstanding DIP Obligations shall be repaid in full in cash on the Commitment Termination Date.

MANDATORY PREPAYMENTS:    The following mandatory prepayments will be required (subject to certain basket amounts to be negotiated in the definitive Loan Documents):

1.    Asset Sales:  Prepayments in an amount equal to 100% of the net cash proceeds of the sale or other disposition of property or assets of

any Debtor (subject to certain exceptions to be determined), other than (i) net cash proceeds of sales or other dispositions of inventory in the ordinary course of business and (ii) net cash proceeds (not in excess of an amount to be agreed upon in the aggregate) that are reinvested in Collateral (as defined below) that is useful in the business of the Borrower and its subsidiaries within sixty (60) days of receipt thereof; provided that until the Commitment Termination Date, any such net cash proceeds shall be held in a segregated cash collateral account and if the Commitment Termination Date has occurred and any DIP Obligations are then outstanding, all such net cash proceeds that have not been so reinvested shall be used to repay the DIP Obligations.

2.  <u>Insurance Proceeds</u>:  Prepayments in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets (other than certain types of property or assets including, without limitation, inventory) of any Debtor, other than net cash proceeds (not in excess of an amount to be agreed upon in the aggregate) that are, or are committed to be, reinvested in the Collateral (or used to replace damaged or destroyed Collateral) within sixty (60) days of receipt thereof; provided that until the Commitment Termination Date, any such net cash proceeds shall be held in a segregated cash collateral account and if the Commitment Termination Date has occurred and any DIP Obligations are then outstanding, all such net cash proceeds that have not been so reinvested shall be used to repay the DIP Obligations.

3.  <u>Incurrence of Indebtedness</u>:  Prepayments in an amount equal to 100% of (a) the net cash proceeds received from the incurrence of indebtedness by any Debtor (other than indebtedness otherwise permitted under the Loan Documents), payable no later than the first business day following the date of receipt.

4.  <u>Equity Offerings</u>:  Prepayments in an amount equal to 100% of the net cash proceeds received from the issuance of equity securities of any Debtor.

<u>SECURITY AND PRIORITY</u>:  Subject only to the Carve-Out and any valid, enforceable, perfected and non-avoidable security interests in existence as of the date of filing the Cases (the "<u>Petition Date</u>") that are senior to the Pre-Petition First Priority Liens (after giving effect to any applicable intercreditor or subordination agreement) (the "<u>Pre-Petition Permitted Encumbrances</u>"), to secure all DIP Obligations, the DIP Agent, on behalf of itself and the DIP Lenders, will receive, pursuant to Section 364(c)(2), Section 364(c)(3) and Section 364(d) of the Bankruptcy Code, through the DIP Loan Documents and the Final Order, a fully perfected, first priority security interest (the "<u>DIP Liens</u>") in all of the property of the Debtors, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Agent or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments,

CH\1781623.16

investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, all rights, claims and causes of action, all other collateral and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, and all rents, products, substitutions, accessions, profits, replacements and cash and non-cash proceeds of all of the foregoing, excluding claims and causes of action arising under sections 502(d), 506(c), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code ("<u>Avoidance Actions</u>") and proceeds thereof (collectively, the "<u>DIP Collateral</u>"); provided, however, that in the case of any DIP Lien on any capital stock of the Borrower or any direct or indirect subsidiary thereof, the DIP liens shall consist of (a) 100% of the capital stock of the Borrower and each direct and indirect domestic subsidiary of Borrower directly owned by the Borrower or any Debtor, and (b) (I) 100% of the non-voting capital stock of each direct or indirect foreign subsidiary directly owned by the Borrower or any other Debtor and (II) 65% of the voting capital stock of each foreign subsidiary directly owned by the Borrower or any Debtor. Pursuant to Section 364(d) of the Bankruptcy Code and subject to the Carve-Out, the DIP Liens shall have priority over (i) any and all liens and security interests securing the Pre-Petition Credit Obligations, and (ii) any and all other pre-petition and post-petition liens and security interests of any creditor other than the Pre-Petition Permitted Encumbrances and such other customary post-petition liens to be agreed.

All DIP Collateral will be free and clear of other liens, claims, interests and encumbrances, except for the Pre-Petition Permitted Encumbrances, the Carve-Out and other customary post-petition liens to be agreed.

The DIP Obligations will also have super-priority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code, with priority over any and all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, subject only to the Carve-Out (the "<u>DIP Claims</u>"); <u>provided</u> <u>that</u> the DIP Claims shall not entitle the DIP Agent and DIP Lenders to proceeds of Avoidance Actions.

| | |
|---|---|
| <u>CARVE-OUT</u>: | "<u>Carve-Out</u>" shall mean: (i) the amount of actual accrued, but unpaid expenditures for reasonable fees, costs and disbursements of the Debtors' retained professionals (other than ordinary course professionals) (the "<u>Debtor Professionals</u>," and such fees, the "<u>Debtor Professional Fees</u>") incurred up to and including the delivery of a Carve-Out Trigger Notice (as defined below) in accordance with the terms set forth in the Final Order and in the DIP Loan Documents that are ultimately allowed by final order of the Bankruptcy Court (whether such Debtor Professional Fees are allowed before or after the delivery of the Carve-Out Trigger Notice), (ii) the |

7

amount of actual accrued, but unpaid expenditures for fees, costs and disbursements of professionals (the "Committee Professionals") retained by the statutory committee of unsecured creditors appointed in the Cases (the "Committee") and of the Committee members (all such fees, costs and expenses of Committee Professionals and Committee members, the "Committee Professional Fees") incurred before the delivery of a Carve-Out Trigger Notice that are ultimately allowed by final order of the Court (whether such Committee Professional Fees are allowed before or after the delivery of the Carve-Out Trigger Notice); provided, that such Committee Professional Fees shall not exceed the amounts budgeted therefor in the Budget for the postpetition period ending on the date the Carve-Out Trigger Notice is delivered, (iii) all allowed and unpaid Debtor Professional Fees and Committee Professional Fees that are incurred from and after the delivery of the Carve-Out Trigger Notice in an aggregate amount not in excess of $2,500,000 for all such claims, (iv) all operating expenses incurred by the Debtors in accordance with the Budget before delivery of a Carve-Out Trigger Notice but unpaid by the Debtors as of the delivery of such Carve-Out Trigger Notice and allowable under 11 U.S.C. § 503(b)(1)(A), (v) the payment of fees pursuant to 28 U.S.C. § 1930(a), plus interest, if any, pursuant to 31 U.S.C. § 3717, and (vi) all reasonable fees and expenses incurred by a trustee under 11 U.S.C. § 726(b) not to exceed $75,000. The figures set forth in clauses (i) through and including (iii) in the preceding sentence are collectively referred to herein as the "*Carve-Out Cap.*" Only following the delivery of a Carve-Out Trigger Notice, the Debtor Professional Fees and the Committee's Professional Fees shall be paid first from retainers held by such professionals, and such payment from retainers shall reduce dollar for dollar the Carve-Out Cap.

The term "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent (or from and after the Repayment in Full of the DIP Obligations, the Pre-Petition Agent) to the Borrower's lead counsel, the U.S. Trustee, counsel to the Consenting Noteholders (as defined in the Plan Support Agreement) and lead counsel to any Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined herein) under the DIP Loan Documents (as defined herein).

Notwithstanding the foregoing, so long as the Carve-Out Trigger Notice has not been delivered, the Borrower shall be permitted to pay, as the same may become due and payable, but subject to the other terms and conditions of this Term Sheet, the Debtor Professional Fees and Committee Professional Fees for the applicable time period under 11 U.S.C. § 330 and § 331 pursuant to court order, including pursuant to an order authorizing procedures for monthly compensation.

PROHIBITED ACTIONS:    No portion of the Carve-Out, any DIP Facility loan proceeds, cash collateral or other DIP Collateral or Pre-Petition Collateral (collectively, "Collateral") proceeds may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, (i) the liens or claims of any or all of the DIP Agent and/or the DIP Lenders, or the initiation or prosecution of any claim or cause of action against any or all of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition

Lenders, including any claim under chapter 5 of the Bankruptcy Code, (ii) any claims or causes of actions (including any claims or causes of action under chapter 5 of the Bankruptcy Code) against any or all of the Pre-Petition Agent and the Pre-Petition Lenders, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any lien or claim of any or all of the Pre-Petition Agent and the Pre-Petition Lenders, or asserting any other lender liability,  or other claim or cause of action against any of the Pre-Petition Agent and the Pre-Petition Lenders and (iii) any claims or challenges relating to the allocation of value as between encumbered and unencumbered assets (if any). The foregoing notwithstanding, no more than $25,000 in the aggregate, of the amounts set forth in the Budget, the Carve-Out, any cash collateral, proceeds of the DIP Facility loans, or other Collateral proceeds may be used by the Committee, or any representative of the estates, to investigate, but not prosecute (or prepare for the prosecution of) any challenge to, the claims and/or liens of the Pre-Petition Agent or the Pre-Petition Lenders.

In addition, neither the Carve-Out nor any proceeds of the DIP Facility, cash collateral or other Collateral proceeds shall be used in connection with preventing, hindering or delaying the DIP Lenders', the DIP Agent's, the Pre-Petition Lenders or the Pre-Petition Agent's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing under the DIP Loan Documents, subject to the notice provision in the second paragraph under the heading "Remedies" below (and a comparable notice provision to be included in the Final Order with respect to the Pre-Petition Agent and the Pre-Petition Lenders) .

| | |
|---|---|
| <u>STIPULATIONS REGARDING PRE-PETITION CREDIT FACILITIES:</u> | The Final Order shall contain a determination by the Bankruptcy Court that, subject to the investigation period which shall be 60 days from entry of the Final Order, (i) the claims in respect of the Pre-Petition Credit Facilities constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms and not subject to avoidance, recharacterization, recovery, attack, off-set, counterclaim, defenses or claims of any kind pursuant to the Bankruptcy Code or other applicable law, (ii) the Pre-Petition First Priority Liens are legal, valid, perfected, enforceable and non-avoidable, with a finding that the Debtors stipulate and agree that the claims in respect of the Pre-Petition Credit Facilities constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms and are not subject to avoidance, recharacterization, subordination recovery, attack, off-set, counterclaim, defenses or claims of any kind pursuant to the Bankruptcy Code or other applicable law, and (iii) the Debtors do not have, and forever release, any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise, against any and all of the Pre-Petition Agent and Pre-Petition Lenders and their respective officers, directors, employees, financial advisors, attorneys, agents and other representatives. |
| <u>ASSET DISPOSITIONS:</u> | No Debtor shall sell or otherwise dispose of any of its assets (other than in the ordinary course of business, dispositions of obsolete or worn out assets or other "Permitted Dispositions" to be defined in the DIP Credit |

Agreement) without the prior written consent of the DIP Agent and Required DIP Lenders.

| | |
|---|---|
| APPLICATION OF PROCEEDS: | Subject to the Carve-Out, the proceeds of Collateral, any amounts held on account of the Collateral, and all payments and collections received by the Debtors shall be applied as follows: |

From and after the entry of the Final Order until the Termination Declaration Date, all Cash Collateral and other proceeds of Collateral shall be applied to reduce the DIP Obligations then due and owing in accordance with the DIP Loan Documents and the Final Order, or to the extent permitted by the DIP Loan Documents or the Final Order, to pay expenses set forth in the Budget.

Upon the occurrence of the Termination Declaration Date, and at all times upon receipt of payments in connection with a sale or disposition of Collateral outside the ordinary course of business (other than "Permitted Dispositions" to be defined in the DIP Credit Agreement), first, to permanently reduce the DIP Obligations and all other obligations owing to RBC (whether as DIP Agent, Pre-Petition Agent, DIP Lender or Pre-Petition Lender) and/or the other DIP Lenders until Repaid in Full in accordance with the DIP Loan Documents and the Final Order, as applicable, and then, subject to further order of the Bankruptcy Court, second, to pay Pre-Petition Credit Obligations in respect of any cost or expense, reimbursements, fees or indemnities due to the Pre-Petition Agent, third, to pay the remaining Pre-Petition Credit Obligations in accordance with the provisions of Section 8.03 of the Pre-Petition Credit Agreement, and, fourth, to the Debtors for distribution in the manner required by the Bankruptcy Code or order of the Bankruptcy Court.

| | |
|---|---|
| DIP LOAN DOCUMENTS: | The credit agreement governing the DIP Facility (the "DIP Credit Agreement") and the Final Order will be in form and substance reasonably satisfactory to the Debtors, and in form and substance satisfactory to the DIP Agent and Required DIP Lenders in their respective sole discretion. Other documentation with respect to the DIP Facility ("Other DIP Documents") will be in form and substance reasonably satisfactory to the Debtors, DIP Agent and Required DIP Lenders (the Other DIP Documents, together with the DIP Credit Agreement and Final Order, collectively, the "DIP Loan Documents").  In addition to those terms set forth herein, the DIP Loan Documents will contain other customary terms and conditions, including mandatory prepayments; representations and warranties; conditions precedent; affirmative covenants, negative covenants and financial covenants; indemnities; and events of default and remedies, in each case as are usual and customary for facilities of this kind, taking into account prevailing market conditions at the time of closing.  All orders of the Bankruptcy Court approving or authorizing the DIP Facility, and all motions relating thereto, shall be in form and substance satisfactory to the DIP Agent. |

| | |
|---|---|
| FINANCIAL REPORTING: | The DIP Loan Documents will require the Borrower to provide to the DIP Agent and the Pre-Petition Agent, for distribution to the DIP Lenders and the Pre-Petition Lenders, (a) as a condition to closing of the DIP Facility, a Budget, (b) on Wednesday of each week, commencing with the first |

calendar week ending after the Effective Date, a Variance Report, (c) on a weekly basis, an updated "rolling" 13 week cash flow projection (unless the stated term of the DIP Facility extends beyond such 13 week period, in which case the period of the forecast shall extend out until the end of the stated term of the DIP Facility), in form consistent with the Budget, (provided, however, this updated cash flow forecast shall not constitute a replacement Budget unless and until agreed upon by the DIP Agent, Pre-Petition Agent, the Required Consenting Holders (as defined in the Plan Support Agreement) and the Debtors), (d) internally prepared monthly financial statements prepared on a consolidated basis consisting of an income statement, balance sheet and written management discussion and analysis on a monthly basis, to be delivered no later than thirty (30) days after the end of each month, and (e) any additional financial reporting requirements set forth under the heading "Affirmative Covenants" below. Consenting Noteholders (as defined in the Plan Support Agreement), the Committee, and their respective advisors shall also be entitled to copies of the foregoing financial reports.

FINANCIAL
COVENANTS:

Compliance with the Budget, subject to the following unfavorable variances, each tested weekly on a rolling four week cumulative basis commencing with the first full week following the closing of the DIP Facility: (i) up to 10% of the Debtors' actual "cash receipts" from the budgeted "cash receipts" reflected in the Budget for the applicable period; and (ii) up to 10% of the Debtors' actual "operating cash disbursements" from that reflected in the Budget for the applicable period. For avoidance of doubt, any amount included in the Budget that is not actually incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks to the extent contemplated by the cumulative Budget testing set forth above.

CASH MANAGEMENT:

Consistent with Pre-Petition arrangements.

ADEQUATE
PROTECTION:

As adequate protection for any diminution in the value of their collateral resulting from the Debtors' use of cash collateral, the priming liens in favor of the DIP Facility, or otherwise, the Debtors shall (i) grant to the Pre-Petition Agent under the Pre-Petition Credit Agreement (for the benefit of itself and the Pre-Petition Lenders): (a) replacement liens on all of the Collateral, subordinate only to the liens in favor of the DIP Facility, the Carve-Out, and Pre-Petition Permitted Encumbrances, and (b) a super-priority administrative claim junior only to that of the DIP Facility and the Carve-Out, (ii) timely pay the reasonable, documented fees and expenses of the professionals retained by the Pre-Petition Agent and the respective Consenting Lenders (as defined in the Plan Support Agreement) upon receipt of an appropriate invoice, redacted as appropriate to exclude information which such professionals believe in good faith to be protected by the attorney-client privilege, the attorney work product doctrine or other privilege; provided that the Debtors' obligation to pay the fees and expenses of the respective Consenting Lenders (as defined in the Plan Support Agreement) (other than the Pre-Petition Agent) incurred on or after the Petition Date shall not exceed $25,000 for each such Consenting Lender (as defined in the Plan Support Agreement), and (iii) current cash pay interest at the non-default rate under the Pre-Petition Credit Agreement subject to

11

appropriate recharacterization as principal if the Pre-Petition Lenders are deemed to be undersecured.

**REPRESENTATIONS AND WARRANTIES:**

Representations and warranties set forth in the Pre-Petition Credit Agreement, with such changes and additions as are deemed appropriate or customary for debtor-in-possession financings of this kind or as otherwise required by the DIP Agent in the context of the proposed transaction, including, without limitation, the following (subject to exceptions, baskets and limitations to be mutually agreed upon): due authorization, execution, delivery and enforceability of the DIP Loan Documents; no conflicts; governmental authorization; no material adverse effect; litigation; ownership of property; environmental compliance; insurance; payment of post-petition taxes; ERISA and other employee matters; subsidiaries; Investment Company Act and margin regulations; disclosure; compliance with laws; intellectual property; use of proceeds; labor matters; anti-terrorism laws; commencement of the Cases; proper service of the Final Order; DIP Obligations are allowed administrative superpriority expense claims; DIP Obligations are secured by valid perfected first priority lien on all Collateral subject only to the Carve-Out and the Pre-Petition Encumbrances; the Final Order is in full force and effect and has not been reversed, stayed, modified or amended.

**AFFIRMATIVE COVENANTS:**

Affirmative covenants set forth in the Pre-Petition Credit Agreement, with such changes and additions as are deemed appropriate or customary for debtor-in-possession financings of this kind or as otherwise required by the DIP Agent in the context of the proposed transaction, including, without limitation, the following (subject to exceptions, baskets and limitations to be mutually agreed upon):

(a)        delivery of the following documents and reports to the DIP Agent and Pre-Petition Agent for distribution to the DIP Lenders and the Pre-Petition Lenders:

1. the Budget;

2. weekly Variance Reports and other weekly reports described under "Financial Reporting" above;

3. upon the request of the DIP Agent or the Pre-Petition Agent, conference calls on a weekly basis with the chief financial officer of the Borrower to discuss the Budget (and all updates and Variance Reports related thereto) or any other issues concerning any Debtor;

4. as soon as practicable in advance of filing by the Debtors with the Bankruptcy Court, delivery of (i) the motion seeking approval of the DIP Facility and the entry of the Final Order, which motion shall be in form and substance reasonably satisfactory to the DIP Agent and Pre-Petition Agent, and the form of Final Order to be filed therewith, (ii) all other proposed orders and pleadings related to the DIP Facility, which orders and pleadings shall be in form and substance reasonably satisfactory to the DIP Agent and the Pre-Petition Agent, (iii) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code, (iv) any motion seeking approval of any sale of the Debtors' assets, including any proposed form of a bidding

CH\1781623.16

procedures order and sale order (each of which must be in form and substance satisfactory to the DIP Agent, the Pre-Petition Agent, Required DIP Lenders and the Required Pre-Petition Lenders), and (v) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance satisfactory to the DIP Agent and the Pre-Petition Agent);

5. notices of litigation, events of defaults and unmatured defaults and all documents filed by the Debtors with the Bankruptcy Court or distributed to any Committee, in each case, to the extent not otherwise provided to the DIP Lenders and Pre-Petition Lenders;

6. notice of any event, occurrence or circumstance in which a material portion of the Collateral is damaged, destroyed or otherwise impaired or adversely affected; and

7. additional reports reasonably requested by the DIP Agent or the Pre-Petition Agent, including, without limitation, with respect to litigation and contingent liabilities.

(b)        reasonable access during normal business hours and upon reasonable prior notice to information (including historical information) and personnel as DIP Agent or the Pre-Petition Agent may reasonably request from time to time, including, without limitation, regularly scheduled meetings among senior management, company advisors and the DIP Agent, the Pre-Petition Agent, Houlihan Lokey Capital, Inc. and such other consultants to the DIP Agent, the Pre-Petition Agent, the DIP Lenders and/or Pre-Petition Lenders (collectively, the "Consultant"), and the Consultant shall be provided with reasonable access during normal business hours and upon reasonable prior notice to information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operation and restructuring activities, progress with respect to the Reorganization Plan (as defined below) and any other aspect of the Cases, all subject to applicable confidentiality restrictions and privileges; provided, however, that the foregoing shall not require the Debtors to permit any access or disclose any information that, in the reasonable judgment of the applicable Debtor, would result in the disclosure of any trade secret or violate any of its obligations with respect to confidentiality or violate applicable laws;

(c)        prompt and diligent opposition of all motions filed by persons in the Bankruptcy Court to lift the stay on any Collateral (other than motions filed by the DIP Agent, the Pre-Petition Agent, the DIP Lenders and/or the Pre-Petition Lenders relating to the DIP Facility), all motions filed by any person or entity in the Cases to terminate the exclusive ability of the Debtors to file a plan of reorganization, and all other motions filed by persons or entities in the Cases that, if granted, could reasonably be expected to have a material adverse effect on the DIP Agent, the Pre-Petition Agent, any DIP Lender or any Pre-Petition Lender or any Collateral;

13

(d)        compliance with the Plan Milestones (as defined herein);

(e)        no later than April 30, 2014 (the "<u>Final Order Deadline</u>"), the Final Order shall have been entered by the Bankruptcy Court;

(f)        maintenance of existence;

(g)        maintenance of properties, and books and records;

(h)        maintenance of insurance;

(i)        compliance with laws; and

(j)        cooperation.

<u>NEGATIVE COVENANTS</u>:    Negative covenants set forth in the Pre-Petition Credit Agreement, with such changes and additions as are deemed appropriate or customary for debtor-in-possession financings of this kind or as otherwise required by the DIP Agent in the context of the proposed transaction, including, without limitation, the following (subject to exceptions, baskets and limitations to be mutually agreed upon): creation of liens senior to or pari passu with the DIP Liens; seeking or consummating sale or other disposition of assets pursuant to a plan of reorganization, section 363 of the Bankruptcy Code or otherwise (other than the Reorganization Plan), without the prior written consent of the DIP Agent, Required DIP Lenders, the Pre-Petition Agent, and the Required Pre-Petition Lenders; incurrence of administrative expense claims pari passu or senior to DIP Claims except for Carve-Out; seeking modification, stay, vacation or amendment of (i) first day orders, or (ii) the Final Order; seeking or consenting to any order seeking authority to take action prohibited by DIP Loan Documents; making cash expenditures on account of pre-petition claims of critical vendors or 503(b)(9) claimants or pursuant to any "first day" orders entered by the Bankruptcy Court, in each case except as set forth in the Budget (including the agreed upon variances thereto) or otherwise agreed to by the DIP Agent and the Pre-Petition Agent; and notwithstanding the Debtors' covenants regarding a Reorganization Plan, without the prior written consent of the DIP Agent and the Pre-Petition Agent; the filing with the Bankruptcy Court of any plan of reorganization that does not Repay in Full the Pre-Petition Credit Obligations and the DIP Obligations; the Debtors' seeking a section 363 sale or confirmation of or supporting a plan of reorganization, in each case that provides for the sale of property that is subject to the liens held by the (i) Pre-Petition Agent for itself and the Pre-Petition Lenders without the prior written consent of the Pre-Petition Agent and the Required Pre-Petition Lenders, or (ii) the DIP Agent for itself and the DIP Lenders without the prior written consent of the DIP Agent and the Required DIP Lenders.

<u>PLAN MILESTONES</u>:    The Debtors shall use commercially reasonable efforts to timely comply with each of the following milestones (the "<u>Plan Milestones</u>"); <u>provided</u>, <u>however</u>, that such Plan Milestones are subject to modification to fit the Bankruptcy Court's calendar; and <u>provided</u> <u>further</u> that notwithstanding anything to the contrary contained herein, to the extent any Plan Milestone is extended pursuant to the terms of the Plan Support Agreement such Plan Milestone shall automatically be extended under this Term Sheet:

CH\1781623.16

- On or before April 30, 2014 (or such later date to which the DIP Agent and the Pre-Petition Agent consent in writing in their sole discretion), the Debtors shall have obtained an order of the Bankruptcy Court, in form and substance acceptable to the DIP Agent and Pre-Plan Agent, approving the Plan Support Agreement to which this Term Sheet is attached (as modified in accordance with its terms, the "Plan Support Agreement").

- On or before April 20, 2014 (or such later date to which the DIP Agent, the Pre-Petition Agent, the Required DIP Lenders and the Required Pre-Petition Lenders (as defined herein) consent in writing in their sole discretion) (the "Plan Filing Date"), the Debtors shall have filed with the Bankruptcy Court (a) a motion (the "Disclosure Statement Motion") reasonably acceptable to the DIP Agent and the Pre-Petition Agent, seeking entry of an order, in form and substance acceptable to the DIP Agent (the "Disclosure Statement Order"), approving a disclosure statement with respect to the Reorganization Plan (as defined below) in form and substance reasonably acceptable to the DIP Agent and the Pre-Petition Agent (the "Disclosure Statement"), and (b) an accompanying plan of reorganization that incorporates the terms and conditions set forth in the Restructuring Term Sheet attached as an exhibit to the Plan Support Agreement (the "Restructuring Term Sheet") and is otherwise in form and substance acceptable to the DIP Agent, Required DIP Lenders, Pre-Petition Agent and Required Pre-Petition Lenders (the "Reorganization Plan").

- On or before May 28, 2014 (or such later date to which the DIP Agent, the Pre-Petition Agent, the Required DIP Lenders and the Required Pre-Petition Lenders consent in writing in their sole discretion), the Bankruptcy Court shall have held a hearing on the Disclosure Statement Motion and shall have entered an order in form and substance acceptable to the DIP Agent and Pre-Petition Agent approving the Disclosure Statement for the Reorganization Plan (the "Disclosure Statement Approval Order").

- On or before July 15, 2014 (or such later date to which the DIP Agent, the Pre-Petition Agent, the Required DIP Lenders and the Required Pre-Petition Lenders consent in writing in their sole discretion), the Bankruptcy Court shall have entered an order, in form and substance acceptable to the DIP Agent and the Pre-Petition Agent in their respective sole discretion, confirming the Reorganization Plan (the "Confirmation Order").

- On or before August 15, 2014 (or such later date to which the DIP Agent, the Pre-Petition Agent, the Required DIP Lenders and the Required Pre-Petition Lenders consent in writing in their sole discretion), the effective date of the Reorganization Plan shall have occurred.

The foregoing Plan Milestones shall survive the termination of the DIP Facility and the Repayment in Full of the DIP Obligations.

CH\1781623.16

EVENTS OF DEFAULT:

Events of default (each, an "Event of Default") as are set forth in the Pre-Petition Credit Agreement with such changes and additions as are usual and customary for debtor-in-possession financings of this kind or as otherwise required by the DIP Agent in the context of the proposed transaction, including, without limitation, the following: (i) entry of an order authorizing, approving or granting (or the filing of a motion by the Debtors seeking such authorization, approval or granting of) (A) additional post-petition financing not otherwise permitted, (B) any liens on the Collateral not otherwise permitted, (C) dismissal of any of the Cases or conversion of any of the Cases to a chapter 7 case, (D) appointment of a chapter 11 trustee in any of the Cases, (E) any other superpriority claim (other than the Carve-Out) senior to or pari passu with superiority priority DIP Claims of the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders, (F) modification of the DIP Facility or the Final Order without the consent of the DIP Agent and Required DIP Lenders, (G) appointment of an examiner in any of the Cases having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code), (H) the Debtors' taking any action materially adverse to the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders or their rights and remedies or their interest in the Collateral, or (I) relief from the automatic stay for the benefit of any other secured creditor with respect to any material portion of Collateral (to be defined by a dollar cap in the DIP Credit Agreement to be negotiated), in each case, without the consent of the DIP Agent and the Pre-Petition Agent; (ii) payment by any Debtor of any pre-petition claim other than as set forth in the Budget (and any agreed upon variances thereto), (iii) the commencement of any action against any of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the Pre-Petition Lenders by or on behalf of any Debtor or any of its affiliates, officers or employees, (iv) the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of the DIP Agent and Pre-Petition Agent or shall have been breached by any Debtor; (v) the Final Order shall not have been entered by the Bankruptcy Court on or before the Final Order Deadline; (vi) any termination of the Plan Support Agreement or any material breach by the Debtors of any of their obligations thereunder, (vii) the failure of the Debtors to comply with any of the Plan Milestones, regardless of whether the Debtors used commercially reasonable efforts to comply with any such Plan Milestone; (viii) after entry thereof, either of the Disclosure Statement Order or the Confirmation Order shall cease to be in full force and effect, shall have been reversed, stayed, vacated or subject to stay pending appeal or shall have been modified or amended without the prior written consent of the DIP Agent and the Pre-Petition Agent; (ix) any claim is allowed under Section 506(c) of the Bankruptcy Code or otherwise against any or all of the DIP Agent, the DIP Lenders and the Collateral, or against the Pre-Petition Agent, any Pre-Petition Lender and the Pre-Petition Collateral; (x) the filing of any plan of reorganization or related disclosure statement or any direct or indirect amendment to the Reorganization Plan or Disclosure Statement, or the entry of an order confirming any such plan of reorganization or related disclosure statement or approving any such amendment, in each case to the extent that such filing is not the Reorganization Plan; (xi) any termination

16

or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code; or (xii) the failure of the Debtors to comply with the terms set forth in the sections titled "Budget and Variance Reports" and "Financial Covenants" or any other term of the Final Order.

REMEDIES:

Immediately upon the occurrence and during the continuation of an Event of Default, the DIP Agent or, in the case of clause (b) the DIP Agent or the Pre-Petition Agent, as applicable, may, and at the direction of the Required DIP Lenders or Required Pre-Petition Lenders, as applicable, (or in the cause of clause (ii), at the direction of the Required DIP Lenders) shall, (a)(i) declare all DIP Obligations to be immediately due and payable, (ii) declare the termination, reduction or restriction of any further commitment to extend credit to the Borrower to the extent any such commitment remains, and (iii) terminate the DIP Facility and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; and (b) declare a termination, reduction or restriction on the ability of the Debtors to use any cash collateral derived solely from the proceeds of Collateral (any such declaration shall be made to the Debtors, counsel to the Consenting Noteholders (as defined in the Plan Support Agreement), the Committee and the U.S. Trustee, and shall be referred to herein as a "Termination Declaration" and the date which is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date"); all of the foregoing however, subject to the Carve-Out.

In addition to the remedies described above and other customary remedies, seven days after the DIP Agent or Pre-Petition Agent has delivered notice to the Borrower's lead counsel, the U.S. Trustee, counsel to the Consenting Noteholders (as defined in the Plan Support Agreement) and lead counsel to any Committee (which notice may only be delivered at any time after the occurrence and during the continuance of any Event of Default under the DIP Facility), the DIP Agent and the Pre-Petition Agent shall have relief from the automatic stay and may foreclose on, or otherwise realize on its DIP Lien or its pre-petition liens, as applicable, on, all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the DIP Obligations (or upon payment in full thereof, the Pre-Petition Credit Obligations), occupy the Debtors' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable non-bankruptcy law, all of the foregoing however, subject to the Carve-Out. During such seven day period, (a) the Debtors shall be permitted to continue use of cash collateral in accordance with the Budget and permitted variances thereto, and (b) the Debtors and any Committee shall be entitled to an emergency hearing before the Bankruptcy Court to contest whether an Event of Default has occurred and/or whether the automatic stay should be vacated upon expiration of such seven day period. Unless during such hearing the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing or the automatic stay should not be vacated, the automatic stay, as to the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Lenders, shall automatically terminate at the end of such seven-day period,

without further notice or order.

REQUIRED DIP
LENDERS:

Except as otherwise provided herein, amendments and waivers will require the approval of DIP Lenders that are also Pre-Petition Lenders (or affiliates or Pre-Petition Lenders or funds or accounts advised or sub-advised by Pre-Petition Lenders) holding more than 50% of total commitments under the DIP Facility (the "Required DIP Lenders"), except that with respect to matters relating to the interest rates, maturity, certain collateral issues, increase of any commitment and the definition of Required DIP Lenders, consent of 80% of DIP Lenders directly and adversely affected thereby shall be required.

CONDITIONS TO
EFFECTIVE DATE:

The Effective Date shall occur upon satisfaction or waiver of conditions precedent customary for debtor-in-possession financings of this kind or as otherwise required by the DIP Agent in the context of the proposed transaction, including, without limitation, the following:

- The Bankruptcy Court shall have entered the Final Order, which shall, among other things, authorize the transactions contemplated by this Term Sheet, including, without limitation, the granting of superpriority administrative expense claim status in respect of the DIP Obligations and the DIP Liens (which liens shall be continuing, valid, binding, enforceable, non-avoidable and automatically perfected) and adequate protection payments, in each case, contemplated by this Term Sheet, the DIP Facility.  The Final Order shall include provisions, in form and substance reasonably satisfactory to DIP Agent, with respect to, among other things, (a) permission for the use of cash and other collateral of the holders of the Pre-Petition Credit Obligations, (b) the adequate protection afforded to such holders as provided above, (c) waivers of the "equities of the case" cutoff under Section 552(b) of the Bankruptcy Code, (d) Section 551 of the Bankruptcy Code not applying to preserve for the benefit of the estate any avoided security interest or lien senior to a security interest or lien securing the DIP Obligations or the Pre-Petition Credit Obligations, (e) the right of the Pre-Petition Agent at the direction of the Required Pre-Petition Lenders to credit bid up to the full amount of the Pre-Petition Credit Obligations in any sale of the Collateral under section 363 of the Bankruptcy Code or otherwise, (f) waivers of any surcharge to the Collateral securing the DIP Facility or the Pre-Petition Credit Obligations under Section 506(c) or otherwise (in any event subject to the provisions in the Carve-Out), (g) modify the automatic stay to permit the creation and perfection of the DIP Agent's and DIP Lenders' liens on the Collateral, (h) provide for the vacation of the automatic stay to permit the enforcement of the DIP Agent's or DIP Lenders' remedies under the DIP Facility, including without limitation the enforcement upon the Collateral, and the Pre-Petition Agent's and Pre-Petition Lenders' exercise of default remedies concurrent with the exercise of default remedies by the DIP Agent and/or DIP Lenders, (i) authorize the payment by the Debtors of all of the fees and indemnities provided for herein, which fees and indemnification obligations shall be secured by all of the priorities and liens granted pursuant to Section 364(c) and (d) of the Bankruptcy Code with respect to any and all other indebtedness under the DIP Facility), (j) contain a good faith finding

CH\1781623.16

under Section 364(e) of the Bankruptcy Code, and (k) contain a determination by the Bankruptcy Court that, subject to an investigation period by the Committee, the claims in respect of the Pre-Petition Credit Facilities constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with its terms and not subject to avoidance, recharacterization, subordination, recovery, attack, off-set, counterclaim, defenses or claims of any kind pursuant to the Bankruptcy Code or other applicable law and that the liens securing the Pre-Petition Credit Facilities are legal, valid, perfected, enforceable and non-avoidable (with a finding that the Debtors stipulate and agrees that the claims in respect of the Pre-Petition Credit Facilities constitute legal, valid and binding obligations of the Debtors, enforceable in accordance with its terms and not subject to avoidance, recharacterization, subordination, recovery, attack, off-set, counterclaim, defenses or claims of any kind pursuant to the Bankruptcy Code or other applicable law and that the liens securing the Pre-Petition Credit Facilities are legal, valid, perfected, enforceable and non-unavoidable).

- Negotiation, execution and delivery of the DIP Credit Agreement acceptable to the DIP Agent and Required DIP Lenders, and reasonably acceptable to the Debtors.

- Negotiation, execution and delivery of Other DIP Documents reasonably acceptable to the Debtors, DIP Agent and DIP Lenders and such other instruments, documents, certificates, opinions, assurances and other such acts as may be reasonably requested by the DIP Agent and DIP Lenders to effect the closing of the DIP Facility.

- The DIP Agent, for the benefit of itself and the DIP Lenders, shall have been granted automatically perfected liens and pledges on the Collateral securing the DIP Facility with the priority set forth in the "Security and Priority" section of this Term Sheet.

- No pleading or application seeking to cause the DIP Facility to be on terms other than the terms set forth herein (and to be set forth more fully in the DIP Loan Documents) shall have been filed in the Bankruptcy Court by any Debtor.

- The motion seeking approval of the DIP Facility, which motion shall be in form and substance reasonably satisfactory to the DIP Agent and Pre-Petition Agent, and the form of Final Order shall have been filed with the Bankruptcy Court.

- Except as otherwise acceptable to the DIP Agent, no litigation shall have commenced which challenges the DIP Obligations (except to the extent permitted by the Final Order).

- Receipt by the DIP Agent and the DIP Lenders of all fees and expenses due and payable in connection with the transactions contemplated by this Term Sheet.

- Receipt and approval by the DIP Agent and the Pre-Petition Agent of the Budget and the financial statements and other financial reports required to be delivered hereunder.

19

- The Final Order and such other orders as may be necessary for the implementation of the DIP Facility or requested by any or all of the DIP Agent, the Pre-Petition Agent, the DIP Lenders and the Pre-Petition Lenders shall have been entered by the Bankruptcy Court and shall be in form and substance reasonably satisfactory to the DIP Agent and the Pre-Petition Agent.

- Such other customary closing documents and customary closing deliverables deemed necessary or desirable by the DIP Agent.

| | |
|---|---|
| INDEMNIFICATION: | The DIP Loan Documents shall provide that the Debtors agree to indemnify and hold the DIP Agent and the DIP Lenders and their respective shareholders, directors, members, principals, agents, advisors, officers, subsidiaries and affiliates (each, an "Indemnified Person") harmless from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an Indemnified Person by reason of or resulting from the Cases, the DIP Facility, this Term Sheet, the transactions contemplated thereby or hereby or by the DIP Facility or any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any of such Indemnified Person is a party thereto and whether or not brought by the Borrower or any other person, except to the extent resulting from the gross negligence or willful misconduct of such Indemnified Person as determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Agent exercising discretionary rights granted under the DIP Facility. In all such litigation, or the preparation therefor, the DIP Agent and the DIP Lenders shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtors agree to pay promptly the reasonable fees and expenses of such counsel. |
| GOVERNING LAW: | New York. |
| COUNSEL TO DIP AGENT: | Latham & Watkins LLP. |
| EXPENSES: | Reasonable legal fees, accounting fees, financial advisory fees, fees and expenses of other consultants, and other reasonable out of pocket expenses of RBC (whether as DIP Agent, Pre-Petition Agent, DIP Lender or Pre-Petition Lender) in connection with the Cases, the DIP Facility, the DIP Loan Documents or the Pre-Petition Loan Documents, and all costs and expenses of the DIP Agent and the DIP Lenders (including documented attorneys' fees) in connection with the enforcement of remedies under the DIP Facility to be reimbursed on a current basis by the Debtors from the proceeds of loans advanced under the DIP Facility. For avoidance of doubt, all fees and expenses in the immediately preceding sentence shall be reimbursed without regard to the amounts set forth in the Budget with respect thereto; provided, that, to the extent the amounts of such fees and expenses exceed the amounts set forth therefor in the Budget, the Budget shall be automatically increased to incorporate such additional amounts. For avoidance of doubt, and nothing to the contrary contained herein notwithstanding, the Debtors shall pay the fees and costs incurred by only one lead law firm, one local-counsel firm and any necessary specialists, one |

20

14-10701-reg    Doc 64    Filed 04/02/14    Entered 04/02/14 18:41:46    Main Document
Pg 96 of 174

<table>
<tr><td></td><td>accounting firm, one financial advisory firm and one Consultant retained for or on behalf of the DIP Agent and the DIP Lenders.</td></tr>
<tr><td>RIGHTS UNDER PLAN SUPPORT AGREEMENT:</td><td>Nothing in this Term Sheet is intended to amend any provision of the Plan Support Agreement or impair or otherwise alter any of the rights of the parties under the Plan Support Agreement, including, without limitation, any rights to consent to various documents and actions of the Debtors referenced herein.  To the extent of any direct conflict between this Term Sheet and the Plan Support Agreement, the applicable provision of the Plan Support Agreement shall govern and control.</td></tr>
</table>

21

## Exhibit C

### Form of Joinder

Reference is hereby made to that certain Plan Support Agreement (as such agreement may be amended, modified or supplemented from time to time, the "Plan Support Agreement") among MModal Holdings, Inc. and the holders of certain debt instruments party thereto, including the undersigned _____ (the "Transferor").  Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan Support Agreement.  As a condition precedent to becoming the beneficial holder or owner of [_____] dollars ($_____) in [___] [Loans/Notes] held by the Transferor, the undersigned _____ (the "Transferee") hereby agrees to become bound by the terms, conditions and obligations set forth in the Plan Support Agreement.  This Joinder shall take effect and shall become an integral part of the Plan Support Agreement immediately upon its execution and the Transferee shall be deemed to be bound by all of the terms, conditions and obligations of the Plan Support Agreement as of the date thereof.

IN WITNESS WHEREOF, this JOINDER has been duly executed by each of the undersigned as of the date specified below.

Date:  _____, 2014

| TRANSFEROR: | TRANSFEREE: |
|---|---|
| _____ | _____ |
| Name of Transferor | Name of Transferee |
| _____ | _____ |
| Signature of Authorized Signatory of Transferor | Signature of Authorized Signatory of Transferee |
| _____ | _____ |
| (Type or Print Name and Title of Authorized Signatory) | (Type or Print Name and Title of Authorized Signatory Address of Transferee: |
|  | _____ |
|  | _____ |
|  | Attn:_____ |
|  | Tel:_____ |
|  | Fax:_____ |
|  | Email:_____ |

**Schedule 1**

Ownership

[*Redacted*]

**EXHIBIT B**

**PROPOSED FORM OF ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------  X
                                                        :
In re:                                                  :   Chapter 11
                                                        :
LEGEND PARENT, INC., et al.,                            :   Case No. 14-10701 (REG)
                                                        :
        Debtors.                                        :   Jointly Administered
                                                        :
-------------------------------------------------------  X
```

**ORDER AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER
A PLAN SUPPORT AGREEMENT WITH HOLDERS OF THE MAJORITY OF
CLAIMS UNDER THE DEBTORS' FIRST LIEN CREDIT
AGREEMENT AND THE MAJORITY OF CLAIMS UNDER THE INDENTURE**

Upon the motion (the "**Motion**")[1] of the Debtors for an order authorizing the

Debtors to enter into and perform under the Plan Support Agreement attached to the Motion as

Exhibit A; and the Court having jurisdiction to consider the Motion and the relief requested

therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; and upon a finding

that negotiation of, and entry into, the Plan Support Agreement does not constitute a solicitation

for purposes of sections 1125 and 1126 of the Bankruptcy Code; and it appearing that the

relief requested in the Motion will benefit the Debtors' estates, their creditors, and all other

parties in interest; and due and proper notice of the Motion having been provided, and it

appearing that no other or further notice need be provided; and after due deliberation and

sufficient cause appearing therefore, it is hereby

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

19137178

ORDERED that, the Motion is granted to the extent provided herein; and it is further

ORDERED that, the Plan Support Agreement represents a valid exercise of the Debtors' business judgment and is hereby approved in its entirety, and the Debtors are authorized to enter into and perform under the Plan Support Agreement, and it is further

ORDERED that, the Debtors' entry into the Plan Support Agreement shall not constitute a solicitation of votes of the Consenting Lenders or the Consenting Noteholders in violation of section 1125(b) of the Bankruptcy Code; and it is further

ORDERED that, for the avoidance of doubt, the Parties to the Plan Support Agreement may serve notices on the Debtors after a Termination Event (as defined in the Plan Support Agreement) in accordance with the terms of the Plan Support Agreement notwithstanding section 362 of the Bankruptcy Code; and it is further

ORDERED that, the Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order, including, without limitation, the payment of fees and expenses as provided for in paragraph 36 of the PSA; and it is further

ORDERED that, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry by the Court; and it is further

ORDERED that, this Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:   New York, New York
         April __, 2014

                                         _____
                                         THE HONORABLE ROBERT E. GERBER
                                         UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT C**

19137178

Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                              :
**In re**                                     :        **Chapter 11 Case No.**
                                              :
**AMR CORPORATION**, *et al.*,                :        **11-15463 (SHL)**
                                              :
                **Debtors.**                  :        **(Jointly Administered)**
                                              :
-------------------------------------------------------------x

<div align="center">

**NOTICE OF HEARING ON**
**DEBTORS' MOTION FOR APPROVAL OF "FEE LETTER" TO**
**PAY CERTAIN WORK FEES AND EXPENSES OF PROFESSIONALS**
**EMPLOYED BY THE AD HOC GROUP OF AMR CORPORATION CREDITORS**

</div>

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated August 29,

2012 (the "**Motion**"), of AMR Corporation and its related debtors, as debtors and debtors in

possession (collectively, the "**Debtors**"), will be held before the Honorable Sean H. Lane, United

States Bankruptcy Judge, in Room 701 of the United States Bankruptcy Court for the Southern

District of New York (the "**Bankruptcy Court**"), One Bowling Green, New York, New York

10004, on **September 20, 2012 at 10:00 a.m. (Eastern Time)**, or as soon thereafter as counsel

may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections to the

Motion (the "**Objections**") must be in writing, shall conform to the Federal Rules of Bankruptcy

Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be

filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing

system, electronically in accordance with General Order M-399 (which can be found at

http://nysb.uscourts.gov) and (b) by all other parties in interest, on a 3.5 inch disk, in text-

searchable portable document format (PDF) (with a hard copy delivered directly to Chambers),

in accordance with the customary practices of the Bankruptcy Court and General Order M-399,

to the extent applicable, and served in accordance with General Order M-399 and on (i) the

attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New

York 10153 (Attn: Stephen Karotkin, Esq.), (ii) the Debtors, c/o AMR Corporation, 4333 Amon

Carter Boulevard, MD 5675, Fort Worth, Texas  76155 (Attn:  Kathryn Koorenny, Esq.), (iii) the

Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street,

21st Floor, New York, New York 10004 (Attn:  Brian Masumoto, Esq.), (iv) the attorneys for the

Official Committee of Unsecured Creditors, Skadden, Arps, Slate, Meagher & Flom LLP, 155

North Wacker Drive, Chicago, Illinois  60606 (Attn:  John Wm. Butler, Jr., Esq.) and Four

Times Square, New York, New York  10036 (Attn:  Jay M. Goffman, Esq.), (v) the attorneys for

the Section 1114 Committee of Retired Employees, Jenner & Block LLP, 353 North Clark

Street, Chicago, Illinois  60654 (Attn:  Catherine L. Steege, Esq. and Charles B. Sklarsky, Esq.)

and 919 Third Avenue, 37th Floor, New York, New York  10022 (Attn:  Marc B. Hankin, Esq.),

(vi) the attorneys for the Ad Hoc Group of AMR Corporation Creditors, Milbank, Tweed,

Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005 (Attn:  Gerard

Uzzi, Esq. and Eric Stodola, Esq.), and (vii) all entities that requested notice in these chapter 11

cases under Fed. R. Bankr. P. 2002 so as to be received no later than **September 13, 2012 at

4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

US_ACTIVE:\44083616\1\14013.0139

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and

served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to

the Bankruptcy Court an order substantially in the form of the proposed order annexed to the

Motion, which order may be entered with no further notice or opportunity to be heard.


Dated: New York, New York
       August 29, 2012

                                        /s/ Stephen Karotkin
                                        Harvey R. Miller
                                        Stephen Karotkin
                                        Alfredo R. Pérez

                                        WEIL, GOTSHAL & MANGES LLP
                                        767 Fifth Avenue
                                        New York, New York 10153
                                        Telephone: (212) 310-8000
                                        Facsimile: (212) 310-8007

                                        Attorneys for Debtors
                                        and Debtors in Possession

US_ACTIVE:\44083616\1\14013.0139

Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                                                  :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11 Case No.** |
| | : | |
| **AMR CORPORATION**, *et al.*, | : | **11-15463 (SHL)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |

----------------------------------------------------------------x

## DEBTORS' MOTION FOR APPROVAL OF "FEE LETTER" TO PAY CERTAIN WORK FEES AND EXPENSES OF PROFESSIONALS EMPLOYED BY THE AD HOC GROUP OF AMR CORPORATION CREDITORS

TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:

        AMR Corporation and its related debtors, as debtors and debtors in possession

(collectively, the "**Debtors**" or "**American**"), respectfully represent:

### Background

        1.      On November 29, 2011 (the "**Commencement Date**"), each of the

Debtors commenced a voluntary case under chapter 11 of title 11, United States Code (the

"**Bankruptcy Code**").  The Debtors have continued to operate their business and manage their

properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  No trustee or examiner has been appointed in these chapter 11 cases.

2.    On December 5, 2011, the United States Trustee for the Southern District

of New York (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the

"**UCC**").

3.    Information regarding the Debtors' business, capital structure, and the

circumstances leading to the commencement of these chapter 11 cases is set forth in the

Affidavit of Isabella D. Goren Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the

Southern District of New York, sworn to on November 29, 2011. (ECF No. 4)

4.    In April, 2012, a group of substantial creditors of the Debtors formed the

Ad Hoc Group of AMR Corporation Creditors (the "**Group**").  The Group intends to promptly

file a verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure.

The Group has expressed an interest in participating in the formulation of a plan of

reorganization and, in connection therewith, potentially providing for equity and other

financings, if any, that may be required to support American's business plan and the

consummation of a chapter 11 plan or plans (collectively, the "**Commitments**").  The Group is

prepared to engage in negotiations with the Debtors concerning a plan or plans and such

Commitments, subject to appropriate due diligence.  In connection with such negotiations, the

Debtors will collaborate with the UCC.

## **Jurisdiction**

5.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2

## Relief Requested

6.      The Debtors request the approval of the "Fee Letter" dated August 28,

2012, attached hereto as **Exhibit "A"** and to pay certain Work Fees (as hereinafter defined) of

the Group's (i) attorneys, Milbank Tweed, Hadley & McCloy LLP ("**Milbank**"), (ii) financial

advisors, Houlihan Lokey Howard & Zukin ("**Houlihan**," and together with Milbank, the

"**Professionals**") pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, in connection

with the Group's due diligence, analyses, negotiation, preparation, and potential obtaining of the

Commitments, all as described in the Fee Letter.

7.      The relief requested has been reviewed with the UCC and the UCC has

indicated that it supports the granting of the relief requested in this motion.

## The Commitments

8.      American's primary objective in these chapter 11 cases is to formulate,

confirm, and consummate a consensual chapter 11 plan or plans.  In furtherance of American's

efforts to secure both broad creditor support and the financing necessary to ensure successful

confirmation and consummation, American has engaged with the UCC and certain other

constituencies in the plan development process, including the Group.  Upon information and

belief, the Group and members thereof represent a substantial and diverse group of creditors of

American.  The Group and certain of its members have expressed interest in participating in

and/or providing Commitments in support of a plan proposal and the confirmation process.

9.      In connection with the Commitments, the Group's Professionals will incur

expenses in conducting the due diligence, analyses, negotiation, and preparation necessarily

involved in pursuing the Commitments, including the exploration of various plan alternatives.

Due to the complex nature of American's chapter 11 cases, such diligence will entail highly

3

sophisticated legal and financial analysis.  Thus, to address the associated costs and risks the

Group is undertaking, and as a condition to the Group's agreement to explore potential

Commitments, American and the Group have entered into the Fee Letter.  Pursuant to the Fee

Letter and subject to the approval of the Bankruptcy Court, American has agreed to pay the fees

for work performed by the Group's Professionals in connection with the obtaining of

Commitments as may be determined by American.  In accordance with the Fee Letter, American

has agreed, commencing as of August 1, 2012, to pay (i) Milbank at its standard hourly rates, as

reflected in the hourly fee schedule attached to the Fee Letter as Schedule A, (ii) Houlihan (a) a

monthly fee of $150,000 earned as of the first day of the month and (b) a reasonable success fee,

first negotiated among American, the Group and the UCC, and, further, subject to Bankruptcy

Court approval, if binding Commitments result from the Group's efforts that are closed and

funded, and (iii) the reasonable out of pocket expenses incurred by the Professionals for the

services performed in connection with the exploration of and efforts to obtain the Commitments

(collectively, the "**Work Fees**").

        10.     The reservation of rights of the Professionals under the Fee Letter to seek

additional fees is not to be construed as limiting, but includes, without limitation, the right to

seek a success fee in circumstances where a Commitment is not obtained or closed and funded.

For example, if the services performed result in the successful negotiation of the terms of a plan

of reorganization that is confirmed and becomes effective, but did not include a Commitment,

the Professionals may request additional compensation and expenses, subject to approval of the

Bankruptcy Court and the rights of all parties in interest to object thereto.

4

## Basis For Relief

11.    "Section 363 [of the Bankruptcy Code] . . . governs the use of funds by the debtor in possession while it operates its business after the bankruptcy petition is filed." *In re Enron Corp.*, 335 B.R. 22, 27 (S.D.N.Y. 2005).   Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b); *In re Lionel Corp.*, 772 F.2d 1063, 1066 (2d. Cir. 1983).  Section 105(a) of the Bankruptcy Code provides that, "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," including the provisions of section 363(b). *See* 11 U.S.C. § 105 (a); *In re Enron Corp.*, 335 B.R. at 27.

### *Good Business Reasons Exist to Reimburse the Work Fees*

12.    Generally, courts will approve a request for relief under section 363 of the Bankruptcy Code where the debtor demonstrates a sound business justification for seeking such relief.  *In re Lionel Corp.*, 722 F.2d at 1071 ("The rule we adopt requires that a judge determining a section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.").  To determine if a "good business reason" exists courts apply the business judgment rule.  *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).  The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company."  *Id.* Additionally, courts generally will not interfere with corporate decisions as to what is in their best interest absent a showing of bad faith, self-interest, or gross negligence.  *Id.*  Furthermore,

5

parties opposing an exercise of a debtor's business judgment have the burden of rebutting the

presumption of validity.  *Id.*

13.     In the instant case, American and all of its economic stakeholders have an

interest in reaching a consensual resolution of these chapter 11 cases in the most cost effective

and efficient manner possible.  The engagement of the Group presents a reasonable prospect of

obtaining Commitments that may facilitate the reorganization efforts and, thus, is in American's

best interests and is consistent with achieving American's primary objective of confirmation and

consummation of a consensual chapter 11 plan or plans.

14.     Courts in this district have approved the payment of such due diligence

work fees incurred by professionals for potential investors when the "reimbursement

arrangement was 'in the best interests of the Debtors and all parties in interest.'"  *In re

Bethlehem Steel Corp.*, 2003 WL 21738964, at *12 (S.D.N.Y. July 28, 2003) (court approved,

pursuant to section 363(b) of the Bankruptcy Code, the reimbursement of professional fees of a

union engaged in early plan negotiations with a debtor).  A motion to authorize such payments is

further bolstered when it is shown, as is the case with the Work Fees, that the use not only has a

"'proper business justification'" but "has potential to lead toward confirmation of a plan and is

not [designed] to evade the plan confirmation process."  *In re Chrysler LLC,* 405 B.R. 84, 96

(Bankr. S.D.N.Y. 2009) (approving an expedited proposal to sell assets).

15.     Accordingly, absent evidence of "self-dealing or manipulation among the

parties who negotiated the reimbursement procedures" reimbursement motions should be

approved.  *In re ASARCO, L.L.C.*, 650 F.3d 593, 603 (5th Cir. 2011) (Fifth Circuit (i) upheld

bankruptcy court decision to prospectively approve payment of due diligence fees of bidders in

an auction for debtor properties pursuant to section 363(b), and (ii) explicitly rejected arguments

6

that such authority could only be granted pursuant to section 503(b)(3)(D)).  As discussed above,

courts are especially inclined to approve reimbursement agreements, when they will facilitate

processes that "maximize the value of [a debtor's] estate."  *Id.*

16.     The negotiations with the Group are an integral part of American's efforts

to move forward to achieve the objectives of chapter 11.  The Commitments, if obtained, will

facilitate the proposal and confirmation of a chapter 11 plan.  A chapter 11 plan with support and

financing from key creditors, such as the Group, will have a greater probability of successful

confirmation.  Accordingly, the relief requested is in the best interests of American and its

economic stakeholders.

<u>Section 363(b) is the Proper Standard to Apply to the Relief Requested</u>

17.     Section 363(b) of the Bankruptcy Code and the business judgment rule is

the proper standard of review for the relief requested.  Although parties objecting to

reimbursement motions occasionally assert that such motions should be brought pursuant to

either section 327(e) (employment of professional persons) or 503(b)(3) of the Bankruptcy Code

(allowance of administrative expense for reimbursement), section 363(b) of the Bankruptcy Code

is the proper source of authority for authorizing reimbursement motions.  *In re Enron Corp.*, 335

B.R. at 29 (upholding bankruptcy courts approval of an application to retain a law firm (and pay

its fees) to represent employees of the debtors in a pending investigation pursuant to section

363(b) as opposed to section 327(e)).  The fact that similar relief may be sought under different

circumstances pursuant to a different section of the code is irrelevant.  As the *ASARCO* court

noted, "[t]he authorization of certain types of payments under section 363(b) is not prohibited

simply because there is another section of the Bankruptcy Code related to the same type of

payment."  *Id.* (*quoting In re Bethlehem Steel Corp.*, 2003 WL 2173864, at *11).  Courts have

7

held "that the business judgment standard is the better fit for assessing [a debtor's]

reimbursement motion" because "[s]ection 363 addresses the debtor's use of the estate property."

*In re ASARCO, L.L.C.*, 650 F.3d at 602.  In denying an argument that section 503 is required for

reimbursement of fees as administrative expenses, the *ASARCO* court held that section 503

"generally applies to third parties that have already incurred expenses in connection to the

debtor's estate," but that in the context of prospective reimbursement orders, "application of the

[363(b)] business judgment standard is appropriate." *Id.* at 602-603.  The court in *Bethlehem*

*Steel* reached a similar conclusion stating that in situations "where a creditor incurs expenses in

attempting to collect on pre-petition claims . . . that situation is covered by § 503," but where the

"[debtor] determined that paying the [creditor's] expenses was a good business decision and

would help develop a reorganization plan . . . it was appropriate for the debtors to reimburse the

[creditor's professionals] for the reasonable cost of [their] advice and counsel." *In re Bethlehem*

*Steel Corp.*, 2003 WL 2173864, at *11.

        18.    American is requesting authority for the Work Fees in furtherance of

American's ultimate goal of confirmation and consummation of a chapter 11 plan.  Therefore,

section 363(b) is the proper standard under which the relief requested should be considered.

## Conclusion

        19.    The relief requested in based upon the exercise of sound business

judgment by American.  The payment of the Work Fees of the Group's Professionals has the

support of the UCC and is in the best interests of American and all parties in interest.  The

Motion should be granted and American authorized to perform in accordance with the Fee

Letter.

8

## **Notice**

20.     Notice of this Motion has been provided to the Group, Milbank, Houlihan, and parties in interest in accordance with the Amended Order Pursuant to 11 U.S.C. §§ 105(a) and (d) and Bankruptcy Rules 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures, dated August 8, 2012 (ECF No. 3952).  In view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

21.     No previous request for the relief sought in this Motion has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request that the Motion be granted and that they be granted such other and further relief as is just.

Dated: New York, New York
      August 29, 2012

/s/ Stephen Karotkin
Harvey R. Miller
Stephen Karotkin
Alfredo R. Pérez

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

9

**EXHIBIT "A"**

## AD HOC GROUP OF AMR CORPORATION CREDITORS
### c/o Milbank, Tweed, Hadley & McCloy LLP
### 1 Chase Manhattan Plaza
### New York, New York 10005

August 28, 2012

AMR Corporation
4333 Amon Carter Boulevard
Fort Worth, Texas 75261
Attention: Gary F. Kennedy, Esq.


Fee Letter

Ladies and Gentlemen:


On November 29, 2011, AMR Corporation and certain of its direct and indirect domestic subsidiaries (collectively, "you" or the "Debtors") commenced cases under chapter 11 of title 11 of the United States Code, 11, U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), which are pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

You have informed that certain Ad Hoc Group of AMR Corporation Creditors, the constituency of which may be modified from time to time (such group, the "Group"), represented by Milbank, Tweed, Hadley & McCloy LLP ("Milbank") as counsel and its financial advisors, Houlihan Lokey Howard & Zukin ("Houlihan"), that the Debtors will be seeking to negotiate, propose and file a chapter 11 plan or plans of reorganization and, in connection therewith, may seek commitments for equity and other financings. You have also advised the Group that you are exploring strategic alternatives involving a potential public combination transaction in collaboration with the UCC. One or more members of the Group, as substantial creditors of the Debtors, have expressed an interest in participating and/or providing for equity and other financings for the Debtors and are prepared to engage in negotiations with the Debtors and the UCC concerning such equity and other financings, subject to analysis of the terms of a plan or plans of reorganization (collectively, the "Commitments") and subject to appropriate due diligence and analyses of the Debtors' reorganization proposals.

The Debtors agree to reimburse the Group, to the extent provided in this Fee Letter and whether or not a Commitment is obtained, closed upon and funded, as allowed administrative expenses of the Debtors' chapter 11 cases the reasonable professional fees and reasonable and documented out of pocket costs and expenses (to the extent that such costs and expenses comply with the Debtors' guidelines for the Debtors' retained professionals and may also include any

reasonable fees, charges and disbursements for specialists retained by Milbank in connection
with the proposed financing) incurred by Milbank and Houlihan incurred on and after August 1,
2012 solely in connection with the Group's due diligence, analyses, negotiation, preparation and
execution of any Commitment and related transaction documents and any ancillary efforts
related thereto. The Group expressly agrees and acknowledges that no professional fees and/or
expenses shall be reimbursable hereunder for any other scope of engagement activity for which
the Group has retained Milbank and Houlihan, including, but not limited to, the monitoring of or
participation in the Debtors' chapter 11 cases on account of any existing or future claims held by
members of the Group and any incidental matters relating to the formulation and maintenance of
the Group such as the preparation, filing and updating of the Group's statement(s) pursuant to
Rule 2019 of the Federal Rules of Bankruptcy Procedure.

Milbank's hourly fee schedule is set forth on **Schedule A**. The Debtors agree also to pay
Houlihan a monthly fee for services performed at the rate of $150,000 per month earned as of the
first day of the month for which Houlihan is being compensated and all reasonable and
documented out of pocket expenses incurred beginning as of August 1, 2012. This Agreement is
without prejudice to the Group, Houlihan or Milbank with respect to any further request for
reimbursement of fees and expenses incurred prior or in addition to the fees and expenses
contemplated hereby, including a reasonable success fee to be paid to Houlihan if a binding
Commitment is received from one or more members of the Group or otherwise resulting
primarily from the efforts of the Group and the Commitment is closed and funded, provided,
however, that any such request shall first be negotiated among the Debtors, the UCC and the
Group and shall be subject to further approval by the Bankruptcy Court having jurisdiction over
the Debtors' chapter 11 cases with the rights of all interested persons, including the Debtors and
the UCC, to object thereto.

The current members of the Group consist, as of the date hereof, of the entities identified
in **Schedule B** annexed hereto. The Group shall at all times comply with Rule 2019 of the
Federal Rules of Bankruptcy Procedure. The Group will promptly inform counsel to the Debtors
and the UCC, in writing, of any deletions or additions to the Group.

Either the Debtors or the UCC may terminate this Fee Letter at any time upon thirty (30)
days' written notice to Milbank; provided that the Debtors shall remain liable for all amounts
owed under this Fee Letter through the effective date of such termination.

All fees and expenses payable pursuant to this Fee Letter, shall be paid promptly upon
delivery of an invoice, copied to counsel to the UCC and the United States Trustee, but in no
event later than 10 business days, and are, once paid, not refundable under any circumstances
and will not be subject to counterclaim or set-off for, or be otherwise affected by, any claim or
dispute relating to any other matter; provided, however, no portion of any statement objected to
by the Debtors, the UCC or the United States Trustee shall be paid unless such objection is
otherwise consensually resolved or withdrawn or the dispute is determined as provided in the
next sentence of this paragraph. Unless otherwise ordered by the Bankruptcy Court, no recipient
of any such payment shall be required to file with respect thereto any interim or final fee
application with the Bankruptcy Court, provided, however, the Bankruptcy Court shall have
jurisdiction to determine any dispute concerning such invoices.

It is understood that this Fee Letter shall not constitute or give rise to any obligation on the part of the Group to provide or arrange any financing or support any plan of reorganization; such an obligation will arise only pursuant to a Commitment if delivered in accordance with its terms. This Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the parties hereto. **THIS FEE LETTER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO THE PRINCIPLES OF CONFLICTS OF LAWS THEREOF, TO THE EXTENT THAT THE SAME ARE NOT MANDATORILY APPLICABLE BY STATUTE AND WOULD REQUIRE OR PERMIT THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION).** This Fee Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Fee Letter by facsimile (or other electronic) transmission shall be effective as delivery of a manually executed counterpart of this Fee Letter.

The Debtors' obligations hereunder shall be subject to the approval of the Bankruptcy Court. The Debtors agree to promptly seek concurrence of the UCC to this Fee Letter and to file a motion seeking Bankruptcy Court approval of this Fee Letter.

If the foregoing correctly sets forth our understanding, please indicate your acceptance of the terms hereof by returning to us an executed counterpart hereof, whereupon this Fee Letter shall become a binding agreement between us.

Very truly yours,

**Milbank, Tweed, Hadley & McCloy LLP, as counsel to and on behalf of the Ad Hoc Group of AMR Corporation Creditors**

By:
Name: Gerard Uzzi
Title: Partner

Accepted and agreed to as of
the date first above written:

**AMR Corporation, for itself
and its Debtor subsidiaries**

By:
Name: Gary F. Kennedy
Title: Senior Vice President and General Counsel

## SCHEDULE A

The standard hourly rates for Milbank professionals are based on each professional's level of experience. At present, the standard hourly rates charged by Milbank are in the following ranges:

| | |
|---|---|
| Partners: | $825 - $1,140 |
| Of Counsel: | $795 - $995 |
| Associates and Senior Attorneys: | $295 - $795 |
| Legal Assistants: | $130 - $290 |

## SCHEDULE B

1. Carlson Capital, L.P.
2. Claren Road Asset Management, LLC
3. CSS, LLC
4. Cyrus Capital Partners, L.P.
5. J.P. Morgan Securities LLC
6. King Street Capital Management, L.P.
7. Litespeed Management, L.L.C.
8. Pentwater Capital Management LP
9. Tricadia Capital Management
10. York Capital Management Global Advisors LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                       :

In re                              :          Chapter 11 Case No.
                                         :

AMR CORPORATION, *et al.*,           :          11-15463 (SHL)
                                         :

               Debtors.        :          (Jointly Administered)
                                         :

-------------------------------------------------------------x

**ORDER AUTHORIZING PAYMENT OF CERTAIN WORK FEES AND
EXPENSES OF PROFESSIONALS EMPLOYED BY THE AD HOC GROUP OF
AMR CORPORATION CREDITORS**

       Upon the Motion, dated August 29, 2012 (the "**Motion**"),[1] of AMR Corporation

and its related debtors, as debtors and debtors in possession (collectively, the "**Debtors**"),

pursuant to sections 105 and 363 of title 11, United States Code (the "**Bankruptcy Code**"), for

authority to reimburse certain work fees of professionals engaged by the Ad Hoc Group of AMR

Corporation Creditors (the "**Group**"), all as more fully described in the Motion; and the Court

having jurisdiction to consider the Motion and the relief requested therein in accordance with 28

U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January

31, 2012 (Preska, C.J.); and consideration of the Motion and the relief requested therein being a

core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court

pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested is supported

by the Official Committee of General Unsecured Creditors, (the "**UCC**"); and due and proper

notice of the Motion having been provided, and it appearing that no other or further notice need

be provided; and a hearing having been held to consider the relief requested in the Motion (the

---

[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

<center>2</center>

"**Hearing**"); and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due consideration and deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted and American is authorized to act in accordance with the Fee Letter and pay the Group's Professionals for their Work Fees subject to the terms and conditions of the Fee Letter attached to the Motion as **Exhibit "A;"** and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to this Order.

Dated: New York, New York
         September __, 2012

_____
United States Bankruptcy Judge

3

**EXHIBIT D**

19137178

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                              :
In re                                         :           Chapter 11 Case No.
                                              :
AMR CORPORATION, *et al.*,                    :           11-15463 (SHL)
                                              :
                          Debtors.            :           (Jointly Administered)
                                              :
---------------------------------------------------------------x

## ORDER APPROVING MOTION FOR APPROVAL OF "FEE LETTER" TO PAY CERTAIN WORK FEES AND EXPENSES OF PROFESSIONALS EMPLOYED BY THE AD HOC GROUP OF AMR CORPORATION CREDITORS

Upon the Motion, dated August 29, 2012 (the "**Motion**"),[1] of AMR Corporation

and its related debtors, as debtors and debtors in possession (collectively, the "**Debtors**"),

pursuant to sections 105 and 363 of title 11, United States Code (the "**Bankruptcy Code**"), for

approval of Fee Letter to pay certain work fees and expenses of professionals employed by the

Ad Hoc Group of AMR Corporation Creditors (the "**Group**"), all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference

M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief

requested is supported by the Official Committee of General Unsecured Creditors, (the "**UCC**");

and due and proper notice of the Motion having been provided, and it appearing that no other or

further notice need be provided; and a hearing having been held to consider the relief requested

---
[1] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

in the Motion (the "**Hearing**"); and upon the record of the Hearing and all of the proceedings

had before the Court; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors, and all parties in interest, and that the legal and

factual bases set forth in the Motion establish just cause for the relief granted herein; and after

due consideration and deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted and American is authorized to act in

accordance with the Fee Letter and pay the Group's Professionals for their Work Fees subject to

the terms and conditions of the Fee Letter attached to the Motion as **Exhibit "A;"** and it is

further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to this Order.

Dated: New York, New York
       September 21, 2012

*/s/ Sean H. Lane*
United States Bankruptcy Judge

**EXHIBIT E**

**Execution Version**

## RESTRUCTURING SUPPORT AGREEMENT

       This Restructuring Support Agreement (the "<u>Restructuring Support Agreement</u>") is made and entered into as of November 14, 2010 by and among (i) Loehmann's Holdings Inc. ("<u>Loehmann's Holdco</u>"), (ii) Loehmann's, Inc. ("<u>Loehmann's</u>"), (iii) Loehmann's Real Estate Holdings, Inc. ("<u>Holdings</u>"), (iv) Loehmann's Operating Co. ("<u>Loehmann's Opco</u>"), (v) Loehmann's Capital Corp. ("<u>Capco</u>") (collectively, the "<u>Company</u>" or the "<u>Loehmann's Entities</u>"), (vi) Istithmar Retail Investments ("<u>Istithmar</u>"), (vii) Whippoorwill Associates, Inc., as agent for certain of its discretionary funds and accounts that are legal and/or beneficial owners of the Senior Secured Notes (as defined below) and as signatory to the Investment Commitment Letter ("<u>Whippoorwill</u>"), and (viii) any other holders of the Senior Secured Notes (as defined below) identified on the signature pages hereto (together with Whippoorwill, the "<u>Supporting Secured Noteholders</u>").    Each of the entities comprising the Company, Istithmar and the Supporting Secured Noteholders is referred to herein individually as a "<u>Party</u>," and collectively, as the "<u>Parties</u>."    As used herein, the phrases "<u>this Agreement</u>", "<u>hereto</u>", "<u>hereunder</u>" and phrases of like import shall mean this Restructuring Support Agreement.

## RECITALS

**WHEREAS:**

       A.    Capco is the issuer of 12% Senior Secured Class A Notes due 2011 (the "<u>12% A Notes</u>"); Senior Secured Floating Rate Notes due 2011 (the "<u>Floating Rate Notes</u>," together with the 12% A Notes, the "<u>Class A Notes</u>"); and 13% Senior Secured Class B Notes due 2011 (the "<u>13% B Notes</u>") (collectively, the "<u>Senior Secured Notes</u>") pursuant to the terms of that certain Indenture, dated as of October 12, 2004 (the "<u>Senior Secured Notes Indenture</u>"), by and among Capco and Wells Fargo Bank National Association, as indenture trustee (the "<u>Senior Secured Notes Indenture Trustee</u>").    $110 million in aggregate principal amount of Senior Secured Notes is currently outstanding;

       B.    Loehmann's Opco is a borrower (and the other Loehmann's Entities are guarantors) pursuant to that certain Credit Agreement, dated as of September 15, 2010 (the "<u>Credit Agreement</u>"), by and among Loehmann's Opco, as borrower, Loehmann's Holdco, Holdings, and Loehmann's, each as a guarantor, any other persons parties thereto designated from time to time as Credit Parties (as defined in the Credit Agreement), and Crystal Financial LLC (the "<u>Senior Agent</u>"), as a lender and as agent for all lenders, and any other lenders party thereto from time to time (such lenders, the "<u>Revolving Facility Lenders</u>");

       C.    Whippoorwill currently beneficially owns, or has investment responsibility for, approximately 33.9% of the aggregate principal amount outstanding of Senior Secured Notes. Whippoorwill intends to purchase 100% of the Class A Notes beneficially owned by Plainfield Special Situations Master Fund Limited, Plainfield Special Situations Master Fund II Limited, and Plainfield OC Master Fund Limited (collectively, "<u>Plainfield</u>," and such Class A Notes purchased by Whippoorwill, the "<u>Purchased Notes</u>") pursuant to an LSTA Purchase and Sale Distressed Trade agreement (the "<u>Note Purchase Agreement</u>") that will be entered into pursuant to that certain trade confirmation, dated as of November 14, 2010 (the "<u>Trade Confirmation</u>", together with the Note Purchase Agreement, the "<u>Trade Documents</u>") between Plainfield and

Whippoorwill. Upon the purchase of the Purchased Notes by Whippoorwill pursuant to the transactions contemplated by the Trade Confirmation and the closing of the Note Purchase Agreement, Whippoorwill will beneficially own, or have investment responsibility for, approximately 70% of the aggregate principal amount outstanding of Senior Secured Notes;

D.    Istithmar, through its subsidiary Designer Apparel Holdings Corp. ("DAC"), beneficially owns 100% of the issued and outstanding common stock of Loehmann's Holdco (such stock, the "Existing Common Stock"). GSS Contract Services III ("GSS") beneficially owns 100% of the issued and outstanding common stock of Capco;

E.    Istithmar and Whippoorwill have entered into an agreement (the "Forward Purchase Agreement") providing that Istithmar will purchase from Whippoorwill at least 50% of the principal amount of the Purchased Notes subject to the terms and conditions set forth in the Forward Purchase Agreement;

F.    The Parties have engaged in good faith negotiations with the objective of reaching an agreement to restructure the Company's debt obligations through the Financial Restructuring (as defined below) in accordance with the terms set forth in this Agreement;

G.    Each of the Loehmann's Entities anticipates that it will, subject to all necessary internal and corporate approvals, commence cases under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to restructure the financial obligations of the Company (collectively, the "Chapter 11 Cases");

H.    The Parties have negotiated and agreed upon the principal terms of a financial restructuring (the "Financial Restructuring") of the obligations of certain of the Loehmann's Entities to be implemented pursuant to a joint plan of reorganization for all or certain of the Loehmann's Entities (the "Debtors") in form and substance satisfactory to each of the Parties in their sole discretion (as it may be amended or otherwise modified in accordance with its terms, the "Restructuring Plan") through the Chapter 11 Cases. Unless each of the Parties otherwise agrees, the Restructuring Plan must be consistent in all respects with the terms and conditions expressly set forth in Exhibit A hereto (the "Plan Term Sheet"), which is incorporated by reference herein as if fully set forth herein, and that certain Investment Commitment Letter, dated November 14, 2010, among Istithmar, Whippoorwill and each of the Loehmann's Entities (the "Investment Commitment Letter"). Notwithstanding anything to the contrary in this Restructuring Support Agreement, any terms or conditions of the Restructuring Plan that are not expressly set forth in the Plan Term Sheet or the Investment Commitment Letter must be satisfactory to each of the Parties in their sole discretion;

I.    To implement the Financial Restructuring, the Company intends to prepare (i) the Restructuring Plan consistent in all respects with the terms and conditions set forth in the Plan Term Sheet and the Investment Commitment Letter and (ii) a supporting disclosure statement consistent in all respects with the terms and conditions set forth in the Plan Term Sheet and the Investment Commitment Letter, in form and substance satisfactory to each of the Parties;

2

J.    Subject to the closing of the transactions contemplated by the Trade Documents and the effectiveness of the Forward Purchase Agreement, each of Istithmar and Whippoorwill has agreed to make an additional investment in Loehmann's Holdco on the effective date of the Restructuring Plan (the "Effective Date") in accordance with the terms and conditions set forth in this Restructuring Support Agreement (including the Plan Term Sheet) and in the Investment Commitment Letter;

K.    Pursuant to the terms of this Restructuring Support Agreement, subject to the satisfaction of the conditions precedent set forth below, the Parties have agreed during the period commencing with the date of execution of this Agreement and ending upon termination of this Restructuring Support Agreement, to support and, with respect to the Supporting Secured Noteholders, vote any and all of their Claims in respect of the Senior Secured Notes (the "Senior Secured Notes Claims") to accept the Restructuring Plan (subject to the terms and conditions of this Restructuring Support Agreement and Bankruptcy Court approval, and the receipt of, the Disclosure Statement); and

L.    In expressing such support and commitment, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable securities and bankruptcy law, or the fiduciary duties of the Company or any other Party having such duties.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1.    Defined Terms.  All capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Plan Term Sheet.

2.    Termination of Prior Restructuring Support Agreement.  Each of the Loehmann's Entities, Whippoorwill and Istithmar agrees:

a.    that certain Restructuring Support Agreement (the "Prior Restructuring Support Agreement") dated as of September 24, 2010 by and among each of the Loehmann's Entities, Istithmar and Whippoorwill is hereby terminated effective as of the date hereof;

b.    notwithstanding anything to the contrary in the Prior Restructuring Support Agreement, including without limitation the Plan Term Sheet (as defined in the Prior Restructuring Support Agreement), the Parties (as defined in the Prior Restructuring Support Agreement) shall have no obligations under the Prior Restructuring Support Agreement; and

c.    no Party (as defined in the Prior Restructuring Support Agreement) shall have any liability to any other Party (as defined in the Prior Restructuring Support Agreement) on account of any rights or obligations arising under the Prior Restructuring Support Agreement.

3.    <u>Termination of Equity Commitment Letter</u>.  Each of the Loehmann's Entities and Istithmar agrees:

a.    that certain Equity Commitment Letter (the "<u>Equity Commitment Letter</u>") dated as of September 24, 2010 by and among each of the Loehmann's Entities and Istithmar is hereby terminated effective as of the date hereof;

b.    notwithstanding anything to the contrary in the Equity Commitment Letter, including without limitation the Investment Term Sheet (as defined in the Equity Commitment Letter), the parties to the Equity Commitment Letter shall have no obligations under the Equity Commitment Letter; and

c.    no party to the Equity Commitment Letter shall have any liability to any other party to the Equity Commitment Letter on account of any rights or obligations arising under the Equity Commitment Letter.

4.    <u>Company Obligations</u>.  The Company believes that prompt consummation of the Restructuring Plan will best facilitate the Company's business and financial restructuring, and is in the best interests of the Company's creditors, employees, stakeholders, vendors and other parties in interest.  Accordingly, each of the Loehmann's Entities hereby expresses its intention to seek to consummate the Restructuring Plan.  Without limiting the foregoing, for so long as this Restructuring Support Agreement remains in effect, and subject to each of the Supporting Secured Noteholders and Istithmar fulfilling its respective obligations as contemplated herein, each of the Loehmann's Entities agrees:

a.    to use best efforts to file its voluntary petitions to commence the Chapter 11 Cases;

b.    to take such actions as may be necessary or appropriate to obtain approval of the Restructuring Plan, including the solicitation of the requisite votes in favor of and all efforts to obtain confirmation of the Restructuring Plan;

c.    not pursue, propose, support, or encourage the pursuit, proposal or support of, any Chapter 11 plan or other restructuring or reorganization for, or the liquidation of, any of the Loehmann's Entities (directly or indirectly) that is inconsistent with the Financial Restructuring unless the Company believes in the good faith (after consultation with outside legal counsel) that the failure to do so would be inconsistent with its fiduciary duties under applicable law, including the Bankruptcy Code;

d.    to provide draft copies of the Restructuring Plan, the Disclosure Statement, the proposed order confirming the Restructuring Plan, the solicitation materials, and pleadings and exhibits related to the foregoing to counsel to the Supporting Secured Noteholders and Istithmar reasonably in advance of, and to the extent practicable, no less than two days prior to, the date when the Debtors intend to file such documents with the Bankruptcy Court and to

4

consult in good faith with the Supporting Secured Noteholders and Istithmar regarding the form and substance of any such proposed filings;

        e.      support consummation of the Financial Restructuring as set forth in the Plan Term Sheet and in the Investment Commitment Letter; and

        f.      to otherwise use its best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by the Financial Restructuring, including consummation of the transactions set forth in the Investment Commitment Letter, at the earliest practicable date; and

        g.      to provide prompt notice to and consult with Conway Del Genio Gries & Co., LLC, in its capacity as financial advisor to the Supporting Secured Noteholders ("CDG") prior to making any decisions relating to store closures, the establishment of new stores or relocation of existing stores, expense rationalization, capital expenditures, 2011 spring and fall merchandising and marketing plans, treatment of critical vendors, cost-cutting initiatives and any other strategic business decisions which could reasonably be expected to have a significant or material effect on the value of the Reorganized Company;

in each case expressly subject to the exercise (after consultation with outside legal counsel) by each of the Loehmann's Entities of its fiduciary duties.

        5.      <u>Supporting Secured Noteholder Obligations</u>.  For so long as this Restructuring Support Agreement remains in effect, and subject to the other Parties hereto fulfilling their respective obligations as provided herein, each Supporting Secured Noteholder shall, and shall cause its affiliates to:

        a.      timely vote any and all of its Claims against each of the Loehmann's Entities to accept the Restructuring Plan consistent in all respects with the Plan Term Sheet;

        b.      support consummation of the Financial Restructuring as set forth in the Plan Term Sheet and in the Investment Commitment Letter;

        c.      not pursue, propose, support, or encourage the pursuit, proposal or support of, any Chapter 11 plan or other restructuring or reorganization for, or the liquidation of, any of the Loehmann's Entities (directly or indirectly) that is inconsistent with the Financial Restructuring or the Investment Commitment Letter;

        d.      not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Restructuring Support Agreement, the Plan Term Sheet or the Investment Commitment Letter or delay, impede, appeal or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Financial Restructuring; and

        e.      not commence any proceeding or prosecute, join in, or otherwise support any objection to oppose or object to the Restructuring Plan;

provided, however, that nothing herein shall require any of the Supporting Secured Noteholders to incur any obligations to provide financial support to the Company or any other entity, except as expressly provided herein or in the Investment Commitment Letter.

6.    Whippoorwill Obligations.  In addition to the obligations set forth in Section 5 of this Restructuring Support Agreement, for so long as this Restructuring Support Agreement remains in effect, and subject to the other Parties hereto fulfilling their respective obligations as provided herein, Whippoorwill agrees that it shall, and shall cause its affiliates to perform all of its obligations set forth in the Investment Commitment Letter, subject to the terms and conditions therein; provided, however, that nothing herein shall require Whippoorwill to incur any obligations to provide financial support to the Company or any other entity, except as expressly provided herein or in the Investment Commitment Letter.

7.    Istithmar Obligations.  For so long as this Restructuring Support Agreement remains in effect, and subject to the other Parties hereto fulfilling their respective obligations as provided herein, Istithmar shall:

a.    support consummation of the Financial Restructuring as set forth in the Plan Term Sheet and in the Investment Commitment Letter;

b.    perform all of its obligations set forth in the Investment Commitment Letter, subject to the terms and conditions therein;

c.    not pursue, propose, support, or encourage the pursuit, proposal or support of, any Chapter 11 plan or other restructuring or reorganization for, or the liquidation of, any of the Loehmann's Entities (directly or indirectly) that is inconsistent with the Financial Restructuring or the Investment Commitment Letter;

d.    not, nor encourage any other person or entity to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Restructuring Support Agreement, the Plan Term Sheet or the Investment Commitment Letter or delay, impede, appeal or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Financial Restructuring; and

e.    not commence any proceeding or prosecute, join in, or otherwise support any objection to oppose or object to the Restructuring Plan;

provided, however, that nothing herein shall require Istithmar to incur any obligations to provide financial support to the Company or any other entity, except as expressly provided herein or in the Investment Commitment Letter.

8.    Acknowledgement.

a.    While the Parties agree herein to support approval of the Restructuring Plan, this Restructuring Support Agreement is not and shall not be deemed to be a solicitation for consent to the Restructuring Plan in contravention of section 1125(b) of the Bankruptcy Code.  Notwithstanding anything to the contrary contained herein, any obligation to vote in favor of the Restructuring Plan as set forth above is expressly conditioned on the receipt

6

of the Restructuring Plan and a copy of the Disclosure Statement which shall have previously
been approved by the Bankruptcy Court, after notice and a hearing, as containing adequate
information as required by section 1125 of the Bankruptcy Code.

       b.    Each Party further acknowledges that no securities of any of the
Loehmann's Entities are being offered or sold hereby and that this Restructuring Support
Agreement neither constitutes an offer to sell nor a solicitation of an offer to buy any securities
of any of the Loehmann's Entities.

       9.    <u>Limitations on Transfer of Senior Secured Notes</u>.  Each Supporting
Secured Noteholder shall not, subject to the provisions of the documents related and necessary to
close the transactions contemplated by the Trade Documents and the Forward Purchase
Agreement (i) sell, transfer, assign, pledge, grant a participation interest in or otherwise dispose,
directly or indirectly, of its right, title or interest in respect of the Senior Secured Notes (to the
extent held by it on the date hereof), in whole or in part, or any interest therein, or (ii) grant any
proxies, deposit any of its Senior Secured Notes (to the extent held by it on the date hereof) into
a voting trust, or enter into a voting agreement with respect to any of such Senior Secured Notes,
unless (a) the transferee agrees in writing at the time of such transfer to be bound by this
Restructuring Support Agreement in its entirety without revision and to become a party to the
Restructuring Support Agreement and the Forward Purchase Agreement, by executing a joinder
agreement in the form attached as <u>Exhibit B</u> hereto with respect to the Senior Secured Notes
being transferred to such transferee and (b) such transferee delivers the counterpart signature
page in subsection (a) above to the Senior Secured Notes Indenture Trustee and Capco no later
than three (3) business days following the closing of such transfer.  No transfer by Whippoorwill
shall release or otherwise relieve Whippoorwill of its obligations under the Investment
Commitment Letter and the Forward Purchase Agreement. No transfer by Istithmar shall release
or otherwise relieve Istithmar of its obligations under the Investment Commitment Letter and the
Forward Purchase Agreement.  No transferring Supporting Secured Noteholder shall have any
liability under this Agreement arising from or related to the failure of its transferee to comply
with the terms of this Agreement.  No Supporting Secured Noteholder may create any subsidiary
or affiliate for the sole purpose of acquiring any Senior Secured Notes or any other claims
against or interests in any of the Loehmann's Entities without first causing such subsidiary or
affiliate to become a party hereto.  Any transfer that fails to comply with the provisions of this
paragraph shall be void *ab initio*.

       10.    <u>Further Acquisition of Senior Secured Notes</u>.  This Restructuring Support
Agreement shall in no way be construed to preclude any Supporting Secured Noteholder from
acquiring additional Senior Secured Notes or other claims against any of the Loehmann's
Entities.  Any such additional Senior Secured Notes or claims so acquired shall be automatically
subject to the terms of this Restructuring Support Agreement.

       11.    <u>Condition to each Party's Obligations</u>.

       a.    Each Party's obligations under this Restructuring Support
Agreement are subject to the prior execution of this Restructuring Support Agreement by each of
the Loehmann's Entities, Whippoorwill, and Istithmar.

b.     The Supporting Secured Noteholders' obligations under this Restructuring Support Agreement are subject to execution (prior to or contemporaneously with this Agreement) of the Investment Commitment Letter by each of the Loehmann's Entities, Whippoorwill and Istithmar.

c.     Whippoorwill's and Istithmar's obligations under this Restructuring Support Agreement are subject to execution of the Forward Purchase Agreement by Whippoorwill and Istithmar.

d.     Whippoorwill's and Istithmar's obligations under this Restructuring Support Agreement are subject to (i) the closing of the transactions contemplated by the Trade Documents and (ii) the closing of the transactions contemplated by the Forward Purchase Agreement, including, without limitation, the execution of the Escrow Agreement and the funding of the Escrow Account (both as defined in the Forward Purchase Agreement) in accordance with the terms of the Forward Purchase Agreement.

In no event shall this Restructuring Support Agreement be effective with respect to any Party until the conditions set forth in this Section 11 are satisfied.

12.     <u>Termination Events</u>.     This Restructuring Support Agreement may be terminated upon the occurrence of any of the following events (each, a "<u>Termination Event</u>"):

a.     any of the Loehmann's Entities has (i) breached any of its material obligations under this Restructuring Support Agreement, including, without limitation, the requirement to pay professional fees and expenses set forth in Section 30 of this Agreement, (ii) failed to diligently prosecute the confirmation of the Restructuring Plan, or (iii) has announced its intention to pursue a Chapter 11 plan or other financial restructuring that differs in any material respect from the terms set forth herein or in the Investment Commitment Letter;

b.     any Party (other than any of the Loehmann's Entities) shall have breached any of its material obligations under this Restructuring Support Agreement or under the Investment Commitment Letter;

c.     the commitment set forth in the Investment Commitment Letter expires or terminates pursuant to any Termination Event as defined and described in the Investment Term Sheet (as defined in the Investment Commitment Letter);

d.     any of the Company, Istithmar or Whippoorwill declares that the Investment Commitment Letter is invalid or has no force or effect and the Investment Commitment Letter therefore terminates in accordance with its terms;

e.     any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

8

   f.  any court (including the Bankruptcy Court) shall declare this Restructuring Support Agreement to be unenforceable, which order has not been reversed or vacated within fourteen (14) days after entry;

   g.  entry of an order by the Bankruptcy Court denying confirmation of the Restructuring Plan, which order has not been reversed or vacated within fourteen (14) days after entry;

   h.  the order of the Bankruptcy Court confirming the Restructuring Plan shall have been stayed, reversed, vacated or otherwise modified in a manner adverse to the Supporting Secured Noteholders or Istithmar;

   i.  entry of an order by the Bankruptcy Court invalidating, disallowing, equitably subordinating or limiting in any respect, as applicable, the Senior Secured Notes Claims;

   j.  if the effective date of the Restructuring Plan shall not have occurred by March 15, 2011; or

   k.  each of the Parties hereto agrees in writing to terminate this Restructuring Support Agreement.

   13.  <u>Termination of this Restructuring Support Agreement</u>.

   a.  Upon the occurrence of any of the Termination Events described in Sections 12(e), 12(f), 12(g), or 12(j) herein, this Restructuring Support Agreement shall terminate automatically and without further notice or action by any Party.

   b.  Upon the occurrence of any other Termination Event set forth herein, this Restructuring Support Agreement shall terminate only upon written notice by any non-breaching Party to the other Parties and, if such Termination Event is based upon a breach of an obligation by a Party and such breach is capable of being cured, failure by the breaching Party to remedy the breach giving rise to such Termination Event within five (5) business days; <u>provided</u>, <u>however</u>, that the right to terminate hereunder shall not preclude any non-breaching Party from seeking specific performance or any other remedy available under applicable law for breach of this Restructuring Support Agreement.

   c.  <u>Specific Performance; Damages</u>.  This Restructuring Support Agreement, including without limitation the Parties' agreement herein to support confirmation of the Restructuring Plan, is intended as a binding commitment enforceable in accordance with its terms.  Each Party acknowledges and agrees that the exact nature and extent of damages resulting from a breach of this Restructuring Support Agreement are uncertain at the time of entering into this Restructuring Support Agreement and that breach of this Restructuring Support Agreement would result in damages that would be difficult to determine with certainty.  It is understood and agreed that money damages would not be a sufficient remedy for any breach of this Restructuring Support Agreement and that the Parties shall each be entitled to specific performance and injunctive relief as remedies for any such breach, and further agree to waive, and to use their best efforts to cause each of their representatives to waive, any requirement for

the securing or posting of any bond in connection with such remedy. Such remedies shall not be deemed to be the exclusive remedies for the breach of this Restructuring Support Agreement by any Party or its representatives, but shall be in addition to all other remedies available at law or in equity. In the event of litigation relating to this Restructuring Support Agreement, if a court of competent jurisdiction determines that any Party or any of its representatives have breached this Restructuring Support Agreement, such breaching Party shall be liable and pay to the non-breaching Parties the reasonable legal fees incurred by such non-breaching Parties in connection with such litigation, including any appeal therefrom.

14. <u>Effect of Termination</u>. Upon termination of this Restructuring Support Agreement, all obligations hereunder shall terminate and shall be of no further force and effect; <u>provided</u>, <u>however</u>, that any claim for breach of this Restructuring Support Agreement shall survive termination and all rights and remedies with respect to such claims shall not be prejudiced in any way; but <u>provided</u> <u>further</u>, that the breach of this Restructuring Support Agreement by one or more Parties shall not create any rights or remedies against any non-breaching Party unless such non-breaching Party has participated in or aided and abetted the breach by the breaching Party or Parties. Except as set forth above in this Section 14, upon such termination, any obligations of the non-breaching Parties set forth in this Restructuring Support Agreement shall be null and void <u>ab</u> <u>initio</u> and all claims, causes of action, remedies, defenses, setoffs, rights or other benefits of such non-breaching Parties shall be fully preserved without any estoppel, evidentiary or other effect of any kind or nature whatsoever.

15. <u>Representations and Warranties</u>. Each of the Loehmann's Entities, the Supporting Secured Noteholders, and Istithmar represents and warrants to each other Party, severally but not jointly, that the following statements are true, correct and complete as of the date hereof:

a. <u>Corporate Power and Authority</u>. It is duly organized, validly existing, and in good standing under the laws of the state of its organization, and has all requisite corporate, partnership or other power and authority to enter into this Restructuring Support Agreement and to carry out the transactions contemplated by, and to perform its respective obligations under, this Restructuring Support Agreement.

b. <u>Authorization</u>. The execution and delivery of this Restructuring Support Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership or other action on its part.

c. <u>Binding Obligation</u>. This Restructuring Support Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with the terms hereof, subject to the conditions precedent set forth herein.

d. <u>No Conflicts</u>. The execution, delivery and performance by it (when such performance is due) of this Restructuring Support Agreement does not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or

10

(ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party.

   e. <u>Governmental Consents</u>.  The execution, delivery and performance by the Loehmann's Entities of this Agreement does not and shall not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body.

   16. <u>Additional Representations</u>.  Each Supporting Secured Noteholder represents that, (i) as of the date hereof, it owns or has investment management responsibility for accounts that own Senior Secured Notes in the principal amount set forth on <u>Schedule I</u> and (ii) it is not aware of any event that, due to any fiduciary or similar duty to any other person, would prevent it from taking any action required of it under this Restructuring Support Agreement. Each of the Parties acknowledges and agrees that <u>Schedule I</u> is being provided, on a confidential basis, to the Loehmann's Entities and Istithmar, including their respective advisors, agents, attorneys and representatives, and is not being provided to any other person.  Unless required by applicable law or regulation, neither the Loehmann's Entities nor Istithmar shall disclose any information contained in a Supporting Secured Noteholder's <u>Schedule I</u> without the prior written consent of such Supporting Secured Noteholder except to their advisors, agents, attorneys and representatives; and if such announcement or disclosure is so required by law or regulation, the Loehmann's Entities or Istithmar, as applicable, shall, to the extent allowed by law or regulation, afford the Supporting Secured Noteholder a reasonable opportunity to review and comment upon any such announcement or disclosure prior to making such announcement or disclosure.  The foregoing shall not prohibit the Loehmann's Entities or Istithmar from disclosing the approximate aggregate holdings of the Supporting Secured Noteholders.

   17. <u>Amendment or Waiver</u>.  Except as otherwise specifically provided herein, this Restructuring Support Agreement may not be modified, waived, amended or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by each Party.  No waiver of any of the provisions of this Restructuring Support Agreement shall be deemed or constitute a waiver of any other provision of this Restructuring Support Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver (unless such waiver expressly provides otherwise).

   18. <u>Notices</u>.  Any notice required or desired to be served, given or delivered under this Restructuring Support Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered if provided by personal delivery, or upon receipt of fax delivery, as follows:

   a. if to any of the Loehmann's Entities, to Loehmann's, 2500 Halsey Street , Bronx, NY 10461, Attn: Jerry Politzer, Chief Executive Officer, with a copy to Frank Oswald, Togut, Segal & Segal, LLP, One Penn Plaza, New York, NY 10119, fax: 212 967-4258;

   b. if to Whippoorwill, to Whippoorwill Associates, Inc., 11 Martine Avenue, 11th Floor, White Plains, NY 10606, Attn: Steven Gendal, with a copy to its General Counsel at the same address and a copy to Robert L. Cunningham and Matt J. Williams, Gibson, Dunn & Crutcher LLP, 200 Park Avenue, New York, New York 10166, fax: 212-351-5208;

11

         c.     if to any Supporting Secured Noteholder other than Whippoorwill, to the address and fax number listed on its respective signature page hereto;

         d.     if to Istithmar, to Istithmar Retail Investments, The Galleries, Limitless Building No. 4, Level 6, Jebel Ali, Dubai, United Arab Emirates, fax: +971 4 390 2100, Attn: Chief Executive Officer and General Counsel, with a copy to Richard S. Lincer, Sean A. O'Neal, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, fax: 212-225-3999.

         19.   <u>Governing Law; Jurisdiction</u>.  THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  By its execution and delivery of this Restructuring Support Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under this Restructuring Support Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought (i) in the event that the Chapter 11 Cases have not been commenced, in the United States District Court for the Southern District of New York or (ii) in the event that the Chapter 11 Cases have been commenced, in the Bankruptcy Court.  By execution and delivery of this Restructuring Support Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the Bankruptcy Court, as applicable, solely with respect to any such action, suit or proceeding, and waives any objection it may have to venue or the convenience of the forum.

         20.   <u>Headings</u>.  The headings of the sections, paragraphs and subsections of this Restructuring Support Agreement are inserted for convenience only and shall not affect the interpretation hereof.

         21.   <u>Interpretation</u>.  This Restructuring Support Agreement is the product of negotiations of the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Restructuring Support Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

         22.   <u>Successors and Assigns</u>.  This Restructuring Support Agreement is intended to bind and inure only to the benefit of the Parties and their respective successors, assigns, heirs, transferees, executors, administrators and representatives.

         23.   <u>Consideration</u>.  It is hereby acknowledged by each of the Parties that no consideration shall be due or paid to any Party for its agreement to vote to accept the Restructuring Plan in accordance with the terms and conditions of this Agreement, other than the Loehmann's Entities' agreement to use best efforts to obtain confirmation of the Restructuring Plan in accordance with the terms and conditions set forth herein.

24.     <u>No Third-Party Beneficiaries</u>.    Unless expressly stated herein, this Restructuring Support Agreement shall be solely for the benefit of the Parties hereto and no other person or entity shall be a third-party beneficiary hereof.

25.     <u>No Waiver of Participation and Reservation of Rights</u>.    Except as expressly provided in this Restructuring Support Agreement and in any amendment among each of the Parties, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties (or their respective affiliates or subsidiaries) or its full participation in the Chapter 11 Cases.  If the transactions contemplated by this Restructuring Support Agreement or the Restructuring Plan are not consummated, or if this Restructuring Support Agreement is terminated for any reason, each of the Parties fully reserves any and all of its rights.

26.     <u>No Special Damages</u>.  Notwithstanding anything to the contrary herein, in the event of any litigation or dispute involving this Restructuring Support Agreement, the Plan Term Sheet, the Financial Restructuring, the Investment Commitment Letter, the Restructuring Plan, the Disclosure Statement or any definitive documents related to the foregoing, neither Istithmar nor any of the Supporting Secured Noteholders shall be responsible or liable to the Company for any special, indirect, consequential, incidental or punitive damages.  The obligations of the Company under this paragraph shall be effective upon execution of this Restructuring Support Agreement and shall remain effective whether or not any of the transactions contemplated by this Agreement are consummated, whether any definitive documents are executed and notwithstanding any termination of this Agreement and shall be binding upon the Reorganized Company in the event that any plan of reorganization of the Company is consummated.

27.     <u>No Admissions</u>.  This Restructuring Support Agreement shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.  No Party shall have, by reason of this Restructuring Support Agreement, a fiduciary relationship in respect of any other Party or any party in interest in the Chapter 11 Cases, or any of the Loehmann's Entities, and nothing in this Restructuring Support Agreement, expressed or implied, is intended to or shall be so construed as to impose upon any Party any obligations in respect of this Restructuring Support Agreement except as expressly set forth herein.

28.     <u>Counterparts</u>.  This Restructuring Support Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.   Delivery of an executed signature page of this Restructuring Support Agreement by facsimile or electronic mail in portable document format (pdf) shall be effective as delivery of a manually executed signature page of this Restructuring Support Agreement.

29.     <u>Representation by Counsel</u>.  Each Party acknowledges that it has been represented by counsel in connection with this Restructuring Support Agreement and the

13

transactions contemplated herein.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Restructuring Support Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

30.    <u>Expenses</u>.  The Loehmann's Entities shall pay, when due and payable, any invoice for reasonable professional fees and expenses incurred in connection with this Restructuring Support Agreement presented for payment by the Supporting Secured Noteholders, including without limitation the reasonable out of pocket fees and expenses of (i) Gibson, Dunn & Crutcher LLP, in its capacity as counsel to Whippoorwill, and (ii) CDG, in its capacity as financial advisor to the Supporting Secured Noteholders.  In the event the Restructuring Plan is consummated, the Loehmann's Entities will reimburse Istithmar for the reasonable out of pocket fees and expenses of Cleary Gottlieb Steen & Hamilton LLP incurred in connection with the Financial Restructuring.

31.    <u>Entire Agreement</u>.  This Restructuring Support Agreement, the Plan Term Sheet and the schedules provided to counsel for the Company constitute the entire agreement between the Parties and supersede all prior and contemporaneous negotiations, agreements, representations, warranties and understandings of the Parties, whether oral, written or implied, as to the subject matter hereof.

32.    <u>Automatic Stay</u>.  Each of the Loehmann's Entities acknowledges that after the commencement of the Chapter 11 Cases, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code.

33.    <u>Several not Joint</u>.  The agreements, representations and obligations of the Parties under this Restructuring Support Agreement are, in all respects, several and not joint. Any breach of this Restructuring Support Agreement by any Party shall not result in liability for any other non-breaching Party.

*[Remainder of page intentionally blank; remaining pages are signature pages]*

**IN WITNESS WHEREOF**, the undersigned have each caused this Restructuring Support Agreement to be acknowledged, duly executed and delivered by their respective, duly authorized officers as of the date first above written.

**LOEHMANN'S HOLDINGS INC.**

By:  /s/ Joseph Melvin
Name: Joseph Melvin
Title:   Chief Operating Officer/Chief Financial Officer

**LOEHMANN'S, INC.**

By:  /s/ Joseph Melvin
Name: Joseph Melvin
Title:   Chief Operating Officer/Chief Financial Officer

**LOEHMANN'S REAL ESTATE HOLDINGS, INC.**

By:  /s/ Joseph Melvin
Name: Joseph Melvin
Title:   Chief Operating Officer/Chief Financial Officer

**LOEHMANN'S OPERATING CO.**

By:  /s/ Joseph Melvin
Name: Joseph Melvin
Title:   Chief Operating Officer/Chief Financial Officer

**LOEHMANN'S CAPITAL CORP.**

By:  /s/ Joseph Melvin
Name: Joseph Melvin
Title:   Chief Operating Officer/Chief Financial Officer

**ISTITHMAR RETAIL INVESTMENTS**

By:  /s/ Kapil Zaveri
Name:  Kapil Zaveri
Title:

[*Signature Page to Restructuring Support Agreement*]

**SUPPORTING SECURED NOTEHOLDERS**:

**WHIPPOORWILL ASSOCIATES, INC.,** as agent for certain of its discretionary funds and accounts

By:  /s/ Steven Gendal
Name:  Steven Gendal
Title:   Principal

**<u>ADDITIONAL SECURED NOTEHOLDERS</u>**:

By: _____
Name:
Title:

Notice Information:

# EXHIBIT A
(Plan Term Sheet)

**Execution Version**

**Exhibit A to Restructuring Support Agreement**

**THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN.**

**SUCH OFFER OR SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

Loehmann's Holdings Inc

Loehmann's, Inc.

Loehmann's Real Estate Holdings, Inc.

Loehmann's Operating Co.

Loehmann's Capital Corp.

**TERM SHEET FOR PROPOSED CHAPTER 11 PLAN OF REORGANIZATION**

This term sheet (the "Plan Term Sheet"), which is part of a Restructuring Support Agreement, dated November 14, 2010 (the "Restructuring Support Agreement"), by and among (i) Loehmann's Holdings Inc. ("Loehmann's Holdco"), (ii) Loehmann's, Inc. ("Loehmann's"), (iii) Loehmann's Real Estate Holdings, Inc. ("Holdings"), (iv) Loehmann's Operating Co. ("Loehmann's Opco"), (v) Loehmann's Capital Corp. ("Capco") (collectively, the "Company" or the "Loehmann's Entities"), (vi) Istithmar Retail Investments ("Istithmar"), (vii) Whippoorwill Associates, Inc., as agent for its discretionary accounts that are legal and/or beneficial owners of the Senior Secured Notes (as defined below) ("Whippoorwill"), and (viii) any other holders of the Senior Secured Notes (as defined below) identified on the signature pages to the Restructuring Support Agreement (together with Whippoorwill, the "Supporting Secured Noteholders"), and is subject to the terms and conditions of the Restructuring Support Agreement, describes the principal terms of a proposed restructuring of the Company to be implemented pursuant to a plan of reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"). Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in the Restructuring Support Agreement.

| | |
|---|---|
| **PLAN PROPONENT:** | The Debtors |
| **PLAN OF REORGANIZATION:** | The Debtors shall file a plan of reorganization (the "Restructuring Plan") and related disclosure statement (the "Disclosure Statement") that incorporate, and are consistent with, the terms of the Restructuring Support Agreement, the Investment Commitment Letter and this Plan Term Sheet. |

The Restructuring Plan and the Disclosure Statement shall be in form and substance acceptable to each Investor in its sole discretion and may not be amended without the consent of the Supporting Secured Noteholders and Istithmar.  All documents related to the Restructuring Plan and Disclosure Statement, including, without limitation, all plan supplement documents, the Investment Commitment Letter, all corporate governance documents, any shareholders' agreement, any registration rights agreement, any Management Incentive Plan and all documentation related to the Exit Facility and the DIP Financing Facility shall be in form and substance acceptable to each Investor in its sole discretion.

The Restructuring Plan shall address, among other things, the Debtors' (i) obligations under that certain Debtor-In-Possession Credit Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Credit Agreement") by and among Loehmann's Opco as borrower (the "Borrower"), Capco, Loehmann's Holdco, Loehmann's and Holdings as guarantors (collectively, the "Guarantors", and together with the Borrower, the "Loan Parties"), Crystal Financial LLC ("Crystal"), as administrative agent and collateral agent (in such capacity, and together with its successors in such capacity, the "Agent") for the lenders party to the DIP Credit Agreement from time to time (individually, a "Lender" and collectively, including the Agent, the "DIP Lenders"); (ii) obligations under the Indenture, dated as of October 12, 2004, by and among Capco and Wells Fargo, as trustee, relating to the issuance of 12% Senior Secured Class A Notes due 2011 (the "12% A Notes"); (iii) obligations under the Indenture, dated as of October 12, 2004, by and among Capco and Wells Fargo, as trustee, relating to the issuance of the Senior Secured Floating Rate Notes due 2011 (the "Floating Rate Notes," together with the 12% A Notes, the "A Notes"); (iv) obligations under the Indenture, dated as of October 12, 2004, by and among Capco and Wells Fargo, as trustee, relating to the issuance of 13% Senior Secured Class B Notes due 2011 (the "13% B Notes"); (v) other obligations; and (vi) equity securities.

The Financial Restructuring shall provide for, among other things: (i) the discharge of Claims and Liens against the Loehmann's Entities, pursuant to the Restructuring Plan, (ii) the cancellation of all existing common stock in Loehmann's Holdco, (iii) the issuance of new common stock in Reorganized Loehmann's Holdco ("New Common Stock")

2

pursuant to the Restructuring Plan and (iv) the issuance of new convertible preferred equity in Reorganized Loehmann's Holdco ("New Convertible Preferred Equity").

**PLAN FUNDING:**

The Reorganized Company shall enter into a senior secured credit facility in the amount of up to $40 million to be negotiated and to be satisfactory to each of the Company, Istithmar, and each of the Supporting Secured Noteholders in their sole discretion (the "Exit Facility").

The Restructuring Plan will be funded with cash from operations, borrowings under the Exit Facility and the proceeds received from the New Investment (as defined in the Investment Commitment Letter).

**DEFINITIVE DOCUMENTS:**

The transactions described in this Plan Term Sheet are subject in all respects to, among other things, definitive documentation, including without limitation, the Restructuring Plan, the documents to be included in the plan supplement to the Restructuring Plan, the Disclosure Statement, the Exit Facility, and the documents contemplated by the Restructuring Support Agreement and the Investment Commitment Letter, all of which shall be in form and substance satisfactory to each of the Supporting Secured Noteholders and Istithmar in their sole discretion.

**TREATMENT OF CLAIMS AND INTERESTS:**

**Administrative Expense Claims**

Unclassified; to be paid in full by the Reorganized Debtors.

**Priority Tax Claims**

Unclassified; to be paid in full by the Reorganized Debtors.

**DIP Financing Claims**

Unclassified; the allowed claims under the DIP Financing Facility shall be paid in full on the Effective Date.

**Other Priority Claims**

Unimpaired; to be paid in full by the Reorganized Debtors; deemed to accept and not entitled to vote on the Restructuring Plan.

**Other Secured Claims**

Unimpaired; to be paid in full by the Reorganized Debtors; deemed to accept and not entitled to vote on the Restructuring Plan.

**Class A Note Claims**

Impaired and entitled to vote on the Restructuring Plan. Class A Note Claims shall be allowed under the Restructuring Plan in the aggregate amount of $75,000,000 plus accrued and unpaid interest as of the Petition Date.

3

In full satisfaction of Class A Note Claims, each holder of an allowed Class A Note Claim shall receive the following treatment:

On the Effective Date, holders of Class A Note Claims shall receive their pro rata share of:

New Common Stock representing 83.2% of the total outstanding New Common Stock on the Effective Date (prior to dilution resulting from any conversion of New Convertible Preferred Equity (as such term is defined in the Investment Commitment Letter) to New Common Stock), subject to dilution for any New Common Stock issued pursuant to any Management Incentive Plan.

Assuming that 100% of the New Convertible Preferred Equity is converted to New Common Stock, holders of Class A Note Claims would receive their pro rata share of New Common Stock representing 42.4% of the total outstanding New Common Stock on the Effective Date.

Any unpaid fees and expenses owed pursuant to the terms of the Senior Secured Notes Indenture, including any fees and expenses owed to the Senior Secured Notes Indenture Trustee and the Special Trustee (as defined in the Indenture), if any, shall be paid in full and in cash on the Effective Date.

The distributions above shall also be in full satisfaction of: (i) any Claim, Lien, right or interest that a holder of an A Note may have arising under, related to, or in connection with, the Related Agreements; and (ii) any Claim, Lien, right or interest that the Senior Secured Notes Indenture Trustee or the Special Trustee may have arising under, related to, or in connection with, the Related Agreements for the benefit of any holder of an A Note.

**Class B Note Claims**

Impaired and entitled to vote on the Restructuring Plan. Class B Note Claims shall be allowed under the Restructuring Plan in the aggregate amount of $35,000,000 plus accrued and unpaid interest as of the Petition Date.

In full satisfaction of the Class B Note Claims, each holder of an allowed Class B Note Claim shall receive the following treatment:

On the Effective Date, holders of Class B Note Claims shall receive their pro rata share of:

New Common Stock representing 16.8% of the total outstanding New Common Stock on the Effective Date (prior

4

to dilution resulting from any conversion of New Convertible Preferred Equity (as such term is defined in the Investment Commitment Letter) to New Common Stock), subject to dilution for any New Common Stock issued pursuant to any Management Incentive Plan.

Assuming that 100% of the New Convertible Preferred Equity is converted to New Common Stock, holders of Class B Note Claims would receive their pro rata share of New Common Stock representing 8.6% of the total outstanding New Common Stock on the Effective Date.

Any unpaid fees and expenses owed pursuant to the terms of the Senior Secured Notes Indenture, including any fees and expenses owed to the Senior Secured Notes Indenture Trustee (as defined in the Indenture), if any, shall be paid in full and in cash on the Effective Date.

The distributions above shall also be in full satisfaction of: (i) any Claim, Lien, right or interest that a holder of a 13% B Note may have arising under, related to, or in connection with, the Related Agreements; and (ii) any Claim, Lien, right or interest that the Senior Secured Notes Indenture Trustee may have arising under, related to, or in connection with, the Related Agreements for the benefit of any holder of a 13% B Note.

|  |  |
| --- | --- |
| **General Unsecured Claims** | Impaired and entitled to vote on the Restructuring Plan.<br><br>In full satisfaction of the General Unsecured Claims, each holder of an allowed General Unsecured Claim shall receive the following treatment:<br><br>On the Effective Date, holders of General Unsecured Claims shall receive their pro rata share of:<br><br>A cash distribution in an amount to be agreed upon by the Company, Istithmar and the Supporting Secured Noteholders, provided however, that subject to the satisfaction of agreed upon conditions, holders of allowed General Unsecured Claims may elect to receive, in lieu of the Cash Distribution, unsecured notes in the principal amount of amount to be agreed upon by the Company, Istithmar and the Supporting Secured Noteholders (the "New Unsecured Notes"), which New Unsecured Notes shall have terms to be mutually agreed between Istithmar and the Supporting Secured Noteholders.<br><br>The distributions provided to holders of allowed General Unsecured Claims shall be funded from the proceeds of the the New Investment (as defined in the Investment Commitment Letter). |

5

| | |
|---|---|
| **Statutory Subordinated Claims** | Impaired and deemed to reject the Restructuring Plan.  The holders of allowed Statutory Subordinated Claims shall be impaired and the holders of such Claims shall receive no distributions under the Restructuring Plan. |
| **Existing Equity of Loehmann's Holdco** | Impaired and deemed to reject the Restructuring Plan. Holders of existing common stock of Loehmann's Holdco will receive no distributions under the Restructuring Plan. Existing common stock of Loehmann's Holdco will be cancelled on the Effective Date.  Any options with respect to existing common stock of Loehmann's Holdco will be cancelled on the Effective Date. |
| **Intercompany Claims** | Unimpaired and deemed to accept the Restructuring Plan. Holders of Intercompany Claims shall receive no distributions under the Restructuring Plan; <u>provided</u>, <u>however</u>, the Debtors reserve the right to reinstate any or all Intercompany Claims on the Effective Date other than any Claims related to the Lease or related transactions. |
| **Executory Contracts and Unexpired Leases** | All executory contracts and unexpired leases of the Loehmann's Entities, including the Lease, will be assumed by the Loehmann's Entity that is a party to such contract or lease, unless expressly rejected by the applicable Loehmann's Entity pursuant to the Restructuring Plan or pursuant to a separate order of the Bankruptcy Court. |
| **RELEASES & EXCULPATION** | In addition to the discharge and release granted to the Loehmann's Entities and their Related Persons under sections 105 and 1141 of the Bankruptcy Code, the Restructuring Plan shall provide for certain releases as set forth below. |

The Restructuring Plan will include:

- exculpation and release of the Released Parties with respect to the formulation, solicitation and implementation of the Exchange Offer, the Restructuring Plan, in connection with or related to the Chapter 11 Cases, and transactions contemplated thereby (except for acts or omissions constituting willful misconduct, gross negligence or bad faith); and

- release of the Released Parties by all holders of Claims who vote to accept the Restructuring Plan of all causes of action  in connection with or related to the Loehmann's Entities, including without limitation, the Chapter 11 Cases, the Restructuring Support Agreement, the Exchange Offer, the Investment Commitment Letter or the Restructuring Plan (including, without limitation,

6

the solicitation of votes on the Restructuring Plan) (other than the rights to enforce the Restructuring Plan and the contracts, releases, indentures, and other agreements or documents delivered thereunder) that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date, which could have been asserted by the holders of Claims; provided, however, that the foregoing shall not operate as a waiver or release from any causes of action arising out of the acts or omissions constituting actual or intentional fraud, willful misconduct or criminal conduct as determined by a final order entered by a court of competent jurisdiction.

**CONDITIONS TO EFFECTIVE DATE:**

The Restructuring Plan shall contain various usual and customary conditions precedent to the Effective Date that must be satisfied (or waived by each of the Supporting Secured Noteholders and Istithmar) prior to, or concurrent with, the occurrence of the Effective Date and conditions that may only be satisfied on the Effective Date.

Such conditions to the Effective Date shall include, without limitation, the following:

(i) an order confirming the Restructuring Plan (the "Confirmation Order"), which Restructuring Plan and Confirmation Order shall be in form and substance reasonably satisfactory to each of the Loehmann's Entities, Istithmar and the Supporting Secured Noteholders in their sole discretion, shall have been entered and shall not have been stayed or modified or vacated on appeal; and

(ii) receipt by the Company of the proceeds of the New Investment (as defined in the Investment Commitment Letter) on or prior to the Effective Date; and

(iii) the Effective Date shall have occurred on or prior to March 15, 2011.

**REORGANIZED DEBTORS' SENIOR MANAGEMENT:**

The officers of the Reorganized Debtors shall constitute such individuals as are acceptable to each Investor and will be designated in the Plan Supplement.

The Reorganized Debtors' officers shall serve in accordance with any employment agreement, policies or other arrangements as is acceptable to each Investor and the Reorganized Debtors and applicable nonbankruptcy law.

**MANAGEMENT INCENTIVE PLAN:**

The Restructuring Plan may provide for a new management incentive plan in form and substance satisfactory to each of the Supporting Secured Noteholders and Istithmar in their

|  | sole discretion (the "<u>Management Incentive Plan</u>"). |
|---|---|
| **POST-EFFECTIVE DATE GOVERNANCE:** | The Restructuring Plan shall provide that the Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Restructuring Plan. |
| **SHAREHOLDER PROTECTIONS:** | The Restructuring Plan shall provide for shareholder protections as set forth in the Investment Term Sheet (as defined in the Investment Commitment Letter) in the section thereof entitled "Shareholder Protections" in form and substance reasonably satisfactory to each of the Supporting Secured Noteholders and Istithmar in their sole discretion. |
| **ADDITIONAL PROVISIONS:** | The Restructuring Plan shall contain other provisions customarily found in other similar plans of reorganization, as are reasonably acceptable to each of the Supporting Secured Noteholders and Istithmar in their sole discretion. |
|  | Additionally, on the Effective Date, Capco and Holdings shall be merged into Loehmann's Opco and all obligations between Capco, Holdings and the other Loehmann's Entities shall be fully extinguished. |
| **MEANS FOR IMPLEMENTATION:** | The Restructuring Plan shall include such provisions as are reasonably necessary to implement the transactions contemplated herein. |
| **PROFESSIONAL FEES AND EXPENSES:** | The Plan shall provide for payment in full, on the Effective Date, of the Commitment Fee as well as any unpaid reasonable fees and expenses incurred by the Supporting Secured Noteholders in connection with the Chapter 11 Cases and the transactions contemplated herein , including without limitation the reasonable fees and expenses of (i) Gibson, Dunn & Crutcher LLP, in its capacity as counsel to Whippoorwill, (ii) Conway Del Genio Gries & Co., LLC, in its capacity as financial advisor to the Supporting Secured Noteholders and (iii) Cleary Gottlieb Steen & Hamilton LLP, in its capacity as counsel to Istithmar; <u>provided</u>, <u>however</u>, that the Expenses of Istithmar shall be reimbursed only in the event that the transactions contemplated by the Restructuring Plan are consummated. |
| **DEFINITIONS:** | "<u>Administrative Expense Claim</u>" means any Claim for costs and expenses of administration of the Chapter 11 Cases that is allowed under section 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) any |

actual and necessary costs and expenses incurred after the Petition Date of preserving the Loehmann's Entities' estates and operating the businesses of the Loehmann's Entities; and (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses allowed by the Bankruptcy Court under section 327, 328, 330, 331, 363, or 503(b) of the Bankruptcy Code to the extent incurred prior to the Effective Date.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Class A Note Claim" means any Claim, Lien, right or interest of (i) a holder of a 12% A Note arising under, related to, or in connection with, the 12% A Notes or the Senior Secured Notes Indenture or (ii) a holder of a Floating Rate Note arising under, related to, or in connection with, the Floating Rate Notes, the Senior Secured Notes Indenture or the Related Agreements.

"Class B Note Claim" means any Claim, Lien, right or interest of a holder of a 13% B Note arising under, related to, or in connection with, the 13% B Notes, the Senior Secured Notes Indenture or the Related Agreements.

"Covenant Compliance and Indemnity Agreement" means the covenant compliance and indemnity agreement dated October 13, 2004 (as amended, supplemented or otherwise modified from time to time) among Capco and each of Loehmann's Holdco, Loehmann's, Holdings, and Loehmann's Opco.

"DIP Financing Claim" means any Claim, Lien, right or interest against any of the Loehmann's Entities (or their property) with respect to the obligations arising under the DIP Financing Facility.

"DIP Financing Facility" means that certain credit facility established pursuant to the DIP Credit Agreement.

"Exchange Offer" means that certain exchange offer with respect to the Senior Secured Notes that was launched pursuant to the terms of an offering memorandum issued by Capco on September 27, 2010, which offering memorandum was supplemented on October 14, 2010, October 25, 2010, and October 28, 2010.

"General Unsecured Claim" means any Claim (including any

9

Lease Rejection Damages Claim) against any of the Loehmann's Entities that is not an Administrative Expense Claim, Priority Tax Claim, DIP Financing Claim, Other Priority Claim, Other Secured Claim, Class A Note Claim, Class B Note Claim, Secured Tax Claim, or Statutory Subordinated Claim.

"Intercompany Claims" means any Claim of one Debtor against another Debtor.

"Lease" means that certain Lease and License Financing and Purchase Option Agreement (as the same may be amended, restated, supplemented or otherwise modified from time to time), dated as of October 13, 2004, between Capco, as Lessor, and Loehmann's Opco, as Lessee.

"Lease Guarantee" means that certain Lease Guarantee (as the same may be amended, restated, supplemented or otherwise modified from time to time), dated as of October 13, 2004, by each of: (i) Loehmann's Holdco, (ii) Loehmann's, (iii) Holdings, (iv) Loehmann's Opco; (v) and any other subsidiary of Loehmann's Holdco, in favor of Capco.

"Lease Rejection Damages Claim" means any Claim arising from, or relating to, the rejection of an unexpired lease pursuant to section 365(a) of the Bankruptcy Code by any of the Loehmann's Entities.

"Lease Security Agreement" shall mean the Lease Security Agreement, dated as of October 13, 2004 (as amended, supplemented or otherwise modified from time to time), among Capco, Loehmann's Holdco, Loehmann's, Holdings and Loehmann's Opco.

"Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"Other Priority Claim" means any Claim against any Loehmann's Entity, other than an Administrative Expense Claim or Priority Tax Claim, that is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

"Other Secured Claim" means any Secured Claim against any Loehmann's Entity other than a Secured Tax Claim. Other Secured Claim includes any Claim, Lien, right or interest against any of the Loehmann's Entities (or their property) with respect to the obligations arising under the Credit

10

Agreement (unless obligations arising under the Credit Agreement are satisfied with the proceeds of the DIP Financing Facility).

"Petition Date" means the date and time that the Loehmann's Entities file their respective voluntary petitions under chapter 11 of the Bankruptcy Code.

"Registration Rights Agreement" means the Registration Rights Agreement, dated as of October 12, 2004 (as amended, supplemented or otherwise modified from time to time), between Capco and Jefferies & Company, Inc.

"Registration Rights Assistance Agreement" means the Registration Rights Assistance Agreement dated as of October 13, 2004 (as amended, supplemented or otherwise modified from time to time) by and among Capco, Loehmann's Opco, Loehmann's Holdco, Loehmann's, and Holdings.

"Registration Rights Assistance Agreement" means the Registration Rights Assistance Agreement dated as of October 13, 2004 (as amended, supplemented or otherwise modified from time to time) by and among Capco, Loehmann's Opco, Loehmann's Holdco, Loehmann's, and Holdings.

"Related Agreements" means the Lease, the Lease Guarantee, the Security Agreement, the Security and Control Agreement, the Lease Security Agreement, the Notes Trademark Security Agreement, the Registration Rights Agreement, the Registration Rights Assistance Agreement, and the Covenant Compliance and Indemnity Agreement.

"Released Parties" means (i) each of the Loehmann's Entities and their affiliates, (ii) each of the DIP Lenders, (iii) each holder of Senior Secured Notes that votes in favor of the Restructuring Plan, (iv) the Senior Secured Notes Indenture Trustee and Special Trustee, solely in the event that such person or persons do not object to the Restructuring Plan, (v) Istithmar, (vi) Whippoorwill and (vii) each of their respective Related Persons.

"Reorganized Debtors" means, collectively, the Debtors after the Effective Date.

"Secured Claim" means any Claim against any Loehmann's Entity that is secured by a Lien on property in which a

11

Loehmann's Entity's estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the applicable estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

"Secured Tax Claim" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"Security Agreement" means the Security Agreement, dated as of October 12, 2004 (as amended, supplemented or otherwise modified from time to time), between Capco and Wells Fargo, as collateral agent.

"Security and Control Agreement" means the Security and Control Agreement, dated as of October 12, 2004 (as amended, supplemented or otherwise modified from time to time), between Capco and Wells Fargo as trustee, collateral agent, and securities intermediary.

"Statutory Subordinated Claim" means any Claim that is subordinated pursuant to section 510(b) or (c) of the Bankruptcy Code.

"Wells Fargo" means Wells Fargo Bank, National Association.

12

**EXHIBIT B**
(Restructuring Support Joinder)

## TRANSFER AND RESTRUCTURING SUPPORT JOINDER AGREEMENT

This Transfer and Restructuring Support Joinder Agreement (the "Joinder Agreement") is dated as of and is entered into by and between [*Insert name of Assignor*] (the "Assignor") and [*Insert name of Assignee*] (the "Assignee") in accordance with Section 9 of the Restructuring Support Agreement attached hereto as Exhibit A (the "Restructuring Support Agreement"). Capitalized terms used but not defined herein shall have the meanings given to them in the Restructuring Support Agreement or the Forward Purchase Agreement.

**WHEREAS**, Assignor is a party to the Restructuring Support Agreement and the Forward Purchase Agreement and has assigned to Assignee by separate agreement claims held by Assignor against the Company;

**WHEREAS**, the assignment by Assignor to Assignee is not effective unless Assignee complies with Section 9 of the Restructuring Support Agreement; and

**WHEREAS**, Assignee agrees to comply with the Restructuring Support Agreement by entering into this Joinder Agreement.

**NOW, THEREFORE**, in consideration of the mutual conditions and agreements set forth in the Assignment and herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1.      Assignee (a) agrees to be bound by the Restructuring Support Agreement as a Supporting Secured Note Holder; (b) assumes the rights and obligations of a Supporting Secured Note Holder under the Restructuring Support Agreement, and shall be deemed for all purposes to be a Supporting Secured Note Holder; (c) agrees to be bound by the Forward Purchase Agreement as a Seller; and (d) assumes the rights and obligations of a Seller under the Forward Purchase Agreement, and shall be deemed for all purposes to be a Seller. Assignee (a) represents and warrants to each of the other Parties to the Restructuring Support Agreement that, solely with respect to itself, the statements set forth in Section 3(a) and Section 3(b) of the Forward Purchase Agreement are true, correct and complete as of the date hereof; (b) represents and warrants to each of the other Parties to the Restructuring Support Agreement that, solely with respect to itself, the statements set forth in Section 15 and Section 16 of the Restructuring Support Agreement are true, correct and complete as of the date hereof; and (c) further represents and warrants that (i) it is acquiring the claims from Assignor in the amounts set forth on Schedule I hereof (the "Assigned Claims"), and (ii) upon consummation of such acquisition under the applicable agreements to which such Assigned Claims relate, it will be the legal or beneficial owner of the Assigned Claims. With respect to the Assigned Claims, Schedule I hereof shall be deemed to constitute Schedule I of the Restructuring Support Agreement.

2.      Assignee shall deliver a copy of this Joinder Agreement to the Company no later than three (3) Business Days after the date of this Joinder Agreement.

3.      When acknowledged by the Company, this Joinder Agreement may be attached to the Restructuring Support Agreement to evidence the foregoing assumptions and agreements;

<u>provided</u> that any failure by the Company to acknowledge this Joinder Agreement shall not affect the validity or enforceability hereof.

4.      THIS JOINDER AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISION WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. By its execution and delivery of this Joinder Agreement, Assignee hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under the Joinder Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought (i) in the event that the Chapter 11 Cases have not been commenced, in the United States District Court for the Southern District of New York or (ii) in the event that the Chapter 11 Cases have been commenced, in the Bankruptcy Court.  By execution and delivery of this Joinder Agreement, Assignee irrevocably accepts and submits itself to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the Bankruptcy Court, as applicable, solely with respect to any such action, suit or proceeding, and waives any objection it may have to venue or the convenience of the forum.

6.      This Joinder Agreement shall be effective upon execution by the Assignor and Assignee and shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Joinder Agreement may be executed in any number of counterparts, which together shall constitute one instrument.    Delivery of an executed counterpart of a signature page of this Joinder Agreement by telecopy or electronic mail in portable document format (pdf) shall be effective as delivery of a manually executed counterpart of this Assignment.

*[Remainder of page intentionally left blank]*

The terms set forth in this Joinder Agreement are hereby agreed to:

ASSIGNOR
**[NAME OF ASSIGNOR]**


By: _____
Title:



Address:
_____
_____
_____
Telephone:_____
Facsimile:_____
Email:_____

ASSIGNEE
**[NAME OF ASSIGNEE]**


By: _____
Title:



Address:
_____
_____
_____
Telephone:_____
Facsimile:_____
Email:_____

## ACKNOWLEDGEMENT

By its signature below, Loehmann's Holdings Inc., on behalf of itself and Loehmann's Inc., Loehmann's Real Estate Holdings Inc., Loehmann's Operating Co. and Loehmann's Capital Corp., acknowledges the transfer evidenced by the Joinder Agreement to which this Acknowledgement is attached.

**LOEHMANN'S HOLDINGS INC.**


By: _____

Title:

## SCHEDULE I

Name of Supporting Secured Noteholder: _____


Total Outstanding Principal Amount of 12% Senior Secured Class A Notes
 Due 2011 held by Supporting Secured Noteholder: _____


Total Outstanding Principal Amount of Senior Secured Floating Rate Notes due 2011 held by
Supporting Secured Noteholder: _____


Total Outstanding Principal Amount of 13% Senior Secured Class B Notes due 2011 held by
Supporting Secured Noteholder: _____

**EXHIBIT F**

19137178

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                            :

In re:                                :           Chapter 11
                                              :

LOEHMANN'S HOLDINGS, INC., *et al.*,      :           Case No.       10-16077 (REG)
                                              :

                             Debtors.     :           (Jointly Administered)
                                              :

-----------------------------------------------------------------x

## ORDER (I) APPROVING AND AUTHORIZING
## ASSUMPTION OF INVESTMENT AGREEMENT;
## (II) APPROVING THE TRANSACTIONS CONTEMPLATED
## THEREIN, INCLUDING PAYMENT OF COMMITMENT FEE
## AND EXPENSE REIMBURSEMENT, AS ADMINISTRATIVE
## EXPENSE;  AND (III) APPROVING DEBTORS' ENTRY INTO
## AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT

Upon the motion and the supplement thereto (the "Supplement")

(together, the "Motion") of Loehmann's Holdings Inc. ("Loehmann's Holdings") and its

affiliated debtors in the above-referenced Chapter 11 cases, as debtors and debtors in

possession (collectively, the "Debtors"),[1] for entry of an order pursuant to sections

105(a), 363(b), 365(a), and 503(b) of title 11 of the United States Code (the "Bankruptcy

Code") and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") (i) authorizing the Debtors to assume that certain Investment

Commitment Letter, dated as of November 14, 2010 and amended and restated on

December 1, 2010 (the "Investment Agreement"), by and among Istithmar Retail

---

[1]     The Debtors are the following entities:  Loehmann's Holdings, Inc., Loehmann's, Inc., Loehmann's
Real Estate Holdings, Inc., Loehmann's Operating Co. and Loehmann's Capital Corp.

Investments, Whippoorwill Associates, Inc., as agent for certain of its discretionary

funds and accounts, (individually, a "Backstop Investor" and together, the "Backstop

Investors") and each of the Debtors (collectively, the "Parties"), (ii) approving and

authorizing the transactions specified therein, including (A) payment of a Commitment

Fee[2] equal to 4% of the New Equity Investment and a certain Expense Reimbursement

specified in the Investment Agreement, in each case in the circumstances, and upon the

terms and subject to the conditions set forth in the Investment Agreement, and (B)

granting administrative expense priority status pursuant to sections 503(b) to the

Commitment Fee and Expense Reimbursement, and (iii) approving the Debtors' entry

into the Restructuring Support Agreement, dated as of November 14, 2010 and

amended and restated on December 1, 2010 (the "Restructuring Support Agreement")

all as more fully set forth in the Motion;  and The Official Committee of Unsecured

Creditors having filed an objection to the Motion (the "Objection"), and the Court

having reviewed the Motion;  and the Court having conducted a hearing and

considered the arguments of counsel on the merits of the Motion and the Objection; it is

hereby

**FOUND AND DETERMINED AS FOLLOWS:**

      A.   <u>Findings and Conclusions</u>.  The findings and conclusions set forth

herein and on the record constitute the Court's findings of fact and conclusions of law

pursuant to Federal Rule of Bankruptcy Procedure 7052, as made applicable to these

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2

proceedings pursuant to Federal Rule of Bankruptcy Procedure 9014.  To the extent that

any finding of fact shall later be determined to be a conclusion of law, it shall be so

deemed and *vice versa*.

        B.      <u>Jurisdiction and Venue</u>.  The Court has jurisdiction to consider the

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.

Consideration of the Motion and the requested relief is a core proceeding pursuant to 28

U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409.

        C.      <u>Statutory Predicate</u>.  The statutory predicates for the relief granted

herein are sections 105(a), 363(b), 365(a) and 503(b) of the Bankruptcy Code.  In

addition, the relief granted herein is in accordance with Bankruptcy Rules 6004 and

6006.

        D.      <u>Notice</u>.  The Debtors have provided due, proper, timely, adequate,

and sufficient notice of the Motion to (i) the United States Trustee for the Southern

District of New York;  (ii) the entities listed on the Debtors' Consolidated List of

Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule

1007(d);  (iii) counsel to the Official Committee of Unsecured Creditors; (iv) the entities

listed on the Debtors' Consolidated List of Prepetition Secured Creditors;  (v) counsel to

the agent for the Debtors' prepetition credit facility;  (vi) the Office of the United States

Attorney for the Southern District of New York;  (vii) the Office of the Attorney General

of New York;  (viii) the Internal Revenue Service;  and (ix) any parties required to be

served under any applicable Bankruptcy Rule or Local Rule.

E.    Business Judgment.  The Debtors have articulated both a sound business purpose and compelling business circumstances in support of:  (i) the assumption of the Investment Agreement pursuant to section 365 of the Bankruptcy Code, including, without limitation, payment of the Commitment Fee and Expense Reimbursement, in each case in the circumstances, and upon the terms and subject to the conditions, set forth in the Investment Agreement;  and (ii) the entry into the amendments reflected in the Investment Agreement and the Restructuring Support Agreement.  Such business reasons include, but are not limited to, the Debtors' belief that the transactions contemplated by the Investment Agreement, the Restructuring Agreement and the Debtors' proposed chapter 11 plan of reorganization (the "Plan") will likely provide the highest recovery to the Debtors' secured and unsecured creditors,  the transactions contemplated by the Investment Agreement and the Restructuring Support Agreement are supported by Whippoorwill, the largest holder of Senior Secured Notes, and that the Debtors could potentially enter into a Competing Transaction (as defined in the Investment Agreement) subject to the terms and conditions of the Investment Agreement and the Restructuring Support Agreement.

F.    Arms' Length Transaction.  The Parties negotiated, proposed, and entered into the Investment Agreement and the Restructuring Support Agreement without collusion, in good faith, and at arms' length with the assistance of their respective advisors.

G.    The Commitment Fee, Expense Reimbursement and Indemnification Obligations.  The Commitment Fee, Expense Reimbursement and the

Debtors' indemnification obligations set forth in Section 8 of the Investment Agreement are reasonable and warranted on the terms set forth in the Investment Agreement given (i) the significant benefit to the estates of having a definitive agreement to facilitate a pre-negotiated chapter 11 restructuring, (ii) the significant time, effort, and substantial costs incurred by the Backstop Investors in connection with negotiating the Investment Agreement and related definitive documentation, and (iii) the risk to the Backstop Investors that the Debtors may ultimately enter into a Competing Transaction. The amount of the Commitment Fee is comparable to industry standards and is reasonable and customary for this type of transaction. The payment of the Commitment Fee, Expense Reimbursement, and the Debtors' indemnification obligations set forth in Section 8 of the Investment Agreement, in each case in the circumstances, and upon the terms and conditions, set forth in the Investment Agreement are bargained-for and integral parts of the transactions specified in the Investment Agreement, and, without such inducements, the Backstop Investors would not have agreed to the terms and conditions of the Investment Agreement. Accordingly, the foregoing transactions are reasonable and enhance the value of the Debtors' estates.

H.    <u>Opportunity to be Heard</u>.  All parties in interest have been afforded a reasonable opportunity to object and be heard with respect to the Motion and Supplement and the transactions set forth within the Investment Agreement and Restructuring Support Agreement and all of the relief granted herein.

I.      Cure Costs and Adequate Assurance.  No defaults requiring cure under section 365(b) of the Bankruptcy Code exist.  Because no such defaults exist, the Debtors are not required to provide adequate assurance of future performance.

**BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED to the extent provided herein.

2.      All objections to the Motion or the relief requested therein, if any, that have not been withdrawn, waived or settled are overruled with prejudice.

3.      The Debtors are authorized to assume the Investment Agreement, pursuant to section 365(a) of the Bankruptcy Code and to take all actions reasonably necessary to perform their obligations thereunder in accordance with the terms thereof. The Investment Agreement, is binding and enforceable against the Debtors, the Backstop Investors and their successors in accordance with its terms.

4.      The Debtors (jointly and severally) are hereby authorized to pay, in each case in the circumstances, and subject to the terms and conditions set forth in the Investment Agreement and this Order, the Commitment Fee, Expense Reimbursement and any indemnification obligations set forth in Section 8 of the Investment Agreement, each of which, in the case of Whippoorwill, shall be entitled to administrative expense priority status pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code and not be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any person or entity.  Notwithstanding anything set

6

forth herein, in the event the Plan is consummated, the Commitment Fee shall be

payable to the Backstop Investors in the form of Commitment Fee Preferred Stock (as

defined in the Investment Agreement) on the Plan Effective Date.  For the avoidance of

doubt, Istithmar's portion of the Commitment Fee shall only be payable to Istithmar in

the form of Commitment Fee Preferred Stock on the Effective Date of the Plan.

   5. The Debtors are hereby authorized to pay the Expense

Reimbursement and indemnification obligations set forth in Section 8 of the Investment

Agreement as such become due and in accordance with the terms of the Investment

Agreement, including without limitation the reasonable fees and disbursements of their

attorneys' and financial advisors', which amounts shall not otherwise be subject to

approval of this Court, provided that any Backstop Party seeking reimbursement of

attorneys' fees shall deliver copies of fee and expense invoices to the Office of the

United States Trustee and the Official Committee of Unsecured Creditors at the same

time such invoices are forwarded to the Debtors, and the Debtors shall promptly

reimburse the applicable Backstop Party within ten (10) business days (if no written

objection is received within such ten (10) business-day period) after such professional

has delivered a summary invoice describing such fees and expenses.  The Court shall

have jurisdiction to determine any dispute concerning the reasonableness of such

invoices, however, that the Debtors shall be required to timely pay the undisputed

amount of the invoice.

6. The Debtors are authorized to provide and perform the indemnities set forth in Section 8 of the Investment Agreement in accordance with the terms and conditions thereof.

7. Pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, the Restructuring Support Agreement is approved in its entirety, and the Debtors are authorized to execute, deliver and implement the Restructuring Support Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of the Restructuring Support Agreement.

8. Notwithstanding anything to the contrary in the Restructuring Support Agreement, the term sheet annexed thereto (the "Term Sheet"), or herein, the Debtors shall retain the express right to terminate the Restructuring Support Agreement should they determine in good faith (after consultation with outside legal counsel) that continued pursuit of the Plan as set forth in the Term Sheet would constitute a breach of its fiduciary duties under applicable law, and, in the event of such termination, the other parties to the Restructuring Support Agreement shall retain and have all of their rights and remedies as set forth in the Restructuring Support Agreement.

9. The Debtors and their officers, employees, and agents are authorized to take such acts, or refrain from taking acts, as may be necessary or appropriate to implement and effectuate the agreements and transaction specified in the Investment Agreement and the Restructuring Support Agreement and the relief granted herein, and such actions shall not constitute a solicitation of acceptances or rejections of a plan pursuant to section 1125.

10.     The Investment Agreement and the Restructuring Support Agreement, all transactions contemplated thereby, and this Order shall be binding upon any successors in interest, including, without limitation, any Chapter 11 trustee, Chapter 7 trustee or other responsible officer appointment for any of the parties thereto.

11.     The failure to specifically include any particular provisions of the Investment Agreement and/or the Restructuring Support Agreement in this Order shall not diminish or impair the efficacy of such provisions, it being the intent of the Court that the Investment Agreement be approved in its entirety; provided, however, that to the extent this Order is inconsistent with any terms of the Investment Agreement and/or the Restructuring Support Agreement, this Order shall control.

12.     The Debtors and the Backstop Investors may make immaterial modifications, amendments, or supplements to the Investment Agreement and the Restructuring Support Agreement in accordance with the terms thereof without further order of the Court upon notice to the Official Committee of Unsecured Creditors appointed in these cases.

13.     The automatic stay set forth in section 362 of the Bankruptcy Code is hereby modified, to the extent necessary, to permit the delivery of the notice of termination of the Investment Agreement and the termination of the Investment Agreement, if applicable, pursuant to its terms.

14.    This Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or

enforcement of this Order.

Dated:   New York, New York
         December _15_, 2010


                                        _/s/ Robert E. Gerber_
                                        HONORABLE ROBERT E. GERBER
                                        UNITED STATES BANKRUPTCY JUDGE