**Hearing Date and Time: May 6, 2014 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: May 1, 2014 at 4:00 p.m. (Eastern Time)**

DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Allan S. Brilliant
Shmuel Vasser
Jeffrey T. Mispagel

*Proposed Attorneys for the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X
                                                        :
In re:                                                  :    Chapter 11
                                                        :
LEGEND PARENT, INC., *et al.*,                          :    Case No. 14-10701 (RG)
                                                        :
         Debtors.                                       :    Jointly Administered
                                                        :
------------------------------------------------------- X

**NOTICE OF DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING DEBTORS**
**TO OBTAIN POST-PETITION FINANCING AND USE CASH COLLATERAL**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)**
**AND 364(e), (II) GRANTING ADEQUATE PROTECTION TO PREPETITION**
**SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364,**
**(III) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT**
**TO 11 U.S.C. § 364 AND (IV) MODIFYING AUTOMATIC STAY**

19252889

PLEASE TAKE NOTICE that, a hearing on the *Debtors' Motion for an Order*

*(I) Authorizing the Debtors to Obtain Post-petition Financing and Use Cash Collateral*

*Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and*

*364(e), (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C.*

*§§ 361, 362, 363 and 364, (III) Granting Liens and Superpriority Claims Pursuant to 11 U.S.C.*

*§ 364 and (IV) Modifying Automatic Stay* (the "**Motion**") will be held before the Honorable

Robert E. Grossman, United States Bankruptcy Judge, United States Bankruptcy Court for the

Southern District of New York (the "**Court**"), One Bowling Green, Courtroom No. 601, New

York, New York 10004, on **May 6, 2014 at 10:00 a.m., prevailing Eastern Time**.

PLEASE TAKE FURTHER NOTICE that, any responses or objections to the

relief requested in the Motion shall conform to the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), all General Orders and Local Bankruptcy Rules of the Court, and the

*Amended Case Management Order* [Docket No. 88] issued by the Court; shall be set forth in

writing describing the basis therefore; shall be filed electronically with the Court on the docket

of *In re Legend Parent, Inc.*, Case No. 14-10701 (RG), pursuant to the Court's General Order M-

399 (which can be found at www.nysb.uscourts.gov) by registered users of the Court's case

filing system and by all parties in interest on a 3.5 inch disk or flash drive, preferably in portable

document format ("**PDF**"), Microsoft Word, or any other Windows-based word processing

format (with a hard copy delivered directly to Chambers) and served in accordance with General

Order M-399 or otherwise so as to be actually received no later than **4:00 p.m. (prevailing**

**Eastern Time) on May 1, 2014** by (i) the Chambers of the Honorable Robert E. Grossman, One

Bowling Green, New York, New York, 10004; (ii) Dechert LLP, Proposed Attorneys for the

Debtors, 1095 Avenue of the Americas, New York, New York, Attn: Allan S. Brilliant, Shmuel

19252889

Vasser and Jeffrey T. Mispagel; (iii) William K. Harrington, United States Trustee, U.S.

Department of Justice, Office of the U.S. Trustee, U.S. Federal Office Building, 201 Varick

Street, Rm 1006, New York, NY 10014, Attn: Andrea Schwartz and Richard Morrissey;

(iv) counsel to the Official Committee of Unsecured Creditors, Stroock & Stroock & Lavan LLP,

180 Maiden Lane, New York, New York 10038, Attn: Kristopher M. Hansen, Frank A. Merola,

and Matthew G. Garofalo; (v) counsel to the DIP Agent (as defined in the Motion) and to the

Administrative Agent under the Credit Facility, Latham & Watkins LLP, 233 South Wacker

Drive, Suite 5800, Chicago, IL  60606, Attn: Richard A. Levy; (vi)  counsel to the holders of the

majority of the Notes under the Indenture, Akin Gump Strauss Hauer & Feld LLP, One Bryant

Park, Bank of America Tower, New York, New York 10036-6745, Attn: Michael S. Stamer and

James Savin, and (vii) all other parties who have filed a notice of appearance and request for

service of documents.

       **PLEASE TAKE FURTHER NOTICE** that, only those responses that are timely

filed, served, and received will be considered at the hearing.  Failure to file a timely objection

may result in entry of an order granting the Motion as requested by the Debtors.

**PLEASE TAKE FURTHER NOTICE** that, the hearing may be adjourned from time to time without notice except for notice posted on the Court's calendar or announced in open court.

Dated:  New York, New York
       April 22, 2014

DECHERT LLP

*/s/  Shmuel Vasser*
Allan S. Brilliant
Shmuel Vasser
Jeffrey T. Mispagel
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
Email:  allan.brilliant@dechert.com
       shmuel.vasser@dechert.com
       jeffrey.mispagel@dechert.com

*Proposed Attorneys for the Debtors and Debtors in Possession*

**Hearing Date and Time: May 6, 2014 at 10:00 a.m. (Eastern Time)**
**Objection Deadline:  May 1, 2014 at 4:00 p.m. (Eastern Time)**

DECHERT LLP
1095 Avenue of the Americas
New York, New York  10036
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
Allan S. Brilliant
Shmuel Vasser
Jeffrey T. Mispagel

*Proposed Attorneys for the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X
                                                        :
In re:                                                  :    Chapter 11
                                                        :
LEGEND PARENT, INC., *et al.*,                          :    Case No. 14-10701 (RG)
                                                        :
        Debtors.                                        :    Jointly Administered
                                                        :
------------------------------------------------------- X

**DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING DEBTORS TO**
**OBTAIN POST-PETITION FINANCING AND USE CASH COLLATERAL**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3),**
**364(d)(1) AND 364(e), (II) GRANTING ADEQUATE PROTECTION TO**
**PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363**
**AND 364, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS**
**PURSUANT TO 11 U.S.C. § 364 AND (IV) MODIFYING AUTOMATIC STAY**

Table of Contents

Page

INTRODUCTION ................................................................................................ 1

JURISDICTION ................................................................................................... 2

RELIEF REQUESTED......................................................................................... 2

THE DEBTORS' PREPETITION CREDIT FACILITY ............................................ 3

CONCISE STATEMENT OF MATERIAL TERMS.................................................. 5

THE DEBTORS' NEED FOR FINANCING........................................................... 20

BASIS FOR RELIEF REQUESTED ..................................................................... 24

     A.    The Debtors Satisfy the Requirements for Using Cash Collateral Under
Section 363(c)(2) of the Bankruptcy Code ....................................... 25

     B.    The Debtors Satisfy the Requirements for Obtaining Credit Under Section
364(c) of the Bankruptcy Code........................................................ 27

     C.    The Debtors Satisfy the Requirements for Obtaining Credit Under Section
364(d) of the Bankruptcy Code........................................................ 29

     D.    The DIP Facility is Fair, Reasonable and Appropriate ...................... 31

     E.    The Scope of the Carve-Out is Appropriate ...................................... 33

     F.    The DIP Lenders Should be Deemed Good Faith Lenders under Section
364(e) ............................................................................................. 33

     G.    Prepetition Secured Parties Have Consented to the Financing ............ 34

     H.    Approval of the DIP Facility Is In the Best Interests of the Debtors'
Estates ............................................................................................ 34

     I.    Modification of the Automatic Stay on a Limited Basis is Warranted ....... 35

     J.    Relief Under Bankruptcy Rule 6004 is Warranted ............................. 36

NOTICE............................................................................................................. 36

NO PRIOR RELIEF ............................................................................................ 37

CONCLUSION.................................................................................................... 37

19145897

# TABLE OF AUTHORITIES

CASES

A&K Endowment, Inc. v. Gen. Growth Props. Inc. (In re Gen. Growth Props., Inc.),
    423 B.R. 716 (Bankr. S.D.N.Y. 2010) ................................................................................24, 33

Bland v. Farmworker Creditors,
    308 B.R. 109 (S.D. Ga. 2003) .............................................................................................30

Bray v. Shenandoah Fed. Savings and Loan (In re Snowshoe Co.),
    789 F.2d 1085 (4th Cir. 1986) .......................................................................................26, 30

Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry.,
    318 U.S. 523 (1943)............................................................................................................25

In re 425 Cent. Park Ave. Corp.,
    136 B.R. 626 (Bankr. S.D.N.Y. 1992) .................................................................................30

In re Ames Dep't Stores, Inc.,
    115 B.R. 34 (Bankr. S.D.N.Y. 1990)................................................................24, 28, 29, 30, 33

In re Barbara K. Enters., Inc.,
    2008 WL 2439649 (Bankr. S.D.N.Y. June 16, 2008)......................................................24, 25

In re Beker Indus. Corp.,
    58 B.R. 725 (Bankr. S.D.N.Y. 1986) ...................................................................................26

In re The Crouse Group, Inc.,
    71 B.R. 544 (Bankr. E.D. Pa. 1987) ..............................................................................28, 29

In re Curlew Valley Assocs.,
    14 B.R. 506 (Bankr. D. Utah 1981) ....................................................................................25

In re Farmland Indus., Inc.,
    294 B.R. 855 (Bankr. W.D. Mo. 2003).................................................................................31

In re Garland Corp.,
    6 B.R. 456 (1st Cir. B.A.P. 1980) ........................................................................................28

In re General Growth Props, Inc.,
    412 B.R. 122 (Bankr. S.D.N.Y. 2009) .................................................................................33

In re Hawker Beechcraft, Inc.,
    No. 12-11873 (SMB) (Bankr. S.D.N.Y. June 1, 2012)........................................................35

In re Hostess Brands, Inc.,
    No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012)........................................................35

ii

In re ION Media Networks, Inc.,
    No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009) ........................................................34

In re Insight Health Services Holdings Corp.,
    No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011)...............................................32

In re Korea Chosun Daily Times, Inc.,
    337 B.R. 773 (Bankr. E.D.N.Y. 2005).......................................................................32

In re Lear Corp.,
    No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) .............................................32

In re McCormick,
    354 B.R. 246 (Bankr. C.D. Ill. 2006)........................................................................26

In re Mosello,
    195 B.R. 277 (Bankr. S.D.N.Y. 1996)......................................................................26

In re NR Liquidation III Co. (f/k/a Neff Corp.),
    No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) ...........................................32

In re The Reader's Digest Ass'n,
    No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) .............................................32

In re Simasko Prod. Co.,
    47 B.R. 444 (D. Colo. 1985).....................................................................................25

In re United Retail Grp., Inc.,
    No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 23, 2012)...........................................35

In re Velo Holdings Inc.,
    No. 12-11384 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012)............................................35

In re YL West 87th Holdings I LLC,
    423 B.R. 421,441 (Bankr. S.D.N.Y. 2010)..............................................................28

Pistole v. Mellor (In re Mellor),
    734 F.2d 1396 (9th Cir. 1984) ..................................................................................26

Resolution Trust Corp. v. Official Creditors' Comm. (In re Defender Drug Stores, Inc.),
    145 B.R. 312 (Bankr. 9th Cir. 1992).........................................................................32

Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.),
    16 F.3d 552 (3d. Cir. 1994).......................................................................................26

Richmond Leasing Co. v. Capital Bank, N.A.,
    762 F.2d 1303 (5th Cir. 1985) ..................................................................................25

Trans World Airlines v. Travelers Int'l AG (In re Trans World Airlines, Inc.),
    163 B.R. 964 (Bankr. D. Del. 1994) ......................................................25

U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.),
    485 B.R. 279 (Bankr. S.D.N.Y. 2013) ....................................................24

Unsecured Creditors Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of
    Escanaba (In re Ellingsen MacLean Oil Co., Inc.),
    65 B.R. 358 (W.D. Mich. 1986) .............................................................31

## STATUTES

11 U.S.C. § 105 ...........................................................................................2, 6, 19

11 U.S.C. § 326 ...............................................................................................6, 19

11 U.S.C. § 328 ...............................................................................................6, 19

11 U.S.C. § 330 ...............................................................................................6, 19

11 U.S.C. § 331 ...............................................................................................6, 19

11 U.S.C. § 361 .........................................................................................2, 19, 26

11 U.S.C. § 362 ....................................................................................2, 3, 19, 35

11 U.S.C. § 363 ............................................................................................. passim

11 U.S.C. § 364 ............................................................................................. passim

11 U.S.C. § 502(d) ..............................................................................................6

11 U.S.C. § 503 ...........................................................................6, 7, 8, 13, 19

11 U.S.C. § 506 ...........................................................................3, 6, 15, 17, 19, 20

11 U.S.C. § 507 .........................................................................................2, 6, 19

11 U.S.C. § 510 ................................................................................................19

11 U.S.C. § 541 ..................................................................................................7

11 U.S.C. §§ 544-545 ........................................................................................6

11 U.S.C. § 546 ...............................................................................................6, 19

11 U.S.C. §§ 547-548 ........................................................................................6

11 U.S.C. § 549 ................................................................................................19

11 U.S.C. § 550 ...................................................................................................6, 19

11 U.S.C. § 551 ...................................................................................................19

11 U.S.C. § 552 ...................................................................................2, 3, 17, 19

11 U.S.C. § 726 ...............................................................................................6, 8, 19

11 U.S.C. §§ 1106(a) (3) and (4) ...........................................................................15

11 U.S.C. §§ 1113-1114 ....................................................................................6, 19

11 U.S.C. § 1121 ...................................................................................................15

11 U.S.C. § 1129(a)(9)(A) .......................................................................................6

28 U.S.C. § 157 ......................................................................................................2

28 U.S.C. § 1334 ....................................................................................................2

28 U.S.C. §§ 1408-1409 .........................................................................................2

28 U.S.C. § 1930(a) ................................................................................................7

31 U.S.C. § 3717 ....................................................................................................7

**FEDERAL RULES OF BANKRUPTCY PROCEDURE**

Fed. R. Bankr. P. 2002 ............................................................................................2

Fed. R. Bankr. P. 4001 ............................................................................................2

Fed. R. Bankr. P. 6004 .......................................................................................2, 36

Fed. R. Bankr. P. 9014 ............................................................................................2

**OTHER AUTHORITIES**

Local Bankruptcy Rule 4001-2 ....................................................................... *passim*

The above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through their undersigned attorneys, hereby file this motion (the "**Motion**") for entry of an order (i) authorizing them to obtain postpetition financing and use cash collateral (the "**Financing**") under a superpriority senior secured term loan facility (the "**DIP Facility**"), (ii) authorizing the Debtors to execute the DIP Credit Agreement (as defined below),[1] (iii) granting adequate protection to Prepetition Secured Parties (as defined below), (iv) granting the DIP Superpriority Claims and DIP Liens (each as defined below) and lifting the automatic stay. In support of the Motion, the Debtors rely respectfully set forth and represent as follows:

## INTRODUCTION

1.      On March 20, 2014 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these chapter 11 cases is contained in the *Declaration of David Woodworth in Accordance With Local Rule 1007-2 in Support of First Day Pleadings* [Docket No. 3] (the "**First Day Declaration**"), filed on the Petition Date and incorporated by reference herein.  In addition to the First Day Declaration, the Debtors rely on the declaration of Brandon Aebersold in support of the Motion, filed contemporaneously herewith (the "**Aebersold Declaration**").

2.      On April 2, 2014, the Debtors filed a motion seeking authority to enter into and perform under a plan support agreement (the "**Plan Support Agreement**") with holders of the majority of the Prepetition Credit Facility Debt (defined below) and holders of the

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

majority of the Notes issued under the Indenture (as defined in the First Day Declaration).  As a component of the Plan Support Agreement, the Debtors agreed to the material terms of a debtor-in-possession credit facility, as set forth in a term sheet attached to the Plan Support Agreement as Exhibit B (the "**DIP Term Sheet**").

3.      The DIP Facility is made pursuant to that certain Superpriority, Senior Secured Debtor-in-Possession Credit Agreement, dated as of  May 7, 2014 substantially in the form attached hereto (the "**DIP Credit Agreement**") and all other loan documents related thereto (collectively, and including the Final Order (as defined below), the "**DIP Loan Documents**"). Copies of the DIP Credit Agreement and the Approved Budget (as defined below) are attached hereto as <u>Exhibits</u> <u>A</u> and <u>B</u>, respectively.

## <u>JURISDICTION</u>

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference of the United States District Court for the Southern District of New York, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (D, (G), (K), and (O).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are sections 105(a), 361, 362, 363(b), 363(c)(2), 363(e), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Rule 4001-2 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**").

## <u>RELIEF REQUESTED</u>

5.      By this Motion, the Debtors request entry of an order, substantially in the form attached hereto as <u>Exhibit C</u> (the "**Final Order**") granting, *inter alia*, the following relief:

(a)    authorization for the Borrower (as defined below) to obtain the Financing, and for each of the other Debtors (the "**Guarantors**") to guaranty the Borrower's obligations in connection with the Financing, consisting of the DIP Facility: a senior secured super-priority debtor-in-possession dual draw term loan facility made available to the Borrower in an aggregate principal amount not to exceed  $30,000,000 of new money term loans (the "**DIP Loans**"), all subject to the terms and conditions of the DIP Loan Documents, with Royal Bank of Canada, as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"), for itself and on behalf of a syndicate of financial institutions (the "**DIP Lenders,**" and together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "**DIP Secured Parties**");

(b)    authorization for the Debtors to execute and deliver the DIP Credit Agreement and to perform such other and further acts as may be required in connection with the DIP Credit Agreement and the other DIP Loan Documents;

(c)    granting adequate protection to the Prepetition Secured Parties, as specifically set forth herein, whose liens and security interests are being primed by the Financing;

(d)    authorizing the Debtors to grant DIP Superpriority Claims pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out;

(e)    granting an automatically perfected, priming, valid and enforceable senior secured, security interest in and liens (the "**DIP Liens**") on substantially all of the assets of the Loan Parties (as defined below), whether now owned or hereafter acquired subject only to (i) the Carve-Out and (ii) any permitted liens identified in the DIP Loan Documents (the "**Prepetition Prior Liens**");

(f)    approving a waiver of the provisions of sections 506(c) and 552(b) of the Bankruptcy Code;

(g)    authorizing the Debtors to pay all fees associated with the DIP Facility, as set forth in the DIP Facility, and

(h)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility and the Final Order; and

## THE DEBTORS' PREPETITION CREDIT FACILITY

6.    The Debtors are indebted under that certain Credit Agreement, dated as of

August 17, 2012, as amended by Amendment No. 1 to the Credit Agreement, dated as of May

15, 2013 (the "**Prepetition Credit Agreement**"), by and among MModal Inc., as borrower,

Legend Parent Inc., as guarantor, Royal Bank of Canada, as administrative agent (the

"**Prepetition Agent**"), and other lenders party thereto (collectively, and together with the

Prepetition Agent, the "**Prepetition Secured Parties**"), and each other document (a

"**Prepetition Loan Document**") executed in connection with the Prepetition Credit Agreement

(as amended, restated, supplemented, or otherwise modified from time to time, and together with

the Prepetition Credit Agreement, the "**Prepetition Credit Facility**").  The obligations under the

Prepetition Credit Facility (the "**Prepetition Credit Obligations**") are guaranteed by each of the

other Debtor entities, except for MModal Holdings, Inc.

       7.     The Prepetition Credit Facility consists of a $75 million revolving facility

and a $445 million term loan.  As of the Petition Date, the Debtors were indebted to the

Prepetition Secured Parties in the aggregate principal amount of approximately $75 million

under the revolving credit commitment, and approximately $424.6 million under the term loan,

plus interest thereon and fees, expenses, charges, and all other obligations incurred in connection

with the Prepetition Credit Facility (collectively, the "**Prepetition Credit Facility Debt**").

       8.     The Prepetition Credit Obligations are secured by security interests in and

liens on substantially all assets of the Debtors, including (i) accounts, (ii) equipment, goods,

inventory, and fixtures, (iii) documents, instruments, and chattel paper, (iv) letters of credit and

letter of credit rights, (v) securities collateral, (vi) investment property, (vii) intellectual property

collateral, (viii) certain commercial torts claims, (ix) general intangibles, (x) money and deposit

accounts, (xi) supporting obligations, (xii) books and records relating to the foregoing, (xiii)

other personal property; and (xiv) all proceeds and products of each of the foregoing and all

accessions to, substitutions and replacements for, and rents, profits, and products of, each of the

foregoing, any and all proceeds of any insurance, indemnity, warranty, or guaranty payable from time to time with respect to any of the foregoing (collectively, the "**Prepetition First Lien Collateral**").

9.      The Debtors have also pledged 100% of the equity interests in their domestic subsidiaries and non-voting stock in their foreign subsidiaries, as well as 65% of the voting stock in their foreign subsidiaries, to the Prepetition Agent for the benefit of the Prepetition Secured Parties.

## CONCISE STATEMENT OF MATERIAL TERMS

10.      In accordance with Bankruptcy Rule 4001 and Local Rule 4001-2, the following is a concise statement of the proposed material terms of the relief requested:[2]

| Borrower | MModal Inc. (the "**Borrower**"). |
|---|---|
| **Guarantors**<br>Final Order: ¶ recitals, (i) | Each of the other Debtors not a Borrower (collectively, the "**Guarantors**", and together with the Borrower, the "**Loan Parties**" and individually a "**Loan Party**"). |
| **DIP Lenders** | The "**DIP Lenders**" are certain of the lenders under the Prepetition Credit Agreement that committed to the DIP Credit Agreement. |
| **DIP Agent/Collateral Agent** | Royal Bank of Canada, as DIP agent and collateral agent. |
| **The DIP Facility**<br>*LBR 4001-2(a)(1),(7), (12)*<br><br>Final Order ¶ recitals, (i) | A senior secured priming and superpriority debtor-in-possession term loan credit facility in an original principal amount of $30,000,000. |
| **Guarantees**<br>*LBR 4001-2(a)(1)* | Each Guarantor shall unconditionally guarantee all of the obligations with respect to the DIP Facility (the "**DIP Obligations**"). |
| **Interest Rate and Default Interest Rate**<br>*LBR 4001-(2)(a)(3)* | All amounts outstanding under the DIP Facility will bear interest at, for Eurodollar Loans, LIBOR plus 7.95% with a LIBOR floor of 1.5% and for Base Rate Loans, the Base Rate plus 6.95% with a Base Rate floor of 2.5%.<br>Upon default, the DIP Facility will accrue interest at an additional 2.0% per annum. |
| **Fees**<br>*LBR 4001-(2)(a)(3)* | **Unused Commitment Fee:** Fee paid by the Borrower to each DIP Lender on the actual daily amount by which such DIP Lender's Commitment exceeds its Pro Rata Share of the aggregate outstanding principal amount of the DIP Loans from the Closing Date (as defined below) through the Termination Date at a rate per annum equal to 4%, payable in arrears (x) on the last Business Day of each Fiscal Month, and |

---

[2]     This summary is qualified in its entirety by the DIP Credit Agreement and the provisions of the proposed Final Order.  To the extent that any provision of this summary is inconsistent with the DIP Credit Agreement or the Final Order, the DIP Credit Agreement or the Final Order, as applicable, shall control.

|  | (y) on the Termination Date. |
|  | **Closing Fee**: 2.0% of the stated principal amount of each DIP Lender's Commitment under the DIP Facility to be paid on the Closing Date to each DIP Lender party to the DIP Credit Agreement as a DIP Lender on the Closing Date, as fee compensation for agreeing to fund such DIP Lenders' Commitments. |
|  | **Arrangement Fee**: $75,000 payable to the DIP Agent in cash on the Closing Date. |
|  | **Backstop Commitment Fee**: An additional fee equal to 2.5% of the Backstop Commitment Amount paid by the Borrower in cash on the Closing Date to each DIP Lender whose Commitment includes a Backstop Commitment Amount.  This backstop commitment fee shall be in addition to, and not in lieu of, the Closing Fee referenced above. |
| **Availability and Use of Proceeds**<br>*LBR 4001-2(a)(9)*<br><br>Final Order ¶ 2(c) | Subject to the terms and conditions set forth in the DIP Credit Agreement, the Borrower may make up to two (2) borrowings under the DIP Lenders' collective Commitments during the Commitment Period in an aggregate principal amount not to exceed the aggregate principal amount of the Commitments. Each DIP Loan shall be made in an amount of no less than $5.0 million and up to $15.0 million.<br><br>The proceeds of each borrowing shall be used by the Debtors to fund working capital and certain other expenses of the Borrower and the Guarantors during the pendency of the Cases in accordance with the Approved Budget, including the agreed upon Variances thereto. |
| **Closing Date**<br>*LBR 4001-2(a)(1)* | The "**Closing Date**" is the date on which the closing conditions under the DIP Facility are satisfied or waived in accordance with the DIP Credit Agreement. |
| **Term**<br>*LBR 4001-2(a)(1), (12)*<br><br>Final Order ¶ 2(c) | The DIP Facility shall be for a term ending on the earliest of:<br><br>(i)      August [28], 2014, subject to extension by up to an additional 60 days with the prior written consent of the DIP Agent and DIP Lenders constituting "Required Lenders" under the DIP Credit Agreement ("**Required DIP Lenders**");<br><br>(ii)     the effective date of the Reorganization Plan;<br><br>(iii)    the occurrence of the Termination Declaration Date;<br><br>(iv)    the date on which a sale of all or substantially all of the Debtors' assets is consummated; and<br><br>(v)     the date on which the DIP Obligations shall have been Paid in Full. |
| **Superpriority Claims**<br>*LBR 4001-2(a)(4), (5)*<br><br>Final Order ¶ 2(m) | All of the DIP Obligations shall constitute an allowed superpriority administrative claim of the DIP Agent, for the benefit of the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, which claim shall have priority, subject only to the payment of the Carve-Out, over all administrative expense claims, adequate protection and other diminution claims (including the First Lien Adequate Protection Superpriority Claim (as defined in the Final Order)), unsecured claims, and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "**DIP Superpriority Claim**").  The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, excluding proceeds of causes of action of the Debtors or their estates under sections 502(d), 544, 545, and 547-550 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law (collectively, the "**Avoidance Actions**"). |

| | |
|---|---|
| **Security**<br><br>*LBR 4001-2(a)(4), (5)*<br><br>Final Order ¶ 2(j) | Subject only to (i) the Carve-Out and (ii) the Prepetition Prior Liens, to secure all DIP Obligations, the DIP Agent, on behalf of itself and the DIP Lenders, will receive, pursuant to section 364(c)(2), section 364(c)(3) and section 364(d)(1) of the Bankruptcy Code, a fully perfected, first priority security interest in all property of the Debtors, now existing or hereinafter acquired (whether prepetition or postpetition), including, without limitation, all cash and cash equivalents (whether maintained with the DIP Agent or otherwise) and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, contract rights, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, securities (whether or not marketable), franchise rights, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, all other Collateral (as defined in the DIP Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, excluding Avoidance Actions and proceeds thereof; <u>provided</u>, <u>however</u>, that the DIP Liens on the equity interests of the Debtors and their direct or indirect subsidiaries shall consist of (A) 100% of the equity interests of Holdings and each direct and indirect domestic Debtor subsidiary thereof, (B) 100% of the non-voting equity interests of each direct or indirect foreign subsidiary of any Debtor; and (C) 65% of the voting equity interests of each foreign subsidiary directly owned by any Debtor (collectively, the "**DIP Collateral**"). |
| **Carve-Out**<br><br>*LBR 4001-2(a)(5)*<br><br>Final Order ¶ 7(a) | The "**Carve-Out**" means:<br><br>i.    all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), plus interest, if any, pursuant to 31 U.S.C. § 3717,<br><br>ii.    the amount of allowed actual accrued, but unpaid expenditures for reasonable fees, costs and disbursements of the Debtors' retained professionals (other than ordinary course professionals) regardless of when allowed (the "**Debtor Professionals**," and such fees, the "**Debtor Professional Fees**") incurred up to and including the delivery of a Carve-Out Trigger Notice (as defined below),<br><br>iii.    the amount of allowed actual accrued, but unpaid expenditures for fees, costs and disbursements of professionals (the "**Committee Professionals**") retained by the statutory committee of unsecured creditors (the "**Committee**") regardless of when allowed and allowed out-of-pocket expenses of the Committee members (all such fees, costs and expenses of Committee Professionals and Committee members regardless when allowed, the "**Committee Professional Fees**") incurred before the delivery of a Carve-Out Trigger Notice; <u>provided</u>, that such Committee Professional Fees shall not exceed the amounts budgeted therefor in the Approved Budget for the postpetition period ending on the date the Carve-Out Trigger Notice is delivered,<br><br>iv.    all allowed and unpaid Debtor Professional Fees and Committee Professional Fees that are incurred from and after the delivery of the Carve-Out Trigger Notice in an aggregate amount not in excess of $2,500,000 for all such claims (inclusive of any unapplied retainers held by such professionals),<br><br>v.    all operating expenses incurred by the Debtors in accordance with the |

|  | Approved Budget before delivery of a Carve-Out Trigger Notice but unpaid by the Debtors as of the delivery of such Carve-Out Trigger Notice and allowable under 11 U.S.C. § 503(b)(1)(A), and |
|  | vi.    all reasonable fees and expenses incurred by a trustee under 11 U.S.C. § 726(b) not to exceed $75,000. |
|  | The term "**Carve-Out Trigger Notice**" means a written notice delivered by the DIP Agent (or from and after the Payment in Full (as defined in the Final Order) of the DIP Obligations, the Prepetition Agent) to the Debtors' lead counsel, the United States Trustee, counsel to the Consenting Noteholders (as defined in the Final Order) and lead counsel to the Committee which notice may be delivered following the occurrence and during the continuation of any Termination Event (as defined in the Final Order). |
| **Restrictions on Use of Proceeds**<br><br>*LBR 4001-2(a)(9)*<br><br>Final Order ¶ 16 | No loans and/or proceeds from the DIP Facility, DIP Collateral, cash collateral (including any retainer held by any professionals for the below-referenced parties), Prepetition First Lien Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, Committee or trustee or other estate representative appointed in the Cases or any Successor Cases (as defined in the Final Order), or any other person, party, or entity (or to pay any professional fees and disbursements incurred in connection therewith) to investigate (except as set forth below) or prosecute any Challenge (as defined in the Final Order) or any other litigation or other action in connection with the value of the Prepetition First Lien Collateral or the DIP Collateral at any time, including with respect to allocating value between and among unencumbered and encumbered assets; and (b) any of the Debtors, the Committee, and any trustee or other estate representative appointed in the Cases or any Successor Cases, or any other person, party, or entity to (or to pay any professional fees and disbursements incurred in connection therewith): (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than from the DIP Secured Parties; (ii) investigate (except as set forth below), assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, the Prepetition Secured Parties, and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including, without limitation, (A) any Challenges and any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code with respect to the DIP Obligations, the Prepetition Credit Obligations, the DIP Liens, the Prepetition Liens (as defined in the Final Order), and/or the First Lien Adequate Protection Liens (as defined in the Final Order); (B) except to contest in good faith the occurrence or continuance of any Termination Event, any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Secured Parties' and, after the Payment in Full of the DIP Obligations the Prepetition Secured Parties', assertion, enforcement, or realization on the cash collateral or the DIP Collateral in accordance with the DIP Loan Documents or the Prepetition Loan Documents, as applicable, or the Final Order; and/or (C) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties hereunder or under the DIP Loan Documents or the Prepetition Loan Documents, as applicable; provided, however, up to $25,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition First Lien Collateral, any cash collateral and proceeds of the DIP Facility may be used by the Committee to investigate (but not prosecute) potential Challenges to the Prepetition Credit Obligations, the Prepetition Liens, or any other claims against the Prepetition Secured Parties so long as such investigation occurs within the Challenge Period (as |

|  | defined in the Final Order); (iii) pay any fees or similar amounts to any person (other than the Prepetition Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent and Prepetition Agent; or (iv) use or seek to use cash collateral, other DIP Collateral proceeds or advances under the DIP Facility, or sell or otherwise dispose of DIP Collateral, in each case unless otherwise permitted in the Final Order, without the consent of the DIP Agent and the Prepetition Agent, as applicable. |
|---|---|
| **Disposition of DIP Collateral**<br>*LBR 4001-2(a)(2)*<br><br>Final Order ¶ 13 | Unless the DIP Obligations are Paid in Full upon the closing of such sale or other disposition, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) outside the ordinary course of business (which ordinary course shall include, without limitation, disposition of obsolete or worn out assets) without the prior written consent of the requisite DIP Secured Parties under the DIP Loan Documents (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or any order of the Court), except as permitted in the DIP Loan Documents.<br><br>After the DIP Obligations are Paid in Full, and unless the Prepetition Credit Obligations are Paid in Full upon the closing of such sale or other disposition, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) outside the ordinary course of business (which shall include, without limitation, disposition of obsolete or worn out assets) without the prior written consent of the requisite Prepetition Secured Parties under the Prepetition Loan Documents (and no such consent shall be implied from any other action, inaction, or acquiescence by any Prepetition Secured Party or any order of the Court), except as permitted in the Prepetition Loan Documents and/or the Final Order. |
| **Application of Proceeds**<br>*LBR 4001-2(a)(9)*<br><br>Final Order ¶ 15(c) | Upon the occurrence of the Termination Declaration Date, all proceeds realized in connection with the exercise of the rights and remedies by or for the benefit of the DIP Secured Parties and/or the Prepetition Secured Parties shall be promptly turned over to DIP Agent or Prepetition Agent, as applicable, for application <u>first</u>, to the DIP Obligations under, and in accordance with, the provisions of the DIP Loan Documents until Payment in Full of the DIP Obligations, <u>second</u>, to the interest, expense reimbursement and other obligations owed to the Prepetition Secured Parties under the Final Order, <u>third</u>, subject to further order of the Court, to pay the remaining Prepetition Credit Obligations in accordance with the provisions of Section 8.03 of the Prepetition Credit Agreement, and <u>fourth</u>, to the Debtors for distribution in the manner required by the Bankruptcy Code and other applicable law. |
| **Conditions Precedent to Initial Credit Extension on the Closing Date**<br>*LBR 4001-2(a)(2), (12)* | The obligation of the DIP Agent and each DIP Lender to make its initial Credit Extension on the Closing Date is subject to satisfaction or waiver of conditions precedent customary for debtor-in-possession financings of this kind, including, without limitation, the following:<br><br>i.    The Bankruptcy Court shall have entered the Final Order.<br><br>ii.    Negotiation, execution and delivery of the DIP Loan Documents acceptable to the DIP Agent and DIP Lenders and such other instruments, documents, certificates, opinions, assurances and other such acts as may be reasonably requested by the DIP Agent and DIP Lenders to affect the closing of the DIP Facility.<br><br>iii.    Receipt of all fees and expenses required to be paid to the DIP Agent and the Lead Arranger on or before the Closing Date and all fees required to be paid to the DIP Lenders on or before the Closing Date.<br><br>iv.    Receipt by the DIP Agent and the Prepetition Agent of the financial statements and other financial reports required to be delivered pursuant to the relevant DIP Loan Documents. |

|  | | |
|---|---|---|
|  | v. | Receipt by the DIP Agent and the Prepetition Agent of the Approved Budget, in form and substance acceptable to the DIP Agent, the Prepetition Agent, the Required Consenting Holders, and the Debtors, in their respective sole discretion |
|  | vi. | Such other customary closing documents and customary closing deliverables deemed necessary or desirable by the DIP Agent. |
| **Conditions to all Credit Extensions**<br><br>*LBR 4001-2(a)(2), (12)* | | The obligation of each DIP Lender to honor any Request for Credit Extension is subject to the following conditions precedent: |
|  | i. | Other than on the Closing Date, the representations and warranties of the Borrower and each other Loan Party shall be true and correct in all material respects on and as of the date of such Credit Extension, subject to certain exceptions. |
|  | ii. | Other than on the Closing Date, no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof. |
|  | iii. | The DIP Agent shall have received a Request for Credit Extension in accordance with the requirements under the DIP Credit Agreement. |
|  | iv. | The Final Order shall be in full force and effect and shall not have been reversed, modified, stayed or amended unless such reversal, modification, stay or amendment is acceptable to the DIP Agent and the Required DIP Lenders in their respective discretion. |
| **Affirmative and Negative Covenants**<br><br>*LBR 4001-2(a)(2)* | | The relevant Loan Parties or any subsidiary thereof shall, among other covenants: |
|  | i. | deliver to the DIP Agent for delivery to each DIP Lender, among other things, the following documents: (a) a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower; (b) copies of each material notice or other material correspondence received from the SEC; (c) copies of all notices, requests and other documents received under or pursuant to any instrument, indenture, loan or credit or similar agreement regarding or related to any breach or default by any party thereto, or any other event, in each case, that could reasonably be expected to materially impair the value of the interests or the rights of any Loan Party or otherwise reasonably be expected to have a Non-Financial Material Adverse Effect; (d) notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (x) reasonably be expected to have a Non-Financial Material Adverse Effect or (y) cause any property described in the Mortgages to be subject to any material restrictions on ownership, occupancy, use or transferability under any Environmental Law; and (e) information regarding the business, financial, legal or corporate affairs of any Loan Party or any subsidiary thereof, or compliance with the terms of the DIP Loan Documents; |
|  | ii. | promptly notify the DIP Agent and each DIP Lender: (a) of the occurrence of any Default; (b) of any matter that has resulted or could reasonably be expected to result in a Financial Material Adverse Effect, including the following to the extent they have resulted or could reasonably be expected to result in a Financial Material Adverse Effect: (x) breach or non-performance of, or any default under, a Contractual Obligation of the Borrower or any subsidiary thereof; (y) any dispute, litigation, investigation, proceeding or suspension between the Borrower or any subsidiary thereof and any Governmental Authority; or (z) the commencement of, or any material development in, any litigation or proceeding affecting the Borrower or any subsidiary thereof, including pursuant to any applicable Environmental |

| | | |
|---|---|---|
| | | Laws; and (c) of the occurrence of any ERISA Event; |
| | iii. | pay and discharge all post-petition Taxes subject to certain exceptions; |
| | iv. | maintain the existence, properties, books and records, insurance, comply with laws and cooperate; |
| | v. | pursuant to certain exceptions, permit representatives and independent contractors of the DIP Agent and each DIP Lender to visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants; |
| | vi. | use the proceeds of the DIP Loans in accordance with the Final Order; |
| | vii. | not effect any change (a) in any Loan Party's legal name, (b) in the location of any Loan Party's chief executive office, (c) in any Loan Party's identity or organizational structure, (d) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (e) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (x) it shall have given the DIP Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the DIP Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the DIP Agent may reasonably request and (y) it shall have taken all action reasonably satisfactory to the DIP Agent to maintain the perfection and priority of the security interest of the DIP Agent for the benefit of the DIP Secured Parties in the DIP Collateral, if applicable; |
| | viii. | guarantee obligations and give security upon the formation or acquisition of (a) any new direct or indirect subsidiary of Holdings (other than an Excluded Subsidiary); (b) any property with a value in excess of $5.0 million (other than Material Real Property), if such property, in the judgment of the DIP Agent, shall not already be subject to a perfected first priority DIP Lien and security interest in favor of the DIP Agent for the benefit of the DIP Secured Parties; |
| | ix. | subject to certain exceptions, comply with all applicable Environmental Laws and Environmental Permits; |
| | x. | promptly upon request by the DIP Agent, or any DIP Lender through the DIP Agent, (a) correct any material defect or error that may be discovered in any DIP Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the DIP Agent, or any DIP Lender through the DIP Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the DIP Loan Documents, (ii) subject to any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the DIP Secured Parties the rights granted or now or hereafter intended to be granted to the DIP Secured Parties under any DIP Loan Document or under any other instrument executed in connection with any DIP Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so; |
| | xi. | to the extent any actions to create or perfect a security interest in DIP |

Collateral is not completed on or prior to the Closing Date, complete each of such actions as soon as commercially reasonable but in no event later than 15 days after the Closing Date or, with respect to actions which may be required pursuant to the laws of any foreign jurisdiction, 30 days after the Closing Date, in each case unless a later date is agreed to by the DIP Agent;

xii.    comply with Plan Milestones in accordance with the Final Order;

xiii.   promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the stay on any DIP Collateral (other than motions filed by the DIP Agent, the Prepetition Agent, the DIP Lenders and/or the Prepetition Lenders relating to the DIP Facilities), all motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Debtors to file a plan of reorganization, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the DIP Agent, the Prepetition Lender or any DIP Collateral;

xiv.    reimburse each L/C Issuer upon notice pursuant to Section 2.03(c) of the Prepetition Credit Agreement, including any fees and expenses related thereto;

xv.     not create, incur, assume or suffer to exist any Lien except, among other things, Liens pursuant to any DIP Loan Document, existing Liens, and certain Liens for Taxes;

xvi.    not create, incur, assume or suffer to exist any Indebtedness except, among other things, Indebtedness pursuant to any DIP Loan Document, existing Indebtedness, Indebtedness in respect of swap contracts or Indebtedness as provided in the Approved Budget (including Permitted Variances) or the Final Order;

xvii.   not make any Investments except those existing on the Petition Date or as provided in the Approved Budget (including Permitted Variances), the Final Order or the budget pursuant to the Cash Collateral Order;

xviii.  subject to certain exceptions, not merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person;

xix.    subject to certain exceptions, not make any Dispositions or enter into any agreement to make Dispositions;

xx.     subject to certain exceptions, not declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so;

xxi.    not change the nature of the business or enter into transactions with any Affiliate of the Borrower

xxii.   subject to certain exceptions, not enter or permit to exist any Contractual Obligation that limits the ability (a) of any subsidiary of Holdings (other than an Excluded Subsidiary) to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to invest in the Borrower or any Guarantor, (ii) of any subsidiary of Holdings (other than an Excluded Subsidiary) to Guarantee the Indebtedness of the Borrower or (iii) of the Borrower or any subsidiary of Holdings (other than an Excluded Subsidiary) to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations;

xxiii.  not use proceeds of any Credit Extension to purchase or carry margin stock, make any Capital Expenditures, amend any of the Organization documents in a manner materially adverse to the DIP Lenders, or make changes to the

|  |  |  |
|---|---|---|
|  |  | accounting policies or reporting practices; |
|  | xxiv. | subject to certain exceptions, not prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness; |
|  | xxv. | not seek or consummate sale of assets pursuant to a plan of reorganization, section 363 of the Bankruptcy Code or otherwise (other than the Reorganization Plan), without the prior written consent of the DIP Agent, Required DIP Lenders, the Prepetition Agent, and the Required Prepetition Lenders; |
|  | xxvi. | not incur administrative expense claims pari passu or senior to DIP Claims except for the Carve-Out; |
|  | xxvii. | not seek modification, stay, vacation or amendment of (a) "first day orders" entered by the Bankruptcy Court, (b) the Final Order or (c) the DIP Loan Documents, except in each case as agreed to by the DIP Agent and Required DIP Lenders in their respective sole discretion; |
|  | xxviii. | not make cash expenditures on account of claims incurred by critical vendors prior to the Petition Date or claims incurred pursuant to Section 503(b)(9) of the Bankruptcy Code, or pursuant to any "first day" orders entered by the Bankruptcy Court, in each case except as agreed to by the DIP Agent and the Prepetition Agent or as permitted by the Approved Budget (including Permitted Variances thereto); |
|  | xxix. | not seek or consent to any order seeking authority to take action prohibited by the Final Order or the other DIP Loan Documents, without the consent of the DIP Agent and the Prepetition Agent or otherwise required any Requirement of Law; and |
|  | xxx. | each Loan Party shall comply with the "Budget Covenants" under, and as defined in, the Final Order and as described below. |
| **Budget Covenants**<br>*LBR 4001-2(a)(2)*<br><br>Final Order ¶ 2(f) | | The Debtors shall operate their businesses, and only expend advances under the DIP Facility and cash collateral and other DIP Collateral proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget (excluding the fees, costs and expenses of the DIP Agent, Prepetition Agent, Prepetition Lenders, Consenting Noteholders and their respective advisors, which shall be paid in accordance with the DIP Loan Documents notwithstanding anything to the contrary in the Approved Budget), subject to the following permitted variances, each of which shall be tested on a weekly basis commencing with the Wednesday after the first full week following the Final Order Entry Date: (i) the sum of the Debtors' actual cash receipts for the Applicable Period shall not be less than 90% of the projected "Accounts Receivable" for the Applicable Period as set forth in the Approved Budget; and (ii) the sum of the Debtors' actual "operating cash disbursements" (calculated in the same manner as the "Operating Cash Disbursements" in the Approved Budget) shall not exceed 110% of the projected "Operating Cash Disbursements" for the Applicable Period as set forth in the Approved Budget (collectively the variances described in (i) and (ii) hereunder, the "**Permitted Variance**"). |
| **Reporting Covenants**<br>*LBR 4001-2(a)(2)* | | The relevant Loan Parties agree to the following reporting covenants, among other covenants:<br><br>Financial Statements: Among other things, the Borrower is required to provide to the DIP Agent and the Prepetition Agent, for distribution to the DIP Lenders as well as the Consenting Noteholders, the Committee, and their advisors  (a) quarterly and annual reports, (b) internally prepared monthly financial statements prepared on a consolidated basis consisting of an income statement and a balance sheet, (c) on Wednesday of each week, commencing with the first calendar week ending after the Closing Date, a Variance Report, (d) written management discussion and analysis |

<table>
<tr><td></td><td>together with each delivery of the financial statements for each Fiscal Quarter or Fiscal Month, (e) a certificate including the Corporate Chart and any updates on the DIP Collateral, (f) Bankruptcy Court filings, (g) a summary of all material insurance coverage, and (h) additional reports reasonably requested by the DIP Agent or the DIP Lenders, including with respect to litigation and contingent liabilities.</td></tr>
</table>

| | |
|---|---|
| | together with each delivery of the financial statements for each Fiscal Quarter or Fiscal Month, (e) a certificate including the Corporate Chart and any updates on the DIP Collateral, (f) Bankruptcy Court filings, (g) a summary of all material insurance coverage, and (h) additional reports reasonably requested by the DIP Agent or the DIP Lenders, including with respect to litigation and contingent liabilities.<br><br>Other Events: The Borrower shall give to the DIP Agent for deliver to each DIP Lender a notice of (a) any event (other than any event involving loss or damage to property) reasonably expected to result in a mandatory payment of the DIP Obligations, (b) the commencement of, or any material developments in, any action, investigation, suit, proceeding, audit, claim, demand, order or dispute with, by or before any Governmental Authority affecting any Group Member or any property of any Group Member that seeks injunctive or similar relief, (c) the acquisition of any material real property or the entering into of any material lease and (d) any event, occurrence or circumstance in which a material portion of the DIP Collateral is damaged, destroyed or otherwise impaired or adversely affected.<br><br>Copies of Notices and Reports; Taxes; Labor Matters: The Borrower shall give to the DIP Agent for deliver to each DIP Lender (a) copies of all reports that Holdings transmits to its security holders generally and all documents that any Group Member files with, or otherwise provides to, the Securities and Exchange Commission, the Financial Industry Regulatory Authority, any securities exchange or any Governmental Authority exercising similar functions, the Bankruptcy Court or any Committee, (b) notices of material tax information and material information on labor matters.<br><br>Lender Calls: The Borrower, Holdings, their officers and their advisors shall make themselves available for conference calls to be held on a weekly basis with the DIP Agent and/or the other DIP Secured Parties or their representatives or advisors to discuss the Approved Budget or any other issues as may be reasonably requested by the DIP Agent and/or the other DIP Secured Parties. |
| **Key Events of Default**<br><br>*LBR 4001-2(a)(2), (10), (11), (12)* | The DIP Credit Agreement provides for the following Events of Default:<br><br>i.   the Borrower's or any other Loan Party's failure to (i) pay when and as required to be paid in the DIP Credit Agreement, any amount of principal of any DIP Loan or pay on the DIP Obligations due to the L/C Issuers, or (ii) pay within three days after the same becomes due, any interest on any DIP Loan or DIP Obligations due to the L/C Issuers or any fee due hereunder, or (iii) pay within five days after the same becomes due, any other amount payable hereunder or under any other DIP Loan Document;<br><br>ii.   failure of the Borrower or any Loan Party to perform or observe certain terms, covenants or agreements;<br><br>iii.   any material incorrect or misleading representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party in any DIP Loan Document;<br><br>iv.   entry of a final judgment or order against any Loan Party or any subsidiary thereof for the payment of money in an aggregate amount exceeding the Threshold Amount, or any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Non-Financial Material Adverse Effect and there is a period of 60 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, or enforcement of such judgment is not subject to the automatic stay provided in the Bankruptcy Code;<br><br>v.   occurrence of an ERISA Event or failure of the Borrower or any ERISA Affiliate to pay when due;<br><br>vi.   occurrence of any Change of Control; |

| | vii. | failure of any material provision of any Collateral Document to remain in full force and effect or to create a valid and perfected first priority Lien; |
|---|---|---|
| | viii. | entry of an order authorizing, approving or granting (or the filing of a motion by the Debtors seeking such authorization, approval or granting of) of (i) additional post-Petition Date financing not otherwise permitted, (ii) any liens on the DIP Collateral not otherwise permitted, (iii) dismissal of the Cases or conversion of any Case to one under Chapter 7 of the Bankruptcy Code, (iv) appointment of a Chapter 11 trustee in any of the Cases, (v) any other superpriority claim senior to or pari passu with superpriority claims of the DIP Agent, the other Secured Parties, the Prepetition Agent and the other Prepetition Secured Parties, (vi) modification of the DIP Facility (other than pursuant to Section 12.01 of the DIP Credit Agreement) or the Final Order, (vii) any action materially adverse to the DIP Agent, the other Secured Parties, the Prepetition Agent and the other Prepetition Secured Parties, or their rights and remedies with respect to or interest in the DIP Collateral, (viii) appointment of an examiner having powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases, or (ix) relief from the automatic stay for the benefit of any creditor with a security interest in the DIP Collateral without the consent of the DIP Agent and the Required DIP Lenders; |
| | ix. | payment by the Debtors of any claim accrued prior to the Petition Date without the prior written consent of the DIP Agent and the Required DIP Lenders in their sole discretion or other than as permitted by the Approved Budget (and any Permitted Variances thereto); |
| | x. | commencement of any action against any of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders by or on behalf of any Debtor or any of its affiliates, officers or employees; |
| | xi. | occurrence of any Financial Material Adverse Effect; |
| | xii. | any termination of the Plan Support Agreement or any material breach by the Debtors of any of their obligations thereunder; |
| | xiii. | failure of the Debtors to comply with any of the Plan Milestones, regardless of whether the Debtors used commercially reasonable efforts to comply with any such Plan Milestone; |
| | xiv. | allowance of any claim under section 506(c) of the Bankruptcy Code or otherwise against any or all of the DIP Agent, the other DIP Secured Parties or the DIP Collateral, or against any Prepetition Agent or other Prepetition Secured Party or  the Prepetition First Lien Collateral; |
| | xv. | the filing of any plan of reorganization or related disclosure statement or any direct or indirect amendment to the Reorganization Plan or Disclosure Statement (as defined below), or the entry of an order confirming any such plan of reorganization or related disclosure statement or approving any such amendment, in each case to the extent that such filing is not the Reorganization Plan or treats the claims of the DIP Agent and DIP Lenders in any manner to which they do not consent in their respective sole discretion; |
| | xvi. | entry of an order that results in any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code except as provided in the Final Order or any such exclusivity periods shall have expired; or |
| | xvii. | failure of the Debtors to comply with the terms set forth in the Reporting Covenants in the DIP Credit Agreement or any other term of the Final Order. |
| | xviii. | failure of any of the Final Order, the order approving the Debtors' disclosure statement with respect to the Reorganization Plan (from and after entry |

| | | |
|---|---|---|
| | | thereof) or the order confirming the Reorganization Plan (from and after entry thereof) to remain in full force and effect, including, without limitation, because the Final Order, disclosure statement approval order or confirmation order shall have been reversed, modified, stayed or amended (unless such reversal, modification, stay or amendment is acceptable to the Administrative Agent and the Required Lenders in their respective discretion) |
| | xix. | failure to reimburse each L/C Issuer upon notice pursuant to the terms of the DIP Credit Agreement. |
| **Milestones**<br>*LBR 4001-2(a)(9), (10), (12)*<br><br>Final Order ¶ 14(b) | i. | On or before April 25, 2014, the Debtors shall have filed with the Bankruptcy Court (a) a motion (the "**Disclosure Statement Motion**") reasonably acceptable to the DIP Agent and the Prepetition Agent, seeking entry of an order, in form and substance acceptable to the DIP Agent approving a disclosure statement with respect to the Reorganization Plan in form and substance reasonably acceptable to the DIP Agent and the Prepetition Agent (the "**Disclosure Statement**"), and (b) the Reorganization Plan; |
| | ii. | On or before June 4, 2014, the Bankruptcy Court shall have held a hearing on the Disclosure Statement Motion and shall have entered an order in form and substance acceptable to the DIP Agent and Prepetition Agent approving the Disclosure Statement for the Reorganization Plan; |
| | iii. | On or before July 16, 2014, the Bankruptcy Court shall have entered an order in form and substance acceptable to the DIP Agent and the Prepetition Agent in their respective sole discretion, confirming the Reorganization Plan; and |
| | iv. | On or before August 15, 2014, the effective date of the Reorganization Plan shall have occurred. |
| **Remedies/Automatic Stay**<br>*LBR 4001-2(a)(10)*<br><br>Final Order ¶ 15(b) | Seven calendar days following a Termination Declaration Date, the DIP Agent (on behalf of the DIP Secured Parties), and upon Payment in Full of the DIP Obligations, the Prepetition Agent (on behalf of the Prepetition Secured Parties) shall be deemed to have further relief from the automatic stay and may foreclose on all or any portion of the DIP Collateral or the Prepetition First Lien Collateral, as applicable, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations (or upon payment in full and subject to the requirements relating to application of proceeds, the Prepetition Credit Obligations), occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral or the Prepetition First Lien Collateral (as defined in the Final Order), or otherwise exercise remedies against the DIP Collateral permitted by applicable nonbankruptcy law. During the seven-day period after a Termination Declaration Date, the Debtors, the DIP Agent, the Prepetition Agent and the Committee shall be entitled to an emergency hearing before the Court to contest whether a Termination Event has occurred and/or whether the automatic stay should be vacated upon expiration of such seven-day period. Unless during such period the Court determines otherwise, the automatic stay, as to the DIP Agent (on behalf of the DIP Secured Parties), and upon the Payment in Full of the DIP Obligations, the Prepetition Agent (on behalf of the Prepetition Secured Parties), shall automatically terminate at the end of such seven-day period, without further notice or order. During such seven-day period, the Debtors may use cash collateral in accordance with the Approved Budget and Permitted Variances thereto. | |
| **Mandatory Prepayments**<br>*LBR 4001-2(a)(2), (13)* | <u>Asset Sales</u>: Prepayments in an amount equal to 100% of the net cash proceeds of the sale or other disposition of property or assets of any Debtor (subject to certain exceptions), other than (i) net cash proceeds of sales or other dispositions of inventory in the ordinary course of business and (ii) net cash proceeds, not to exceed $50,000, that are reinvested in DIP Collateral that is useful in the business of the Borrower and its subsidiaries within sixty (60) days of receipt thereof. | |

16

| | |
|---|---|
| | **Insurance Proceeds:**  Prepayments in an amount equal to 100% of the net cash proceeds of insurance paid on account of any loss of any property or assets (other than certain types of property or assets including, without limitation, inventory) of any Debtor, other than net cash proceeds, not to exceed $50,000, that are, or are committed to be, reinvested in the DIP Collateral (or used to replace damaged or destroyed DIP Collateral) within sixty (60) days of receipt thereof.<br><br>**Equity Offerings:**  Prepayments in an amount equal to 100% of the net cash proceeds received from the issuance of equity securities of any Debtor, other than such portion of such net cash proceeds that the Borrower shall have, on or prior to such date, given written notice to the DIP Agent of its intent to reinvest in accordance with.<br><br>**Incurrence of Indebtedness:**  Prepayments in an amount equal to 100% of (a) the net cash proceeds realized or received from the incurrence of indebtedness by any Debtor (other than indebtedness otherwise permitted under the DIP Loan Documents), payable five (5) business day following the date of realization or receipt. |
| **506(c) Surcharge and Waivers**<br><br>Final Order ¶ recitals, (G); ¶ 8 | No costs or expenses of administration of the Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties and/or the Prepetition Secured Parties, the Prepetition First Lien Collateral, the DIP Collateral and the cash collateral, in each case pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the Prepetition Agent and the DIP Agent, and no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the Prepetition Secured Parties and the DIP Secured Parties.<br><br>**Equities of the Case Waiver.**  Based on the subordination of the Prepetition Liens, First Lien Adequate Protection Liens and the First Lien Adequate Protection Superpriority Claim (as each term is defined in the Final Order) to the Carve-Out, the DIP Liens and DIP Superpriority Claim, each of the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.  For the avoidance of doubt, because the DIP Loan Documents are deemed entered into following the commencement of these Cases, section 552 of the Bankruptcy Code shall not be applicable to the DIP Secured Parties or DIP Protections (as defined in the Final Order). |
| **Investigation Period**<br>*LBR 4001-2(a)(2)*<br><br>Final Order ¶¶ 6(a), (b), 16 | A party in interest and the Committee have 60 days from entry of the Final Order to investigate the validity, perfection, enforceability, and extent of the Debtors' Prepetition Credit Obligations and/or the Prepetition Liens or the property of the Debtors encumbered thereby.  No loans and/or proceeds from the DIP Facility, DIP Collateral, cash collateral (including any retainer held by certain stipulated professionals), Prepetition First Lien Collateral, or any portion of the Carve-Out may be used in connection with the Challenge of any claims or liens with respect to the DIP Facility or the Debtors' prepetition indebtedness, except that up to $25,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition First Lien Collateral, any cash collateral and proceeds of the DIP Facility may be used by the Committee to investigate (but not prosecute) potential Challenges to the Prepetition Credit Obligations, the Prepetition Liens, or any other claims against the Prepetition Secured Parties so long as such investigation occurs within the Challenge Period |
| **Budget**<br>*LBR 4001-2(a)(2)*<br><br>Final Order ¶ 2(d) | The Loan Parties and the DIP Agent agreed on a form of budget for the Debtors' business (the "**Approved Budget**"), each projecting cash flow for 13 weeks. |
| **Expenses and Indemnity**<br>*LBR 4001-2(a)(3), (14)* | The Borrower shall pay (i) all reasonable, documented and invoiced out-of-pocket expenses incurred by the DIP Agent (including the reasonable fees, charges and disbursements of counsel for the DIP Agent), in connection with the syndication of the credit facilities provided for in the DIP Credit Agreement, the preparation, negotiation, execution, delivery and administration of the DIP Loan Documents or |

|  | any amendments, modifications or waivers of the provisions thereof (whether or not the transactions contemplated thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the DIP Agent and any DIP Lender (including the fees, charges and disbursements of any counsel for the DIP Agent or any DIP Lender) in connection with the enforcement of its rights and interests under the DIP Loan Documents, including in connection with any workout, restructuring or waiver or similar matters in respect of such obligations and DIP Loan Documents..<br><br>The Borrower shall indemnify the DIP Agent (and any sub-agent thereof), each Lead Arranger and each DIP Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable, documented and invoiced fees, charges and disbursements of one counsel for the Indemnitees taken as a whole and, if necessary, one firm of local counsel in each appropriate jurisdiction to the Indemnified Persons taken as a whole, and, in the case of a conflict of interest, one additional counsel to the affected Indemnified Persons taken as a whole), and shall indemnify and hold harmless each Indemnitee from all reasonable, documented and invoiced fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the transactions contemplated thereby, or, in the case of the DIP Agent (and any sub-agent thereof) and its Related Parties only, the administration of the Loan Documents, (ii) any DIP Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (1) (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its officers or directors or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations under any DIP Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (2) relate to any proceeding solely between or among Indemnitees other than (A) claims against DIP Lenders or their Affiliates, in each case in their capacity or in fulfilling their role as the agent or arranger or any other similar role under the DIP Loan Documents (including their role as a DIP Lender), and (B) claims arising out of any act or omission on the part of the Equity Investors, the Borrower or their respective Subsidiaries. |
|---|---|
| **Adequate Protection**<br><br>*LBR 4001-2(a)(4), (5), (6)*<br><br>Final Order ¶ 4 | In consideration for the use of the Prepetition First Lien Collateral (including cash collateral) and the priming of the Prepetition Liens, the Prepetition Agent, for the benefit of the Prepetition Secured Parties, shall receive the following adequate protection:<br><br><u>First Lien Adequate Protection Liens.</u> To the extent there is a diminution in value of the interests of the Prepetition Secured Parties in the Prepetition First Lien Collateral (including cash collateral) from and after the Petition Date resulting from the use, |

sale, or lease by the Debtors of the Prepetition First Lien Collateral (including cash collateral), the granting of the DIP Superpriority Claim, the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code or otherwise ("**Diminution in Prepetition First Lien Collateral Value**"), the Prepetition Agent, for the benefit of all the Prepetition Secured Parties, shall benefit from, subject certain terms and conditions, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, Liens upon all of the DIP Collateral (such adequate protection replacement liens, the "**First Lien Adequate Protection Liens**"), which First Lien Adequate Protection Liens on the DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, and the Carve-Out, and shall be senior in priority to all other liens, including the Prepetition Liens and the Primed Liens. The First Lien Adequate Protection Liens and the First Lien Adequate Protection Superpriority Claim (as defined below) (A) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall be senior in priority and right of payment to (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases.

First Lien Adequate Protection Superpriority Claim. To the extent of Diminution in Prepetition First Lien Collateral Value, the Prepetition Agent, for the benefit of the Prepetition Secured Parties, shall benefit from an allowed superpriority administrative claim (such adequate protection superpriority claim, the "**First Lien Adequate Protection Superpriority Claim**"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, and 1114 and any other provision of the Bankruptcy Code, junior only to the DIP Superpriority Claim and the Carve-Out, and payable from and having recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof, excluding proceeds of Avoidance Actions; provided, however, that the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the First Lien Adequate Protection Superpriority Claim unless and until all DIP Obligations have been Paid in Full. Subject to the relative priorities set forth above, the First Lien Adequate Protection Superpriority Claim shall be against each Debtor on a joint and several basis.

Further Adequate Protection. As further Adequate Protection, the Debtors shall use commercially reasonable efforts to timely comply with the Plan Milestones.

Interest and Professional Fees. As further adequate protection, and without limiting any rights of the Prepetition Agent and the other Prepetition Secured Parties under section 506(b) of the Bankruptcy Code which have been preserved, and in consideration, and as a requirement, for obtaining the consent of the Prepetition Agent (on behalf of the Prepetition Secured Parties) to the entry of the Final Order and the Debtors' consensual use of cash collateral as provided therein, the Debtors shall (i) pay or reimburse in cash all fees, costs, expenses, and charges of the respective professionals retained by or for the benefit of the Prepetition Agent and the respective Consenting Lenders (as defined in the Final Order); provided that the Debtors' obligation to pay the fees, costs, expenses, and charges of professionals of the respective Consenting Lenders (other than professionals retained by or for the benefit of the Prepetition Agent) incurred on or after the Petition Date shall not exceed $25,000 in the aggregate for each such Consenting Lender, (ii) on the Final Order

|  | Entry Date, pay interest accrued from the Petition Date through March 31, 2014 at the non-default rate, and (iii) on April 30, 2014, and on the last day of each subsequent calendar month, pay in cash to the Prepetition Agent for prompt distribution to the applicable Prepetition Secured Parties all of the interest accruing on the Prepetition Credit Obligations under the Prepetition Credit Agreement from and after the Petition Date at the non-default rate(s) set forth therein, in the case of each of sub-clauses (i) through (iii) above, all whether accrued prepetition or postpetition and whether or not budgeted in the Approved Budget, and without further notice (except with respect to certain postpetition professional fees, costs, and expenses), motion, or application to, order of, or hearing before, the Court; provided further that any payments of interest to the Prepetition Agent and other Prepetition Secured Parties shall be reapplied to reduce the principal amount of the Prepetition Credit Obligations to the extent the Prepetition Agent and the other Prepetition Secured Parties are deemed by a final non-appealable order of a court of competent jurisdiction not entitled to such payment under Section 506(b) of the Bankruptcy Code or otherwise. |
|  | Consent to Priming and Adequate Protection.  The Prepetition Agent, on behalf of the Prepetition Secured Parties, has consented to to the Prepetition Secured Parties' Adequate Protection and the priming conditioned upon the entry of the Final Order. |
|  | Right to Seek Additional Adequate Protection.  The Prepetition Agent, on behalf of the Prepetition Secured Parties, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any requested or proposed additional or alternative adequate protection; provided that any such additional or alternative adequate protection approved by the Court shall at all times be subordinate and junior to the claims and Liens of the DIP Secured Parties granted under the DIP Loan Documents. |

## **THE DEBTORS' NEED FOR FINANCING**

11.    The Debtors need to obtain access to the Financing (including cash collateral) to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital and operational needs, including to address potential adverse impact on their business and operations relating to the filing of these cases.  The access of the Debtors to sufficient working capital and liquidity through the Financing, is vital to the preservation and maintenance of the going concern values of the Debtors, to their ability to sustain market confidence in the business and for a successful reorganization contemplated by the Plan Support Agreement.  The Prepetition Secured Parties have consented to the Debtors' use of their cash collateral on an interim basis only, and without a consensual funding package, it is

likely that the Prepetition Secured Parties would have objected to the Debtors' use of cash collateral, resulting in unnecessary litigation, costs and expenses and uncertainty as to the Debtors' on-going operations. As discussed herein, the DIP Lenders have committed to provide financing and consented to the continued use of cash collateral to allow the Debtors to operate their business as debtors-in-possession.

12.     The Debtors, in consultation with their restructuring advisor, Alvarez & Marsal North America, LLC ("**A&M**") and their financial advisor, Lazard Frères & Co LLC ("**Lazard**") have determined that projected cash flows could be insufficient to provide adequate liquidity to the Debtors for a period necessary to effectuate a successful reorganization. In addition, the availability of credit is of crucial importance to the Debtors' ability to assure their customers, vendors and business partners that their business is sound. Moreover, the DIP Facility is an integral component of the Plan Support Agreement which together provide milestones for the course of the Debtors' reorganization and emergence from chapter 11, thereby enhancing and expediting creditor recoveries. Accordingly, the Debtors request approval of the DIP Facility to continue to fund their operations and maintain their going concern value.

13.     Because the obligations owed by the Debtors to the Prepetition Secured Parties under the Prepetition Credit Facility are secured by substantially all property of the Debtors, the liens of the Prepetition Secured Parties would have to be primed in order to obtain postpetition financing. Considering that "priming" the Prepetition Secured Parties would not be possible without an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied assuming a lender could be found who would lend on that basis), none of the parties contacted by Lazard prior to the Petition Date submitted financing

proposals.  Indeed, the Prepetition Secured Parties advised the Debtors that they would not consent to be primed by another lender group.

14.     Additionally, in order to obtain financing from a new third-party lender, such lender, unlike the Pre Petition Secured Parties, would have required payment of work fees and a period of time in which to complete substantial due diligence.

15.     Both pre and post petition, Lazard contacted five (5) third-party potential financing sources seeking proposals for post-petition financing to the Debtors.  None of the potential financing sources that were approached agreed to provide unsecured financing, or to provide the requisite level of financing secured by the Debtors' unencumbered assets.  A few were willing to consider financing secured by priming liens, but only on a consensual basis. Thus, obtaining post-petition financing other than the Financing, did not appear to be practical under the circumstances.  See Aebersold Declaration, ¶¶ 16-17.

16.     Consequently, the Debtors were unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Loan Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Credit Agreement without the Debtors granting to the DIP Agent and the DIP Lenders, subject to the Carve-Out, the DIP Liens and the DIP Superpriority Claims under the terms and conditions set forth in the DIP Loan Documents, including the Final Order.

17.     As a result, after considering their alternatives and taking into account the need to obtain financing on a timely basis, including the need to continue use Cash Collateral, the Debtors determined in the exercise of their business judgment to accept the DIP Lenders'

22

proposal as the only truly viable option for the Debtors (as evidenced by, inter alia, the absence

of third party interest in providing financing).   The Debtors believe that the terms of the DIP

Facility are competitive in the marketplace, address the Debtors' working capital and liquidity

needs, and present the best option available to enable the Debtors to continue to operate their

business and maintain their going concern value.

18.     The terms of the DIP Facility were negotiated in good faith and at arm's

length between the Debtors, the DIP Agent, and the DIP Lenders (all parties being represented

by competent and experienced counsel), and the terms of the DIP Facility were recommended by

Lazard and approved by the Debtors' boards.  The Debtors believe that such terms are fair and

reasonable under the circumstances, are supported by reasonably equivalent value and fair

consideration, are the best terms available under the circumstances, and will allow the Debtors

sufficient capital to operate their business and complete a successful reorganization.

19.     As described above, the Financing is an essential component of the of the

Debtors' emergence strategy.  The DIP Lenders would not agree to provide the DIP Facility or

consented to the Debtors' use of their Cash Collateral, without the inclusion of all terms set forth

in the DIP Loan Documents, each of which was heavily negotiated between the parties.

Therefore, the terms of the Financing are fair and reasonable, reflect the Debtors' exercise of

prudent business judgment consistent with their fiduciary duties, and constitute reasonably

equivalent value and fair consideration.

20.     The Debtors believe that the Approved Budget will be adequate,

considering all available assets, to pay all administrative expenses due or accruing during the

period covered by both the thirteen week period (the "**Budget Period**") projected on the

Approved Budget and through the completion of these chapter 11 cases.

## BASIS FOR RELIEF REQUESTED

21.     The Debtors have a need to obtain the Financing (including the cash collateral component thereof) to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital and operational needs, including to address potential adverse impact on their business and operations relating to the filing of these cases.  The access of the Debtors to sufficient working capital and liquidity through use of cash collateral, incurrence of new indebtedness for borrowed money and other financial accommodations under the Financing is vital to the preservation and maintenance of the going concern values of the Debtors, to their ability to sustain market confidence in the business and for a successful reorganization of the Debtors.

22.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  A&K Endowment, Inc. v. Gen. Growth Props. Inc. (In re Gen. Growth Props., Inc.), 423 B.R. 716, 725 (S.D.N.Y. 2010) (finding that DIP financing benefitted estate and reflected an exercise of the debtors' prudent business judgment); U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.), 485 B.R. 279, 288 (Bankr. S.D.N.Y. 2013) ("In determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest"); In re

<u>Barbara K. Enters., Inc.</u>, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining

that courts defer to a debtor's business judgment "so long as a request for financing does not

'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in

interest"); <u>In re Curlew Valley Assocs.</u>, 14 B.R. 506, 514 n.11a (Bankr. D. Utah 1981); <u>see</u> <u>Trans</u>

<u>World Airlines v. Travelers Int'l AG (In re Trans World Airlines, Inc.)</u>, 163 B.R. 964, 974

(Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility

were approved because they "reflect[ed] sound and prudent business judgment … [were]

reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); <u>cf.</u>

<u>Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry.</u>, 318 U.S. 523, 550 (1943) (holding

that decisions regarding assumption or rejection of leases are left to the business judgment of the

debtor); <u>In re Simasko Prod. Co.</u>, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments

should be left to the board room and not to this Court.").

        23.     In fact, one court has noted that "[m]ore exacting scrutiny [of the debtor's

business decisions] would slow the administration of the debtor's estate and increase its cost,

interfere with the Bankruptcy Code's provision for private control of administration of the estate,

and threaten the court's ability to control a case impartially."  <u>Richmond Leasing Co. v. Capital</u>

<u>Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985).  Bankruptcy courts generally will not second-

guess a debtor-in-possession's business decisions involving "a business judgment made in good

faith, upon a reasonable basis, and within the scope of his authority under the Code."  <u>Curlew</u>

<u>Valley</u>, 14 B.R. at 513-14.

**A.      The Debtors Satisfy the Requirements for Using Cash Collateral Under**
         **Section 363(c)(2) of the Bankruptcy Code**

        24.     Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor-in-

possession may use cash collateral with the consent of the secured party holding liens in the cash

collateral or with court approval. Section 363(e) of the Bankruptcy Code provides that upon

request of an entity that has an interest in property to be used by a debtor (*e.g.*, cash collateral),

the court shall prohibit or condition such use as necessary to provide adequate protection of such

interest. Pistole v. Mellor (In re Mellor), 734 F.2d 1396, 1400 (9th Cir. 1984); see also In re

McCormick, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the cash collateral of a secured

creditor, the debtor must have the consent of the secured creditor or must establish to the Court

that the secured creditor's interest in the cash collateral is adequately protected).

      25.      The Bankruptcy Code does not explicitly define "adequate protection."

Section 361 suggests, however, that adequate protection may be provided by (i) periodic cash

payments to the extent that there is a decrease in the lien holder's interest in that property;

(ii) providing additional or replacement liens; or (iii) other relief resulting in the realization of

the "indubitable equivalent" of the lien holder's interest in the property. See 11 U.S.C. § 361.

The third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-

by-case basis, to determine what level of protection is appropriate to provide a secured party.

See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16

F.3d 552, 564 (3d. Cir. 1994). Appropriate adequate protection is decided on a case-by-case

basis. See, e.g., Bray v. Shenandoah Fed. Savings and Loan (In re Snowshoe Co.), 789 F.2d

1085, 1088 (4th Cir. 1986); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re

Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986).

      26.      The measures of protection provided to the Prepetition Secured Parties in

the proposed Final Order, pursuant to and in accordance with sections 361 and 363(e) of the

Bankruptcy Code, constitute adequate protection for any diminution in the value of their

Prepetition First Lien Collateral resulting from, among other things (i) the priming of the  liens

and security interests under the Prepetition Credit Facility; (ii) the use by the Debtors of the cash collateral; (iii) the use, sale, lease, other disposition or depreciation of the Prepetition First Lien Collateral; and (iv) the imposition of the automatic stay.

27.     The proposed Final Order provides that as adequate protection for any diminution in the value of their Prepetition First Lien Collateral resulting from the Debtors' use of cash collateral, the priming liens in favor of the DIP Facility, or otherwise, the Debtors shall:

(i)     grant to the Prepetition Agent under the Prepetition Credit Agreement (for the benefit of itself and the Prepetition Lenders): (a) replacement liens on all of the DIP Collateral, subordinate only to the liens in favor of the DIP Facility, the Carve-Out, and Prepetition Prior Liens, and (b) a super-priority administrative claim junior only to that of the DIP Facility and the Carve-Out,

(ii)     timely pay the reasonable, documented fees and expenses of the professionals retained by the Prepetition Agent and the respective Consenting Lenders (as defined in the Final Order) upon receipt of an appropriate invoice, redacted as appropriate to exclude information which such professionals believe in good faith to be protected by the attorney-client privilege, the attorney work product doctrine or other privilege; *provided that* the Debtors' obligation to pay the fees and expenses of the respective Consenting Lenders (as defined in the Final Order) (other than the Prepetition Agent) incurred on or after the Petition Date shall not exceed $25,000 for each such Consenting Lenders (as defined in the Final Order), and

(iii)     pay in cash current interest at the non-default rate under the Prepetition Credit Agreement subject to appropriate recharacterization as principal if the Prepetition Lenders are deemed to be undersecured, and

(iv)     provide the Prepetition Lenders with copies of the Approved Budget, variance reports and other financial reports more fully described in the DIP Facility.

The Debtors submit that the foregoing provisions adequately protect the Prepetition Secured Parties for any potential diminution in the value of their Prepetition First Lien Collateral subsequent to the Petition Date.

**B.      The Debtors Satisfy the Requirements for Obtaining Credit Under Section 364(c) of the Bankruptcy Code**

28.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c) of the

Bankruptcy Code.  The statutory requirement for obtaining post-petition credit under 364(c) of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtors-in-possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."[3]  See In re Garland Corp., 6 B.R. 456, 461 n.11 (1st Cir. B.A.P. 1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); In re The Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code); In re YL West 87th Holdings I LLC, 423 B.R. 421,441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); In re Ames Dep't Stores, Inc., 115 B.R. at 37 (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

29.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(i)    the debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

(ii)    the credit transaction is necessary to preserve the assets of the estate; and

---

[3]    Section 364(c) of the Bankruptcy Code provides that:

(c)    If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)    with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)    secured by a junior lien on property of the estate that is subject to a lien.

(iii)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, Inc., 115 B.R. at 37-39; In re The Crouse Group, Inc., 71 B.R. at 549.

30.    Based upon discussions with potential lenders, post-petition financing on an unsecured basis or on a junior priority basis alone was unobtainable.  See  Aebersold Declaration, ¶¶ 16-17.  Thus, the Debtors conducted substantial negotiations in connection with the DIP Facility and obtained the best financing proposal available under the circumstances.

31.    The DIP Facility ensures that the Debtors have continued access to cash collateral and capital to pay employees, vendors, and suppliers.  Without use of collateral and possibly post-petition financing, the Debtors would be unable to operate their business as a going concern, which would significantly impair the value of the Debtors' assets and their ability to successfully reorganize.  Given the Debtors' circumstances and the advantages of the Financing, the Debtors believe the terms of the DIP Facility are fair, reasonable, and adequate, all as more fully set forth below.

## C.    The Debtors Satisfy the Requirements for Obtaining Credit Under Section 364(d) of the Bankruptcy Code

32.    If a debtor is unable to obtain credit solely under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit by a senior or equal lien on property of the estate that is already subject to a lien (a "**Priming Lien**").  See 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code authorizes a debtor-in-possession to incur superpriority senior secured Priming Liens if: (a) the debtor is unable to obtain financing from any other source and (b) the interests of the secured creditors whose liens are being primed by the post-petition financing are adequately protected.  See 11 U.S.C. §§ 364(d)(1)(A) and (B).

33.    Under section 364(d)(1)(A) of the Bankruptcy Code, the adequacy of a debtor's efforts to obtain post-petition financing is a case specific inquiry.  However, courts have

generally found that a good-faith effort to seek credit from other sources is sufficient to carry the

burden under section 364(d)(1). See Bray, 789 F.2d at 1088 ("there is no duty to seek credit

from every possible lender"); In re 425 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr.

S.D.N.Y. 1992) (the Bankruptcy Code "does not require the debtor to seek alternate financing

from every possible lender").

        34.     In determining whether to approve a financing agreement pursuant to

section 364, courts may also consider: (i) whether the proposed financing is necessary to

preserve estate assets and is necessary, essential, and appropriate for continued operation of the

debtors' business; (ii) whether the terms of the proposed financing are reasonable and adequate

given the circumstances of both the debtors and proposed lender(s); (iii) whether the proposed

financing agreement adequately protects prepetition secured creditors; and (iv) whether the

proposed financing agreement was negotiated at arm's length and entry thereto is an exercise of

sound and reasonable business judgment and in the best interest of the debtors' estate and its

creditors. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. at 37-39; Bland v. Farmworker

Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003).

        35.     The Debtors could not obtain financing on less onerous terms than those

of the DIP Facility. See Paragraph 15, *supra*, Aebersold Declaration, ¶¶ 16-17. Additionally,

without access to the Financing, the Debtors would be unable to assure parties in interest that

they have adequate liquidity, which could impair the value of the Debtors' assets and their

chances at a successful and expeditious reorganization. Moreover, the Prepetition Lenders

consented to the proposed financing and are adequately protected. Finally, the terms and

conditions of the proposed DIP Facility are fair, reasonable, and were negotiated in good faith

and at arm's length.

D.    **The DIP Facility is Fair, Reasonable and Appropriate**

36.    In determining whether the terms of a debtor's proposed postpetition

financing arrangement are fair and reasonable, courts consider the relative circumstances of both

the debtor and the potential lender.  See In re Farmland Indus., Inc., 294 B.R. 855, 885-89

(Bankr. W.D. Mo. 2003) (finding that terms of postpetition financing were reasonable when

taken in context and relative circumstances of the parties were considered); see also Unsecured

Creditors Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen

MacLean Oil Co., Inc.), 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may

have to enter into "hard" bargains to acquire funds for its reorganization).  When judged from the

foregoing perspective, the terms of the DIP Facility are fair, within the range of reasonableness,

and appropriate under the circumstances.

37.    The DIP Facility provides the Debtors with the liquidity they need to

operate their business during the chapter 11 cases, thus facilitating the reorganization process and

enabling the Debtors to restructure their balance sheet.  As discussed more fully above, the

Debtors made concerted, good-faith efforts to obtain credit on the most favorable terms available

in the market to entities in their particular circumstances.  Against this backdrop, the Debtors and

their advisors carefully evaluated the proposed financing offered by the DIP Facility and

engaged in good faith, arm's-length negotiations with the DIP Lenders.  Ultimately, as discussed

above, the Debtors, exercising their sound business judgment, agreed to the DIP Facility as the

proposal best suited to the Debtors' needs.

38.    The various fees and charges required by the DIP Lenders under the DIP

Facility are necessary to secure their agreement to provide the Financing and are reasonable

under the circumstances.  See Aebersold Declaration, ¶ 25.  As described above, the Debtors

have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for

the DIP Facility.  Specifically, the Debtors will pay to the DIP Lenders a closing fee of 2.0% of each DIP Lender's commitment under the DIP Facility, an arrangement fee of $75,000 payable to the DIP Agent in cash on the Closing Date, an unused commitment fee paid to each DIP Lender on the actual daily amount by which such DIP Lender's commitment exceeds its Pro Rata Share of the aggregate outstanding principal amount of the DIP Loans from the date of the DIP Credit Agreement at a rate per annum equal to 4%, payable in arrears (x) on the last Business Day of each calendar month, and (y) on the Commitment Termination Date, and a backstop commitment fee of 2.5% of each DIP Lender's backstop commitment under the DIP Facility payable in cash on the Closing Date.  Furthermore, the fees and charges were a necessary inducement for the DIP Lenders to provide the DIP Facility, consent to the Debtors' continued use of Cash Collateral and enter into the Plan Support Agreement (which is the cornerstone of the Debtors' exit strategy).

39.    Courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtors' business judgment, beneficial to the debtors' estates.  See, e.g., Resolution Trust Corp. v. Official Creditors' Comm. (In re Defender Drug Stores, Inc.), 145 B.R. 312, 316-19 (Bankr. 9th Cir. 1992) (approving facility containing enhancement fee); In re Korea Chosun Daily Times, Inc., 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (noting the post petition financing may include commitment fee); In re Insight Health Services Holdings Corp., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.0% DIP closing fee); In re NR Liquidation III Co. (f/k/a Neff Corp.), No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee); In re The Reader's Digest Ass'n, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3% exit fee), In re Lear Corp., No. 09-14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0% upfront

fee and a 1.0% exit/conversion fee);.  Accordingly, the Court should authorize the Debtors to pay

the fees provided under the DIP Facility.

**E.**     **The Scope of the Carve-Out is Appropriate**

40.     The proposed DIP Facility subjects the security interests and

administrative expense claims of the DIP Lender to the Carve-Out. Such carve outs for

professional fees have been found to be reasonable and necessary to ensure that a debtor's estate

and any statutory committee can retain assistance from counsel.  See In re Ames Dep't Stores,

115 B.R. at 40; see also Gen. Growth, 412 B.R. at 136-37.  Other than the ability to fund a

challenge to the secured creditors' rights, the DIP Facility does not directly or indirectly deprive

the Debtor's estate or other parties in interest of possible rights and powers by restricting the

services for which professionals may be paid in these cases.  Id. at 38 (observing that courts

insist on carve outs for professionals representing parties in interest because "[a]bsent such

protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

In addition, the Carve-Out ensures that proceeds of the DIP Facility may be used for the payment

of U.S. Trustee fees and professional fees of the Debtors and the Committee notwithstanding the

grant of superpriority and administrative liens and claims under the DIP Facility.

**F.**     **The DIP Lenders Should be Deemed Good Faith Lenders under Section 364(e)**

41.     The terms and conditions of the DIP Loan Documents were negotiated in

good faith, and at arm's length, and with the assistance of competent and experienced legal,

financial, and restructuring professionals, and were ultimately approved by the Debtors' in an

exercise of informed business judgment.  See Aebersold Declaration, ¶¶ 8-10, 24-26.

42.     Based on the Lazard's advice, the Debtors believe that the terms of the

DIP Facility are fair and reasonable under the circumstances, reflect prudent exercise of their

business judgment, and are supported by reasonably equivalent value and fair consideration.

33

Accordingly, the DIP Lenders under the DIP Facility should be accorded the benefits of section

364(e) of the Bankruptcy Code in respect of such agreement.

**G.      Prepetition Secured Parties Have Consented to the Financing**

43.      The terms of the DIP Facility were negotiated with the Prepetition Agent

and the holders of a majority of the Prepetition Credit Facility Debt, who have consented to the

relief herein.

**H.      Approval of the DIP Facility Is In the Best Interests of the Debtors' Estates**

44.      The Court may take into consideration non-economic benefits to the

Debtors offered by the DIP Facility.  For example, in In re ION Media Networks, Inc., the

Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms, a
> business decision to obtain credit from a particular lender is almost never
> based purely on economic terms.  Relevant features of the financing must
> be evaluated, including non-economic elements such as the timing and
> certainty of closing, the impact on creditor constituencies and the
> likelihood of a successful reorganization.  This is particularly true in a
> bankruptcy setting where cooperation and established allegiances with
> creditor groups can be a vital part of building support for a restructuring
> that ultimately may lead to a confirmable reorganization plan.  That which
> helps foster consensus may be preferable to a notionally better transaction
> that carries the risk of promoting unwanted conflict.

No. 09-13125 (Bankr. S.D.N.Y. July 6, 2009).

45.      A denial of the Debtors' requested relief could cause irreparable harm to

the Debtors and their estates.  The Debtors require access to ongoing working capital which is

critical to the Debtors' entire business.  Absent access to cash collateral and the DIP Facility, the

Debtors would not be able to meet their ongoing obligations and finance their operations.  In

contrast, the Debtors' access to cash collateral and the DIP Facility will ensure that the "going

concern" value of their assets is preserved.  Moreover, the DIP Facility is an integral component

of the Plan Support Agreement which ensures a smooth and expeditious reorganization process
and will maximize the value of the Debtors' estates.  The Debtors submit for all these reasons the
there is ample justification exists for the relief requested herein.

## I.      Modification of the Automatic Stay on a Limited Basis is Warranted

46.     The relief requested herein contemplates a modification of the automatic
stay pursuant to section 362(a) of the Bankruptcy Code to the extent necessary to permit the DIP
Lenders upon the continuation of any Event of Default, all rights and remedies provided for in
the DIP Loan Documents, including the Final Order, after seven (7) business days' notice
thereof, and to take various actions without further order of or application to the Court.

47.     Stay modification provisions of this sort are ordinary features of debtor-in-
possession financing facilities and, in the Debtors' business judgment, are reasonable under the
circumstances.  See, e.g., In re Hawker Beechcraft, Inc., No. 12-11873 (SMB) (Bankr. S.D.N.Y.
June 1, 2012); In re Velo Holdings Inc., No. 12-11384 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012);
In re United Retail Grp., Inc., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 23, 2012); In re
Hostess Brands, Inc., No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012).

48.     Because the Debtors have consented to these stay modifications in an
exercise of their business judgment, and such consent is necessary to obtain access to cash
collateral and the DIP Facility, the Debtors submit that cause exists to modify the automatic stay
to the extent contemplated by the DIP Loan Documents, including the Final Order.

**J.**    **Relief Under Bankruptcy Rule 6004 is Warranted**

49.    Because the Debtors have an urgent need for use of cash collateral, the

Debtors submit that cause exists for a waiver of the fourteen day stay imposed by Bankruptcy

Rule 6004(h), to the extent applicable.

## NOTICE

50.    Notice of this Motion has been provided to: (i) the United States Trustee

for Region 2, for the Southern District of New York; (ii) the DIP Agent; (iii) counsel to the DIP

Agent; (iv) the Prepetition Agent; (v) counsel to the Prepetition Agent; (vi) the Trustee under the

Indenture; (vii) counsel to the Trustee under the Indenture; (viii) counsel to the holders of the

majority of the Notes under the Indenture; (ix) counsel to the Committee of Unsecured Creditors;

(x) the Internal Revenue Service; (xi) the New York State Department of Taxation and Finance;

(xii) the New York State Department of Health; (xiii) the Securities and Exchange Commission;

(xiv) the United States Attorney's Office; (xv) the United States Attorney General; and (xvi) all

parties who have filed a notice of appearance in these cases.  In light of the nature of the relief

requested, the Debtors submit that no further notice is required or needed under the

circumstances.

## NO PRIOR RELIEF

51.    No previous motion for the relief sought herein has been made to this or

any other Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter the Final

Order, substantially in the form attached hereto as Exhibit C, and grant the Debtors such other

and further relief as may be just and appropriate under the circumstances.

Dated: New York, New York
     April 22, 2014                DECHERT LLP

                                  */s/  Shmuel Vasser*_____
                                  Allan S. Brilliant
                                  Shmuel Vasser
                                  Jeffrey T. Mispagel
                                  1095 Avenue of the Americas
                                  New York, New York  10036
                                  Telephone:  (212) 698-3500
                                  Facsimile:  (212) 698-3599
                                  Email:  allan.brilliant@dechert.com
                                           shmuel.vasser@dechert.com
                                           jeffrey.mispagel@dechert.com

                                  *Proposed Attorneys for the Debtors and
Debtors-in-Possession*

**<u>EXHIBIT A</u>**

**DIP Credit Agreement**

19145897

DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of May 7, 2014

among

MMODAL INC.,

as Debtor and Debtor-In-Possession,

LEGEND PARENT, INC.,
as Holdings,

ROYAL BANK OF CANADA,
as Administrative Agent and Collateral Agent,

and

The Other Lenders Party Hereto

# TABLE OF CONTENTS

Section  Page

## ARTICLE I.
### DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Other Interpretive Provisions | 21 |
| Section 1.03 | Accounting Terms | 22 |
| Section 1.04 | Rounding | 22 |
| Section 1.05 | Times of Day | 22 |
| Section 1.06 | Currency Equivalents Generally | 22 |

## ARTICLE II.
### THE COMMITMENTS AND CREDIT EXTENSIONS

| | | |
|---|---|---|
| Section 2.01 | The Commitments | 22 |
| Section 2.02 | Borrowings, Conversions and Continuations of Loans | 23 |
| Section 2.03 | [Reserved] | 24 |
| Section 2.04 | [Reserved] | 24 |
| Section 2.05 | Prepayments | 24 |
| Section 2.06 | [Reserved] | 25 |
| Section 2.07 | Repayment of Loans | 25 |
| Section 2.08 | Interest | 25 |
| Section 2.09 | Fees | 26 |
| Section 2.10 | Computation of Interest and Fees | 26 |
| Section 2.11 | Evidence of Debt | 26 |
| Section 2.12 | Payments Generally; Administrative Agent's Clawback | 27 |
| Section 2.13 | Sharing of Payments by Lenders | 28 |
| Section 2.14 | [Reserved] | 29 |
| Section 2.15 | [Reserved] | 29 |
| Section 2.16 | Defaulting Lenders | 29 |

## ARTICLE III.
### TAXES, YIELD PROTECTION AND ILLEGALITY

| | | |
|---|---|---|
| Section 3.01 | Taxes | 29 |
| Section 3.02 | Illegality | 32 |
| Section 3.03 | Inability to Determine Rates | 32 |
| Section 3.04 | Increased Costs; Reserves on Eurodollar Rate Loans | 32 |
| Section 3.05 | Compensation for Losses | 33 |
| Section 3.06 | Mitigation Obligations; Replacement of Lenders | 34 |
| Section 3.07 | Survival | 34 |

## ARTICLE IV.
### CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

| | | |
|---|---|---|
| Section 4.01 | Conditions of Initial Credit Extension | 34 |
| Section 4.02 | Conditions to all Credit Extensions | 36 |

CH\1787007.21

Page

ARTICLE V.
REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power ...................................................................37
Section 5.02    Authorization; No Contravention ....................................................................37
Section 5.03    Governmental Authorization; Other Consents .................................................37
Section 5.04    Binding Effect ..................................................................................................37
Section 5.05    Financial Statements ........................................................................................38
Section 5.06    Litigation ..........................................................................................................38
Section 5.07    [Reserved] ........................................................................................................38
Section 5.08    Ownership of Property; Liens; Investments .....................................................38
Section 5.09    Environmental Compliance ..............................................................................38
Section 5.10    Insurance ..........................................................................................................39
Section 5.11    Taxes .................................................................................................................39
Section 5.12    ERISA Compliance ..........................................................................................39
Section 5.13    Subsidiaries; Equity Interests; Loan Parties ...................................................40
Section 5.14    Margin Regulations; Investment Company Act ...............................................40
Section 5.15    Disclosure .........................................................................................................40
Section 5.16    Compliance with Laws .....................................................................................40
Section 5.17    Intellectual Property; Licenses, Etc. ................................................................40
Section 5.18    Use of Proceeds ...............................................................................................41
Section 5.19    Labor Matters ...................................................................................................41
Section 5.20    Anti-Terrorism Laws ........................................................................................41
Section 5.21    Bankruptcy Representations .............................................................................41

ARTICLE VI.
REPORTING COVENANTS

Section 6.01    Financial Statements ........................................................................................42
Section 6.02    Other Events .....................................................................................................44
Section 6.03    Copies of Notices and Reports .........................................................................44
Section 6.04    Taxes .................................................................................................................44
Section 6.05    Labor Matters ...................................................................................................44
Section 6.06    [Reserved] ........................................................................................................44
Section 6.07    [Reserved] ........................................................................................................44
Section 6.08    Other Information .............................................................................................44
Section 6.09    Lender Calls ......................................................................................................44

ARTICLE VII.
AFFIRMATIVE COVENANTS

Section 7.01    [Reserved] ........................................................................................................45
Section 7.02    Certificates; Other Information ........................................................................45
Section 7.03    Notices ..............................................................................................................46
Section 7.04    Payment of Taxes .............................................................................................46
Section 7.05    Preservation of Existence, Etc. ........................................................................47
Section 7.06    Maintenance of Properties................................................................................47
Section 7.07    Maintenance of Insurance ................................................................................47
Section 7.08    Compliance with Laws .....................................................................................47
Section 7.09    Books and Records ...........................................................................................47
Section 7.10    Inspection Rights ..............................................................................................48
Section 7.11    Use of Proceeds ...............................................................................................48
Section 7.12    Information Regarding Collateral .....................................................................48
Section 7.13    Covenant to Guarantee Obligations and Give Security....................................48

ii

Page

Section 7.14    Compliance with Environmental Laws ..................................................................50
Section 7.15    Further Assurances ...........................................................................................50
Section 7.16    [Reserved] .......................................................................................................50
Section 7.17    [Reserved] .......................................................................................................50
Section 7.18    Post-Closing Covenant ......................................................................................51
Section 7.19    Compliance with Milestones ..............................................................................51
Section 7.20    Opposition to Certain Motions ...........................................................................51
Section 7.21    Entry of Final Order ..........................................................................................51

ARTICLE VIII.
NEGATIVE COVENANTS

Section 8.01    Liens..............................................................................................................51
Section 8.02    Investments .....................................................................................................51
Section 8.03    Indebtedness....................................................................................................51
Section 8.04    Fundamental Changes .......................................................................................52
Section 8.05    Dispositions.....................................................................................................52
Section 8.06    Restricted Payments .........................................................................................53
Section 8.07    Change in Nature of Business .............................................................................54
Section 8.08    Transactions with Affiliates ...............................................................................54
Section 8.09    Burdensome Agreements ...................................................................................54
Section 8.10    Use of Proceeds ...............................................................................................55
Section 8.11    [Reserved] .......................................................................................................55
Section 8.12    Capital Expenditures .........................................................................................55
Section 8.13    Amendments of Organization Documents .............................................................55
Section 8.14    Accounting Changes .........................................................................................55
Section 8.15    Prepayments, Etc. of Indebtedness......................................................................55
Section 8.16    Holding Company ............................................................................................56
Section 8.17    Bankruptcy Provisions ......................................................................................56
Section 8.18    Compliance with Budget ...................................................................................56

ARTICLE IX.
EVENTS OF DEFAULT AND REMEDIES

Section 9.01    Events of Default .............................................................................................56
Section 9.02    Remedies upon Event of Default .........................................................................58
Section 9.03    Application of Funds .........................................................................................59

ARTICLE X.
ADMINISTRATIVE AGENT

Section 10.01    Appointment and Authority ..............................................................................60
Section 10.02    Rights as a Lender...........................................................................................60
Section 10.03    Exculpatory Provisions ....................................................................................60
Section 10.04    Reliance by Administrative Agent ......................................................................61
Section 10.05    Delegation of Duties .......................................................................................61
Section 10.06    Resignation of Administrative Agent...................................................................61
Section 10.07    Non-Reliance on Administrative Agent and Other Lenders .......................................62
Section 10.08    No Other Duties, Etc. ......................................................................................62
Section 10.09    Administrative Agent May File Proofs of Claim .....................................................62
Section 10.10    Collateral and Guaranty Matters ........................................................................62
Section 10.11    Secured Cash Management Agreements and Secured Hedge Agreements.....................63
Section 10.12    Withholding Tax. ............................................................................................63

iii

Page

ARTICLE XI.
CONTINUING GUARANTY

Section 11.01    Guaranty.................................................................................................................63
Section 11.02    Rights of Lenders................................................................................................64
Section 11.03    Certain Waivers..................................................................................................64
Section 11.04    Obligations Independent .....................................................................................64
Section 11.05    Subrogation.........................................................................................................64
Section 11.06    Termination; Reinstatement ................................................................................64
Section 11.07    Subordination......................................................................................................65
Section 11.08    Condition of Borrower ........................................................................................65


ARTICLE XII.
MISCELLANEOUS

Section 12.01    Amendments, Etc. ..............................................................................................65
Section 12.02    Notices; Effectiveness; Electronic Communications .........................................67
Section 12.03    No Waiver; Cumulative Remedies; Enforcement ..............................................68
Section 12.04    Expenses; Indemnity; Damage Waiver ..............................................................69
Section 12.05    Payments Set Aside............................................................................................70
Section 12.06    Successors and Assigns.......................................................................................70
Section 12.07    Treatment of Certain Information; Confidentiality .............................................73
Section 12.08    Right of Setoff.....................................................................................................74
Section 12.09    Interest Rate Limitation ......................................................................................74
Section 12.10    Counterparts; Integration; Effectiveness.............................................................74
Section 12.11    Survival of Representations and Warranties .......................................................74
Section 12.12    Severability .........................................................................................................74
Section 12.13    Replacement of Lenders......................................................................................75
Section 12.14    Governing Law; Jurisdiction; Etc. .....................................................................75
Section 12.15    Waiver of Jury Trial............................................................................................76
Section 12.16    No Advisory or Fiduciary Responsibility ..........................................................76
Section 12.17    Electronic Execution of Assignments and Certain Other Documents.................76
Section 12.18    USA PATRIOT Act ............................................................................................77


SIGNATURES .............................................................................................................................S-1

SCHEDULES

1.01            Legal Proceeding
2.01            Commitments and Applicable Percentages
5.13            Subsidiaries and Other Equity Investments; Loan Parties
5.17            Intellectual Property Matters
7.13            Subsidiary Guarantors
8.01(b)         Existing Liens
8.02(a)         Existing Investments
8.03(b)         Existing Indebtedness
12.02           Administrative Agent's Office, Certain Addresses for Notices

EXHIBITS

***Form of***

| | |
|---|---|
| A | Committed Loan Notice |
| B | [Reserved] |
| C-1 | Term Note |
| C-2 | [Reserved] |
| D | Compliance Certificate |
| E-1 | Assignment and Assumption |
| E-2 | Administrative Questionnaire |
| F | Guaranty |
| G | Security Agreement |
| I | Opinion Matters — Counsel to Loan Parties |
| J | U.S. Tax Compliance Certificate |
| K | Prepayment Notice |

CH\1787007.21

CREDIT AGREEMENT

This CREDIT AGREEMENT ("Agreement") is entered into as of May 7, 2014, among MModal Inc., a Delaware corporation (the "Borrower") and a Debtor and Debtor-In-Possession under the Bankruptcy Code (as defined below), each Guarantor (as defined below), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and ROYAL BANK OF CANADA, as Administrative Agent.

PRELIMINARY STATEMENTS:

On March 20, 2014 (the "Petition Date"), the Borrower, and each other Guarantor (as defined below) (each a "Debtor" and collectively, the "Debtors"), commenced Chapter 11 Case Nos. 14-10700 through 14-10714, administratively consolidated as Chapter 11 Case No. 14-10701 (RG) (each a "Case" and collectively, the "Cases") under the Bankruptcy Code (as defined below) with the United States Bankruptcy Court for the Southern District of New York, (the "Bankruptcy Court");

From and after the Petition Date, the Debtors will continue to operate their respective businesses and to manage their respective properties as debtors and debtors-in-possession pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

On March 21, 2014, the Bankruptcy Court entered an order [ECF No. 25] directing the joint administration of the Cases and entered the Interim Order Approving Debtors' Motion for Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Lenders and (III) Granting Related Relief [ECF No. 28], which order has been extended by the Stipulation and Order (I) Extending Interim Cash Collateral Order And (II) Scheduling Status Conference For May 6, 2014 [ECF No. 87] (together, the "Cash Collateral Order");

On March 27, 2014, the United States Trustee appointed a statutory committee of unsecured creditors (the "Committee");

Prior to the Petition Date, the Borrower received financing pursuant to that certain Credit Agreement dated as of August 17, 2012 (as amended, supplemented, restated or otherwise modified from time to time prior to the date hereof, the "Prepetition Credit Agreement"), among the Borrower, the other Loan Parties party thereto, Royal Bank of Canada, as administrative agent (the "Prepetition Agent"), the other parties party thereto, and the various lenders from time to time party thereto (the "Prepetition Lenders"); and

The Borrower has requested, and the Lenders have agreed to make available to the Borrower, a senior secured priming and superpriority debtor-in-possession multiple draw term loan credit facility in an original principal amount of $30,000,000, the proceeds of which will be used to fund working capital and certain other expenses of the Borrower and the Guarantors (as defined below) during the pendency of the Cases in accordance with the Budget (as defined below), including the Permitted Variances (as defined below) thereto.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I.
DEFINITIONS AND ACCOUNTING TERMS

Section 1.01     Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

 "Administrative Agent" means Royal Bank of Canada in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent appointed in accordance with the terms hereof.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 12.02, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form of Exhibit E-2 or any other form approved by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Aggregate Excess Crossholder Voting Amount" has the meaning specified in Section 12.01.

"Agreement" means this Credit Agreement.

"Anti-Money Laundering Law" means any and all laws, judgments, orders, executive orders, decrees, ordinances, rules, regulations, statutes, case law or treaties applicable to a Loan Party, its Subsidiaries or Affiliates, related to terrorism financing or money laundering including any applicable provision of Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT Act) of 2001 (Title III of Pub. L. 107-56) and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Percentage" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Facility represented by the sum of (i) such Lender's unfunded Commitment at such time and (ii) the principal amount of such Lender's Loans at such time.  The initial Applicable Percentage of each Lender in respect of the Facility is set forth opposite the name of such Lender on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Rate" means  6.95% per annum for Base Rate Loans and 7.95% per annum for Eurodollar Rate Loans.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 12.06(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit E-1 or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"Audited Financial Statements" means the audited consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2013, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Borrower and its Subsidiaries, including the notes thereto.

"Avoidance Actions" has the meaning set forth in the Final Order.

2

"Backstop Commitment Amount" means, with respect to each applicable Lender, the commitment of such Lender to make Loans hereunder as set forth in the "Backstop Commitment" column on Schedule 2.01(b), which shall comprise a portion of such Lender's Commitment hereunder.

"Bankruptcy Code" means the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.).

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"Base Rate" means for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 1/2 of 1%, (b) the rate of interest in effect for such day as publicly announced from time to time by the Administrative Agent as its "prime rate," and (c) the one-month Eurodollar Rate plus 1.00%; provided that in no event will the Base Rate be lower than 2.50% at any time; provided further that, with respect to any Loan, during the period from the date hereof to the date that is 30 days following the Closing Date (or such earlier date as shall be specified by the Administrative Agent on which a Eurodollar Rate Loan has become available), "Base Rate" shall mean the rate determined pursuant to clause (c). The "prime rate" is a rate set by the Administrative Agent based upon various factors including the Administrative Agent's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate. Any change in such rate announced by the Administrative Agent shall take effect at the opening of business on the day specified in the public announcement of such change.

"Base Rate Loan" means a Loan that bears interest based on the Base Rate.

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 7.02.

"Borrowing" means a borrowing consisting of Loans made on the same day by the Lenders according to their respective Commitments as set forth by the Borrower on the Committed Loan Notice therefor.

"Budget" means as of any date of determination, the "Approved Budget," as such term is defined in the Final Order.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in New York, New York, and, if such day relates to any Eurodollar Rate Loan, means any such day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"Capital Expenditures" means, with respect to any Person for any period, any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding assets acquired in normal replacements and maintenance which are properly charged to current operations) that, in conformity with GAAP are required to be included as additions during such period to property, plant or equipment reflected in the consolidated balance sheet of the Borrower and its Subsidiaries.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; provided that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"Carve-Out" has the meaning specified in the Final Order.

"Carve-Out Cap" has the meaning specified in the Final Order.

"Case" and "Cases" have the meanings specified in the recitals hereto.

"Cash Collateral Account" means  a deposit account subject to a Control Agreement reasonably satisfactory to Administrative Agent and Prepetition Agent.

"Cash Collateral Order" has the meaning specified in the recitals hereto.

"Cash Equivalents" means:

(a)        U.S. dollars or, in the case of a Foreign Subsidiary, any other foreign currency held by such Foreign Subsidiary in the ordinary course of business;

(b)        securities issued or directly and fully and unconditionally guaranteed or insured by the U.S. government or any agency or instrumentality thereof the securities of which are unconditionally guaranteed as a full faith and credit obligation of such government with maturities of 24 months or less from the date of acquisition;

(c)        certificates of deposit, time deposits and eurodollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case with any commercial bank having capital and surplus of not less than $500.0 million in the case of U.S. banks and, in the case of any Foreign Subsidiary, $100.0 million (or the U.S. dollar equivalent as of the date of determination) in the case of non-U.S. banks, and in each case in a currency permitted under clause (a) above;

(d)        repurchase obligations for underlying securities of the types described in clauses (b), (c) and (h) entered into with any financial institution meeting the qualifications specified in clause (c) above, and in each case in a currency permitted under clause (a) above;

(e)        commercial paper rated at least P-2 by Moody's or at least A-2 by S&P and in each case maturing within 3 months after the date of creation thereof, and in each case in a currency permitted under clause (a) above;

(f)        marketable short-term money market and similar securities having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another Rating Agency) and in each case maturing within 3 months after the date of creation thereof and in a currency permitted under clause (a) above;

(g)        investment funds investing 95% of their assets in securities of the types described in clauses (a) through (f) above;

(h)        readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or, in either case, an equivalent rating by any other Rating Agency with maturities of 3 months or less from the Closing Date;

(i)        Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 3 months or less from the date of acquisition and in each case in a currency permitted under clause (a) above;

(j)        Investments with average maturities of 3 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's and in each case in a currency permitted under clause (a) above; and

(k)        credit card receivables and debit card receivables so long as such are considered cash equivalents under GAAP and are so reflected on the Issuer's balance sheet.

4

Notwithstanding the foregoing, Cash Equivalents shall include amounts denominated in currencies other than those set forth in clause (a) above, provided that such amounts are converted into any currency listed in clause (a) as promptly as practicable and in any event within ten Business Days following the receipt of such amounts.

"Casualty Event" means any event that gives rise to the receipt by Holdings, Borrower or any Subsidiary of any insurance proceeds or condemnation award in respect of any equipment, fixed assets or real property (including improvements thereon) to replace, restore or repair such equipment, fixed assets or real property.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"CFC" means a Foreign Subsidiary of the Borrower that is a controlled foreign corporation under Section 957 of the Code, and any direct or indirect Subsidiary of such a Foreign Subsidiary.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a)    Permitted Holders, collectively, shall cease to own and control legally and beneficially (free and clear of all Liens), either directly or indirectly, equity securities in Holdings representing more than 50% of the combined voting power of all of equity securities entitled to vote for members of the board of directors or equivalent governing body of Holdings on a fully-diluted basis (and taking into account all such securities that the Permitted Holders have the right to acquire, whether such right is exercisable immediately or only after the passage of time); or

(b)    [Reserved];

(c)    At any time, a majority of the members of the board of directors or other equivalent governing body of Holdings cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(d)    Holdings shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in the Borrower; or

(e)    a "change of control" or any comparable term under, and as defined in, the Senior Unsecured Notes Indenture shall have occurred.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 12.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means all of the "DIP Collateral" as defined in the Final Order.

"Collateral Documents" means, collectively, the Security Agreement, each Intellectual Property Security Agreement, the Mortgages, the collateral assignments, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent pursuant to Sections 7.12 and 7.13 and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties, each as the Administrative Agent may request.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans here-under as set forth in the "Total Commitments" column on Schedule 2.01(b), or in the Assignment and Acceptance pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.05 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 12.06.  The total amount of the Commitments is $30,000,000.

"Committed Loan Notice" means a notice of (a) a Borrowing, (b) a conversion of Loans from one Type to the other, or (c) a continuation of Eurodollar Rate Loans, pursuant to Section 2.02(a), which, if in writing, shall be substantially in the form of Exhibit A.

"Commitment Period" shall mean the period from and including the Closing Date to the Termination Date.

"Company IP Rights" means rights in Intellectual Property owned by a Loan Party or its Subsidiaries.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Consolidated" means, with respect to any Person, the accounts of such Person and its Subsidiaries consol-idated in accordance with GAAP.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its prop-erty is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account, any securities account, commodity ac-count, securities entitlement or commodity contract, an agreement, in form and substance satisfactory to the Admin-istrative Agent in its sole discretion, among the Administrative Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintain-ing such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Ad-ministrative Agent.

"Corporate Chart" means a document in form reasonably acceptable to the Administrative Agent and set-ting forth, as of a date set forth therein, for each Person that is a Loan Party, that is subject to Section 7.10 or that is a Subsidiary or joint venture of any of them, (a) the full legal name of such Person, (b) the jurisdiction of organiza-tion and any organizational number and tax identification number of such Person, (c) the location of such Person's

6

chief executive office (or, if applicable, sole place of business) and (d) the number of shares of each class of Stock of such Person (other than Holdings) authorized, the number outstanding and the number and percentage of such outstanding shares for each such class owned, directly or indirectly, by any Loan Party or any Subsidiary of any of them.

"Credit Extension" means a Borrowing.

"Crossholder Debt Fund Affiliate"  means an affiliate of a Crossholder Prepetition  Lender that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or other-wise investing in commercial loans, bonds and similar extensions of credit or securities in the ordinary course and with respect to which no holder of Senior Unsecured Notes, directly or indirectly, has access to information with respect to, or provided pursuant to, the DIP Facilities and possesses the power, directly or indirectly, to direct or cause the direction of the investment policies of such Crossholder Debt Fund Affiliate.

"Crossholder Prepetition Lenders" means (a) Brigade Capital Management, LLC and its affiliates (and funds and accounts advised or sub-advised by such person), (b) Fidelity Management and Research Company and its affiliates (and funds and accounts advised or sub-advised by such person), and (c) all other Lenders that directly or indirectly through one or more affiliates or as an investment manager or advisor for a fund, individually hold at least 7% of the principal amount of the Senior Unsecured Notes; provided that (x) Crossholder Debt Fund Affiliates shall not be counted toward such 7% threshold, and (y) for avoidance of doubt, CS Loan Funding and its affiliates shall be deemed not to fall within clause (c) hereof and shall not be a "Crossholder Prepetition  Lender".

"Debt Fund Affiliate" shall mean any Affiliate of Holdings (other than the Borrower or any Subsidiary of the Borrower) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, mak-ing, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit or secu-rities in the ordinary course and with respect to which no Equity Investor, directly or indirectly, possesses the power to direct or cause the direction of the investment policies of such Affiliate.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conserva-torship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

 "Default" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default; provided that any Default that results solely from the taking of an action that would have been permitted but for the continuation of a previous Default will be deemed to be cured if such previous Default is cured prior to becoming an Event of Default.

"Default Rate" means (a) when used with respect to Obligations consisting of principal, an interest rate equal to (i) the Base Rate with respect to any Base Rate Loan, or Eurodollar Rate with respect to any Eurodollar Loan plus (ii) the Applicable Rate for such loan, plus (iii) 2% per annum, (b) when used with respect to Obligations (including the obligation to pay on letters of credit drawn under the Prepetition Credit Agreement) other than princi-pal, an interest rate equal to (i) the Base Rate, plus (ii) the Applicable Rate applicable to Base Rate Loans under the Facility, plus (iii) 2% per annum.

"Defaulting Lender" means any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within two Business Days of the date required to be funded by it hereunder, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it here-under within two Business Days of the date when due, unless the subject of a good faith dispute, (c) has notified the Borrower or the Administrative Agent or any Lender that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations, (d) has failed within three Business Days after request by the Administrative Agent, to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations, or (e) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, as-

7

signee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it, or (iii) taken any action in furtherance of, or indicated its consent to, approval of, or acquiescence in any such proceeding or appointment; *provided* that, for the avoidance of doubt, a Lender shall not be a defaulting lender solely by virtue of (i) the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority or (ii) in the case of a solvent Person, the precautionary appointment of an administrator, guardian, custodian or other similar official by a Governmental Authority under or based on the law of the country where such Person is subject to home jurisdiction supervision if applicable law requires that such appointment not be publicly disclosed so long as, in any such case, where such action does not result in or provide such Person with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"DIP Facilities" means the Commitments and the provisions herein related to the Loans.

"Disqualified Lenders" means (i) any competitor of the Borrower or its Subsidiaries, which Person has been identified in writing to the Administrative Agent prior to the Closing Date as being a "Disqualified Lender," the identities of which will be made available to Lenders upon request and (ii) the Crossholder Prepetition Lenders, to the extent any assignment or participation to such Lender would cause the Crossholder Prepetition Lenders, in the aggregate, to own or otherwise control through any means greater than 49% of the Commitments.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments) (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the latest then existing Termination Date.

"Dollar" and "$" mean lawful money of the United States.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Sections 12.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 12.06(b)(iii)), and in no event shall include any Disqualified Lender or any Affiliate of any Loan Party, including any Affiliates of Permitted Holders other than Debt Fund Affiliates; *provided* that each such assignee shall certify to the Administrative Agent and the other Lenders either that (x) it is not a Crossholder Prepetition Lender or (y) it is not, and will not be, after giving effect to such assignment, a Disqualified Lender.

"Environmental Laws" means any and all applicable Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any Hazardous Materials into the environment, including those related to hazardous substances or wastes, air emissions of Hazardous Materials and discharges of sanitary process wastewater to public systems.

8

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Investors" means OEP and any successor to OEP pursuant to applicable Law (by merger, consolidation or otherwise) or any Person that directly or indirectly succeeds to the assets or business of OEP, in each case, in connection with complying with any applicable Law, including the Dodd-Frank Wall Street Reform and Consumer Protection Act or any rule or regulation promulgated thereunder.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Eurodollar Rate" means, for any Interest Period with respect to any Eurodollar Rate Loan:

(a)       the rate of interest per annum, expressed on the basis of a year of 360 days, determined by the Administrative Agent,  which is equal to the offered rate that appears on the page of the Reuters LIBOR01 screen (or any successor thereto as may be selected by the Administrative Agent) that displays an average British Bankers Association Interest Settlement Rate for deposits in Dollars with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or

(b)       if the rates referenced in the preceding subsection (a) are not available, the rate per annum determined by the Administrative Agent as the rate of interest, expressed on a basis of 360 days at which deposits in Dol-

9

lars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Rate Loan being made, continued or converted by the Administrative Agent and with a term and amount comparable to such Interest Period and principal amount of such LIBO Rate Loan as would be offered by the Administrative Agent's London Branch to major banks in the offshore Dollar market at their request at approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period.  In no event will the Eurodollar Rate be lower than 1.50% at any time.

"Eurodollar Rate Loan" means a Loan that bears interest at a rate based on the Eurodollar Rate.

"Event of Default" has the meaning specified in Section 9.01.

"Excluded Subsidiary" means each (i) Immaterial Subsidiary, (ii) CFC and (iii) Transparent Subsidiary.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) Taxes imposed on or measured by its overall net income (however denominated), franchise Taxes imposed on it (in lieu of net income Taxes) and branch profits Taxes, in each case, imposed by the jurisdiction (or any political subdivision thereof) under the Laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, or as the result of any other connection between such recipient and such jurisdiction (other than any such connection arising solely from the execution or delivery of, receipt of payments under, receipt or perfection of a security interest under, enforcement of, becoming a party to, performing its obligations under or otherwise participating in the transactions contemplated in, or otherwise with respect to, the Loan Documents), (b) in the case of any Lender (other than an assignee pursuant to a request by the Borrower under Section 12.13), any U.S. federal withholding Tax that (i) is required to be imposed on amounts payable to such Lender pursuant to the Laws in force at the time such Lender becomes a party hereto (or designates a new Lending Office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding Tax pursuant to Section 3.01(a) or (ii) is attributable to such Lender's failure to comply with Section 3.01(e), and (c) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Facility" means the term facility provided for herein.

"FATCA" means Sections 1471 through 1474 of the Code as of the date of this Agreement, and any amended or successor version that is substantively comparable and not materially more onerous to comply with, and any current or future Treasury regulations or other official administrative guidance or interpretations thereof (including any Revenue Ruling, Revenue Procedure, Notice or similar guidance issued by the Internal Revenue Service) promulgated thereunder.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"Final Order" means a final order entered by the Bankruptcy Court in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures approved by the Bankruptcy Court, which order shall authorize the transactions contemplated by this Agreement, and shall otherwise be in form and substance satisfactory to the Administrative Agent and the Required Lenders in their respective sole discretion, and also in form and substance reasonably satisfactory to the Debtors.

CH\1787007.21

"Financial Material Adverse Effect" means (x) after the date hereof, the terms of Holdings' and/or its subsidiaries' engagement with any single customer contractually changes adversely (including due to an amendment of the pricing or volume (including, to the extent permitted by such contract, by notice in writing from such customer to Holdings or any of its subsidiaries of the exercise of its right to reduce volume under such contract) or termination of all or a portion of such customer relationship) such that, if such amended terms or termination with respect to only such customer had been effective during fiscal 2013, the aggregate fiscal 2013 TOS revenue of Holdings and its subsidiaries on a consolidated basis would have declined by more than six percent (6%) from the actual TOS revenue of Holdings and its subsidiaries on a consolidated basis during such period, or (y) commencing with the month of March 2014, any month's consolidated TOS volume for Holdings and its subsidiaries is more than twenty percent (20%) below the actual consolidated TOS volume of Holdings and its subsidiaries on a consolidated basis in February 2014 (the last full month prior to the Petition Date) normalized to take into account the business day equivalents of each respective month, as applicable.

"Financial Statement" means each financial statement delivered pursuant to Section 6.01.

"Fiscal Quarter" means each 3-fiscal-month period ending on March 31, June 30, September 30 or December 31.

"Fiscal Year" means the twelve-month period ending on December 31.

"Flood Documentation" means, with respect to each parcel of Material Real Property subject to a Mortgage that is located in the United States or any territory thereof, (i) a completed "life-of-loan" Federal Emergency Management Agency standard flood hazard determination (together with a notice about Special Flood Hazard Area status and flood disaster assistance duly executed by the Borrower and the applicable Loan Party relating thereto) and (ii) a copy of, or a certificate as to coverage under, and a declaration page relating to, the insurance policies required by Section 6.13(c) hereof and the applicable provisions of the Loan Documents, each of which shall (A) be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable), (B) name the Administrative Agent, on behalf of the Secured Parties, as additional insured and loss payee/mortgagee and (C) identify the address of each property located in a Special Flood Hazard Area, the applicable flood zone designation and the flood insurance coverage and deductible relating thereto and (iv) be otherwise in form and substance reasonably satisfactory to the Administrative Agent.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means each Subsidiary of the Borrower that is not organized under the Laws of the United States, any state thereof, or the District of Columbia.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be

approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Group Members" means, collectively, the Loan Parties and their respective Subsidiaries (each such entity individually being a "Group Member").

"Group Members' Accountants" means Deloitte Tax LLP or other nationally-recognized independent registered certified public accountants reasonably acceptable to the Administrative Agent.

"Guarantee" means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition or assets permitted under this Agreement (other than such obligations with respect to Indebtedness). Except as provided in the definition of Indebtedness, the amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor Subsidiaries" means the Subsidiaries of the Borrower listed on Schedule 7.13 and each other Subsidiary of the Borrower that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 7.13; provided that in no event shall any CFC or Transparent Subsidiary be considered a Guarantor Subsidiary.

"Guarantors" means, collectively, MModal Holdings, Inc., Holdings and the Guarantor Subsidiaries.

"Guaranty" means, collectively, the Guaranty made by Holdings under Article X in favor of the Secured Parties and the Guaranty made by the Guarantors in favor of the Secured Parties, substantially in the form of Exhibit F, together with each other guaranty and guaranty supplement delivered pursuant to Section 7.13.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, infectious or medical wastes and all other hazardous or toxic substances or wastes of any nature regulated pursuant to any Environmental Law.

"Holdings" has the meaning specified in the introductory paragraph hereto.

12

"Immaterial Subsidiary" means, at any date of determination, each Subsidiary of the Borrower that has been designated by the Borrower in writing to the Administrative Agent as an "Immaterial Subsidiary" for purposes of this Agreement (and not redesignated as a Material Subsidiary as provided below), provided that (a) for purposes of this Agreement, at no time shall (i) the Total Assets of all Immaterial Subsidiaries at the last day of the most recent Measurement Period are equal to or exceed 5.0% of the Total Assets of the Borrower and its Subsidiaries at such date or (ii) the gross revenues for such Measurement Period of all Immaterial Subsidiaries equal or exceed 5.0% of the consolidated gross revenues of the Borrower and its Subsidiaries for such period, in each case determined in accordance with GAAP, (b) the Borrower shall not designate any new Immaterial Subsidiary if such designation would not comply with the provisions set forth in clause (a) above, and (c) if the Total Assets or gross revenues of all Subsidiaries so designated by the Borrower as "Immaterial Subsidiaries" (and not redesignated as "Material Subsidiaries") shall at any time exceed the limits set forth in clause (a) above, then all such Subsidiaries shall be deemed to be Material Subsidiaries unless and until the Borrower shall redesignate one or more Immaterial Subsidiaries as Material Subsidiaries, in each case in a written notice to the Administrative Agent, and, as a result thereof, the total assets and gross revenues of all Subsidiaries still designated as "Immaterial Subsidiaries" do not exceed such limits; and provided further that the Borrower may designate and re-designate a Subsidiary as an Immaterial Subsidiary at any time, subject to the terms set forth in this definition.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    net obligations of such Person under any swap contract;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and not past due for more than 90 days);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness in respect of Capitalized Leases of such Person;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends;

(h)    all obligations in respect of Disqualified Equity Interests; and

(i)    all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of Indebtedness of any Person for the purposes of clause (e) (or any secured Guarantee thereof) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

13

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 12.04(b).

"Information" has the meaning specified in Section 12.07.

"Intellectual Property" has the meaning specified in the Collateral Documents.

"Intellectual Property Security Agreement" means, collectively, the Copyright Security Agreement, the Trademark Security Agreement and the Patent Security Agreement (as each such term is defined in the Security Agreement).

"Interest Payment Date" means, (a) as to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan and the Termination Date; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Termination Date of the Facility under which such Loan was made.

"Interest Period" means, as to each Eurodollar Rate Loan, the period commencing on the date such Eurodollar Rate Loan is disbursed or converted to or continued as a Eurodollar Rate Loan and ending on the date one month thereafter; provided that:

(a)      any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)      no Interest Period shall extend beyond the Termination Date.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all applicable international, foreign, Federal, state and local statutes, treaties, rules, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case having the force of law.

"L/C Issuer" shall have the meaning given to such term in the Prepetition Credit Agreement.

"Lead Arranger" means Royal Bank of Canada.

"Lender" has the meaning specified in the introductory paragraph hereto.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"<u>Lien</u>" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"<u>Loans</u>" shall have the meaning assigned to such term in <u>Section 2.01(b)</u>.

"<u>Loan Documents</u>" means, collectively, (a) this Agreement, (b) the Notes, if any, (c) the Guaranty, (d) the Collateral Documents and (e) the Final Order.

"<u>Loan Parties</u>" means, collectively, the Borrower and each Guarantor.

"<u>Material Real Property</u>" means any fee owned real property owned by any Loan Party or any of its Subsidiaries which are subject to any Liens granted under the Final Order.

"<u>Measurement Period</u>" means, at any date of determination, the most recently completed four fiscal quarters of the Borrower or, if fewer than four consecutive fiscal quarters of the Borrower have been completed since the Closing Date, the fiscal quarters of the Borrower that have been completed since the Closing Date.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto.

"<u>Mortgages</u>" means deeds of trust, trust deeds, deeds to secure debt and mortgages, each in a form to be mutually agreed upon by the Borrower and the Administrative Agent.

"<u>Mortgage Policies</u>" means fully paid American Land Title Association Lender's Extended Coverage (or equivalent) title insurance policies with endorsements and in amounts reasonably acceptable to the Administrative Agent (but not to exceed 100% of the fair market value of the Material Real Property in jurisdictions where mortgage taxes are applicable or 110% otherwise), issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent, insuring the Mortgages to be valid first and subsisting Liens on the property described therein, free and clear of all defects (including, but not limited to, mechanics' and materialmen's Liens) and encumbrances, excepting only Liens permitted under <u>Section 8.01</u> hereof.

"<u>Mortgaged Property Requirement</u>" means, with respect to any Material Real Property owned by any Loan Party and any of its Subsidiaries, (i) delivery of (a) a Mortgage Policy and (b) a Mortgage executed by the Loan Party or Subsidiary that is the owner of such Material Real Property in recordable form and otherwise in form and substance reasonably acceptable to the Administrative Agent, (ii) recording of such Mortgage in the land records of the county in which such Material Real Property to be so encumbered is located, (iii) the Flood Documentation, (iv) opinions addressed to the Administrative Agent, of (a) local counsel in each jurisdiction where each Material Real Property is located with respect to the enforceability and perfection of the Mortgages (and such other matters customarily covered in real estate counsel opinions as the Administrative Agent may reasonably request) and (b) opinions of counsel for each Loan Party and each of its Subsidiaries regarding due authorization, execution and delivery of the Mortgages, both in form and substance reasonably acceptable to the Administrative Agent, (v) a Survey, provided, however, that a Survey shall not be required to the extent that (A) an existing survey is provided, and (B) the issuer of the applicable Mortgage Policy provides reasonable and customary survey related coverages in the applicable Mortgage Policy and (vi) a zoning report, municipal or other zoning letter or other evidence of compliance with applicable zoning laws and regulations reasonably satisfactory to the Administrative Agent.

CH\1787007.21

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Net Cash Proceeds</u>" means:

(a)        with respect to any Disposition by any Loan Party or any of its Subsidiaries, or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received by any Loan Party in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (B) the reasonable out-of-pocket cash fees and expenses (including attorney's fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consulting and other customary fees) incurred by such Loan Party or such Subsidiary in connection with such transaction, (C) any Taxes paid or reasonably estimated by the Borrower to be payable with respect to such Disposition; <u>provided</u> that, if the amount of any estimated Taxes pursuant to subclause (C) exceeds the amount of Taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds and (D) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or with respect to any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include (i) any cash or Cash Equivalents received upon the Disposition of any non-cash consideration by the Borrower or any Subsidiary in any such Disposition and (ii) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in subclause (D) above or if such liabilities have not been satisfied in cash and such reserve is not reversed within 365 days after such Disposition or Casualty Event, the amount of such reserve;

(b)        with respect to the incurrence or issuance of any Equity Interest or Indebtedness by the Borrower or any of its Subsidiaries, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such transaction over (ii) the investment banking fees, underwriting discounts and commissions, costs and other reasonable and customary out-of-pocket fees and expenses, incurred by the Borrower or such Subsidiary in connection therewith.

"<u>Non-Financial Material Adverse Effect</u>" means a material adverse change in, or a material adverse effect upon, the operations, business or assets of the Loan Parties and their Subsidiaries taken as a whole, measured from and after the date of this Agreement; <u>provided</u>, <u>however</u>, that none of the following shall be deemed, either alone or in combination, to constitute, and none of the following shall be taken into account in determining whether there has been, will be, could or would be, or could or would reasonably be expected to have or result in, a Non-Financial Material Adverse Effect: (a) any adverse effect, event or occurrence attributable to conditions affecting (i) the industry in which the Debtors participate generally (including fluctuating conditions resulting from cyclicality or seasonality affecting the Debtors, including their customers and suppliers) or (ii) U.S. economic or financial conditions or global economic or financial conditions generally; (b) any adverse effect, event or occurrence resulting from compliance with the terms of, or the taking of any action or the omission to act, in either case, as required by, this Agreement; (c) any adverse effect, event or occurrence resulting from or relating to changes generally in the securities markets, capital markets, credit markets, currency markets or other national, international or regional financial markets; (d) any adverse effect, event or occurrence arising from or relating to any change in accounting requirements or principles or any change in any laws, or the interpretation or enforcement thereof; (e) any adverse effect, event or occurrence arising from or relating to actions required to be taken under applicable laws or Debtor contracts in effect on the date hereof; (f) any effect, event or occurrence arising in connection with natural disasters or acts of nature, national, international or regional political or social conditions, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism

16

or military actions existing or underway as of the date hereof; (g) the commencement of the Debtors' Cases; or (h) events that are directly attributable to the commencement and pendency of the Debtors' Cases.

"Note" means a promissory note of the Borrower, in substantially the form of Exhibit C-1, payable to the order of a Lender in a principal amount equal to the amount of such Lender's Commitment.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means (i) all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, and (ii) any obligations to reimburse each L/C Issuer upon notice pursuant to Section 2.03(c) of the Prepetition Credit Agreement, including any fees and expenses related thereto.

"OEP" means any of (a) One Equity Partners V, L.P., OEP II Partners Co-Invest, L.P. and OEP Holding Corporation (all such Persons described in this clause (a), collectively, "OEP Affiliates") and (b) any investment vehicle that is Controlled or managed by an OEP Affiliate (whether through the ownership of the majority of the aggregate issued and outstanding voting Equity Interests of such investment vehicle or through the management of investments of such investment vehicle by an OEP Affiliate or otherwise).

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise, property, intangible, mortgage recording or similar Taxes arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, except any such Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 12.13) that are imposed as a result of a present or former connection between the assignor or assignee and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, sold or assigned an interest in any Loan or Loan Document).

"Outstanding Amount" means the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans as the case may be, occurring on such date.

"Participant" has the meaning specified in Section 12.06(d).

"Participant Register" has the meaning specified in Section 12.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obliga-

17

tion to contribute, or in the case of a multiple employer plan or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Permitted Holder" means the Equity Investors, members of management of the Borrower or any direct or indirect parent of the Borrower, any other shareholders who are holders of Equity Interests of the Borrower (or any of its direct or indirect parent companies) on the Closing Date, and any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act or any successor provision) of which any of the foregoing consti-tute the majority; provided that the voting power of the voting stock owned by the Equity Investors shall be greater than the voting power of the voting stock owned by such groups and/or members of management.

"Permitted Refinancing" means, with respect to any Person, any modification (other than a release of such Person), refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (a) the prin-cipal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other reasonable amounts paid, and fees and expenses reasona-bly incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 8.03, such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended and (c) at the time thereof, no Event of Default shall have occurred and be continuing.

"Permitted Tax Distributions" means, for so long as any Group Member is a member of a combined, con-solidated or unitary tax group of which it is not the parent, payments, dividends or distributions by such Group Member to its direct or indirect parent, as applicable, to the extent necessary to allow the payment by such direct or indirect parent of any consolidated, combined or unitary federal, state or local Taxes not payable directly by such Group Member and its Subsidiaries.

"Permitted Variance" shall have the meaning set forth in the Final Order.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the recitals hereto.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Plan Milestones" has the meaning set forth in the Final Order, as applicable.

"Plan Support Agreement" means that certain agreement dated as of April 1, 2014, by and among the Bor-rower, Consenting Lenders (as defined in the Plan Support Agreement), and the Consenting Noteholders (as defined in the Plan Support Agreement), as amended, restated or otherwise modified in accordance with its terms.

"Platform" has the meaning specified in Section 7.02.

"Pledged Securities" has the meaning specified in Section 1.1(c) of the Security Agreement.

"Prepetition Agent" has the meaning specified in the recitals hereto.

"Prepetition Credit Agreement" has the meaning specified in the recitals hereto.

"<u>Prepetition Credit Obligations</u>" means collectively, all "Obligations" as defined in the Prepetition Credit Agreement.

"<u>Prepetition Lenders</u>" has the meaning specified in the recitals hereto.

"<u>Prepetition Required Lenders</u>" means, collectively, the "Required Lenders" as defined in the Prepetition Credit Agreement.

"<u>Prepetition Secured Parties</u>" shall have the meaning set forth in the Final Order.

"<u>Pro Rata Share</u>" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments (or Loans, as applicable) of such Lender under the Facility at such time and the denominator of which is the amount of the Aggregate Commitments (or aggregate Loans, as applicable) under the Facility at such time.

"<u>Public Lender</u>" has the meaning specified in <u>Section 7.02</u>.

"<u>Purchasing Borrower Party</u>" shall mean any Loan Party or any Subsidiary of any Loan Party.

"<u>Qualified Equity Interests</u>" means any Equity Interests that are not Disqualified Equity Interests.

"<u>Register</u>" has the meaning specified in <u>Section 12.06(c)</u>.

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"<u>Reorganization Plan</u>" means a plan of reorganization in the Cases implementing the terms of the Restructuring (as defined in the Plan Support Agreement) in accordance with the Plan Support Agreement.

"<u>Reportable Event</u>" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"<u>Request for Credit Extension</u>" means with respect to a Borrowing, conversion or continuation of a Loan, a Committed Loan Notice.

"<u>Required Lenders</u>" means Lenders having at such time in excess of 50% of the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date.

"<u>Responsible Officer</u>" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"<u>S&P</u>" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw-Hill Companies, Inc., and any successor thereto.

"<u>SEC</u>" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"<u>Secured Parties</u>" means, the "DIP Secured Parties" as defined in the Final Order.

"<u>Security Agreement</u>" has the meaning specified in <u>Section 4.01(a)(iii)</u>.

"<u>Security Agreement Supplement</u>" has the meaning specified in Section 1.1(c) of the Security Agreement.

"<u>Senior Unsecured Notes</u>" means up to $250,000,000 in aggregate principal amount of the Borrower's Senior Notes due 2020, issued pursuant to the Senior Unsecured Notes Indenture.

"<u>Senior Unsecured Notes Indenture</u>" means that certain indenture, dated August 17, 2012, by and among the Borrower, U.S. Bank, National Association, as trustee and the guarantors party thereto.

"<u>Subsidiary</u>" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of Holdings.

"<u>Survey</u>" means a survey of any Material Real Property (and all improvements thereon) which is sufficient for the title insurance company to remove all standard survey exceptions from the title insurance policy (or commitment) relating to such Mortgaged Property and issue the standard survey-related endorsements, or otherwise reasonably acceptable to the Administrative Agent.

"<u>Tax Affiliate</u>" means, (a) Holdings, Borrower and each of their Subsidiaries and (b) any Affiliate of Holdings or the Borrower with which Holdings, Borrower or any of their Subsidiaries files or is eligible to file consolidated, combined or unitary tax returns, but only if and to the extent that Holdings, Borrower or any of their Subsidiaries may be liable for the tax in question of such Affiliate pursuant to Treasury Regulation Section 1.1502-6 (or similar provision of state or local law).

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Termination Date</u>" shall have the meaning set forth in the Final Order.

"<u>Termination Declaration</u>" has the meaning specified in <u>Section 9.02</u>.

"<u>Termination Declaration Date</u>" has the meaning specified in <u>Section 9.02</u>.

"<u>Threshold Amount</u>" means $5 million.

"<u>Total Assets</u>" means the total assets of the Borrower and its Subsidiaries on a consolidated basis, as shown on the most recent balance sheet of the Borrower delivered pursuant to Section 6.01(a) or (b).

"<u>Total Outstandings</u>" means the aggregate Outstanding Amount of all Loans.

"<u>Transparent Subsidiary</u>" means a Subsidiary of the Borrower that is treated as a disregarded entity or partnership for U.S. federal income Tax purposes and that has no material assets other than Equity Interests (held directly or indirectly through other Transparent Subsidiaries) in one or more CFCs.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a Eurodollar Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"Unfunded Pension Liability" means the excess of a Pension Plan's "benefit liabilities" (as defined in Section 4001(a)(16) of ERISA), over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Variance Report" shall have the meaning set forth in the Final Order.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment by (ii) the then outstanding principal amount of such Indebtedness.

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    Accounting Terms.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)    Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder together with a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP; provided further that such reconciliation shall be required to be provided only for the four fiscal quarters following such change or such longer period as may be reasonably requested by the Administrative Agent.

Section 1.04    Rounding.  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern Time (daylight or standard, as applicable).

Section 1.06    Currency Equivalents Generally.  Any amount specified in this Agreement (other than in Articles II, IX and X) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount thereof in the applicable currency to be determined by the Administrative Agent at such time on the basis of the Spot Rate (as defined below) for the purchase of such currency with Dollars.  For purposes of this Section 1.06, the "Spot Rate" for a currency means the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.  Notwithstanding the foregoing, for purposes of determining compliance with Sections 8.01, 8.02 and 8.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; provided that, for the avoidance of doubt, the foregoing provisions of this Section 1.06 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

ARTICLE II.
THE COMMITMENTS AND CREDIT EXTENSIONS

Section 2.01    The Commitments.

(a)    [Reserved]

(b)    Term Loan Commitments.  Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, during the Commitment Period,

22

to make loans to the Borrower in an aggregate principal amount not to exceed its Commitment (such loans, individually, a "<u>Loan</u>" and, collectively, the "<u>Loans</u>").  Each Lender's Commitment shall (i) reduce on a dollar-for-dollar basis immediately following any and each making of a Loan by it pursuant to this <u>Section 2.01(b)</u> by the principal amount of such Loan and (ii) terminate immediately and without further action on the Termination Date.  Subject to the terms and conditions set forth herein, the Borrower may make up to two (2) borrowings under the Lenders' collective Commitments during the Commitment Period in an aggregate principal amount not to exceed the aggregate principal amount of the Commitments.  Each Loan shall be made in an amount of no less than $5.0 million and up to $15.0 million.  Once funded, each Loan shall be a "Loan" for all purposes under this Agreement and the other Loan Documents.  Amounts paid or prepaid in respect of Loans may not be reborrowed.

Section 2.02    <u>Borrowings, Conversions and Continuations of Loans</u>.

(a)    Each Borrowing or each conversion of Loans from one Type to the other, and each continuation of Eurodollar Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by telephone.  Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) two Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurodollar Rate Loans or of any conversion of Eurodollar Rate Loans to Base Rate Loans, and (ii) one Business Day prior to the requested date of any Borrowing of Base Rate Loans.  Not later than 11:00 a.m., one Business Day before the requested date of such Borrowing, conversion or continuation, the Administrative Agent shall notify the Borrower (which notice may be by telephone) whether or not the requested Interest Period has been consented to by all the Lenders.  Each telephonic notice by the Borrower pursuant to this <u>Section 2.02(a)</u> must be confirmed promptly by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a duly authorized officer of the Borrower.  Each Borrowing of, conversion to or continuation of Eurodollar Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $500,000 in excess thereof.  Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $500,000 in excess thereof.  Each Committed Loan Notice (whether telephonic or written) shall specify (i) whether the Borrower is requesting a Borrowing or a conversion of Loans from one Type to the other, or a continuation of Eurodollar Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto.  If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans.  Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurodollar Rate Loans.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage under the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in <u>Section 2.02(a)</u>.  Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in <u>Section 4.02</u> (and, if such Borrowing is the initial Credit Extension, <u>Section 4.01</u>), the Administrative Agent shall make all funds so received available to the Borrower, subject to the Final Order and the Budget (including Permitted Variances), in like funds as received by the Administrative Agent, provided that such funds be deposited into the Cash Collateral Account.

(c)    Except as otherwise provided herein, a Eurodollar Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurodollar Rate Loan.  During the existence of a Default, no Loans may be requested as, converted to or continued as Eurodollar Rate Loans without the consent of the Required Lenders.

(d)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurodollar Rate Loans upon determination of such interest rate.  At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any

23

change in RBC Capital Markets' prime rate used in determining the Base Rate promptly following the public announcement of such change.

(e)        After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than 2 Interest Periods in effect in respect of the Facility.

Section 2.03        [Reserved]

Section 2.04        [Reserved]

Section 2.05        Prepayments.

(a)        Optional.  The Borrower may, upon three (3) Business Days prior notice for a Eurodollar Rate Loan and upon one Business Day prior notice for a Base Rate Loan, prepay the outstanding principal amount of any Loan in whole or in part at any time (together with any breakage costs that may be owing pursuant to Section 3.05 after giving effect to such prepayment); provided, however, that each partial prepayment that is not of the entire outstanding amount under the Facility shall be in a minimum amount of $1,000,000 and increments of $250,000 in excess thereof.

(b)        Mandatory.  (i)  [Reserved]

(ii)        (A) if (x) Holdings, the Borrower or any Subsidiary Disposes of any property or assets (other than Net Cash Proceeds of sales or other dispositions of inventory in the ordinary course of business as permitted by Section 8.05(a), Section 8.05(b) and Section 8.05(d) (to the extent constituting a Disposition to a Loan Party) and Net Cash Proceeds, not to exceed $50,000, that are reinvested in accordance with Section 8.02, provided that such Net Cash Proceeds are deposited into the Cash Collateral Account until the Termination Date; provided, further, that such reinvestment shall occur within 60 days of receipt of such Net Cash Proceeds), (y) any Casualty Event occurs (other than Net Cash Proceeds, not to exceed $50,000, that are reinvested in accordance with Section 8.02, provided that such Net Cash Proceeds are deposit into the Cash Collateral Account until the Termination Date; provided, further, that such reinvestment shall occur within 60 days of receipt of such Net Cash Proceeds) or (z) the Borrower or any Guarantor issues any Equity Interest, the Borrower shall make a prepayment, in accordance with Section 2.05(b)(ii)(C), of an aggregate principal amount of Loans equal to 100% of all such Net Cash Proceeds realized or received; provided that no such prepayment shall be required pursuant to this Sections 2.05(b)(ii)(A)(x) and 2.05(b)(ii)(A)(y) with respect to such portion of such Net Cash Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with this Section 2.05(b)(ii) (which notice may only be provided if no Event of Default has occurred and is then continuing).

(B)        [Reserved]

(C)        On each occasion that the Borrower must make a prepayment of the Loans pursuant to this Section 2.05(b)(ii), the Borrower shall, within five (5) Business Days after the date of realization or receipt of such Net Cash Proceeds (or, in the case of prepayments required pursuant to Section 2.05(b)(ii)(A)(x) and 2.05(b)(ii)(A)(y), within ten (10) Business Days of the deadline specified in clause (x) or (y) thereof, as applicable, or of the date the Borrower reasonably determines that such Net Cash Proceeds are no longer intended to be or cannot be so reinvested, as the case may be), make a prepayment, in accordance with Section 2.05(b)(v) below, of the principal amount of Loans in an amount equal to 100% of such Net Cash Proceeds realized or received.

(iii)        If Holdings, the Borrower or any Subsidiary incurs or issues any, Indebtedness not expressly permitted to be incurred or issued pursuant to Section 8.03, the Borrower shall cause to be prepaid

24

an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom on the first Business Day following the date of receipt of such Net Cash Proceeds.

(iv)    [Reserved]

(v)    Each prepayment of Loans pursuant to this Section 2.05(b) shall be applied in accordance with the provisions set forth in Section 9.03.

(vi)    The Borrower shall notify the Administrative Agent in writing substantially in the form of Exhibit K of any mandatory prepayment of Loans required to be made pursuant to clauses (ii) and (iii) of this Section 2.05(b) at least one (1) Business Day prior to 1:00 p.m. on the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each Lender of the contents of the Borrower's prepayment notice and of such Lender's Pro Rata Share of the prepayment.

(c)    Interest, Funding Losses, Etc. All prepayments under this Section 2.05 shall be accompanied by all accrued interest thereon, together with, in the case of any such prepayment of a Eurodollar Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurodollar Rate Loan pursuant to Section 3.05.

Notwithstanding any of the other provisions of this Section 2.05, so long as no Event of Default shall have occurred and be continuing, if any prepayment of Eurodollar Rate Loans is required to be made under this Section 2.05, prior to the last day of the Interest Period therefor, in lieu of making any payment pursuant to this Section 2.05 in respect of any such Eurodollar Rate Loan prior to the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit with the Administrative Agent the amount of any such prepayment otherwise required to be made hereunder until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05. Such deposit shall constitute cash collateral for the Eurodollar Rate Loans to be so prepaid, provided that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this Section 2.05.

Section 2.06    [Reserved].

Section 2.07    Repayment of Loans.

(a)    The Borrower promises to repay the Loans on the Termination Date.

Section 2.08    Interest.

(a)    Subject to the provisions of Section 2.08(b), (i) each Eurodollar Rate Loan under the Facility shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurodollar Rate for such Interest Period plus the Applicable Rate for the Facility; and (ii) each Base Rate Loan under the Facility shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate for the Facility.

(b)    (i)    If any Event of Default under Section 9.01(a) exists and is continuing, then all outstanding amounts shall bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate.

(ii)    Upon the request of the Required Lenders, while any other Event of Default exists, the Borrower shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate.

(iii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

25

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.09        Fees.

(a)    Unused Commitment Fee.  The Borrower agrees to pay to each Lender (other than a Defaulting Lender) a commitment fee on the actual daily amount by which the Commitment of such Lender exceeds its Pro Rata Share of the aggregate outstanding principal amount of Loans (the "Unused Commitment Fee") from the Closing Date through the Termination Date at a rate per annum equal to 4% per annum, payable in arrears (x) on the last Business Day of each Fiscal Month, and (y) on the Termination Date.

(b)    Closing Fee.  The Borrower shall pay on the Closing Date to each Lender party to this Agreement as a Lender on the Closing Date, as fee compensation for agreeing to the fund such Lender's Commitments, a closing fee in an amount equal to 2.0% of the stated principal amount of such Lender's Commitments (the "Closing Fee").  Such Closing Fee shall be in all respects fully earned, due and payable on the Closing Date and non-refundable and non-creditable thereafter.

(c)    Arrangement Fee.  Borrower shall pay to the Administrative Agent an arrangement fee (the "Arrangement Fee"), for its own account, in the amount of $75,000 payable in cash on the Closing Date.

(d)    Backstop Commitment Fee.  Borrower shall pay in cash on the Closing Date to each Lender whose Commitment includes a Backstop Commitment Amount an additional backstop commitment fee equal to 2.5% of such Backstop Commitment Amount.  For the avoidance of doubt, this backstop commitment fee shall be in addition to, and not in lieu of, the Closing Fee referenced in subsection (b) above.

(e)    Other Fees.  The Borrower shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.10        Computation of Interest and Fees.  All computations of interest for Base Rate Loans when the Base Rate is determined by Royal Bank of Canada's "prime rate" shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11        Evidence of Debt.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to

26

such accounts or records.  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)        [Reserved].

Section 2.12        <u>Payments Generally; Administrative Agent's Clawback</u>.

(a)        <u>General</u>.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected on computing interest or fees, as the case may be.

(b)        (i)  <u>Funding by Lenders; Presumption by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Eurodollar Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> (or, in the case of a Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by <u>Section 2.02</u>) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)        <u>Payments by Borrower; Presumptions by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, as the case may be, the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

27

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 12.04(c) are several and not joint.  The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 12.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and, except as set forth in Section 2.16(e), no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 12.04(c).

(e)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(f)     Insufficient Funds.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.13     Sharing of Payments by Lenders.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of (a) Obligations in respect of any the Facilities due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations due and payable to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations in respect of the Facilities due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (b) Obligations in respect of any of the Facilities owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (i) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (ii) the aggregate amount of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Parties at such time) of payment on account of the Obligations in respect of the Facilities owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations in respect of the Facilities then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that:

(a)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)     the provisions of this Section shall not be construed to apply to (A) any payment made by the Borrower or Holdings pursuant to and in accordance with the express terms of this Agreement or (B) any payment ob-

CH\1787007.21

tained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

Section 2.14        [Reserved]

Section 2.15        [Reserved].

Section 2.16        Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the Commitment and Outstanding Amount of Loans of such Defaulting Lender shall not be included in determining whether all Lenders or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment, waiver or other modification pursuant to Section 12.01); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately when compared to the other affected Lenders, or increases or extends the Commitment of such Defaulting Lender, or extends the Termination Date or reduces the principal of the Loans of such Defaulting Lender, shall require the consent of such Defaulting Lender;

ARTICLE III.
TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01        Taxes.

(a)        Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.  (i)  Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall to the extent permitted by applicable Laws be made free and clear of and without reduction or withholding for any Taxes.

(ii)        If any applicable withholding agent shall be required by applicable Laws to withhold or deduct any Taxes from any payment, then (A) the applicable withholding agent shall withhold or make such deductions as are determined by the applicable withholding agent to be required, (B) the applicable withholding agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with applicable Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes or Other Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)        Payment of Other Taxes by the Borrower.  Without limiting or duplicating the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Laws.

(c)        Tax Indemnifications.  Without limiting or duplicating the provisions of subsection (a) or (b) above, the Borrower shall indemnify the Administrative Agent and each Lender, and shall make payment in respect thereof within 10 days after receipt of written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid or payable by the Administrative Agent or such Lender, as the case may be, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of any such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative

29

Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority as provided in this Section 3.01, such Loan Party shall deliver to the Administrative Agent, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by applicable Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders; Tax Documentation.  (i)  Each Lender shall deliver to the Borrower and to the Administrative Agent, at the time or times prescribed by applicable Laws or when reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Laws and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to withholding or deduction of any Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Lender by a Loan Party pursuant to this Agreement or otherwise to establish such Lender's status for withholding Tax purposes in the applicable jurisdiction.  Each Lender shall, whenever a lapse in time or change in circumstances renders such documentation (including any specific documents required to below in Section 3.01(e)(ii)) obsolete, expired or inaccurate in any material respect, deliver promptly to the Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrower or the Administrative Agent) or promptly notify the Borrower and the Administrative Agent in writing of its inability to do so.

(ii)    Without limiting the generality of the foregoing:

(A)    any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to the Borrower and the Administrative Agent, on or before the date on which it becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), two properly completed and duly executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding; and

(B)    each Foreign Lender that is entitled under the Code or any applicable treaty to an exemption from or reduction of withholding Tax with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(iii)    two properly completed and duly executed originals of IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable) claiming eligibility for the applicable benefits of an income tax treaty to which the United States is a party,

(iv)    two properly completed and duly executed originals of IRS Form W-8ECI,

(v)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, substantially in the form of Exhibit J, to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (any such certificate, a "U.S. Tax Compliance Certificate") and (y) two properly completed and duly executed originals of  IRS Form W-8BEN,

(vi)    to the extent a Foreign Lender is not the beneficial owner, two properly completed and duly executed originals of IRS Form W-8IMY of the Foreign Lender, accompanied by IRS Form W-8ECI,

30

IRS Form W-8BEN (or IRS Form W-8BEN-E, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner that would be required under this Section 3.01(e) if such beneficial owner were a Lender, as applicable; provided that if the Foreign Lender is a partnership for U.S. federal income tax purposes and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J on behalf of each such direct and indirect partner, or

(vii)     properly completed, duly executed originals of any other form prescribed by applicable Laws as a basis for claiming exemption from or a reduction in United States Federal withholding Tax together with such supplementary documentation as may be prescribed by applicable Laws to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made.

(C)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Laws (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so. Notwithstanding any other provision of this clause (e), a Lender shall not be required to deliver any form that such Lender is not legally eligible to deliver.

(f)    Treatment of Certain Refunds.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender.  If the Administrative Agent or any Lender receives a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by the Borrower or any other Loan Party, or with respect to which the Borrower or any other Loan Party has paid additional amounts pursuant to this Section 3.01, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses incurred by the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection (f), in no event will the Administrative Agent or any Lender be required to pay any amount to the Borrower pursuant to this subsection (f) the payment of which would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the Administrative Lender or such Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection (f) shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

31

(g)    Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 3.02    <u>Illegality</u>.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurodollar Rate Loans, or to determine or charge interest rates based upon the Eurodollar Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the London interbank market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurodollar Rate Loans or to convert Base Rate Loans to Eurodollar Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurodollar Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurodollar Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurodollar Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

Section 3.03    <u>Inability to Determine Rates</u>.  If the Required Lenders determine that for any reason in connection with any request for a Eurodollar Rate Loan or a conversion to or continuation thereof that (a) Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and Interest Period of such Eurodollar Rate Loan, (b) adequate and reasonable means do not exist for determining the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan, or (c) the Eurodollar Rate for any requested Interest Period with respect to a proposed Eurodollar Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Eurodollar Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurodollar Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

Section 3.04    <u>Increased Costs; Reserves on Eurodollar Rate Loans</u>.

(a)    <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 3.04(e)</u>);

(ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Eurodollar Rate Loan made by it (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u>, or any Excluded Tax); or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, within 15 days after Borrower's receipt of a written request from such Lender, including a reasonably detailed calculation of such increased costs or reduction, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

32

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by, or participations in Letters of Credit held by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, and a reasonably detailed calculation of such amounts, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 15 days after receipt thereof.

(d)    Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender, as the case may be, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)    Reserves on Eurodollar Rate Loans.  The Borrower shall pay to each Lender, as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurodollar funds or deposits (currently known as "Eurodollar liabilities"), additional interest on the unpaid principal amount of each Eurodollar Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive), which shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least 10 days' prior notice (with a copy to the Administrative Agent) of such additional interest from such Lender.  If a Lender fails to give notice 10 days prior to the relevant Interest Payment Date, such additional interest shall be due and payable 10 days from receipt of such notice.

Section 3.05    Compensation for Losses.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)    any assignment of a Eurodollar Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 12.13;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

33

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurodollar Rate Loan made by it at the Eurodollar Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurodollar Rate Loan was in fact so funded.

Section 3.06    Mitigation Obligations; Replacement of Lenders.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay Indemnified Taxes or any additional amount with respect to Indemnified Taxes to any Lender, or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall, as applicable, use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender, as the case may be, to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender, as the case may be.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any Indemnified Taxes or pay any additional amount with respect to any Indemnified Taxes to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 12.13.

Section 3.07    Survival.  All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

ARTICLE IV.
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

Section 4.01    Conditions of Initial Credit Extension.  The obligation of the Administrative Agent and each Lender to make its initial Credit Extension on the Closing Date hereunder is subject to satisfaction of the following conditions precedent:

(a)    The Administrative Agent's receipt of the following, each of which shall be originals or telecopies (followed promptly by originals) unless otherwise specified, each properly executed by a duly authorized officer of the signing Loan Party (if applicable), each dated the Closing Date (or, in the case of searches and certificates of governmental officials, a recent date before the Closing Date) and each in form and substance reasonably satisfactory to the Administrative Agent, Debtors, and each of the Lenders:

(i)    executed counterparts of this Agreement and the Guaranty, sufficient in number for distribution to the Administrative Agent, each Lender and the Borrower;

(ii)    [Reserved];

(iii)    If requested by the Administrative Agent, a security agreement, in substantially the form of Exhibit G (together with each security agreement supplement delivered pursuant to Section 7.13, in each case as amended, the "Security Agreement"), duly executed by each Loan Party, together with:

(A)    if requested by the Administrative Agent, certificates representing the Pledged Securities referred to therein accompanied by undated stock powers executed in blank,

34

(B)      if requested by the Administrative Agent, proper Financing Statements in form appropriate for filing under the Uniform Commercial Code of all jurisdictions that the Administrative Agent may reasonably deem necessary or desirable in order to perfect the Liens created under the Security Agreement, covering the Collateral described in the Security Agreement,

(C)      if requested by the Administrative Agent, UCC, United States Patent and Trademark Office and United States Copyright Office, tax and judgment lien searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that name any Loan Party as debtor and that are filed in those state and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that are required by the Perfection Certificate,

(D)      if requested by the Administrative Agent, evidence of the completion of all other actions, recordings and filings of or with respect to the Security Agreement that the Administrative Agent may deem necessary or desirable in order to perfect the Liens created thereby, except as permitted by Section 7.18 hereof,

(E)      except as permitted by Section 7.18 hereof,  each Control Agreement required by the Security Agreement to perfect security interests in the Cash Collateral Account, Deposit Accounts, Securities Accounts, or Commodities Accounts, duly executed by the appropriate parties, and

(iv)      if requested by the Administrative Agent, except as permitted by Section 7.18 hereof, the Intellectual Property Security Agreements, duly executed by each Loan Party, together with evidence that all action that the Administrative Agent may reasonably deem necessary or desirable in order to perfect the Liens created under each Intellectual Property Security Agreements has been taken;

(v)      such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(vi)      such documents and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of the Borrower and the Guarantors is validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to do so could not reasonably be expected to have a Non-Financial Material Adverse Effect;

(vii)      a favorable opinion of Dechert LLP, counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, as to valid existence of the Loan Parties and due authorization by the Loan Parties of the Loan Documents; and

(viii)      evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with, subject to Section 7.18 the certificates of insurance, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitutes Collateral.

(b)      (i) All fees and expenses required to be paid to the Administrative Agent and the Lead Arranger on or before the Closing Date pursuant to the terms of the Final Order shall have been paid and (ii) all fees required to be paid to the Lenders on or before the Closing Date shall have been paid.

CH\1787007.21

(c)        The Administrative Agent and the Lead Arranger shall have received all documentation and other information about the Borrower and the Guarantors as has been reasonably requested in writing at least five days prior to the Closing Date by the Administrative Agent and the Lead Arranger that they reasonably determine is required by regulatory authorities under applicable "know your customer" and Anti-Money Laundering Laws, including without limitation the USA PATRIOT Act.

(d)        The Administrative Agent and the Prepetition Agent shall have received on or prior to the Closing Date each of the following, each dated the Closing Date unless otherwise agreed by the Administrative Agent and the Prepetition Agent:

(i)        the Consolidated unaudited balance sheet of Holdings as of the close of the Fiscal Month (and that portion of the Fiscal Year ending as of the close of such Fiscal Month) and (y) the related Consolidated income statement for such Fiscal Month (and that portion of the Fiscal Year ending as of the close of such Fiscal Month), in each case setting forth in comparative form the figures for the corresponding periods in the prior Fiscal Year and in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position, results of operations and cash flow of Holdings as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments) and in each case otherwise reasonably satisfactory to the Administrative Agent and the Prepetition Agent;

(ii)        the Budget, in form and substance acceptable to the Administrative Agent, the Prepetition Agent, the Required Consenting Holders (as defined in the Plan Support Agreement), and the Debtors, in their respective sole discretion; and

(iii)        such other documents and information as any Lender through the Administrative Agent may reasonably request.

(e)        The Bankruptcy Court shall have entered the Final Order.

(f)        [Reserved].

(g)        [Reserved].

Without limiting the generality of the provisions of the last paragraph of Section 10.03, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 4.02        Conditions to all Credit Extensions.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of Eurodollar Rate Loans) is subject to the following conditions precedent:

(a)        Other than on the Closing Date, the representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of such Credit Extension, except (i) to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date, (ii) to the extent that such representations are qualified as to materiality, in which case they shall be true and correct in all respects and (iii) that for purposes of this Section 4.02, the representations and warranties contained in Sections 5.05(a) and (b) shall be deemed to refer to the most recent statements furnished pursuant to Sections 6.01(b) and (a), respectively.

CH\1787007.21

(b)        Other than on the Closing Date, no Default or Event of Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)        The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)        [Reserved].

(e)        [Reserved].

(f)        The Final Order shall be in full force and effect and shall not have been reversed, modified, stayed or amended unless such reversal, modification, stay or amendment is acceptable to the Administrative Agent and the Required Lenders in their respective discretion.

ARTICLE V.
REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrower represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01        Existence, Qualification and Power.  Each Loan Party and each of its Subsidiaries (a) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority, (c) has all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) subject to the entry of the Final Order, execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (d) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (c)(i) or (d), to the extent that failure to do so could not reasonably be expected to have a Non-Financial Material Adverse Effect.

Section 5.02        Authorization; No Contravention.  Subject to the entry of the Final Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is or is to be a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law in any material respect.

Section 5.03        Governmental Authorization; Other Consents.  Subject to the entry of the Final Order, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the authorizations, approvals, actions, notices and filings listed on Schedule 5.03, all of which have been duly obtained, taken, given or made and are in full force and effect and (iii) those authorizations, approvals, actions, notices or filings, the failure of which to obtain or make could not, individually or in the aggregate, reasonably be expected to have a Non-Financial Material Adverse Effect.

Section 5.04        Binding Effect.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the

37

entry of the Final Order, this Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principals of equity.

Section 5.05    Financial Statements.

(a)    The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness to the extent required by GAAP.

(b)    The unaudited consolidated balance sheet of the Borrower and its Subsidiaries and the related consolidated statements of income or operations, shareholders' equity and cash flows for the most recent fiscal quarter delivered pursuant to Section 6.01(a) (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

Section 5.06    Litigation.  Other than the Cases, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement, any other Loan Document, or (b) either individually or in the aggregate could reasonably be expected to have a Non-Financial Material Adverse Effect.

Section 5.07    [Reserved].

Section 5.08    Ownership of Property; Liens; Investments.  Each Loan Party and each of its Subsidiaries has good record and marketable defensible title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not individually or in the aggregate materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted under the Loan Documents and except where the failure to have such title or other interest could not reasonably be expected to have, individually or in the aggregate, a Non-Financial Material Adverse Effect.  The property of each Loan Party and each of its Subsidiaries, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of each Loan Party and each of its Subsidiaries as presently conducted.

Section 5.09    Environmental Compliance.

Except for any matters that, individually or in the aggregate, would not reasonably be expected to have a Non-Financial Material Adverse Effect:

(a)    None of the real property currently owned or operated by any Loan Party or any of its Subsidiaries is listed or, to the knowledge of the Borrower, proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list ; to the knowledge of the Borrower, there are no and never have been any underground or above-ground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by any Loan Party or any of its Subsidiaries or, to the knowledge of the Borrower, on any property formerly owned or operated by any Loan Party or any of its Subsidiaries, in each case which would reasonably be expected to result in any

Loan Party incurring an Environmental Liability; to the knowledge of the Borrower, there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries that would reasonably be expected to result in any Loan Party incurring an Environmental Liability; and Hazardous Materials have not been released, discharged or disposed of on any property currently or, to the knowledge of the Borrower, formerly owned or operated by any Loan Party or any of its Subsidiaries in violation of Environmental Law or which would reasonably be expected to result in any Loan Party incurring an Environmental Liability.

(b)        Neither any Loan Party nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law; and, all Hazardous Materials generated, used, treated, handled or stored by any Loan Party or any of its Subsidiaries at, or transported to or from, any property currently or, to the knowledge of the Borrower, formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result in any Loan Party or any of its Subsidiaries incurring an Environmental Liability.

Section 5.10        Insurance.  The properties of the Borrower and its Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Subsidiary operates.

Section 5.11        Taxes.  Each of Holdings, the Borrower and the Subsidiaries has timely filed all federal income Tax returns and reports and all other material Tax returns and reports required to be filed, and has paid all material Taxes (including any Taxes payable in the capacity of a withholding agent) levied or imposed upon it or its income, profits, properties or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed Tax audit, Tax assessment, deficiency or other claim against Holdings, the Borrower or any Subsidiary that, if made, individually or in the aggregate could reasonably be expected to have a Non-Financial Material Adverse Effect.  The charges, accruals and reserves on the books of the Loan Parties in respect of any Taxes are adequate.  Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

Section 5.12        ERISA Compliance.

(a)        Each Plan is in compliance in all respects with the applicable provisions of ERISA, the Code and other Federal or state Laws, except to the extent that could not reasonably be expected to have a Non-Financial Material Adverse Effect.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto (or such Plan or the prototype sponsor in respect of such Plan has remaining a period of time under the Code or pronouncements of the Internal Revenue Service in which to apply for such a determination and make any amendments necessary to obtain a favorable determination or opinion, as applicable, as to the qualified status of such Plan) and, to the knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification.  The Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)        There are no pending or, to the knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Non-Financial Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Non-Financial Material Adverse Effect.

(c)        (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not

CH\1787007.21

delinquent under Section 4007 of ERISA); (iv) neither the Borrower nor any ERISA Affiliate has incurred, or rea-sonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiem-ployer Plan; and (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, except, in each case, that could not reasonably be expected to have a Non-Financial Material Adverse Effect.

Section 5.13    Subsidiaries; Equity Interests; Loan Parties.  As of the Closing Date, no Loan Party has any Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, and all of the outstanding Equi-ty Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents.  No Loan Party has any equity investments in any other corporation or entity other than those specifically disclosed in Part (b) of Schedule 5.13.  All of the outstanding Equity Interests in the Borrower have been validly issued, are fully paid and non-assessable and are owned by Holdings in the amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens except those created under the Collateral Documents.  Set forth on Part (d) of Schedule 5.13 is a complete and accurate list of all Loan Parties, showing as of the Closing Date (as to each Loan Party) the jurisdiction of its incorporation, the address of its principal place of business and its U.S. taxpayer identi-fication number, if any, or in the case of any Subsidiary Guarantor that does not have a U.S. taxpayer identification number, any unique identification number issued to it by the jurisdiction of its incorporation.  The copy of the char-ter of each Loan Party and each amendment thereto provided pursuant to Section 4.01(a)(vi) is a true and correct copy of each such document, each of which is valid and in full force and effect.

Section 5.14    Margin Regulations; Investment Company Act.

(a)    No Loan Party is engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extend-ing credit for the purpose of purchasing or carrying margin stock and no proceeds of any Borrowings will be used for any purpose that violates Regulation U or Regulation X of the FRB.

(b)    None of the Borrower, any Person Controlling the Borrower, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

Section 5.15    Disclosure.  No report, financial statement, certificate or other written information fur-nished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transac-tions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case as modified or supplemented by other information so furnished) contains any material mis-statement of fact or omits to state any material fact necessary to make the statements therein, in the light of the cir-cumstances under which they were made, not materially misleading; provided that, with respect to projected finan-cial information, the Borrower represents only that such information was prepared in good faith based upon assump-tions believed to be reasonable at the time; it being understood that such projections may vary from actual results and that such variances may be material.

Section 5.16    Compliance with Laws.  Except to the extent excused by the Bankruptcy Code, each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceed-ings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Non-Financial Material Adverse Effect.

Section 5.17    Intellectual Property; Licenses, Etc.  Each Loan Party and each of its Subsidiaries own, or possess the valid title to all of the Intellectual Property owned or purported to be owned by such Loan Party and its Subsidiaries, free and clear of all Liens (other than licenses granted in the ordinary course of business) except for minor defects in title that do not individually or in the aggregate materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted under the Loan.  All Intellectual

40

Property which the Loan Party and its Subsidiaries uses under license from third parties and which is material to their business operations is subject to license agreements that are valid and in full force and effect, except where the failure could not reasonably be expected to have, individually or in the aggregate, a Non-Financial Material Adverse Effect.  As of the Closing Date, Schedule 5.17 sets forth a true, complete and accurate list of all Company IP Rights, which are registered or pending application for registration with applicable intellectual property registries world-wide.  To the knowledge of the Borrower, the operation of the businesses of each Loan Party and each of its Subsidiaries, including technology, slogan or other advertising device, product, process, method, substance, part or other material now employed in connection therewith, or now contemplated to be employed, by any Loan Party or any of its Subsidiaries, does not infringe or otherwise violate any proprietary rights held by any other Person.  No claim or litigation alleging any of the foregoing, or disputing the ownership, validity or enforceability of any Company IP Rights, is pending or, to the knowledge of the Borrower, threatened in writing, which, either individually or in the aggregate, could reasonably be expected to have a Non-Financial Material Adverse Effect.

Section 5.18    Use of Proceeds.  The proceeds of the Loans shall be used in a manner consistent with this Agreement, the Budget (including Permitted Variances thereto) and the Final Order.

Section 5.19    Labor Matters.  There are no collective bargaining agreements or Multiemployer Plans covering the employees of the Borrower or any of its Subsidiaries as of the Closing Date and neither the Borrower nor any Subsidiary has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five years.

Section 5.20    Anti-Terrorism Laws.

(a)    No Loan Party, none of its Subsidiaries and, to the knowledge of any Responsible Officer of any Loan Party, none of the respective officers, directors of such Loan Party or such Subsidiary that is acting or benefiting in any capacity in connection with the Loans is an Embargoed Person.

(b)    No Loan Party, none of its Subsidiaries and, to the knowledge of senior management of each Loan Party and none of the respective officers or directors of such Loan Party or such Subsidiary acting or benefiting in any capacity in connection with the Loans conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Embargoed Person.

(c)    No Loan Party, none of its Subsidiaries and, to the knowledge of any Responsible Officer of any Loan Party, none of the respective officers or directors of such Loan Party or such Subsidiary (i) has violated or is in violation of any applicable Anti-Money Laundering Law or (ii) has engaged or engages in any transaction, investment, undertaking or activity that conceals the identity, source or destination of the proceeds from any category of offenses designated in any applicable law, regulation or other binding measure implementing the "Forty Recommendations" and "Nine Special Recommendations" published by the Organization for Economic Cooperation and Development's Financial Action Task Force on Money Laundering.

Section 5.21    Bankruptcy Representations.

The Final Order (i) is in full force and effect and (ii) has not been reversed, stayed, vacated or subjected to a stay pending appeal or, without the prior written consent of the Administrative Agent and the Required Lenders in their respective sole discretion, modified or amended.

ARTICLE VI.
REPORTING COVENANTS

Each of Holdings and the Borrower agrees with the Lenders and the Administrative Agent to each of the following, as long as any Obligation (other than contingent indemnification claims not then due and payable) or any Commitment remains outstanding:

CH\1787007.21

Section 6.01    Financial Statements.  The Borrower shall deliver to the Administrative Agent and Prepetition Agent, for delivery to each Lender, as well as the Consenting Noteholders (as defined in the Plan Support Agreement), the Committee, and their advisors, each of the following:

(a)    Quarterly Reports.  As soon as available, and in any event within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year  (or such later date that the Administrative Agent may agree in its sole discretion), the Consolidated and consolidating unaudited balance sheet of Holdings as of the close of such Fiscal Quarter and related Consolidated and consolidating statements of operations and cash flow for such Fiscal Quarter and that portion of the Fiscal Year ending as of the close of such Fiscal Quarter, setting forth in comparative form the figures for the corresponding period in the prior Fiscal Year certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position, results of operations and cash flow of Holdings as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments).

(b)    Annual Reports.  As soon as available, and in any event within 120 days after the end of each Fiscal Year (or such later date that the Administrative Agent may agree in its sole discretion), the Consolidated and consolidating balance sheet of Holdings as of the end of such year and related Consolidated and consolidating statements of operations, unitholders' equity and cash flow for such Fiscal Year, each prepared in accordance with GAAP, together with a certification (with respect to such Consolidated financial statements) by the Group Members' Accountants that (i) such Consolidated Financial Statements fairly present in all material respects the Consolidated financial position, results of operations and cash flow of Holdings as at the dates indicated and for the periods indicated therein in accordance with GAAP without qualification as to the scope of the audit and (ii) in the course of the regular audit of the businesses of the Group Members, which audit was conducted in accordance with the standards of the United States' Public Company Accounting Oversight Board (or any successor entity), such Group Members' Accountants have obtained no knowledge that a Default in respect of any financial covenant contained in Article VI is continuing or, if in the opinion of the Group Members' Accountants such a Default is continuing, a statement as to the nature thereof (which certification may be limited to the extent required by customary applicable auditing rules or guidelines acceptable to the Administrative Agent).

(c)    Monthly Reports.  As soon as available, and in any event within 30 days after the end of each Fiscal Month (other than the third Fiscal Month of each Fiscal Quarter), (i) the Consolidated and consolidating unaudited balance sheet of Holdings as of the close of such Fiscal Month (and that portion of the Fiscal Year ending as of the close of such Fiscal Month) and (ii) the related Consolidated and consolidating income statement for such Fiscal Month (and that portion of the Fiscal Year ending as of the close of such Fiscal Month), in each case setting forth in comparative form the figures for the corresponding periods in the prior Fiscal Year and in each case certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the Consolidated and consolidating financial position and results of operations of Holdings as at the dates indicated and for the periods indicated in accordance with GAAP (subject to the absence of footnote disclosure and normal year-end audit adjustments). Together with such monthly reports delivered pursuant to this clause, the Borrower shall deliver a certificate, in form and substance satisfactory to the Administrative Agent, by a Responsible Officer of the Borrower that (i) the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this clause (c)) is correct and complete as of the date of such monthly report, (ii) the Loan Parties have delivered all documents (including updated schedules as to locations of Collateral and acquisition of Intellectual Property or real property) they are required to deliver pursuant to any Loan Document on or prior to the date of delivery of such monthly report and (iii) complete and correct copies of all documents modifying any term of any Organization Document of any Group Member or any Subsidiary or joint venture thereof on or prior to the date of delivery of such monthly report have been delivered to the Administrative Agent or are attached to such certificate.

(d)    [Reserved.]

(e)    Variance Report. On each Wednesday (or if such Wednesday is not a Business Day, the following Business Day) following the Closing Date, a Variance Report.

CH\1787007.21

(f)    <u>Management Discussion and Analysis</u>.  Together with each delivery of the financial statements for each Fiscal Quarter or Fiscal Month required by clauses (a) or (c) above, a customary written management discussion and analysis (MD&A) of the financial condition and results of operations of the Group Members for the portion of the Fiscal Year then elapsed and discussing the reasons for any significant variations from (i) the previous Fiscal Quarter or Fiscal Month, as applicable for such period, (ii) the figures for the corresponding period in the previous Fiscal Year and (iii) to the extent forecasts and projections have been delivered pursuant to Section 6.01(h), the figures for the corresponding period in such forecasts and projections, including written qualitative discussion and analysis, in each case with detail satisfactory to the Administrative Agent.

(g)    <u>Corporate Chart and Other Collateral Updates</u>.  A certificate by a Responsible Officer of the Borrower that (i) the Corporate Chart attached thereto (or the last Corporate Chart delivered pursuant to this <u>clause (g)</u>) is correct and complete as of the date of the Variance Report most recently required to be delivered pursuant to <u>Section 6.01(e)</u>, (ii) the Loan Parties have delivered all documents (including updated schedules as to locations of Collateral and acquisition of Intellectual Property or real property) they are required to deliver pursuant to any Loan Document on or prior to the date of the Variance Report most recently required to be delivered pursuant to <u>Section 6.01(e)</u> and (iii) complete and correct copies of all documents modifying any term of any Organization Document of any Group Member or any Subsidiary or joint venture thereof on or prior to the date of the Variance Report most recently required to be delivered pursuant to <u>Section 6.01(e)</u>.

(h)    <u>Additional Projections</u>.  As soon as available and in any event not later than 45 days after the end of the 2014 Fiscal Year, (i) a revised annual business plan of the Group Members for the 2015 Fiscal Year in form and substance acceptable to the Administrative Agent and the Required Lenders in their reasonable discretion and (ii) forecasts prepared by management of the Borrower for each Fiscal Quarter in such next succeeding Fiscal Year, including in such forecasts, (x) a projected year-end Consolidated and consolidating balance sheet, income statement and statement of cash flows, (y) a statement of all of the material assumptions on which such forecasts are based and (z) substantially the same type of financial information as that contained in financial projections provided by or on behalf of the Borrower to the Administrative Agent or the Prepetition Agent (in such capacities) prior to the Closing Date.

(i)    [Reserved.]

(j)    <u>Bankruptcy Court Filings</u>.  As soon as practicable in advance of filing with the Bankruptcy Court, (i) all other proposed orders and pleadings related to the DIP Facilities, which orders and pleadings shall be in form and substance satisfactory to the Administrative Agent and the Prepetition Agent, (ii) any plan of reorganization or liquidation, and/or any disclosure statement related to such plan (which plan shall be a Reorganization Plan and with the disclosure statement shall comply with the requirements set forth herein), (iii) any motion and proposed form of order seeking to extend or otherwise modify the Debtors' exclusive periods set forth in section 1121 of the Bankruptcy Code, (iv) any motion seeking approval of any sale of the Debtors' assets in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders and any proposed form of a bidding procedures order and sale order (each of which must be in form and substance satisfactory to the Administrative Agent, the Prepetition Agent, Required Lenders and the Required Prepetition Lenders) and (v) any motion and proposed form of order filed with the Bankruptcy Court relating to any management equity plan, incentive plan or severance plan, the assumption, rejection, modification or amendment of any employment agreement, or the assumption, rejection, modification or amendment of any material contract (each of which must be in form and substance satisfactory to the Administrative Agent and the Prepetition Agent).

(k)    [Reserved].

(l)    <u>Insurance</u>.  Together with each delivery of any Financial Statement for any Fiscal Month pursuant to clause (c) above, each in form and substance satisfactory to the Administrative Agent and certified as complete and correct by a Responsible Officer of the Borrower, a summary of all material insurance coverage maintained as of the date thereof by any Group Member, together with such other related documents and information as the Administrative Agent may reasonably require; <u>provided</u>, that in lieu of such summary, a Responsible Officer of the

Borrower may certify that there have been no changes since the Closing Date or the end of the previous fiscal month, as applicable.

(m)     [Reserved].

(n)     Additional Reports. Such additional reports reasonably requested by the Administrative Agent or the Lenders, including with respect to litigation and contingent liabilities.

Section 6.02     Other Events.  The Borrower shall give the Administrative Agent, for delivery to each Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing) promptly after any Responsible Officer of any Group Member knows: (a) any event (other than any event involving loss or damage to property) reasonably expected to result in a mandatory payment of the Obligations pursuant to Section 2.05, stating the material terms and conditions of such transaction and estimating the Net Cash Proceeds thereof, (b) the commencement of, or any material developments in, any action, investigation, suit, proceeding, audit, claim, demand, order or dispute with, by or before any Governmental Authority affecting any Group Member or any property of any Group Member that seeks injunctive or similar relief, (c) the acquisition of any material real property or the entering into of any material lease and (d) any event, occurrence or circumstance in which a material portion of the Collateral is damaged, destroyed or otherwise impaired or adversely affected.

Section 6.03     Copies of Notices and Reports.  The Borrower shall promptly deliver to the Administrative Agent, for delivery to each Lender, copies of each of the following: (a) all reports that Holdings transmits to its security holders generally, and (b) all documents that any Group Member files with, or otherwise provides to, the Securities and Exchange Commission, the Financial Industry Regulatory Authority, any securities exchange or any Governmental Authority exercising similar functions, the Bankruptcy Court or any Committee.

Section 6.04     Taxes.  The Borrower shall give the Administrative Agent, for delivery to each Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing) promptly after any Responsible Officer of any Group Member knows of it:  (a) the creation, or filing with the IRS or any other Governmental Authority, of any Contractual Obligation or other document extending, or having the effect of extending, the period for assessment or collection of any Taxes with respect to any Tax Affiliate and (b) the creation of any Contractual Obligation of any Tax Affiliate, or the receipt of any request directed to any Tax Affiliate, to make any adjustment under Section 481(a) of the Code, by reason of a change in accounting method or otherwise, which, in either case, could reasonably be expected to have a Non-Financial Material Adverse Effect.

Section 6.05     Labor Matters.  The Borrower shall give the Administrative Agent, for delivery to each Lender, notice of each of the following (which may be made by telephone if promptly confirmed in writing), promptly after, and in any event within 30 days after any Responsible Officer of any Group Member knows or has reason to know of it: (a) the commencement of any material labor dispute to which any Group Member is or may become a party, including any strikes, lockouts or other disputes relating to any of such Person's plants and other facilities and (b) the incurrence by any Group Member of any Worker Adjustment and Retraining Notification Act or related or similar liability incurred with respect to the closing of any plant or other facility of any such Person (other than, in the case of this clause (b), those that could not, in the aggregate, reasonably be expected to have a Non-Financial Material Adverse Effect).

Section 6.06     [Reserved].

Section 6.07     Lender Calls.  The Borrower, Holdings, their officers (including, the chief financial officer of the Borrower) and their advisors (including any investment banker or financial advisor retained by any Debtor) shall make themselves available for conference calls to be held on a weekly basis with the Administrative Agent and/or the other Secured Parties or their representatives or advisors to discuss the Budget (and all updates and Variance Reports related thereto), or any other issues as may be reasonably requested by the Administrative Agent and/or the other Secured Parties, and such conference calls may be held without the participation of the Loan Parties or any other representative or advisor of the Loan Parties.

44

ARTICLE VII.
AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations) shall remain unpaid or unsatisfied shall remain outstanding, each of Holdings and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 7.01, 7.02, 7.03 and 7.11) cause each Subsidiary to:

Section 7.01    [Reserved].

Section 7.02    Certificates; Other Information.  Deliver to the Administrative Agent for delivery to each Lender:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.01(a) (commencing with the delivery of the financial statements for the fiscal quarter ended June 30, 2014, a duly completed Compliance Certificate signed by the chief executive officer, chief financial officer, treasurer or controller of the Borrower;

(b)    [Reserved];

(c)    [Reserved];

(d)    promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Subsidiary thereof, copies of each material notice or other material correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Subsidiary thereof;

(e)    promptly after receipt thereof by any Loan Party or any Subsidiary thereof, copies of all notices, requests and other documents (including amendments, waivers and other modifications) so received under or pursuant to any instrument, indenture, loan or credit or similar agreement regarding or related to any breach or default by any party thereto, or any other event, in each case, that could reasonably be expected to materially impair the value of the interests or the rights of any Loan Party or otherwise reasonably be expected to have a Non-Financial Material Adverse Effect;

(f)    promptly after the assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Non-Financial Material Adverse Effect or (ii) cause any property described in the Mortgages to be subject to any material restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(g)    promptly, such additional information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 12.02; or (ii) on which such documents are posted on the Borrower's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:  (i) the Borrower shall deliver paper copies of such documents to the Administrative Agent or any Lender that requests the Borrower to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify the

45

Administrative Agent and each Lender (by telecopier or electronic mail) of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 7.02(a) to the Administrative Agent. Except for such Compliance Certificates, the Administrative Agent shall have no obligation to request the delivery or to maintain copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent and/or the Lead Arranger will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Lead Arranger and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary), with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 12.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Lead Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." For purposes of this Agreement, public information shall not be deemed to include any information and documentation that is of a type that would be required under applicable securities laws to have been made publicly available if the Borrower were a public reporting company.

Section 7.03    Notices. Promptly notify the Administrative Agent and each Lender:

(a)    of the occurrence of any Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Financial Material Adverse Effect, including the following to the extent they have resulted or could reasonably be expected to result in a Financial Material Adverse Effect: (i) breach or non-performance of, or any default under, a Contractual Obligation of the Borrower or any Subsidiary; (ii) any dispute, litigation, investigation, proceeding or suspension between the Borrower or any Subsidiary and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting the Borrower or any Subsidiary, including pursuant to any applicable Environmental Laws; and

(c)    of the occurrence of any ERISA Event.

Each notice pursuant to Section 7.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto, to the extent such details and other information are known to the Borrower. Each notice pursuant to Section 7.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

Section 7.04    Payment of Taxes. Each of Holdings and the Borrower will pay and discharge, and will cause each of the Subsidiaries to pay and discharge, all post-petition Taxes imposed upon it or upon its income or profits, or upon any properties or assets belonging to it, in each case on a timely basis, and all lawful claims which,

46

if unpaid, may reasonably be expected to become a Lien upon any properties or assets of Holdings, the Borrower or any of the Subsidiaries not otherwise permitted under this Agreement; provided that neither the Borrower nor any of the Subsidiaries shall be required to pay any such Tax that is being contested in good faith by proper proceedings diligently conducted if it has maintained adequate reserves with respect thereto in accordance with GAAP or which could not reasonably be expected to, individually or in the aggregate, have a Non-Financial Material Adverse Effect.

Section 7.05    Preservation of Existence, Etc.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization and (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Financial Material Adverse Effect, except in the case of clauses (a) (other than with respect to the Borrower) and (b), (i) to the extent that failure to do so could not reasonably be expected to have a Financial Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 8.04 or Section 8.05.

Section 7.06    Maintenance of Properties.  (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and (b) make all necessary repairs thereto and renewals and replacements thereof, except in each case where the failure to do so could not reasonably be expected to have a Non-Financial Material Adverse Effect.

Section 7.07    Maintenance of Insurance.  Maintain with financially sound and reputable insurance companies not Affiliates of the Borrower, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons.  All such insurance shall name the Administrative Agent as an additional insured or loss payee, as applicable.  If any portion of any Mortgaged Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then, to the extent required by the Flood Insurance Laws, the Borrower shall, or shall cause each Loan Party to, (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount reasonably satisfactory to the Administrative Agent and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

Section 7.08    Compliance with Laws.  Except as required by the Bankruptcy Code, comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Financial Material Adverse Effect.

Section 7.09    Books and Records.  (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Subsidiary, as the case may be.  In addition, each Group Member shall provide full and direct access during normal business hours and upon reasonable prior notice to information (including historical information) and personnel as the Administrative Agent or the Prepetition Agent may reasonably request from time to time, including regularly scheduled meetings among senior management, company advisors and the Administrative Agent, the Prepetition Agent, Houlihan Lokey Capital, Inc. and such other consultants to the Administrative Agent, the Prepetition Agent, the Lenders and/or the Prepetition Lenders as may be identified in such Person to the Borrower, shall be provided with reasonable access during normal business hours and upon reasonable prior notice to all information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operation and restructuring activities, progress with respect to the Reorganization Plan and any other aspect of the Cases; provided, however, that the foregoing shall not require the Borrower to permit any access, disclose any privileged information or trade secret or violate any of its obliga-

47

tions with respect to confidentiality or violate applicable laws. All access rights of the Administrative Agent, the Prepetition Agent or any other Lender under this Section 7.09 shall extend to any of their respective representatives, agents, counsel, advisors, accountants, appraisers, consultants, independent contractors or other designees.

Section 7.10    Inspection Rights. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; provided that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 7.10, and the Administrative Agent shall not exercise such rights more often than one (1) time during any calendar year absent the existence of an Event of Default, and only one (1) such visit shall be at the Borrower's expense; provided further that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in this Section 7.10, none of the Borrower or any Restricted Subsidiary will be required to disclose or permit the inspection or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by Law or any binding agreement or (iii) that is subject to attorney client or similar privilege or constitutes attorney work product.

Section 7.11    Use of Proceeds. The proceeds of the Loans shall be used in accordance with the Final Order.

Section 7.12    Information Regarding Collateral.

(a)    Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Administrative Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Administrative Agent to maintain the perfection and priority of the security interest of the Administrative Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Administrative Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence. Each Loan Party also agrees to promptly notify the Administrative Agent of any change in the location of any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral is located (including the establishment of any such new office or facility), other than changes in location to a Mortgaged Property or a leased property subject to a Landlord Access Agreement.

Section 7.13    Covenant to Guarantee Obligations and Give Security.

(a)    Upon the formation or acquisition of any new direct or indirect Subsidiary (other than an Excluded Subsidiary) by any Loan Party, then the Borrower shall, at the Borrower's expense:

(i)    within 15 days after such formation or acquisition, cause such Subsidiary , to duly execute and deliver to the Administrative Agent a guaranty or guaranty supplement, in form and substance satisfactory to the Administrative Agent, guaranteeing the other Loan Parties' obligations under the Loan Documents,

48

(ii)        within 15 days after such formation or acquisition, furnish to the Administrative Agent a description of the real and personal properties of such Subsidiary, in detail reasonably satisfactory to the Administrative Agent,

(iii)        within 30 days after such formation or acquisition, cause such Subsidiary to duly execute and deliver to the Administrative Agent any Mortgages, Security Agreement Supplements, IP Security Agreements, each item required pursuant to the Mortgaged Property Requirement and other security and pledge agreements required by the Security Agreement, as specified by and in form and substance reasonably satisfactory to the Administrative Agent (including delivery of all Pledged Securities in and of such Subsidiary, and other instruments of the type specified in Section 4.01(a)(iii)), to grant a security interest in the assets of such Subsidiary constituting Collateral;

(iv)        within 30 days after such formation or acquisition, cause such Subsidiary to take whatever action (including the recording of Mortgages, the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) required hereunder or in the Security Agreement to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on the assets of such Subsidiary constituting Collateral, and

(v)        concurrently with the actions taken under clauses (iii) and (iv) above, deliver to the Administrative Agent, upon the request of the Administrative Agent in its sole discretion, a signed copy of a favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (i), (iii) and (iv) above, and as to such other matters as the Administrative Agent may reasonably request, and

(vi)        as promptly as practicable after such formation or acquisition, deliver, upon the request of the Administrative Agent in its sole discretion, to the Administrative Agent with respect to each parcel of Material Real Property owned or held by the entity that is the subject of such formation or acquisition title reports, a Phase I environmental assessment report, provided, however, that to the extent that any Loan Party or any of its Subsidiaries shall have otherwise received such report with respect to such Material Real Property, such items shall, promptly after the receipt thereof, be delivered to the Administrative Agent.

(b)        Upon the acquisition of (i) any property with a value in excess of $5.0 million by any Loan Party (other than Material Real Property), if such property, in the judgment of the Administrative Agent, shall not already be subject to a perfected first priority Lien and security interest in favor of the Administrative Agent for the benefit of the Secured Parties, then the Borrower shall, at the Borrower's expense:

(i)        within 15 days after such acquisition, furnish to the Administrative Agent a description of the property so acquired in detail satisfactory to the Administrative Agent,

(ii)        within 15 days after such acquisition, cause the applicable Loan Party to duly execute and deliver to the Administrative Agent, Security Agreement Supplements, IP Security Agreements and other security and pledge agreements required by the Security Agreement, as specified by and in form and substance reasonably satisfactory to the Administrative Agent, to grant a security interest in the assets of the applicable Loan Party constituting Collateral,

(iii)        within 30 days after such acquisition, cause the applicable Loan Party to take whatever action (including the filing of Uniform Commercial Code financing statements, the giving of notices and the endorsement of notices on title documents) required hereunder or in the Security Agreement to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on the assets of such Loan Party constituting Collateral,

(iv)        concurrently with the actions taken under clauses (ii) and (iii) above, deliver to the Administrative Agent, upon the request of the Administrative Agent in its sole discretion, a signed copy of a

49

favorable opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties acceptable to the Administrative Agent as to the matters contained in clauses (ii) and (iii) above and as to such other matters as the Administrative Agent may reasonably request,

(c)    within 30 days after the acquisition of any Material Real Property, deliver or cause to be delivered to the Administrative Agent each item required pursuant to the Mortgaged Property Requirement, and

(d)    At any time upon request of the Administrative Agent, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent may reasonably deem necessary or desirable in obtaining the full benefits of, or (as applicable) in perfecting and preserving the Liens of, such guaranties, deeds of trust, trust deeds, deeds to secure debt, mortgages, Security Agreement Supplements and other security and pledge agreements and supplements thereto.

(e)    Notwithstanding anything to the contrary herein, in no case shall a Loan Party be required to grant a security interest in any Equity Interests in a CFC or a Transparent Subsidiary, other than (i) 100% of the non-voting Equity Interests (if any) in a CFC or Transparent Subsidiary, as applicable, that is a first-tier Subsidiary of such Loan Party, and (ii) 65% of the voting Equity Interests in a CFC or Transparent Subsidiary, as applicable, that is a first-tier Subsidiary of such Loan Party, in each case to secure Obligations of such Loan Party.

(f)    Notwithstanding anything to the contrary herein, the Administrative Agent may agree in its sole discretion to extend any of the time periods set forth in this Section 7.13.

Section 7.14    Compliance with Environmental Laws.  Except as required by the Bankruptcy Code or orders of the Bankruptcy Court, comply, and cause all its lessees and other Persons operating or occupying its properties to comply, with all applicable Environmental Laws and Environmental Permits, except where the failure to comply would not reasonably be expected to result in a Non-Financial Material Adverse Effect; obtain and renew all Environmental Permits necessary for its operations and properties, except whether the failure to obtain or renew would not reasonably be expected to result in a Non-Financial Material Adverse Effect; and conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up Hazardous Materials from any of its properties, to the extent required of it by and in material compliance with Environmental Laws; provided, however, that neither the Borrower nor any of its Subsidiaries shall be required to undertake any such investigation, study, sampling, testing, cleanup, removal, remedial or other action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

Section 7.15    Further Assurances.  Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof, and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) subject to any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Documents or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party, and cause each of its Subsidiaries to do so.

Section 7.16    [Reserved].

Section 7.17    [Reserved].

50

Section 7.18    <u>Post-Closing Covenant</u>.  To the extent any actions  to create or perfect a security interest in Collateral to be provided hereunder is not completed on or prior to the Closing Date notwithstanding the Borrower's use of commercially reasonable efforts to do so, the Borrower will complete each of such actions as soon as commercially reasonable but in no event later than 15 days after the Closing Date or, with respect to actions which may be required pursuant to the laws of any foreign jurisdiction, 30 days after the Closing Date, in each case unless a later date is agreed to by the Administrative Agent.

Section 7.19    <u>Compliance with Milestones</u>.  The Debtors shall comply with Plan Milestones in accordance with the Final Order.

Section 7.20    <u>Opposition to Certain Motions</u>. Each Loan Party shall promptly and diligently oppose all motions filed by Persons in the Bankruptcy Court to lift the stay on any Collateral (other than motions filed by the Administrative Agent, the Prepetition Agent, the DIP Lenders and/or the Prepetition Lenders relating to the DIP Facilities), all motions filed by Persons in the Bankruptcy Court to terminate the exclusive ability of the Debtors to file a plan of reorganization, and all other motions filed by Persons in the Bankruptcy Court that, if granted, could reasonably be expected to have a material adverse effect on the Administrative Agent, the Prepetition Lender or any Collateral.

Section 7.21    <u>Prepetition Credit Agreement Letters of Credit</u>.  The Borrower shall reimburse each L/C Issuer upon notice pursuant to Section 2.03(c) of the Prepetition Credit Agreement, including any fees and expenses related thereto.

ARTICLE VIII.
NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder (other than contingent indemnification obligations) shall remain unpaid or unsatisfied shall remain outstanding, the Borrower shall not, nor shall it permit any Subsidiary to, directly or indirectly, and solely in the case of <u>Section 8.16</u>, Holdings shall not:

Section 8.01    <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)    Liens existing on the date hereof and listed on Schedule 8.01(b); and

(c)    Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP.

Section 8.02    <u>Investments</u>.  Make any Investments, except:

(a)    Investments existing on the Petition Date and listed on Schedule 8.02(a);

(b)    Investments as provided in the Budget (including Permitted Variances), the Final Order or the budget pursuant to the Cash Collateral Order.

Section 8.03    <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, except

(a)    Indebtedness pursuant to any Loan Document;

(b)    Indebtedness existing on the date hereof and listed on Schedule 8.03(b) and any permitted refinancing thereof allowed pursuant to Section 8.15; and

51

(c)      Indebtedness in respect of swap contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes.

(d)      Indebtedness as provided in the Budget (including Permitted Variances) or the Final Order.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 8.03.

Section 8.04      Fundamental Changes.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)      any Subsidiary may merge with (i) the Borrower (including a merger the purpose of which is to reorganize the Borrower in a new State within the United States); provided that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries; provided that when any Subsidiary that is a Loan Party is merging with another Subsidiary, a Loan Party shall be the continuing or surviving Person;

(b)      the Borrower may change its legal form if it determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries, and the Administrative Agent reasonably determines it is not disadvantageous to the Lenders;

(c)      any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Loan Party (other than Holdings);

(d)      any Subsidiary that is not a Loan Party may dispose of all or substantially all its assets (including any Disposition that is in the nature of a liquidation) to (i) another Subsidiary that is not a Loan Party or (ii) to a Loan Party;

(e)      in connection with any acquisition permitted under Section 8.02, any Subsidiary of the Borrower may merge into or consolidate with any other Person or permit any other Person to merge into or consolidate with it; provided that (i) the Person surviving such merger shall be a wholly-owned Subsidiary of the Borrower and (ii) in the case of any such merger to which any Loan Party (other than the Borrower) is a party, such Loan Party is the surviving Person;

(f)      so long as no Default exists or would result therefrom, the Borrower may merge with any other Person; provided that the Borrower shall be the continuing or surviving corporation; and

(g)      so long as no Default exists or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 8.05, may be effected.

Section 8.05      Dispositions.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)      Dispositions of obsolete, worn out or surplus property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used or useful in the conduct of the business of the Borrower and its Subsidiaries;

(b)      Dispositions of inventory, equipment and immaterial assets in the ordinary course of business (including allowing any registrations or any applications for registration of any immaterial Company IP Rights to lapse or go abandoned in the ordinary course of business);

52

(c)        [Reserved]

(d)        Dispositions of property by any Subsidiary to the Borrower or to a wholly-owned Subsidiary; pro-vided that if the transferor of such property is a Guarantor, the transferee thereof must either be the Borrower or a Guarantor;

(e)        Dispositions permitted by Section 8.02, Section 8.04 and Section 8.06 and Liens permitted by Section 8.01;

(f)        Dispositions in the ordinary course of business of Cash Equivalents;

(g)        leases, subleases, licenses or sublicenses, in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and its Subsidiaries, taken as a whole;

(h)        transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(i)        Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(j)        Dispositions of accounts receivable in the ordinary course of business in connection with the collection or compromise thereof;

(k)        The unwinding of any swap contract pursuant to its terms;

(l)        [Reserved];

(m)        Dispositions in the ordinary course of business consisting of the abandonment of Company IP Rights which, in the reasonable good faith determination of the Borrower or any Subsidiary, are uneconomical, negligible, obsolete or otherwise not material in the conduct of its business; and

(n)        any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of business.

(o)        [Reserved].

To the extent any Collateral is disposed of as expressly permitted by this Section 8.05 to any Person other than to a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents and, if requested by the Administrative Agent, upon the certification by the Borrower that such Disposition is permitted by the is Agreement, the Administrative Agent shall be authorized to take and shall take any actions deemed appropriate in order to effect the foregoing.

Section 8.06        Restricted Payments.  Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(a)        each Subsidiary may make Restricted Payments to the Borrower, any Subsidiaries of the Borrower that are Guarantors and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b)        Permitted Tax Distributions may be made by any Group Member;

(c)        [Reserved];

CH\1787007.21

(d)       to the extent constituting Restricted Payments, the Borrower and its Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 8.02 or Section 8.04.

Section 8.07       Change in Nature of Business.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and its Subsidiaries on the date hereof or any business substantially related or incidental thereto.

Section 8.08       Transactions with Affiliates.  Except with the prior written consent of the Administrative Agent and Required Lenders, enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than:

(a)       transactions between or among the Borrower or any Subsidiary that is a Guarantor or any entity that becomes a Subsidiary that becomes a Guarantor as a result of such transaction;

(b)       transactions on terms not less favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate;

(c)       [Reserved];

(d)       [Reserved];

(e)       [Reserved];

(f)       [Reserved];

(g)       loans and other transactions by and among the Borrower and/or one or more Subsidiaries to the extent permitted under this Article VIII;

(h)       employment and severance arrangements between the Borrower or any of its Subsidiaries and their respective officers and employees in the ordinary course of business and transactions pursuant to stock option plans and employee benefit plans and arrangements; provided that such arrangements are limited to incentive plans approved by the Bankruptcy Court in accordance with the Plan Support Agreement;

(i)       the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, directors, officers, employees and consultants of the Borrower and its Subsidiaries or any direct or indirect parent of the Borrower in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and its Subsidiaries;

(j)       [Reserved];

(k)       [Reserved].

Section 8.09       Burdensome Agreements.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document or as required under the Bankruptcy Code) that limits the ability (a) of any Subsidiary (other than an Excluded Subsidiary) to make Restricted Payments to the Borrower or any Guarantor or to otherwise transfer property to invest in the Borrower or any Guarantor, (ii) of any Subsidiary (other than an Excluded Subsidiary) to Guarantee the Indebtedness of the Borrower or (iii) of the Borrower or any Subsidiary (other than an Excluded Subsidiary) to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations; provided, however, that the foregoing shall not apply to:

(a)       restrictions and conditions imposed by law, any Loan Document, or the Senior Unsecured Notes;

CH\1787007.21

(b)        restrictions and conditions existing on the Closing Date or to any extension, renewal, amendment, modification or replacement thereof, except to the extent any such amendment, modification or replacement expands the scope of any such restriction or condition;

(c)        customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary or any assets pending such sale, provided that such restrictions and conditions apply only to the Subsidiary or assets that is or are to be sold and such sale is permitted hereunder;

(d)        customary provisions in leases, licenses and other contracts restricting the assignment thereof;

(e)        restrictions imposed by any agreement relating to secured Indebtedness permitted by this Agreement to the extent such restriction applies only to the property securing such Indebtedness;

(f)        restrictions or conditions set forth in any agreement in effect at any time a Person becomes a Subsidiary (but not any modification or amendment expanding the scope of any such restriction or condition), provided that such agreement was not entered into in contemplation of such Person becoming a Restricted Subsidiary and the restriction nor condition set forth in such agreement does not apply to the Borrower or any other Subsidiary;

(g)        restrictions or conditions in any Indebtedness permitted pursuant to Section 7.03 to the extent such restrictions or conditions are no more restrictive than the restrictions and conditions in the Loan Documents or, in the case of subordinated debt, are market terms at the time of issuance or, in the case of Indebtedness of any non-Guarantor, are imposed solely on such non-Guarantor and its Subsidiaries;

(h)        restrictions on cash or other deposits imposed by agreements entered into in the ordinary course of business;

(i)        encumbrances and restrictions under the Organization Documents of any joint ventures; and

(j)        negative pledges incurred or provided in favor of any holder of Indebtedness permitted under Section 8.03 solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness.

Section 8.10        Use of Proceeds.  Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

Section 8.11        [Reserved].

Section 8.12        Capital Expenditures.  Make or become legally obligated to make any Capital Expenditure, other than as set forth in the Budget (including Permitted Variances thereto).

Section 8.13        Amendments of Organization Documents.  Amend any of its Organization documents in a manner materially adverse to the Lenders.

Section 8.14        Accounting Changes.  Make any change in (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal year; provided, however, that the Borrower may, upon written notice to the Administrative Agent change its (x) accounting policies and/or reporting practices and/or (y) fiscal year, in each case as may be reasonably acceptable to the Administrative Agent, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year and/or accounting policies or reporting practices.

Section 8.15        Prepayments, Etc. of Indebtedness.  (i) Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness (it being understood that payments of

55

regularly scheduled interest and mandatory prepayments under Indebtedness shall be permitted) except (a) the conversion of any such Indebtedness to Qualified Equity Interests of Holdings (or any direct or indirect parent thereof), and (b) refinancings and refundings of such Indebtedness in compliance with the Budget, or (ii) amend, modify or change in any manner any term or condition of any Indebtedness set forth in Schedule 8.03(b) and the Senior Unsecured Notes Indenture in a manner materially adverse to the Administrative Agent or the Lenders without the consent of the Required Lenders (not to be unreasonably withheld or delayed), except for any refinancing, refunding, renewal or extension thereof permitted by the Budget.

Section 8.16    Holding Company.  In the case of Holdings, engage in any business or activity other than (a) the ownership of all outstanding Equity Interests in the Borrower, (b) maintaining its corporate existence, including general and corporate overhead, provided that Holdings may change its form of organization, so long as (A) it is organized under the laws of the United States of America, any State thereof or the District of Columbia and (B) its Guarantee of the Obligations and the Lien on or security interest in any Collateral held by it under the Loan Documents shall remain in effect to the same extent as immediately prior to such change, (c) activities required to comply with applicable laws, (d) participating in tax, accounting and other administrative activities as the parent of the consolidated group of companies, including the Loan Parties, (e) the receipt of Restricted Payments to the extent permitted by Section 8.06 and the making of Restricted Payments (including, in each case, for the avoidance of doubt, Permitted Tax Distributions), (f) to the extent not otherwise covered by the other clauses of this Section 8.16, any of the activities of Holdings referred to in Section 8.06, (g) concurrently with any issuance of Qualified Equity Interests, the redemption, purchase or retirement of any Equity Interest of Holdings using the proceeds of, or conversion or exchange of any equity Interests of Holdings for, such Qualified Equity Interests, (h) compliance with its obligation under the Loan Documents and the Senior Unsecured Notes Indenture (or any Permitted Refinancings thereof) the execution and delivery of the Loan Documents to which it is a party and the performance of its obligations thereunder, (i) incurring guarantees of Indebtedness permitted to be incurred by the Borrower or any Guarantor Subsidiary hereunder, provided such guarantee shall be subordinated to the Obligations to the same extent as such other Indebtedness, and (j) activities incidental to the businesses or activities described in clauses (a) through (i) of this Section.

Section 8.17    Bankruptcy Provisions.  No Group Member shall: (a) seek or consummate a sale of assets under a plan of reorganization, Section 363(b) of the Bankruptcy Code or otherwise (other than the Reorganization Plan) without the consent of the Administrative Agent, Required Lenders, the Prepetition Agent and the Required Prepetition Lenders; (b) except for the Carve-Out (in an amount up to the Carve-Out Cap and subject to the other limitations set forth herein and in the Final Order), incur administrative expense claims pari passu with or senior to the Obligations; (c) seek or consent to any modification, stay, vacation or amendment with respect to (i) "first day orders" entered by the Bankruptcy Court, (ii) the Final Order or (iii) the Loan Documents, except in each case as agreed to by the Administrative Agent and Required Lenders in their respective sole discretion; (d) create any Lien that ranks senior to, or *pari passu* with, the Liens securing the Obligations; (e) make cash expenditures on account of claims incurred (i) by critical vendors prior to the Petition Date or (ii) pursuant to Section 503(b)(9) of the Bankruptcy Code, or pursuant to any "first day" orders entered by the Bankruptcy Court, in each case except as agreed to by the Administrative Agent and the Prepetition Agent and the Required Lenders or as permitted by the Budget (including Permitted Variances thereto) or (f) seek or consent to any order seeking authority to take any action prohibited by the Final Order or the other Loan Documents without the consent of the Administrative Agent and the Prepetition Agent or otherwise required by any Requirement of Law.

Section 8.18    Compliance with Budget Covenants.  Each Loan Party shall comply with the "Budget Covenants" under, and as defined in, the Final Order.

ARTICLE IX.
EVENTS OF DEFAULT AND REMEDIES

Section 9.01    Events of Default.  Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower or any other Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan or pay on the Obligations due to the L/C Issuers, or (ii) pay within

three days after the same becomes due, any interest on any Loan or Obligations due to the L/C Issuers or any fee due hereunder, or (iii) pay within five days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)     <u>Specific Covenants</u>.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections <u>7.03(a)</u>, <u>7.05(a)</u> (solely with respect to the Borrower), 7.<u>11</u>, <u>7.13</u>, 7.<u>19</u> or <u>Article VIII</u>; or

(c)     <u>Other Defaults</u>.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>Section 9.01(a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; provided that an Event of Default under <u>Article VI</u> (other than under <u>Sections 6.01(d)</u>, 6.01<u>(e)</u> and <u>Section 6.07</u>) is subject to a grace period of 5 Business Days and an Event of Default under <u>Sections 6.01(d)</u>, <u>6.01(e)</u> or <u>6.07</u> is subject to a grace period of 2 Business Days; or

(d)     <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     <u>Judgments</u>.  There is entered against any Loan Party or any Subsidiary thereof a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and does not dispute coverage), or any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Non-Financial Material Adverse Effect and there is a period of 60 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect, or enforcement of such judgment is not subject to the automatic stay provided in the Bankruptcy Code; or

(f)     <u>ERISA</u>.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(g)     <u>Invalidity of Collateral Documents</u>.  Any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or as a result of acts or omissions by the Administrative Agent or any Lender or satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to create a valid and perfected first priority Lien (subject to Liens permitted by <u>Section 8.01</u>) on the Collateral to be covered thereby; or any Loan Party or any other Person contests in any manner the validity or enforceability of any material provision of any Collateral Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Collateral Document, or purports to revoke, terminate or rescind any Collateral Document; or

(h)     <u>Change of Control</u>.  There occurs any Change of Control; or

(i)     <u>Bankruptcy Matters</u>.  The Bankruptcy Court shall enter an order authorizing, approving or granting (or the Debtors shall file a motion seeking such authorization, approval or grant) of (i) additional post-Petition Date financing not otherwise permitted herein, (ii) any liens on the Collateral not otherwise permitted herein, (iii) dismissal of the Cases or conversion of any Case to one under Chapter 7 of the Bankruptcy Code, (iv) appointment of a Chapter 11 trustee in any of the Cases, (v) any other superpriority claim senior to or pari passu with superpriority claims of the Administrative Agent, the other Secured Parties, the Prepetition Agent and the other Prepetition Secured Parties, (vi) modification of the Facility (other than pursuant to Section 12.01) or the Final Order, (vii) any action materially adverse to the Administrative Agent, the other Secured Parties, the Prepetition Agent

57

and the other Prepetition Secured Parties, or their rights and remedies with respect to or interest in the Collateral, (viii) appointment of an examiner having powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases, or (ix) relief from the automatic stay for the benefit of any creditor with a security interest in the Collateral without the consent of the Administrative Agent and the Required Lenders; or

(j)    Prepetition Debts.    Any Debtor shall pay any claim accrued prior to the Petition Date without the prior written consent of the Administrative Agent and the Required Lenders in their sole discretion or other than as permitted by the Budget (and any Permitted Variances thereto); or

(k)    Actions against Administrative Agent.    Any Debtor shall commence any action against the Administrative Agent, any other Secured Parties, the Prepetition Agent and any other Prepetition  Secured Parties, on behalf of itself or any of its affiliates, officers or employees; or

(l)    Financial Material Adverse Effect.    Any Financial Material Adverse Effect shall have occurred.

(m)    Plan Support Agreement.    Any termination of the Plan Support Agreement or any material breach by the Debtors of any of their obligations thereunder; or

(n)    Plan Milestones.    The failure of the Debtors to comply with any of the Plan Milestones, regardless of whether the Debtors used commercially reasonable efforts to comply with any such Plan Milestone; or

(o)    506(c) Claims.    A claim under Section 506(c) of the Bankruptcy Code or otherwise shall have been allowed against any of all of the Administrative Agent, the other Secured Parties or the Collateral, or against any Prepetition Agent or other Prepetition  Secured Party or the collateral securing the Prepetition Credit Obligations; or

(p)    Competing Plans.    The filing of any plan of reorganization or related disclosure statement or any direct or indirect amendment to the Reorganization Plan or related disclosure statement, or the entry of an order confirming any such plan of reorganization or approving any such disclosure statement or approving any such amendment, in each case to the extent that such filing is not the Reorganization Plan or treats the claims of the Administrative Agent and Lenders in any manner to which they do not consent in their respective sole discretion; or

(q)    Exclusivity.    The Bankruptcy Court shall enter an order that results in any termination or modification of the exclusivity periods set forth in Section 1121 of the Bankruptcy Code except as provided in the Final Order or any such exclusivity periods shall have expired; or

(r)    Budgets.    the failure of the Debtors to comply with the terms set forth in the Reporting Covenants of Article VI or any other term of the Final Order; or

(s)    Bankruptcy Orders Not In Full Force and Effect.    Any of the Final Order, the order approving the Debtors' disclosure statement with respect to the Reorganization Plan (from and after entry thereof) or the order confirming the Reorganization Plan (from and after entry thereof) shall cease to be in full force and effect, including, without limitation, because the Final Order, disclosure statement approval order or confirmation order shall have been reversed, modified, stayed or amended (unless such reversal, modification, stay or amendment is acceptable to the Administrative Agent and the Required Lenders in their respective discretion); or

(t)    Prepetition Credit Agreement Letters of Credit.    the failure to reimburse each L/C Issuer upon notice pursuant to Section 2.03(c) of the Prepetition Credit Agreement as required by Section 7.21 hereof.

Section 9.02    Remedies upon Event of Default.    Subject to the Final Order:

(a)    During the continuance of any Event of Default, the Administrative Agent, may, and, at the request of the Required Lenders, as applicable, (or in the case of clause (ii), at the direction of the Required Lenders) shall, in each case by notice to the Borrower and in addition to any other right or remedy provided under any Loan

Document or by any applicable Requirement of Law, do each of the following: (i) declare all or any portion of the Commitments terminated, whereupon the Commitments shall immediately be reduced by such portion or, in the case of a termination in whole, shall terminate together with any obligation any Lender may have hereunder to make any Loan, (ii) declare immediately due and payable all or part of any Obligation (including any accrued but unpaid interest thereon), whereupon the same shall become immediately due and payable, without presentment, demand, protest or further notice or other requirements of any kind, all of which are hereby expressly waived by Holdings and the Borrower (and, to the extent provided in any other Loan Document, other Loan Parties), (iii) terminate the Facilities and any other Loan Documents as to any future liability or obligation of the Administrative Agent and the Lenders, but without affecting any of the Obligations or the Liens securing the Obligations and (iv) declare a termination, reduction or restriction on the ability of the Debtors, to use any cash collateral (any such declaration shall be made to the Debtors, counsel to the Consenting Noteholders (as defined in the Plan Support Agreement) the Committee(s) and the United States Trustee, and shall be referred to herein as a "Termination Declaration" and the date which is the earliest to occur of any such Termination Declaration being herein referred to as the "Termination Declaration Date");

(b)    On the seventh calendar day following a Termination Declaration Date, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Administrative Agent and the Prepetition Agent shall have relief from the automatic stay and may foreclose on, or otherwise realize on its DIP Lien or its prepetition liens, as applicable, on, all or any portion of the Collateral, collect accounts receivable and apply the proceeds thereof to the Obligations (or upon payment in full thereof, the Prepetition Credit Obligations), occupy the Debtors' premises to sell or otherwise dispose of the Collateral or otherwise exercise remedies against the Collateral permitted by applicable non-bankruptcy law. During such seven day period, (a) the Debtors shall be permitted to continue use of cash collateral in accordance with the Budget and Permitted Variances thereto, and (b) the Debtors and any Committee shall be entitled to an emergency hearing before the Bankruptcy Court to contest whether an Event of Default has occurred and/or whether the automatic stay should be vacated upon expiration of such seven day period. Unless during such hearing the Bankruptcy Court determines that an Event of Default has not occurred and/or is not continuing or the automatic stay should not be vacated, the automatic stay, as to the Administrative Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, shall automatically terminate at the end of such seven day period, without further notice or order

Section 9.03    Application of Funds. After the exercise of remedies provided for in Section 9.02 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 9.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order, subject to the Carve-Out:

First, to the Obligations under, and in accordance with, the provisions of the Loan Documents until payment in full of the Obligations,

Second, to pay the interest, expense reimbursement and other obligations owed to the Prepetition Secured Parties under the Final Order;

Third, subject to further order of the Bankruptcy Court, to pay the remaining Prepetition Credit Obligations in accordance with the provisions of Section 8.03 of the Prepetition Credit Agreement; and

Fourth, to the Loan Parties for distribution in the manner required by the Bankruptcy Code and other applicable law.

ARTICLE X.
ADMINISTRATIVE AGENT

Section 10.01    Appointment and Authority.

(a)    Each of the Lenders hereby irrevocably appoints Royal Bank of Canada to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

(b)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (including in its capacities as a potential Hedge Bank and a potential Cash Management Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 10.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article X and Article XII (including Section 12.04(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 10.02    Rights as a Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 10.03    Exculpatory Provisions. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(d)    The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be

60

necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 12.01 and 9.02) or (ii) in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower, a Lender.

(e)        The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Collateral Documents, (v) the value or the sufficiency of any Collateral, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

Section 10.04    Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 10.05    Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Section 10.06    Resignation of Administrative Agent.  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, upon the consent of the Borrower, to appoint a successor, not to be unreasonably withheld (and not required during the continuance of an Event of Default) which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring

61

(or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 12.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

Section 10.07    Non-Reliance on Administrative Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 10.08    No Other Duties, Etc.  Anything herein to the contrary notwithstanding, none of the Bookrunners, Lead Arranger, Documentation Agents or Syndication Agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender hereunder.

Section 10.09    Administrative Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.09 and 12.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, if the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 12.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 10.10    Collateral and Guaranty Matters.  Each of the Lenders (including in its capacities as a potential Cash Management Bank and a potential Hedge Bank) irrevocably authorize the Administrative Agent, at its option and in its discretion,

62

(a)    to release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Commitments and payment in full in cash of all Obligations (other than contingent indemnification obligations) and the expiration or termination of all Letters of Credit (other than Letters of Credit as to which other arrangements satisfactory to the Administrative Agent shall have been made), (ii) that is sold or to be sold as part of or in connection with any sale permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, or (iii) if approved, authorized or ratified in writing in accordance with Section 12.01;

(b)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted hereunder; and

(c)    to subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 8.01.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 10.10.  In each case as specified in this Section 10.10, the Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents or to subordinate its interest in such item, or to release such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 10.10.

Section 10.11    [Reserved].

Section 10.12    Withholding Tax.  To the extent required by any applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 3.01, each Lender shall, and does hereby severally, indemnify the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.06 relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this Section 10.12.  The agreements in this Section 10.12 shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other Obligations.

ARTICLE XI.
CONTINUING GUARANTY

Section 11.01    Guaranty.  Holdings hereby absolutely and unconditionally guarantees, as a guaranty of payment and performance and not merely as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all of the Obligations, whether for principal, interest, premiums, fees, indemnities, damages, costs, expenses or otherwise, of the Borrower to the Secured Parties, and whether arising hereunder or under any other Loan Document (including all renewals, extensions, amendments, refinancings and other modifications thereof and all costs, attorneys' fees and expenses incurred by the Secured Parties in connection with the collection or enforcement thereof).  The Administrative Agent's books and records showing the amount of the Obligations shall be admissible in evidence in

63

any action or proceeding, and shall be binding upon Holdings, and conclusive for the purpose of establishing the amount of the Obligations. This Guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any instrument or agreement evidencing any Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Obligations which might otherwise constitute a defense to the obligations of Holdings under this Guaranty, and Holdings hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

Section 11.02    Rights of Lenders.    Holdings consents and agrees that the Secured Parties may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof:  (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any security for the payment of this Guaranty or any Obligations; (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent and the Lenders in their sole discretion may determine; and (d) release or substitute one or more of any endorsers or other guarantors of any of the Obligations. Without limiting the generality of the foregoing, Holdings consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of Holdings under this Guaranty or which, but for this provision, might operate as a discharge of Holdings.

Section 11.03    Certain Waivers.    Holdings waives (a) any defense arising by reason of any disability or other defense of the Borrower or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of any Secured Party) of the liability of the Borrower; (b) any defense based on any claim that Holdings' obligations exceed or are more burdensome than those of the Borrower; (c) the benefit of any statute of limitations affecting Holdings' liability hereunder; (d) any right to proceed against the Borrower, proceed against or exhaust any security for the Obligations, or pursue any other remedy in the power of any Secured Party whatsoever; (e) any benefit of and any right to participate in any security now or hereafter held by any Secured Party; and (f) to the fullest extent permitted by law, any and all other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties. Holdings expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of nonpayment or nonperformance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of this Guaranty or of the existence, creation or incurrence of new or additional Obligations.

Section 11.04    Obligations Independent.    The obligations of Holdings hereunder are those of primary obligor, and not merely as surety, and are independent of the Obligations and the obligations of any other guarantor, and a separate action may be brought against Holdings to enforce this Guaranty whether or not the Borrower or any other person or entity is joined as a party.

Section 11.05    Subrogation.    Holdings shall not exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guaranty until all of the Obligations and any amounts payable under this Guaranty have been indefeasibly paid and performed in full and the Commitments and the Facilities are terminated. If any amounts are paid to Holdings in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to reduce the amount of the Obligations, whether matured or unmatured.

Section 11.06    Termination; Reinstatement.    This Guaranty is a continuing and irrevocable guaranty of all Obligations now or hereafter existing and shall remain in full force and effect until all Obligations and any other amounts payable under this Guaranty are indefeasibly paid in full in cash and the Commitments and the Facilities with respect to the Obligations are terminated. Notwithstanding the foregoing, this Guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of the Borrower or Holdings is made, or any of the Secured Parties exercises its right of setoff, in respect of the Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any of the Secured Parties in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Re-

64

lief Laws or otherwise, all as if such payment had not been made or such setoff had not occurred and whether or not the Secured Parties are in possession of or have released this Guaranty and regardless of any prior revocation, rescission, termination or reduction.  The obligations of Holdings under this paragraph shall survive termination of this Guaranty.

Section 11.07    Subordination.  Holdings hereby subordinates the payment of all indebtedness of the Borrower owing to Holdings, whether now existing or hereafter arising, including but not limited to any obligation of the Borrower to Holdings as subrogee of the Secured Parties or resulting from Holdings' performance under this Guaranty, to the payment in full in cash of all Obligations (other than contingent indemnification obligations); provided that the foregoing shall not be deemed to prohibit any payments with respect to any such indebtedness as long as no Event of Default is continuing at the time of such payment.  If the Secured Parties so request during the continuance of an Event of Default, any such indebtedness of the Borrower to Holdings shall be enforced and performance received by Holdings as trustee for the Secured Parties and the proceeds thereof shall be paid over to the Secured Parties on account of the Obligations, but without reducing or affecting in any manner the liability of Holdings under this Guaranty.

Section 11.08    Condition of Borrower.  Holdings acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from the Borrower and any other guarantor such information concerning the financial condition, business and operations of the Borrower and any such other guarantor as Holdings requires, and that none of the Secured Parties has any duty, and Holdings is not relying on the Secured Parties at any time, to disclose to Holdings any information relating to the business, operations or financial condition of the Borrower or any other guarantor (Holdings waiving any duty on the part of the Secured Parties to disclose such information and any defense relating to the failure to provide the same).

ARTICLE XII.
MISCELLANEOUS

Section 12.01    Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no such amendment, waiver or consent shall:

(a)    waive any condition set forth in Section 4.01 (other than Section 4.01(b)(i)), or, in the case of the initial Credit Extension, Section 4.02, without the written consent of each Lender;

(b)    without limiting the generality of clause (a) above, waive any condition set forth in Section 4.02 as to any Credit Extension without the written consent of the Required Lenders;

(c)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 9.02) without the written consent of such Lender;

(d)    postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document without the written consent of each Lender entitled to such payment;

(e)    reduce the principal of, or the rate of interest specified herein on, any Loan or (subject to clause (iv) of the second proviso to this Section 12.01) any fees or other amounts payable hereunder or under any other Loan Document, or change the manner of computation of any financial ratio (including any change in any applicable defined term) used in determining the Applicable Rate that would result in a reduction of any interest rate on any Loan or any fee payable hereunder without the written consent of each Lender entitled to such amount; provided, however, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

65

(f)        change (i) <u>Section 2.13</u> or <u>Section 9.03</u> in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender or (ii) the order of application of any reduction in the Commitments or any prepayment of Loans from the application thereof set forth in the applicable provisions of <u>Section 2.05(b)</u>;

(g)        change any provision of this <u>Section 12.01</u> or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder (other than the definitions specified in clause (ii) of this <u>Section 12.01(g)</u>), without the written consent of each Lender;

(h)        release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(i)        release all or substantially all of the value of the Guaranty, without the written consent of each Lender, except to the extent the release of any Subsidiary from the Guaranty is permitted pursuant to <u>Section 9.10</u> (in which case such release may be made by the Administrative Agent acting alone); or

(j)        impose any greater restriction on the ability of any Lender under the Facility to assign any of its rights or obligations hereunder without the written consent of the Required Lenders;

<u>provided</u>, <u>further</u>, that notwithstanding the foregoing which might require the consent of each Lender or each affected Lender, with respect to  the matters set forth in Sections 12.01(a), (c), (d), (g), (h) and (i), only the consent of Lenders having at such time in excess of 80% of the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date shall be required, except that with amendments, waivers or consents with respect to Section 12.01(d) any postponing must affect all Lenders ratably;

<u>provided</u>, <u>further</u>, that for the purposes of this Section 12.01, with respect to each such amendment, waiver or consent, (a) if the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date held by the Crossholder Prepetition Lenders does not exceed 30% of the sum of such amounts held by all Lenders, each Crossholder Prepetition  Lender shall be entitled to vote the full amount of sum of the its aggregate Commitments then outstanding as of such date plus its Total Outstandings as of such date, and (b) if the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such Date held by the Crossholder Prepetition Lenders exceeds 30% of the sum of such amounts held by all Lenders (such excess amount, the "<u>Aggregate Excess Crossholder Voting Amount</u>"), then (i) each Crossholder Prepetition  Lender shall be entitled to vote the sum of its Commitments then outstanding as of such date plus its Total Outstandings as of such date, minus the portion equal to the product of the Aggregate Excess Crossholder Voting Amount times a fraction, the numerator of which is such Crossholder Prepetition  Lender's Commitments then outstanding as of such date plus its Total Outstandings as of such date, and the denominator of which is the aggregate amount of the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date  held by all Crossholder Prepetition Lenders, and (ii) each Lender other than a Crossholder Prepetition Lender shall be entitled to vote (in addition to the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date held by such Lender) a portion of the Aggregate Excess Crossover Voting Amount equal  to the product of the Aggregate Excess Crossholder Voting Amount times a fraction, the numerator of which is the sum of such Lender's aggregate Commitments then outstanding as of such date plus its Total Outstandings as of such date and the denominator of which is the sum of the aggregate Commitments then outstanding as of such date plus the Total Outstandings as of such date held by all Lenders other than the Crossholder Prepetition Lenders.

and <u>provided</u>, <u>further</u>, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

66

If any Lender does not consent to a proposed amendment, waiver, consent or release with respect to any Loan Document that requires the consent of each Lender or each adversely affected Lender and that has been approved by the Required Lenders or the majority of the Lenders whose consent is required therefor, the Borrower may replace such non-consenting Lender in accordance with Section 12.13; provided that such amendment, waiver, consent or release can be effected as a result of the assignment contemplated by such Section (together with all other such assignments required by the Borrower to be made pursuant to this paragraph).

Section 12.02    Notices; Effectiveness; Electronic Communications.

(a)    Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to Holdings, the Borrower, the Administrative Agent to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 12.02; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative

CH\1787007.21

Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; provided, however, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender, or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    Change of Address, Etc.  Each of Holdings, the Borrower, the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower, the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States Federal or state securities laws.

(e)    Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 12.03    No Waiver; Cumulative Remedies; Enforcement.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 12.08 (subject to the terms of Section 2.13), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 9.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso

68

and subject to Section 2.13, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

Section 12.04    Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses.  The Borrower shall pay (i) all reasonable, documented and invoiced out-of-pocket expenses incurred by the Administrative Agent (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated thereby shall be consummated), and (ii) all out-of-pocket expenses incurred by the Administrative Agent and any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender) in connection with the enforcement of its rights and interests under this Agreement and the other Loan Documents, including in connection with any workout, restructuring or waiver or similar matters in respect of such Obligations and Loan Documents.  For avoidance of doubt, and nothing to the contrary contained herein notwithstanding, the Debtors shall pay the fees and costs incurred by only one lead law firm, one local-counsel firm and any necessary specialists, one accounting firm, one financial advisory firm and one Consultant retained for or on behalf of the Administrative Agent and the Lenders.

(b)    Indemnification by the Borrower.  The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Lead Arranger and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable, documented and invoiced fees, charges and disbursements of one counsel for the Indemnitees taken as a whole and, if necessary, one firm of local counsel in each appropriate jurisdiction to the Indemnified Persons taken as a whole, and, in the case of a conflict of interest, one additional counsel to the affected Indemnified Persons taken as a whole), and shall indemnify and hold harmless each Indemnitee from all reasonable, documented and invoiced fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Borrower's or such Loan Party's directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (1) (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or any of its officers or directors or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction or (2) relate to any proceeding solely between or among Indemnitees other than (A) claims against Lenders or their Affiliates, in each case in their capacity or in fulfilling their role as the agent or arranger or any other similar role under the Loan Documents (including their role as a Lender), and (B) claims arising out of any act or omission on the part of the Equity Investors, the Borrower or their respective Subsidiaries.

(c)    Reimbursement by Lenders.  To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Ad-

ministrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, underlined provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and nonappealable judgment of a court of competent jurisdiction.

(e)    Payments.  All amounts due under this Section shall be payable not later than ten Business Days after presentation of a reasonably detailed invoice therefor.

(f)    Survival.  The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 12.05    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 12.06    Successors and Assigns.

(a)    Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of Section 12.06(b), (ii) by way of participation in accordance with the provisions of Section 12.06(d), or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 12.06(f) (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent

70

expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)    <u>Minimum Amounts</u>.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under the Facility and the Loans at the time owing to it under the Facility or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $1,000,000; <u>provided</u>, <u>however</u>, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    <u>Proportionate Amounts</u>.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis;

(iii)    <u>Required Consents</u>.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; <u>provided</u> that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) Business Days after having received notice thereof;

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (1) any Commitment or if such assignment is to a Person that is not a Lender with a Commitment in respect of the Facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (2) any Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund;

(iv)    <u>Assignment and Assumption</u>.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; <u>provided</u>, <u>however</u>, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment and no such fee shall be due in connection with assignments to or from Affiliates of the Lead Arranger.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

71

(v)    No Assignment to Borrower.  No such assignment shall be made to any Purchasing Borrower Party.

(vi)    No Assignment to Natural Persons.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05 and 12.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 12.06(d).

(c)    Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender (solely to the extent of the provisions related to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than any Disqualified Lender, a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 12.01 that affects such Participant.  Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be subject to Section 12.13 and entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and limitations of those subsections, including the requirements under Section 3.01(e) (it being understood that the documentation required under Section 3.01(e) shall be delivered to the participating Lender) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 12.06(b).  Each Lender that sells a participation agrees, at the Borrower's request and expense, to use reasonable efforts to cooperate with the Borrower to effectuate the provisions of Section 12.13 with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any

information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary in connection with a Tax audit or other inquiry to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)        Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 3.01 or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, except to the extent such entitlement to a greater payment results from a change in any Law after the sale of the participation takes place.

(f)        Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, the European Central Bank or any other central bank or similar monetary authority in the organizational jurisdiction of such Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 12.07        Treatment of Certain Information; Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent and any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

For purposes of this Section, "Information" means all information received from any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof or their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Loan Party or any Subsidiary thereof, provided that, in the case of information received from a Loan Party or any such Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

73

Section 12.08    Right of Setoff.  If an Event of Default shall have occurred and be continuing each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower or any other Loan Party against any and all of the obligations of the Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

Section 12.09    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 12.10    Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 12.11    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

Section 12.12    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

74

Section 12.13    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any Indemnified Taxes or is required to pay any additional amount with respect to Indemnified Taxes to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, if any Lender is a Defaulting Lender or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 12.06</u>), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee specified in <u>Section 12.06(b)</u>;

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)    such assignment does not conflict with applicable Laws.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 12.14    <u>Governing Law; Jurisdiction; Etc.</u>

(a)    <u>GOVERNING LAW</u>.  THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND THE BANKRUPTCY CODE.

(b)    <u>SUBMISSION TO JURISDICTION</u>.  THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, OR IF THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURTS OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)    <u>WAIVER OF VENUE</u>.  THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE

75

LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURTS REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PER- MITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTE- NANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURTS.

(d)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SER- VICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 12.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTH- ER MANNER PERMITTED BY APPLICABLE LAW

Section 12.15    Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRI- AL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELAT- ING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEM- PLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 12.16    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transac- tion contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees, and acknowledges its Affiliates' understanding, that:  (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lead Arranger are arm's-length commercial transactions between the Borrower, Hold- ings and their respective Affiliates, on the one hand, and the Administrative Agent and the Lead Arranger, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advi- sors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the oth- er Loan Documents; (ii) (A) the Administrative Agent, each Lead Arranger and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings or any of their respective Affiliates, or any other Person and (B) none of the Administrative Agent, the Lead Arranger or the Lenders has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lead Arranger and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Administrative Agent, the Lead Arranger or the Lenders has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates.  To the fullest extent permitted by law, each of the Borrow- er and Holdings hereby waives and releases any claims that it may have against the Administrative Agent, the Lead Arranger and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 12.17    Electronic Execution of Assignments and Certain Other Documents.  The words "execu- tion," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce

76

Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.18    USA PATRIOT Act.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" an anti-money laundering rules and regulations, including the Act.

Section 12.19    Conflicts.  In the event of any inconsistency between the terms and conditions of the Loan Documents and of the Final Order, the provisions of the Final Order shall govern and control.

77

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed as of the date first above written.

MMODAL INC.

By: _____
    Name:
    Title:

LEGEND PARENT, INC.

By: _____
    Name:
    Title:

MMODAL HOLDINGS, INC.

By: _____
    Name:
    Title:

ALL TYPE MEDICAL TRANSCRIPTION SERVICES, INC.

By: _____
    Name:
    Title:

MEDQUIST OF DELAWARE, INC.

By: _____
    Name:
    Title:

MIRRUS SYSTEMS, INC.

By: _____
    Name:
    Title:

MMODAL CB INC.

By: _____
    Name:
    Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

MMODAL MQ INC.


By: _____
Name:
Title:

MMODAL SERVICES, LTD.


By: _____
Name:
Title:

MMODAL SYSTEMS & SERVICES INC.


By: _____
Name:
Title:

POIESIS INFORMATICS, INC.


By: _____
Name:
Title:

MMODAL IP LLC


By: _____
Name:
Title:

MEDQUIST CM LLC


By: _____
Name:
Title:

MULTIMODAL TECHNOLOGIES, LLC


By: _____
Name:
Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

ROYAL BANK OF CANADA, as Administrative Agent and a Lender

By: _____

     Name:
     Title:

**[SIGNATURE PAGE TO DEBTOR-IN-POSSESSION CREDIT AGREEMENT]**

[OTHER LENDERS]

**<u>EXHIBIT B</u>**

**Budget**

19145897

**M*Modal**
DIP Cash Flow Budget
*($ In Millions)*

| | 1 18-Apr | 2 25-Apr | Stub 30-Apr | 3 2-May | 4 9-May | 5 16-May | 6 23-May | 7 30-May | Stub 31-May | 8 6-Jun | 9 13-Jun | 10 20-Jun | 11 27-Jun | Stub 30-Jun | 12 4-Jul | 13 11-Jul | 14 18-Jul | 15 25-Jul | Stub 31-Jul | 16 1-Aug | 17 8-Aug | 18 15-Aug | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Collections:** | | | | | | | | | | | | | | | | | | | | | | | |
| Accounts Receivable | 6.0 | 5.4 | 5.6 | 1.4 | 7.0 | 5.5 | 7.1 | 7.5 | - | 7.2 | 7.2 | 6.6 | 5.6 | 2.0 | 3.8 | 6.3 | 6.3 | 6.3 | 5.1 | 1.3 | 6.3 | 6.3 | 115.7 |
| **Disbursements:** | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll & Related | (6.4) | (0.8) | - | (6.4) | (0.8) | (6.4) | (0.8) | (6.4) | - | (0.8) | (6.4) | (0.8) | (6.4) | - | (0.8) | (6.4) | (0.8) | (6.4) | - | (0.8) | (6.4) | (0.8) | (65.0) |
| Accounts Payable (including CapEx) | (1.3) | (1.3) | - | (1.3) | (1.3) | (1.3) | (1.3) | (1.3) | - | (1.3) | (1.3) | (1.3) | (1.3) | - | (1.3) | (1.3) | (1.3) | (1.3) | - | (1.3) | (1.3) | (1.3) | (22.6) |
| Services provided by Foreign Subsidaries | (0.0) | (0.4) | - | (0.3) | (3.0) | (0.0) | (0.0) | (0.6) | - | (3.0) | (0.0) | (0.0) | (0.6) | - | (3.0) | (0.0) | (0.0) | (0.4) | - | (0.3) | (3.0) | (0.0) | (14.8) |
| **Operating Cash Disb.** | (7.7) | (2.4) | - | (8.0) | (5.1) | (7.7) | (2.1) | (8.3) | - | (5.1) | (7.7) | (2.1) | (8.3) | - | (5.1) | (7.7) | (2.1) | (8.0) | - | (2.3) | (10.7) | (2.1) | (102.5) |
| **Cash Flow Before Other Disb.** | (1.7) | 3.0 | 5.6 | (6.6) | 1.9 | (2.3) | 5.0 | (0.8) | - | 2.2 | (0.5) | 4.5 | (2.7) | 2.0 | (1.3) | (1.4) | 4.3 | (1.7) | 5.1 | (1.1) | (4.4) | 4.2 | 13.3 |
| **Other** | | | | | | | | | | | | | | | | | | | | | | | |
| Restructuring Prof. Fees | - | - | (1.2) | - | - | - | - | - | (3.1) | - | - | - | - | (3.1) | - | - | - | - | (4.2) | - | - | - | (11.6) |
| UCC Committee Fees/Costs [a] | - | - | - | - | - | - | - | - | (0.1) | - | - | - | - | (0.1) | - | - | - | - | (0.1) | - | - | (0.2) | (0.5) |
| Adequate Protection Payments | - | - | - | - | - | (4.8) | - | - | - | - | (3.5) | - | - | - | - | - | (3.4) | - | - | - | (3.5) | - | (15.3) |
| DIP Fees | - | - | - | - | (1.4) | - | - | - | - | - | - | - | (0.1) | - | - | - | - | - | (0.1) | - | - | - | (1.7) |
| | - | - | (1.2) | - | (1.4) | (4.8) | - | - | (3.3) | - | (3.5) | - | - | (3.3) | - | - | (3.4) | - | (4.5) | - | - | (3.7) | (29.2) |
| **Net Cash Flow** | (1.7) | 3.0 | 4.4 | (6.6) | 0.5 | (7.1) | 5.0 | (0.8) | (3.3) | 2.2 | (4.1) | 4.5 | (2.7) | (1.3) | (1.3) | (1.4) | 0.8 | (1.7) | 0.6 | (1.1) | (4.4) | 0.5 | (15.9) |
| US - Beginning Cash Balance | 29.6 | 27.9 | 30.9 | 35.2 | 28.6 | 29.1 | 22.1 | 27.1 | 26.3 | 23.0 | 25.1 | 21.1 | 25.6 | 22.8 | 21.5 | 20.3 | 18.9 | 19.7 | 18.0 | 18.6 | 17.6 | 13.2 | 17.6 |
| US - Ending Cash Balance | 27.9 | 30.9 | 35.2 | 28.6 | 29.1 | 22.1 | 27.1 | 26.3 | 23.0 | 25.1 | 21.1 | 25.6 | 22.8 | 21.5 | 20.3 | 18.9 | 19.7 | 18.0 | 18.6 | 17.6 | 13.2 | 13.7 | 1.7 |
| REST OF WORLD - Beginning Cash Balance | 5.7 | 4.7 | 3.7 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 8.0 |
| Net Cash Flow / (Deficit) | (1.0) | (1.0) | (0.7) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | (5.0) |
| REST OF WORLD - Ending Cash Balance | 4.7 | 3.7 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 | 3.0 |
| CONSOLIDATED - Beginning Cash Balance | 35.3 | 32.5 | 34.5 | 38.2 | 31.6 | 32.1 | 25.0 | 30.0 | 29.2 | 26.0 | 28.1 | 24.0 | 28.5 | 25.8 | 24.5 | 23.2 | 21.9 | 22.7 | 21.0 | 21.6 | 20.5 | 16.2 | |
| CONSOLIDATED - Ending Cash Balance | 32.5 | 34.5 | 38.2 | 31.6 | 32.1 | 25.0 | 30.0 | 29.2 | 26.0 | 28.1 | 24.0 | 28.5 | 25.8 | 24.5 | 23.2 | 21.9 | 22.7 | 21.0 | 21.6 | 20.5 | 16.2 | 16.7 | |
| DIP Availability | - | - | - | - | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | 29.2 | |
| **Total Liquidity** | 32.5 | 34.5 | 38.2 | 31.6 | 61.3 | 54.2 | 59.2 | 58.4 | 55.1 | 57.3 | 53.2 | 57.7 | 54.9 | 53.6 | 52.4 | 51.0 | 51.8 | 50.1 | 50.8 | 49.7 | 45.3 | 45.8 | |

[a] Assumes total balance, including hold backs, to be paid on or around WE 8/15.

# EXHIBIT C

## Proposed Form of Final Order

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEGEND PARENT, INC., et al., | Case No. 14-10701 (RG) |
| Debtors. | Jointly Administered |

**FINAL ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION
FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,
(II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363
OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE
PREPETITION SECURED PARTIES PURSUANT TO SECTIONS 361, 362, 363 AND 364
OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY
CLAIMS, AND (V) MODIFYING AUTOMATIC STAY**

Upon the motion, dated April [        ], 2014 (the "**DIP Motion**"), of MModal, Inc. (the

"**Borrower**") and the other debtors and debtors-in-possession (collectively, with the Borrower,

the "**Debtors**"), in the above-referenced chapter 11 cases (the "**Cases**"), seeking entry of a final

order (this "**Final Order**") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l),

364(c)(2), 364(c)(3), 364(d)(l), 364(e), 507, and 552 of chapter 11 of title 11 of the United States

Code (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001, 6004, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules

of Bankruptcy of the United States Bankruptcy Court for the Southern District of New York (the

"**Local Rules**"), that, among other things:

(i)        authorizes the Borrower to obtain, and MModal Holdings, Inc. and its direct and

indirect domestic Debtor subsidiaries other than Borrower (collectively, the "**DIP Guarantors**")

to unconditionally guaranty, jointly and severally, the Borrower's obligations in respect of,

senior secured priming and superpriority postpetition financing, which consists of a dual draw

term loan facility in an aggregate principal amount not to exceed $30,000,000 (the "**DIP**

Facility") pursuant to the terms of (a) this Final Order, (b) that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement, dated as of May 7, 2014, in substantially the same form as attached to <u>Exhibit A</u> to the DIP Motion (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and this Final Order, the "**DIP Credit Agreement**"),[1] by and among the Borrower, the DIP Guarantors, Royal Bank of Canada (individually, "**RBC**"), as administrative agent and collateral agent (in such capacities, the "**DIP Agent**"), RBC and the other financial institutions party to the DIP Credit Agreement as "Lenders" under, and as defined in, the DIP Credit Agreement (collectively, the "**DIP Lenders**," and together with the DIP Agent and any other party to which DIP Obligations (as defined below) are owed, the "**DIP Secured Parties**"), and (c) any and all other Loan Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**");

(ii)    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents and this Final Order;

(iii)    grants (a) to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, Liens (as defined in the DIP Credit Agreement) on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, which Liens shall be senior to all Liens, including, without limitation, the Primed Liens (as defined below), except that such Liens shall be junior solely to any valid, enforceable and non-avoidable Liens that are (I) in existence on the Petition Date, (II) either perfected as of the Petition Date or perfected

---

[1]  Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given to such terms in the DIP Credit Agreement.  A copy of the DIP Credit Agreement without schedules or exhibits is attached hereto as <u>Exhibit B</u>.

subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, and (III) senior in priority to the Prepetition Liens (as defined below) after giving effect to any intercreditor or subordination agreement (all such Liens, collectively, the "**Prepetition Prior Liens**") and (b) to the DIP Agent, for the benefit of the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, except Avoidance Actions (as defined below);

(iv)    authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including, without limitation, Cash Collateral in which the Prepetition Secured Parties (as defined below) and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Final Order or otherwise, and provides the Prepetition Secured Parties (as defined below) the Prepetition Secured Parties' Adequate Protection (as defined below) as set forth herein;

(v)    vacates the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Final Order; and

(vi)    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Final Order.

Having considered the DIP Motion, the DIP Credit Agreement, the Declaration of Brandon Aebersold, a Managing Director with Lazard Freres & Co. LLC (the "**Aebersold Declaration**") in support of the DIP Motion and the Declaration of David Woodworth in Accordance With Local Rule 1007-2 In Support of First Day Motions, the Chief Financial

3

Officer of MModal Holdings, Inc. (the "**First Day Declaration**," and together with the Aebersold Declaration, the "**DIP Motion Declarations**"), and the evidence submitted or proferred at the hearing on this Final Order (the "**Final Hearing**"); and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014 and all applicable Local Rules, notice of the DIP Motion and the Final Hearing having been provided pursuant to Bankruptcy Rule 4001(b)(1)(C); an interim hearing on the use of cash collateral having been held and concluded on March 20, 2014; and the Court having entered an interim order authorizing the use of Cash Collateral (the "**Interim Cash Collateral Order**"); and it appearing that approval of the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' business; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter this Final Order consistent with the United States Constitution; and it appearing that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[2]

        A.        **Bankruptcy Cases**.  On March 20, 2014 (the "**Petition Date**"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of New York (this "**Court**").  The Debtors have continued in the management and operation of their businesses and properties as

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as appropriate, pursuant to Bankruptcy Rule 7052.

4

debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  A statutory

committee of unsecured creditors (the "**Committee**") was appointed on March 27, 2014.  No

trustee or examiner has been appointed in the Cases.  On April 2, 2014, the Debtors filed their

motion (the "**PSA Motion**") to assume the Plan Support Agreement dated April 1, 2014 (the

"**Plan Support Agreement**") by and among the Debtors, Prepetition Lenders signatory thereto

(the "**Consenting Lenders**"), and Consenting Noteholders (as defined therein, the "**Consenting**

**Noteholders**"), pursuant to which the parties thereto, among other things, agreed to support (i) a

restructuring of the Debtors through a plan of reorganization consistent with the terms and

conditions of the Restructuring Term Sheet, attached as an exhibit to the Plan Support

Agreement (the "**Reorganization Plan**") and (ii) the DIP Facility and entry of this Final Order.

The PSA Motion was heard, and the Court entered an order granting the relief requested therein,

on April [30], 2014.

        B.       **Jurisdiction and Venue**.  This Court has core jurisdiction over the Cases,

the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§

157(b)(2)(A), (D), (G), (K), and (O) and 1334.  Venue for the Cases and proceedings on the DIP

Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for

the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy

Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the applicable Local Rules.

        C.       **Notice**.  The Final Hearing is being held pursuant to the authorization of

Bankruptcy Rule 4001.  Notice of the Final Hearing and the relief requested in the DIP Motion

has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier or

hand delivery, to certain parties in interest, including: (i) the United States Trustee for Region 2

for the Southern District of New York, (ii) the Administrative Agent under the Credit Facility;

(iii) counsel to the Administrative Agent under the Credit Facility; (iv) the Trustee under the Indenture; (v) counsel to the Trustee under the Indenture; (vi) counsel to the holders of the majority of the Notes under the Indenture; (vii) counsel to the Committee; (viii) the Internal Revenue Service; (ix) the New York State Department of Taxation and Finance; (x) the New York State Department of Health; (xi) the Securities and Exchange Commission; (xii) the United States Attorney's Office; (xiii) the United States Attorney General; and (xiv) all parties who have filed a notice of appearance in these cases.  Under the circumstances, such notice of the DIP Motion, the relief requested therein and the Final Hearing complies with Bankruptcy Rule 4001(b), (c) and (d) and the applicable Local Rules, and no other notice need be provided for entry of this Final Order.

> D.    **<u>Debtors' Stipulations Regarding the Prepetition Secured Credit Facility</u>**.  Without prejudice to the rights of parties in interest solely to the extent set forth in Paragraph 6 below, the Debtors on their behalf and on behalf of their estates admit, stipulate, acknowledge, and agree as follows (the stipulations set forth in this Paragraph D shall be referred to herein as the "**Debtors' Stipulations**"):[3]

> (i)    <u>Prepetition First Lien Credit Facility</u>.  Pursuant to that certain Credit Agreement, dated as of August 17, 2012, (as amended, restated or otherwise modified from time to time prior to the Petition Date, the "**Prepetition Credit Agreement**," and collectively with any other agreements and documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition Loan Documents**"), among MModal Inc. (successor-in-interest to Legend Acquisition Sub, Inc.), as borrower,

---

[3] Capitalized terms used but not otherwise defined in this Paragraph D shall have the meanings ascribed to such terms in the Prepetition Credit Agreement.

6

Legend Parent, Inc., as guarantor ("**Holdings**"), and the other financial institutions party thereto as "Lenders" (collectively, the "**Prepetition Lenders**"), RBC, as administrative agent and collateral agent (in such capacities, the "**Prepetition Agent**"), Swing-Line Lender and L/C Issuer, and Merrill Lynch, Pierce Fenner & Smith Incorporated, as Syndication Agent, SunTrust Bank, and ING Capital LLC, as Documentation Agents (the Prepetition Agent, the Prepetition Lenders, the Swing-Line Lender, L/C Issuers, Syndication Agent, Documentation Agents and all other parties to which Prepetition Credit Obligations (as defined below) are owed, collectively, the "**Prepetition Secured Parties**"), the Prepetition Secured Parties agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition Credit Agreement and other Prepetition Loan Documents.   All obligations of the Debtors arising under the Prepetition Credit Agreement (including, without limitation, the "Obligations" as defined therein) and/or the other Prepetition Loan Documents shall collectively be referred to herein as the "**Prepetition Credit Obligations**."   Pursuant to the Prepetition Credit Agreement, Holdings agreed to unconditionally guaranty the Prepetition Credit Obligations (as amended, restated or otherwise modified prior to the Petition Date, the "**Holdings Prepetition Guaranty**").

          (ii)        <u>Prepetition Liens and Prepetition First Lien Collateral</u>.   Pursuant to the Collateral Documents (as defined in the Prepetition Credit Agreement) (as such documents are amended, restated, supplemented, or otherwise modified from time to time, the "**Prepetition First Lien Collateral Documents**"), by and among each of the Pledgors (as defined in the Prepetition First Lien Collateral Documents) party thereto and the Prepetition Agent, each Pledgor granted to the Prepetition Agent, for the benefit of itself and the Prepetition Secured Parties, to secure the Prepetition Credit Obligations, a first priority security interest in and continuing Lien (the "**Prepetition Liens**") on all of such Pledgor's assets and properties (which,

7

for the avoidance of doubt, include Cash Collateral) and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, except for equity pledges specifically excluded by the Prepetition First Lien Collateral Documents.  All "Collateral" (as defined in the Prepetition Credit Agreement) granted or pledged by such Pledgors to the Prepetition Agent or any other Prepetition Secured Party pursuant to or otherwise in connection with any Prepetition First Lien Collateral Document or any other Prepetition Loan Document shall collectively be referred to herein as the "**Prepetition First Lien Collateral**."  The Prepetition Liens (a) are valid, binding, enforceable, and perfected liens, (b) were granted to, or for the benefit of, the applicable Prepetition Secured Parties for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming expressly permitted herein), and (d) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve-Out (as defined below), and (C) the Prepetition Prior Liens.  The Prepetition Credit Obligations constitute legal, valid, and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Loan Documents and applicable law (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Credit Obligations exist, and no portion of the Prepetition Credit Obligations or any payments made to any or all of the Prepetition Secured Parties are subject to avoidance, recharacterization, recovery, subordination, attack, recoupment, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The Holdings Prepetition Guaranty shall continue in full force and effect to unconditionally guaranty

8

the Prepetition Credit Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the Debtors pursuant to the terms of this Final Order or the DIP Loan Documents.

(iii) <u>Amounts Owed under Prepetition Loan Documents</u>.  As of the Petition Date, the applicable Debtors owed the Prepetition Secured Parties, pursuant to the Prepetition Loan Documents, an aggregate principal amount of not less than $499,600,000 with respect to the Revolving Credit Facility and the Term B Borrowings (as defined in the Prepetition Credit Agreement), *plus* obligations in respect of letter of credit facilities, cash management and hedging arrangements, all accrued and hereafter accruing and unpaid interest thereon, and any additional fees and expenses (including any reasonable attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents), and other amounts now or hereafter due under the Prepetition Credit Agreement and the other Prepetition Loan Documents.

(iv) <u>Release of Claims</u>.  Subject solely to the reservation of rights set forth in Paragraph 6 below, each Debtor and its estate shall be deemed to have forever waived, discharged, and released each of the Prepetition Secured Parties and their respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives (all of the foregoing, collectively, the "**Prepetition Secured Party Releasees**") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, setoff, recoupment, and/or other offset rights against any and all of the Prepetition Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the Prepetition Credit Obligations, the Prepetition Liens, or

9

the debtor-creditor relationship between any of the Prepetition Secured Parties, on the one hand, and any of  the Debtors, on the other hand, including, without limitation, (I) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, or municipal law and (II) any right or basis or action to challenge or object to the amount, validity, or enforceability of the Prepetition Credit Obligations or any transfers made on account of the Prepetition Credit Obligations, or the extent, value, validity, enforceability, priority, or non-avoidability of the Prepetition Liens or the assets of the Debtors encumbered thereby.

E.  <u>**Findings Regarding the DIP Facility**</u>.

   (i)  <u>Need for Postpetition Financing</u>.  The Debtors need to obtain the DIP Facility and use Cash Collateral to, among other things, permit the orderly continuation of the operation of their businesses, to maintain business relationships, to make capital expenditures, to satisfy other working capital and operation needs, to comply with the Plan Support Agreement and to consummate the Reorganization Plan contemplated thereby, in each case in accordance with this Final Order and the DIP Loan Documents.  The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to consummate a restructuring of the Debtors through the Reorganization Plan and to otherwise preserve and maximize the enterprise value of the Debtors' estates.  Irreparable harm will be caused to the Debtors and their estates if the financing under the DIP Facility is not obtained and permission to use Cash Collateral is not granted, in each case in accordance with the terms of this Final Order and the DIP Loan Documents.

   (ii)  <u>No Credit Available on More Favorable Terms</u>.  As set forth in the

10

DIP Motion and in the DIP Motion Declarations in support thereof, the Debtors have determined, at the time hereof, that no acceptable financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents and this Final Order is available. Furthermore, the agreement among the parties under the Plan Support Agreement and the success of the Debtors in implementing the terms therein, is contingent on the Debtors' obtaining the DIP Facility.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit on terms acceptable to the Debtors allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code.  The Debtors are unable to obtain secured credit under section 364(d)(1) of the Bankruptcy Code without (a) granting to the DIP Secured Parties the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Loan Documents, including, without limitation, the DIP Liens and the DIP Superpriority Claim (each as defined below), (b) allowing the DIP Secured Parties to provide the loans and other financial accommodations under the DIP Facility on the terms set forth herein and in the DIP Loan Documents (all of the foregoing described in clauses (a) and (b) above, including, without limitation, the DIP Liens and the DIP Superpriority Claim, collectively, the "**DIP Protections**"), and (c) providing the Prepetition Secured Parties the adequate protection more fully described in Paragraph 4 below.

F.       **Adequate Protection for Prepetition Secured Parties**.  The Prepetition Secured Parties have negotiated in good faith regarding the Debtors' use of the Prepetition First Lien Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses.  The Prepetition Secured Parties have agreed to permit the Debtors to use the Prepetition First Lien Collateral, including the Cash Collateral,

11

subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code. In addition, the DIP Facility contemplated hereby provides for a priming of the Prepetition Liens pursuant to section 364(d) of the Bankruptcy Code. The Prepetition Secured Parties are entitled to the adequate protection as set forth herein, including, with respect to the Prepetition Secured Parties, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code. Based on the DIP Motion, the DIP Motion Declarations and on the record presented to the Court at the interim cash collateral hearing and the Final Hearing, the terms of the proposed adequate protection arrangements, use of the Cash Collateral, and the DIP Facility contemplated hereby are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for the consent of the Prepetition Secured Parties.

G.    **Section 552**.  Based on the subordination of the Prepetition Liens, First Lien Adequate Protection Liens and the First Lien Adequate Protection Superpriority Claim (as each term is defined herein) to the Carve-Out, the DIP Liens and DIP Superpriority Claim, each of the Prepetition Secured Parties is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply. For the avoidance of doubt, because the DIP Loan Documents are deemed entered into following the commencement of these Cases, section 552 of the Bankruptcy Code shall not be applicable to the DIP Secured Parties or DIP Protections.

H.    **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)    The DIP Secured Parties have indicated a willingness to provide postpetition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Final Order.

12

(ii)    The terms and conditions of the DIP Facility as set forth in the DIP

Loan Documents and this Final Order, and the fees, costs, expenses and other charges paid and

to be paid thereunder or otherwise in connection therewith, are fair, reasonable, and the best

available under the circumstances, and the Debtors' agreement to the terms and conditions of the

DIP Loan Documents and this Final Order, and to the payment of such fees, costs, expenses and

other charges reflects the Debtors' exercise of prudent business judgment consistent with their

fiduciary duties.  Such terms and conditions are supported by reasonably equivalent value and

fair consideration.

(iii)    The DIP Facility, the DIP Loan Documents and the Prepetition

Secured Parties' Adequate Protection (as defined below) were negotiated in good faith and at

arm's length among the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, and

the other parties to the Plan Support Agreement, with the assistance and counsel of their

respective advisors.  The DIP Secured Parties shall be deemed to have extended the DIP

Obligations to the Debtors and consented to the use of DIP Collateral (including Cash Collateral)

and the priming of the DIP Protections by the Carve-Out, and the Prepetition Secured Parties did

not object and thus shall be deemed to have consented to use of Prepetition First Lien Collateral

(including Cash Collateral) and the priming of the Prepetition Liens, the First Lien Adequate

Protection Liens and the First Lien Adequate Protection Superpriority Claim by the Carve-Out,

the DIP Liens and the DIP Superpriority Claim, in each case for valid business purposes, in good

faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon

the protections offered by section 364(e) of the Bankruptcy Code or this Final Order.

Accordingly, all of the Prepetition Secured Parties' Adequate Protection (as defined below) and

the DIP Liens, the DIP Superpriority Claim (as defined below) and the other DIP Protections

13

shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and this Final Order in the event this Final Order or any other order or any provision hereof or thereof is vacated, reversed, amended, or modified, on appeal or otherwise.

I. **Relief Essential; Best Interest**. For the reasons stated above, the Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2), and the Local Rules. Absent granting the relief set forth in this Final Order, the Debtors' estates and their ability to successfully consummate the Reorganization Plan and otherwise preserve and maximize the enterprise value of the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Facility and authorization of the use of Cash Collateral in accordance with this Final Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates and consistent with their fiduciary duties.

**NOW, THEREFORE**, on the DIP Motion and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition Agent (on behalf of the Prepetition Secured Parties), the DIP Agent (on behalf of the DIP Secured Parties) and the other parties to the Plan Support Agreement to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1. **Motion Granted**. The DIP Motion is hereby granted in accordance with the terms and conditions set forth in this Final Order and the DIP Loan Documents. Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, are hereby denied and overruled. Any authorization to use Cash Collateral pursuant to the Interim Cash Collateral Order is hereby terminated and superseded by the terms and conditions of this Final Order and the other DIP Loan Documents.

14

2.      **DIP Loan Documents and DIP Protections**.

(a)      <u>Approval of DIP Loan Documents</u>.   The Debtors are expressly and immediately authorized to establish the DIP Facility, to execute, deliver, and perform under the DIP Loan Documents and this Final Order, to incur the DIP Obligations (as defined below) in accordance with, and subject to, the terms of this Final Order and the DIP Loan Documents, and to execute, deliver, and perform under all other instruments, certificates, agreements, and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and the creation and perfection of the DIP Liens described in, and provided for, by this Final Order and the DIP Loan Documents.   The Debtors are hereby authorized and empowered to do and perform all acts and pay the principal, interest, fees, costs, expenses, and other amounts described in the DIP Loan Documents and/or this Final Order as such become due and payable pursuant to the DIP Loan Documents and this Final Order, including, without limitation, all closing fees, administrative fees, commitment fees, "backstop fees," and reasonable attorneys', financial advisors', and accountants' fees, and disbursements arising under the DIP Loan Documents and this Final Order, which amounts shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect.   Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the applicable Debtors enforceable against such Debtors in accordance with their terms.   Each officer of a Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of such officer's respective authority to act in the name of and on behalf of such Debtor.

15

(b)    <u>DIP Obligations</u>.    For purposes of this Final Order, the term "**DIP Obligations**" shall mean all amounts and other obligations and liabilities owing by the respective Debtors under the DIP Credit Agreement and other DIP Loan Documents (including, without limitation, all "Obligations" as defined in the DIP Credit Agreement) and shall include, without limitation, the principal, interest, fees, costs, expenses, and other charges arising thereunder (including, without limitation, any reasonable attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Loan Documents and/or this Final Order), and any obligations in respect of indemnity claims, whether contingent or otherwise.    All outstanding letters of credit under the Prepetition Agreement shall be deemed to have been issued under the DIP Facility and all draws made, and all amounts, fees and expenses due, with respect to such letters of credit shall, for the avoidance of doubt, constitute DIP Obligations.

(c)    <u>Authorization to Incur DIP Obligations</u>.    To enable the Debtors to continue to operate their business and preserve and maximize the value of their estates as they diligently pursue the Reorganization Plan, during the period from the entry of this Final Order through the earliest to occur of (such ending date, the "**Termination Date**"): (a) August 28, 2014, subject to extension by up to an additional 60 days with the prior written consent of the DIP Agent and DIP Lenders constituting "Required Lenders" under the DIP Credit Agreement ("**Required DIP Lenders**"); (b) the effective date of the Reorganization Plan; (c) the occurrence of the Termination Declaration Date (as defined herein); (d) the date on which a sale of all or substantially all of the Debtors' assets is consummated; and (e) the date on which the DIP Obligations shall have been Paid in Full, and subject to the terms and conditions of this Final Order and the DIP Loan Documents, including, without limitation, the Budget Covenants as

16

defined and contained in Paragraph 2(e) below, the Borrower is hereby authorized to use Cash Collateral and borrow under the DIP Facility in two separate drawings of up to $15,000,000 each, up to an aggregate outstanding principal amount for all such borrowings not to exceed $30,000,000.

(d)    Budget.    Attached hereto as <u>Exhibit A</u> is a weekly cash flow budget covering the stated term of the DIP Facility (the "**Initial Approved Budget**") prepared by the Debtors and approved by the DIP Agent, Pre-Petition Agent, and the Required Consenting Holders (as defined in the Plan Support Agreement) or their financial advisors (the "**Budget Approval Parties**"), which reflects on a line-item basis the Debtors' (i) weekly projected cash receipts, (ii) weekly projected disbursements (including ordinary course operating expenses and capital expenditures, bankruptcy-related expenses under the Cases, fees and expenses of the DIP Agent, DIP Lenders, Pre-Petition Agent, Prepetition Lenders and the Consenting Noteholders (including counsel, financial advisors and other professionals therefor) and any other fees and expenses relating to the DIP Facility), (iii) unrestricted cash on hand of the Debtors, and (iv) the weekly outstanding principal balance of the loans made under the DIP Facility.  On June 10, 2014 and seven (7) Business Days following each month's end thereafter, the Debtors shall prepare and deliver to the Budget Approval Parties an updated "rolling" 13 week budget, which shall also include adjustments to the immediately preceding four weeks (based on the Approved Budget (as defined below) then in effect) to the extent that any specifically identified amount included in such Approved Budget (as defined below) that was not actually disbursed during a particular week is carried forward into the updated "rolling" 13 week budget (each, a "**Carried Forward Unused Disbursement**").  For the avoidance of doubt, the Debtors shall be permitted to remove from forecasted weeks in the "rolling" 13 week budget any specifically identified

17

receipts that were projected to be collected in those weeks, but were actually collected prior to the projected period; provided, however, that the Debtors shall provide the rationale for such adjustments.  Once such "rolling" 13-week budget is approved in writing (email shall be sufficient to constitute written approval) by each of the Budget Approval Parties in their respective sole discretion, such "rolling" 13-week budget shall supplement and replace the Approved Budget or Supplemental Approved Budget, as applicable, then in effect (each such updated budget that has been approved in writing by each of the Budget Approval Parties, a "**Supplemental Approved Budget**") without further notice, motion, or application to, order of, or hearing before, this Court; provided, however, that the Budget Approval Parties shall each have five (5) Business Days to approve each updated "rolling budget" (any such party that fails to timely provide the Debtors and each of the other aforementioned parties written notice of any objection to such updated "rolling budget" shall be deemed to have approved such updated "rolling budget").  Unless and until each of the Budget Approval Parties have approved (or be deemed to have approved as provided above) such updated budget, the Debtors shall still be subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect in accordance with this Final Order, and the DIP Agent, the other DIP Secured Parties, and the Prepetition Secured Parties shall, as applicable, have no obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto, as applicable; provided, however, the Budget Approval Parties shall not have the right to withhold their respective approval of any updated "rolling budget" solely because any Carried Forward Unused Disbursement or carry forward receipts variance are moved from one week in the Approved Budget then in effect to another week in such updated

18

"rolling budget."  The Initial Approved Budget or any Supplemental Approved Budget in effect on a particular date shall constitute the "**Approved Budget**" in effect on such particular date.

(e)      Variance Reports. On Wednesday of each week beginning with the first full week following the date on which this Final Order is entered by the Court, (the "**Final Order Entry Date**"), the Debtors shall prepare and deliver simultaneously to the DIP Agent, the Prepetition Agent and the financial advisors a variance report/reconciliation report certified by the Chief Financial Officer of the Debtors (each such report, a "**Variance Report**") setting forth: (i) the actual cash receipts, disbursements, and outstanding loan balance of the Debtors on a line item basis for such immediately preceding calendar week and on a cumulative basis for the four-week period through and including the Friday immediately preceding the applicable delivery date of such Variance Report (each, an "**Applicable Period;**" provided, that, the Applicable Period corresponding to the first testing date shall include the immediately preceding four weeks notwithstanding that certain of such weeks occurred prior to the Final Order Entry Date), and (ii) the variance in dollar amounts of such actual receipts, disbursements, and outstanding loan balance for the immediately preceding calendar week and the Applicable Period from the corresponding budgeted amounts for such week and the Applicable Period, respectively, reflected in the Approved Budget, together with a reasonably detailed explanation for each such variance.   Notwithstanding anything to the contrary in this Final Order, the reasonable professional fees, costs and expenses of the advisors of the DIP Agent, Prepetition Agent, Prepetition Lenders (to the extent provided herein) and the Consenting Noteholders shall be due, payable and paid in accordance with the terms of this Final Order notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget and such amounts shall not be subject to the Budget Covenant set forth below.   The Debtors shall provide the

19

reporting set forth in this Paragraph and other financial reporting required under the DIP Loan Documents to lead counsel to the Consenting Noteholders and the Committee.

(f)        Budget Covenants.  The Debtors shall operate their businesses, and only expend advances under the DIP Facility and Cash Collateral and other DIP Collateral proceeds in accordance with the specific purposes, and at the specific time periods, set forth in the Approved Budget (excluding the fees, costs and expenses of the DIP Agent, Prepetition Agent, Prepetition Lenders, Consenting Noteholders and their respective advisors, which shall be paid in accordance with the DIP Loan Documents and this Final Order notwithstanding anything to the contrary in the Approved Budget), subject to the following permitted variances, each of which shall be tested on a weekly basis commencing with the Wednesday after the first full week following the Final Order Entry Date: (i) the sum of the Debtors' actual cash receipts for the Applicable Period shall not be less than 90% of the projected "Accounts Receivable" for the Applicable Period as set forth in the Approved Budget; and (ii) the sum of the Debtors' actual "operating cash disbursements" (calculated in the same manner as the "Operating Cash Disbursements" in the Approved Budget) shall not exceed 110% of the projected "Operating Cash Disbursements" for the Applicable Period as set forth in the Approved Budget (collectively the variances described in (i) and (ii) hereunder, the "**Permitted Variance**").  The foregoing budget-related covenants are collectively referred to herein as the "**Budget Covenants**."  The DIP Agent and the Prepetition Agent may, in their discretion, provide copies of the Approved Budget and the Variance Reports referenced herein to the DIP Lenders and the Prepetition Lenders.

(g)        Interest, Fees, Costs and Expenses.  The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with

20

the terms and conditions of, this Final Order and the DIP Loan Documents, in each case without further notice, motion, or application to, order of, or hearing before, this Court.  The Debtors shall pay on demand all fees, costs, expenses (including, subject to the notice procedures in Paragraph 22(b) hereof) reasonable out-of-pocket legal, financial advisor and other professional fees and expenses of the DIP Agent) and other charges payable under the terms of the DIP Loan Documents.  All such fees, costs, expenses and disbursements, whether incurred, paid or required to be paid prepetition or post-petition, are hereby affirmed, ratified, authorized and payable (and any funds held by the DIP Agent and/or its professionals as of the Petition Date for payment of such fees, costs, expenses and disbursements may be applied for payment) as contemplated in this Final Order and the DIP Loan Documents filed with the Court, and shall be non-refundable and not subject to challenge in any respect.

(h)    Use of DIP Facility and Proceeds of DIP Collateral.  The DIP Borrowers shall apply the proceeds of all DIP Collateral (as defined below) solely in accordance with this Final Order and the applicable provisions of the DIP Loan Documents.  Without limiting the foregoing, the Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the effective date of a confirmed chapter 11 plan or plans with respect to any of the Debtors, except with respect to (a) the Prepetition Secured Obligations as set forth in this Final Order; (b) as provided in any motions, orders, and requests for relief (including any "first day orders" or "second day orders") that are (i) consistent with the Approved Budget or (ii) approved in advance by the DIP Agent and Prepetition Agent; or (c) as otherwise permitted by the DIP Credit Agreement.

(i)    Conditions Precedent.  The DIP Secured Parties and Prepetition Secured Parties each have no obligation to extend credit under the DIP Facility or permit use of any DIP

21

Collateral proceeds, including Cash Collateral (except to the extent permitted pursuant to the

Interim Cash Collateral Order), as applicable, unless and until all conditions precedent to the

extension of credit and/or use of DIP Collateral or proceeds thereof under the DIP Loan

Documents and this Final Order have been satisfied in full or waived by the requisite DIP

Secured Parties and requisite Prepetition Secured Parties in accordance with the DIP Loan

Documents or Prepetition Credit Agreement, as applicable, and this Final Order.

(j)    DIP Liens.  As security for the DIP Obligations, the security interests and

liens described in subparagraphs (I) through (III) below (all such Liens granted to the DIP Agent

for the benefit of all the DIP Secured Parties pursuant to this Final Order and the DIP Loan

Documents, the "**DIP Liens**"), are hereby granted to the DIP Agent, for its own benefit and the

ratable benefit of the DIP Secured Parties, on all property of the Debtors, now existing or

hereinafter acquired (whether prepetition or postpetition), including, without limitation, all cash

and cash equivalents (whether maintained with the DIP Agent or otherwise) and any investment

in such cash or cash equivalents, money, inventory, goods, accounts receivable, contract rights,

other rights to payment, intercompany loans and other investments, investment property,

contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment

intangibles, accounts, deposit accounts, documents, instruments, chattel paper, securities

(whether or not marketable), franchise rights, documents of title, letters of credit, letter of credit

rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures,

patents, copyrights, trademarks, trade names, other intellectual property, intellectual property

licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort

claims, all other Collateral (as defined in the DIP Loan Documents), and all other "property of

the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or

22

personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all

rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds

of all of the foregoing, excluding causes of action of the Debtors or their estates under sections

502(d), 544, 545, and 547-550 of the Bankruptcy Code and any other avoidance or similar action

under the Bankruptcy Code or similar state or municipal law (collectively, the "**Avoidance**

**Actions**") and proceeds thereof; provided, however, that the DIP Liens on the equity interests of

the Debtors and their direct or indirect subsidiaries shall consist of (A) 100% of the equity

interests of Holdings and each direct and indirect domestic Debtor subsidiary thereof, (B) 100%

of the non-voting equity interests of each direct or indirect foreign subsidiary of any Debtor; and

(C) 65% of the voting equity interests of each foreign subsidiary directly owned by any Debtor

(all assets described in this subsection (i), collectively, the "**DIP Collateral**"):

> (I)      pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable first priority Lien on all unencumbered DIP Collateral;
>
> (II)     pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, and non-avoidable junior Lien upon all DIP Collateral that is subject solely to the Prepetition Prior Liens (other than the Primed Liens (as defined below)); and
>
> (III)    pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming lien on all DIP Collateral (including, without limitation, Cash Collateral), which DIP Lien shall be senior to the Adequate Protection Replacement Liens (as defined below) and senior and priming to (x) the Prepetition Liens and (y) any Liens that are junior to, or pari passu with, the Prepetition Liens and the Adequate Protection Replacement Liens, after giving effect to any intercreditor or subordination agreements (the liens referenced in clauses (x) and (y), collectively, the "**Primed Liens**"); provided, however, that the liens described in these subsections (I)-(III) shall be junior solely to the Carve-Out and the Prepetition Prior Liens.
>
> (k)      DIP Lien Priority.  Notwithstanding anything to the contrary contained in

this Final Order or the DIP Loan Documents, for the avoidance of doubt, the DIP Liens granted

to the DIP Agent for the ratable benefit of the DIP Secured Parties shall in each and every case

be first priority senior liens that (i) are subject only to the Prepetition Prior Liens, and to the

extent provided in this Final Order and the DIP Loan Documents, shall also be subject to the

Carve-Out, and (ii) except as provided in the immediately preceding sub-clause (i), are senior to

all prepetition and postpetition liens of any other person or entity (including, without limitation,

the Primed Liens and the Adequate Protection Replacement Liens).  The DIP Liens and the DIP

Superpriority Claim (as defined below): (A) shall not be subject to sections 506, 510, 549, 550,

or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the

Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided

and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy

Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (C)

shall be valid and enforceable against any trustee or any other estate representative appointed or

elected in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the

Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor**

**Case**"), and/or upon the dismissal of any of the Cases.

(l)    <u>Enforceable Obligations</u>.  The DIP Loan Documents shall constitute and

evidence the DIP Obligations, which DIP Obligations shall be valid, binding and enforceable

against the Debtors, their estates and any successors thereto (including, without limitation, any

trustee or other estate representative in any Successor Case), and their creditors and other parties-

in-interest, in accordance with their terms.  No obligation, payment, transfer, or grant of security

under the Interim Cash Collateral Order, DIP Credit Agreement, the other DIP Loan Documents,

or this Final Order shall be stayed, restrained, voidable, avoidable, or recoverable under the

Bankruptcy Code or under any applicable law (including, without limitation, under sections

24

502(d), 544, 547-550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent

Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject

to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination

(whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other

challenge under the Bankruptcy Code or any applicable law or regulation by any person or

entity.

(m)     Superpriority Administrative Claim Status.  In addition to the DIP Liens

granted herein, effective immediately upon entry of this Final Order, all of the DIP Obligations

shall constitute allowed a superpriority administrative claim of the DIP Agent, for the benefit of

the DIP Secured Parties, pursuant to section 364(c)(1) of the Bankruptcy Code, which claim shall

have priority, subject only to the payment of the Carve-Out in accordance with this Final Order,

over all administrative expense claims, adequate protection and other diminution claims

(including the First Lien Adequate Protection Superpriority Claim (as defined below)),

unsecured claims, and all other claims against the Debtors, now existing or hereafter arising, of

any kind or nature whatsoever, including, without limitation, administrative expenses or other

claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a),

503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the

Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment

lien or other non-consensual lien, levy, or attachment (the "**DIP Superpriority Claim**").  The

DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be

considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall

be against each Debtor on a joint and several basis, and shall be payable from and have recourse

to all prepetition and postpetition property of the Debtors and all proceeds thereof, excluding

25

proceeds of the Avoidance Actions.    Other than as expressly provided in the DIP Credit

Agreement and/or this Final Order with respect to the Carve-Out, no costs or expenses of

administration, including, without limitation, professional fees allowed and payable under

sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be

incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be,

senior to, prior to, or on a parity with the DIP Superpriority Claim or the DIP Obligations, or

with any other claims of the DIP Secured Parties arising under the DIP Loan Documents and/or

this Final Order.

3.        **Authorization to Use Cash Collateral and Proceeds of the DIP Facility**.

Subject to, and solely in accordance with, the terms and conditions of this Final Order and the

DIP Loan Documents, including, without limitation, the Budget Covenants set forth in Paragraph

2(e) hereof, (a) the Debtors are authorized to use proceeds of credit extended under the DIP

Facility from and after the Closing Date, and (b) the Debtors are authorized to use Cash

Collateral. Without limiting the foregoing, the terms and protections of the Interim Cash

Collateral Order are hereby ratified and confirmed, except to the extent amended or modified by

this Final Order, and all payments made and protections provided thereunder for any party,

including creditors of the Debtors, are ratified and confirmed and shall be deemed made or

provided in accordance with this Final Order.

4.        **Adequate Protection for Prepetition Secured Parties**.  In consideration for the

use of the Prepetition First Lien Collateral (including Cash Collateral) and the priming of the

Prepetition Liens, the Prepetition Agent, for the benefit of the Prepetition Secured Parties, shall

receive the following adequate protection (collectively referred to as the "**Prepetition Secured**

**Parties' Adequate Protection**"):

26

(a)    <u>First Lien Adequate Protection Liens</u>.  To the extent there is a diminution in value of the interests of the Prepetition Secured Parties in the Prepetition First Lien Collateral (including Cash Collateral) from and after the Petition Date resulting from the use, sale, or lease by the Debtors of the Prepetition First Lien Collateral (including Cash Collateral), the granting of the DIP Superpriority Claim, the granting of the DIP Liens, the subordination of the Prepetition Liens thereto and to the Carve-Out, the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code or otherwise ("**Diminution in Prepetition First Lien Collateral Value**"), the Prepetition Agent, for the benefit of all the Prepetition Secured Parties, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, Liens upon all of the DIP Collateral (such adequate protection replacement liens, the "**First Lien Adequate Protection Liens**"), which First Lien Adequate Protection Liens on the DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Prior Liens, and the Carve-Out, and shall be senior in priority to all other liens, including the Prepetition Liens and the Primed Liens.  The First Lien Adequate Protection Liens and the First Lien Adequate Protection Superpriority Claim (as defined below) (A) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall be senior in priority and right of payment to (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any intercompany or affiliate liens or claims of the Debtors, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed in the Cases or any Successor Cases, and/or upon the dismissal of any of the Cases.

27

(b)    <u>First Lien Adequate Protection Superpriority Claim</u>.    To the extent of

Diminution in Value of the Prepetition First Lien Collateral, the Prepetition Agent, for the

benefit of the Prepetition Secured Parties, is hereby further granted an allowed superpriority

administrative claim (such adequate protection superpriority claim, the "**First Lien Adequate**

**Protection Superpriority Claim**"), pursuant to section 507(b) of the Bankruptcy Code, with

priority over all administrative expense claims and unsecured claims against the Debtors and

their estates, now existing or hereafter arising, of any kind or nature whatsoever, including,

without limitation, administrative expenses of the kind specified in or ordered pursuant to

sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to

the extent permitted by law), 1113, and 1114 and any other provision of the Bankruptcy Code,

junior only to the DIP Superpriority Claim and the Carve-Out, and payable from and having

recourse to all prepetition and postpetition property of the Debtors and all proceeds thereof,

excluding proceeds of Avoidance Actions; <u>provided</u>, <u>however</u>, that the Prepetition Secured

Parties shall not receive or retain any payments, property, or other amounts in respect of the First

Lien Adequate Protection Superpriority Claim unless and until all DIP Obligations have been

Paid in Full (as defined below).    Subject to the relative priorities set forth above, the First Lien

Adequate Protection Superpriority Claim shall be against each Debtor on a joint and several

basis.    For purposes of this Final Order, the terms "**Paid in Full**" and "**Payment in Full**" shall

mean, with respect to any referenced DIP Obligations and/or Prepetition Credit Obligations, (i)

the indefeasible payment in full in cash of such obligations, (ii) the termination of all credit

commitments under the DIP Loan Documents and/or Prepetition Loan Documents, as applicable,

(iii) the termination or full cash collateralization of any letters of credit in accordance with the

28

DIP Credit Agreement and/or Prepetition Credit Agreement, as applicable, and (iv) the absence

of any contingent indemnification claim arising from any pending or potential Challenge.

(c)     Further Adequate Protection.  As further Adequate Protection, the Debtors

have committed, as set forth in this Final Order, to use commercially reasonable efforts to timely

comply with the Plan Milestones.

(d)     Interest and Professional Fees.    As further adequate protection, and

without limiting any rights of the Prepetition Agent and the other Prepetition Secured Parties

under section 506(b) of the Bankruptcy Code which are hereby preserved, and in consideration,

and as a requirement, for obtaining the consent of the Prepetition Agent (on behalf of the

Prepetition Secured Parties) to the entry of this Final Order and the Debtors' consensual use of

Cash Collateral as provided herein, the Debtors shall (i) pay or reimburse in cash all fees, costs,

expenses, and charges of the respective professionals retained by or for the benefit of the Pre-

Petition Agent and the respective Consenting Lenders in accordance with the procedures set

forth in Paragraph 22(b) hereof; provided that the Debtors' obligation to pay the fees, costs,

expenses, and charges of professionals of the respective Consenting Lenders (other than

professionals retained by or for the benefit of the Pre-Petition Agent) incurred on or after the

Petition Date shall not exceed $25,000 in the aggregate for each such Consenting Lender, (ii) on

the Final Order Entry Date, pay interest accrued from the Petition Date through March 31, 2014

at the non-default rate, and (iii) on April 30, 2014, and on the last day of each subsequent

calendar month, pay in cash to the Prepetition Agent for prompt distribution to the applicable

Prepetition Secured Parties all of the interest accruing on the Prepetition Credit Obligations

under the Prepetition Credit Agreement from and after the Petition Date at the non-default rate(s)

set forth therein, in the case of each of sub-clauses (i) through (iii) above, all whether accrued

CH\1784396.21

prepetition or postpetition and whether or not budgeted in the Approved Budget, and without further notice (except as provided in Paragraph 22(b) below with respect to postpetition professional fees, costs, and expenses), motion, or application to, order of, or hearing before, this Court; provided further that any payments of interest to the Prepetition Agent and other Prepetition Secured Parties hereunder shall be reapplied to reduce the principal amount of the Prepetition Credit Obligations to the extent the Prepetition Agent and the other Prepetition Secured Parties are deemed by a final non-appealable order of a court of competent jurisdiction not entitled to such payment under Section 506(b) of the Bankruptcy Code or otherwise.

(e)    Consent to Priming and Adequate Protection. The Prepetition Agent, on behalf of the Prepetition Secured Parties, consents to the Prepetition Secured Parties' Adequate Protection and the priming provided for herein; provided, however, that such consent of the Prepetition Agent to the priming of the Prepetition Liens, the use of Cash Collateral, and the sufficiency of the Prepetition Secured Parties' Adequate Protection provided for herein is expressly conditioned upon the entry of this Final Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Loan Documents; and provided, further, that such consent shall be of no force and effect in the event this Final Order is not entered or is entered and subsequently reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition Agent) or the DIP Loan Documents and DIP Facility as set forth herein are not approved.

(f)    Right to Seek Additional Adequate Protection. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is

30

reasonable and sufficient to protect the interests of the Prepetition Secured Parties. However, the Prepetition Agent, on behalf of the Prepetition Secured Parties, may request Court approval for additional or alternative adequate protection, without prejudice to any objection of the Debtors or any other party in interest to the grant of any requested or proposed additional or alternative adequate protection; provided that any such additional or alternative adequate protection approved by the Court shall at all times be subordinate and junior to the claims and Liens of the DIP Secured Parties granted under this Final Order and the DIP Loan Documents.

5.      **Automatic Postpetition Lien Perfection.**  This Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, non-avoidability and priority of the DIP Liens and the First Lien Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, control agreement, or other instrument or document which may otherwise be required under the law of any jurisdiction or (b) taking any other action to validate or perfect the DIP Liens and the First Lien Adequate Protection Liens or to entitle the DIP Liens and the First Lien Adequate Protection Liens to the priorities and other treatment granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Agent (in the latter case, solely with respect to the First Lien Adequate Protection Liens) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time and on the date of this Final Order.  The applicable Debtors shall execute and deliver to the DIP Agent and/or the Prepetition Agent, as applicable, all such financing statements, mortgages, notices,

31

and other documents as such parties may reasonably request to evidence and confirm the contemplated priority of, the DIP Liens and the First Lien Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, each of the DIP Agent and the Prepetition Agent may in its discretion, file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order.  To the fullest extent permitted by applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Final Order or in favor of the Prepetition Secured Parties in accordance with this Final Order.  To the extent that the Prepetition Agent is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee under any of the Debtors' insurance policies, or is the secured party under any of the Prepetition Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee under the Debtors' insurance policies, and the secured party

32

under each such Prepetition Loan Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement), and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and second, subsequent to Payment in Full of all DIP Obligations, for the benefit of the Prepetition Secured Parties.  Without in any way limiting the automatic perfection of the DIP Liens and First Lien Adequate Protection Liens hereunder, the Prepetition Agent shall serve as agent for the DIP Agent for purposes of perfecting its respective DIP Liens on all DIP Collateral that is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party.

6.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**.  (a)    The Debtors' Stipulations shall be binding upon the Debtors and their estates in all circumstances upon entry of this Final Order.  The Debtors' Stipulations shall be binding upon each other party in interest, including the Committee, unless any such other party in interest first commences a Challenge (as defined below) within sixty (60) calendar days from entry of this Final Order (as the same may be extended with the written consent of the Prepetition Agent in its sole discretion, the "**Challenge Period**," and the date that is (i) with respect to parties who have not properly raised a Challenge, the next calendar day after such sixty (60) calendar day period, or (ii) with respect only to those parties who seek and successfully obtain standing and who properly file a Challenge (as defined below) during the Challenge Period, the date such Challenge is fully and finally adjudicated or otherwise consensually resolved, shall be referred to as the "**Challenge Period Termination Date**"), and second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge.  If a Chapter 7 trustee or a Chapter 11 trustee is appointed during the Challenge Period, the Challenge Period Termination

33

Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) days after the date on which such trustee is appointed.

(b)      For purposes of this Final Order, "**Challenge**" shall mean (i) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations and/or any other matter relating to the extent, value, validity, enforceability, priority or avoidability of the respective Prepetition Credit Obligations and/or the Prepetition Liens or the property of the Debtors encumbered thereby, or (ii) a contested matter, adversary proceeding, or other action against any or all of the Prepetition Secured Parties in connection with or related to the Prepetition Credit Obligations (including any "for cause" challenge to the rights of the Prepetition Secured Parties to credit bid under Section 363(k) of the Bankruptcy Code), or the actions or inactions of any of the Prepetition Secured Parties arising out of or related to the Prepetition Credit Obligations or otherwise, including, without limitation, any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Prepetition Credit Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Secured Parties).

(c)      Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Cases and any Successor Cases, (i) all payments made to or for the benefit of the Prepetition Secured Parties pursuant to, or otherwise authorized by, the Interim Cash Collateral Order, this Final Order or otherwise (whether made prior to, on, or after the Petition Date) (in all cases except those payments which are expressly not subject to any Challenge pursuant to the Interim Cash Collateral Order or this

34

Final Order) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred; (iii) the Prepetition Credit Obligations shall be deemed to be a fully allowed secured claim within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations, including the release provisions therein, shall be binding on all parties in interest, including the Committee.  Notwithstanding the foregoing, to the extent any Challenge is timely asserted in any such adversary proceeding, contested matter or other action or proceeding in accordance with this Final Order, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on the Committee and on any other party in interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly and successfully challenged in such adversary proceeding, contested matter, or other action.

(d)     Notwithstanding any provision to the contrary herein, nothing in this Final Order shall be construed to grant standing on any party in interest, including the Committee, to bring any Challenge on behalf of the Debtors' estates.  The failure of any party in interest, including the Committee, to obtain an order of this Court prior to the expiration or termination of the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this Paragraph 6.

7.     **Carve-Out**.  Subject to the terms and conditions contained in this Paragraph 7, each of the DIP Liens, the DIP Superpriority Claim, the Prepetition Liens, the First Lien

Adequate Protection Liens, and the First Lien Adequate Protection Superpriority Claim shall be subject and subordinate to payment of the Carve-Out (as defined below) in accordance with the terms of this Final Order:

(a)     Carve-Out.  For purposes of this Final Order, "Carve-Out" means (i) all unpaid fees required to be paid in these Cases to the clerk of the Bankruptcy Court and to the office of the United States Trustee under 28 U.S.C. § 1930(a), plus interest, if any, pursuant to 31 U.S.C. § 3717; (ii) subject to the terms and conditions of this Final Order, the amount of actual accrued but unpaid expenditures for reasonable fees, costs, and disbursements of professionals retained by the Debtors in these Cases (other than ordinary course professionals) (collectively, the "**Debtors' Professionals**" and such expenditures and disbursements, the "**Debtor Professional Fees**") incurred from and after the Petition Date and up to and including the delivery of a Carve-Out Trigger Notice (as defined below) in accordance with the terms set forth in the Final Order and in the DIP Loan Documents that are ultimately allowed by final order of the Bankruptcy Court (whether such Debtor Professional Fees are allowed before or after the delivery of the Carve-Out Trigger Notice); (iii) subject to the terms and conditions of this Final Order and the Approved Budget, the amount of actual accrued, but unpaid expenditures for reasonable fees, costs, and disbursements of the professionals (the "**Committee's Professionals**") retained by the Committee in these Cases and the reasonable out of pocket expenses of the Committee members (all such fees, costs and expenses of Committee's Professionals and Committee Members, the "**Committee Professional Fees**") incurred from and after appointment of the Committee and up to and including the delivery by the DIP Agent of a Carve-Out Trigger Notice that are ultimately allowed by final order of the Court (whether such Committee Professional Fees are allowed before or after the delivery of the Carve-Out Trigger

36

Notice); *provided,* that such Committee Professional Fees shall not exceed the amounts budgeted therefore in the Approved Budget for the postpetition period ending on the date the Carve-Out Trigger Notice is delivered; (iv) all allowed and unpaid Debtor Professional Fees and Committee Professional Fees that are incurred from and after the delivery of the Carve-Out Trigger Notice in an aggregate amount not in excess of $2,500,000 (inclusive of any unapplied retainers held by such professionals); (v) all operating expenses incurred by the Debtors in accordance with the Approved Budget before delivery of a Carve-Out Trigger Notice but unpaid by the Debtors as of the delivery of such Carve-Out Trigger and allowable under 11 U.S.C. § 503(b)(1)(a); (vi) all reasonable fees and expenses incurred by a trustee under 11 U.S.C. § 726(b) not to exceed $75,000, (clauses (ii), (iii), and (iv), collectively, the "**Carve-Out Cap**").  The term "**Carve-Out Trigger Notice**" shall mean a written notice delivered by the DIP Agent (or from and after the Payment in Full of the DIP Obligations, the Prepetition Agent) to the Debtors' lead counsel, the United States Trustee, counsel to the Consenting Noteholders, and lead counsel to the Committee, which notice may be delivered at any time following the occurrence and during the continuation of any Termination Event.

(b)     No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees.  Subject to their obligations under Paragraph 7(a) hereof, neither the DIP Secured Parties nor the Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Debtors' Professionals or Committee's Professionals incurred in connection with the Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Final Order or otherwise shall be construed (i) to obligate any DIP Secured Party or any Prepetition Secured Party in any way to pay compensation to, or to reimburse expenses of, any of the Debtors' Professionals or Committee's Professionals, or to

37

guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement or (ii) to increase the Carve-Out if actual allowed fees and expenses of any of the Debtors' Professionals or Committee's Professionals are higher in fact than the Carve-Out Cap. Notwithstanding any provision in this Paragraph 7 to the contrary, no portion of the Carve-Out, Cash Collateral, Prepetition First Lien Collateral, DIP Collateral or proceeds of the DIP Facility shall be utilized for the payment of professional fees and disbursements to the extent restricted under Paragraph 16 hereof.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee, any other official or unofficial committee in these Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party or any Prepetition Secured Party to object to the allowance and payment of such fees and expenses.

(c)    Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Prior to the occurrence of the Termination Declaration Date (as defined below), the Debtors shall be permitted to pay, subject to this Final Order, allowed fees of the Debtors' Professionals and the Committee's Professionals (to the extent the fees of the Debtors' Professionals and the Committee's Professionals were incurred in accordance with the Approved Budget, and without limiting the terms of the Carve-Out), subject to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any interim compensation procedures order entered by this Court.  The amounts paid prior to the Carve-Out Trigger Notice shall not reduce the Carve-Out.

8.    **Waiver of 506(c) Claims**.  As a further condition of the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and as a condition to the Prepetition Secured Parties consenting to the priming set

38

forth herein and to the use of Cash Collateral, and all parties' consent to the payment of the

Carve-Out to the extent provided herein) and as a further condition to the Debtors' use of Cash

Collateral pursuant to this Final Order, no costs or expenses of administration of the Cases or any

Successor Cases shall be charged against or recovered from or against any or all of the DIP

Secured Parties and/or the Prepetition Secured Parties, the Prepetition First Lien Collateral, the

DIP Collateral and the Cash Collateral, in each case pursuant to section 506(c) of the Bankruptcy

Code or otherwise, without the prior written consent of the Prepetition Agent and the DIP Agent,

and no such consent shall be implied from any other action, inaction, or acquiescence of any or

all of the Prepetition Secured Parties and the DIP Secured Parties.

9. **After-Acquired Property**. Except as otherwise expressly provided in this Final

Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtors

on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity

resulting from any security agreement entered into by the Debtors prior to the Petition Date,

except to the extent that such property constitutes proceeds of property of the Debtors that is

subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date which is

not subject to subordination or avoidance under the Bankruptcy Code or other provisions or

principles of applicable law.

10. **Protection of DIP Secured Parties' and Prepetition Secured Parties Rights**.

(a)      Unless the requisite DIP Secured Parties under the DIP Loan Documents

shall have provided their prior written consent, or all DIP Obligations have been Paid in Full,

there shall not be entered in these proceedings, or in any Successor Cases, any order which

authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is

secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the

CH\1784396.21

DIP Collateral and/or that is entitled to administrative priority status, in each case which is senior

to or *pari passu* with the DIP Liens, the DIP Superpriority Claim, the other DIP Protections; or

(ii) the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations, or as

otherwise permitted in the DIP Loan Documents and this Final Order.

(b)        Unless the requisite Prepetition Secured Parties under the Prepetition Loan

Documents shall have provided their prior written consent, or the Prepetition Credit Obligations

have been Paid in Full, there shall not be entered in these proceedings, or in any Successor

Cases, any order (other than this Final Order) which authorizes any of the following: (i) the

obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or

collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled

to administrative priority status, in each case which is senior to or *pari passu* with the First Lien

Adequate Protection Liens and the First Lien Adequate Protection Superpriority Claim; or (ii)

the use of Cash Collateral for any purpose other than to Pay in Full the DIP Obligations and the

Prepetition Credit Obligations, or as otherwise permitted in the DIP Loan Documents and this

Final Order.

(c)        The Debtors (and/or their legal and financial advisors in the case of

clauses (ii) and (iii) below) will (i) maintain books, records, and accounts to the extent and as

required by the DIP Loan Documents, (ii) reasonably cooperate, consult with, and provide to the

DIP Agent and the Prepetition Agent all such information and documents as required or allowed

under the DIP Loan Documents and/or the provisions of this Final Order, and (iii) grant

representatives of the DIP Agent and the Pre-Petition Agent reasonable access during normal

business hours and upon reasonable prior notice to information (including historical information)

and personnel as DIP Agent or the Pre-Petition Agent may reasonably request from time to time,

40

including, without limitation, regularly scheduled meetings among senior management, company advisors and the DIP Agent, the Pre-Petition Agent, Houlihan Lokey Capital, Inc.. Blackstone Advisory Partners L.P.,  and such other consultants to the DIP Agent, the Pre-Petition Agent, the DIP Lenders and/or Prepetition Lenders (collectively, the "**Consultant**"), and the Consultant shall be provided with reasonable access during normal business hours and upon reasonable prior notice to information it shall reasonably request and to other internal meetings regarding strategic planning, cash and liquidity management, operation and restructuring activities, progress with respect to the Reorganization Plan, compliance with the Plan Support Agreement, and any other aspect of the Cases, all subject to applicable confidentiality restrictions and privileges; provided, however, that the foregoing shall not require the Debtors to permit any access or disclose any information that, in the reasonable judgment of the applicable Debtor, would result in the disclosure of any trade secret or violate any of its obligations with respect to confidentiality or violate applicable laws.

11.    **Proceeds of Subsequent Financing**.    Without limiting the provisions and protections of Paragraph 10 above, if at any time prior to the Payment in Full of all the DIP Obligations (including subsequent to the confirmation of any Chapter 11 plan or plans with respect to any of the Debtors), the Debtors' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Agent until Payment in Full of the DIP Obligations occurs.

41

12.    **Cash Collection**.  From and after the date of the entry of this Final Order, all collections and proceeds of any DIP Collateral and Prepetition First Lien Collateral or services provided by any Debtor and all Cash Collateral which shall at any time come into the possession, custody, or control of any Debtor, or to which any Debtor is now or shall become entitled at any time, shall be promptly deposited in the same bank accounts into which the collections and proceeds of the Prepetition First Lien Collateral were deposited under the Prepetition Loan Documents (or in such other accounts as are designated by the DIP Agent from time to time).

13.    **Disposition of DIP Collateral**.  Unless the DIP Obligations are Paid in Full upon the closing of such sale or other disposition, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) outside the ordinary course of business (which ordinary course shall include, without limitation, disposition of obsolete or worn out assets) without the prior written consent of the requisite DIP Secured Parties under the DIP Loan Documents (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Secured Party or any order of this Court), except as permitted in the DIP Loan Documents and/or this Final Order.  After the DIP Obligations are Paid in Full, and unless the Prepetition Credit Obligations are Paid in Full upon the closing of such sale or other disposition, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) outside the ordinary course of business (which shall include, without limitation, disposition of obsolete or worn out assets) without the prior written consent of the requisite Prepetition Secured Parties under the Prepetition Loan Documents (and no such consent shall be implied from any other action, inaction, or acquiescence by any Prepetition Secured

CH\1784396.21

Party or any order of this Court), except as permitted in the Prepetition Loan Documents and/or this Final Order.

14.    **Termination Events**.  Each of the following shall constitute a termination event under this Final Order and the DIP Loan Documents unless waived in writing by each of the DIP Agent (upon direction from the Required DIP Lenders) and the Prepetition Agent (each, a "**Termination Event**"):

(a)    The occurrence of an "Event of Default" under, and as defined in, the DIP Credit Agreement (a "<u>DIP Default Termination Event</u>");

(b)    The Debtors' failure to timely and strictly comply with any of the following plan milestones (collectively, the "**Plan Milestones**") unless waived by the DIP Agent, Required DIP Lenders and the Prepetition Agent in their respective absolute and sole discretion; <u>provided</u> that to the extent any Plan Milestone is extended pursuant to, and in accordance with, the terms of the Plan Support Agreement, such Plan Milestone shall automatically be extended under this Final Order without further notice to or order of the Court:

i.    On or before April 25, 2014 (or such later date to which the DIP Agent, the Prepetition Agent, the Required DIP Lenders and the Required Prepetition Lenders (as defined herein) consent in writing in their sole discretion), the Debtors shall have filed with the Bankruptcy Court (a) a motion (the "**Disclosure Statement Motion**") reasonably acceptable to the DIP Agent and the Prepetition Agent, seeking entry of an order, in form and substance acceptable to the DIP Agent approving a disclosure statement with respect to the Reorganization Plan (as defined below) in form and substance reasonably acceptable to the DIP Agent and the Prepetition Agent (the "**Disclosure Statement**"), and (b) the Reorganization Plan;

ii.    On or before June 4, 2014 (or such later date to which the DIP Agent, the Prepetition Agent, the Required DIP Lenders and the Required Prepetition Lenders consent in writing in their sole discretion), the Bankruptcy Court shall have held a hearing on the Disclosure Statement Motion and shall have entered an order in form and substance acceptable to the DIP Agent and Prepetition Agent approving the Disclosure Statement for the Reorganization Plan.

43

iii.     On or before July 16, 2014 (or such later date to which the DIP Agent, the
Prepetition Agent, the Required DIP Lenders and the Required Prepetition
Lenders consent in writing in their sole discretion), the Bankruptcy Court
shall have entered an order in form and substance acceptable to the DIP
Agent and the Prepetition Agent in their respective sole discretion,
confirming the Reorganization Plan.

iv.     On or before August 15, 2014 (or such later date to which the DIP Agent,
the Prepetition Agent, the Required DIP Lenders and the Required
Prepetition Lenders consent in writing in their sole discretion), the
effective date of the Reorganization Plan shall have occurred.

(c)     The failure by the Debtors to timely perform any of the terms, provisions,

condition, covenants, or other obligations under this Final Order.

(d)     any termination of the Plan Support Agreement by any party thereto.

15.     **Rights and Remedies Upon Termination Event**.

(a)     Any automatic stay otherwise applicable to the DIP Secured Parties and

Prepetition Secured Parties is hereby modified, without requiring prior notice to or authorization

of this Court, to the extent necessary to permit the DIP Agent, or in the case of clause (vii)

below, the DIP Agent or the Prepetition Agent, as applicable, to exercise the following rights and

remedies immediately upon the occurrence and during the continuance of any Termination Event

and the delivery of written notice by the DIP Agent or Prepetition Agent, as applicable, to the

Debtors, lead counsel to the Consenting Noteholders, the lead counsel for the Committee, and

the United States Trustee of the occurrence of a Termination Event (such notice shall be referred

to herein as a "**Termination Declaration**," and the date such Termination Declaration is

delivered shall be referred to herein as the "**Termination Declaration Date**"): (i) terminate any

or all the DIP Obligations; (ii) declare the principal amount then outstanding of, and the accrued

interest on, any or all of the DIP Obligations and all other amounts payable by the Debtors under

the DIP Loan Documents to be forthwith due and payable, whereupon such amounts shall be

immediately due and payable without presentment, demand, protest, or other formalities of any

44

kind, all of which are hereby expressly waived by the Debtors; (iii) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (iv) declare a termination, reduction, or restriction on the ability of the Debtors to use any proceeds of the DIP Facility and/or DIP Collateral (including Cash Collateral except as permitted in Paragraph 15(b) below); (v) reduce any claim to judgment; and (vi) subject to subparagraphs 15(b) and (c) below, take any other action permitted by law (including, without limitation, under the DIP Loan Documents and/or the Prepetition Loan Documents, as applicable), during the continuance of any Termination Event.

(b)    Seven calendar days following a Termination Declaration Date, the DIP Agent (on behalf of the DIP Secured Parties), and upon Payment in Full of the DIP Obligations, the Prepetition Agent (on behalf of the Prepetition Secured Parties) shall be deemed to have further relief from the automatic stay and may foreclose on all or any portion of the DIP Collateral or the Prepetition First Lien Collateral, as applicable, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations (or upon payment in full and subject to the requirements of subparagraph (c), the Prepetition Credit Obligations), occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral or the Prepetition First Lien Collateral, or otherwise exercise remedies against the DIP Collateral permitted by applicable nonbankruptcy law.  During the seven-day period after a Termination Declaration Date, the Debtors, the DIP Agent, the Prepetition Agent and any Committee shall be entitled to an emergency hearing before the Court to contest whether a Termination Event has occurred and/or whether the automatic stay should be vacated upon expiration of such seven-day period.  Unless during such period the Court determines otherwise, the automatic stay, as to the DIP Agent (on

45

behalf of the DIP Secured Parties), and upon the Payment in Full of the DIP Obligations, the Prepetition Agent (on behalf of the Prepetition Secured Parties), shall automatically terminate at the end of such seven-day period, without further notice or order.  During such seven-day period, the Debtors may use Cash Collateral in accordance with the Approved Budget and Permitted Variances thereto.

(c)    Except as otherwise expressly provided in the DIP Credit Agreement or this Final Order, all proceeds of DIP Collateral, including, without limitation, all proceeds realized in connection with the exercise of the rights and remedies by or for the benefit of the DIP Secured Parties and/or the Prepetition Secured Parties, shall be promptly turned over to DIP Agent or Prepetition Agent, as applicable, for application <u>first</u>, to the DIP Obligations under, and in accordance with, the provisions of the DIP Loan Documents until Payment in Full of the DIP Obligations, <u>second</u>, to the interest, expense reimbursement and other obligations owed to the Prepetition Secured Parties under this Final Order, <u>third</u>, subject to further order of this Court, to pay the remaining Prepetition Credit Obligations in accordance with the provisions of Section 8.03 of the Prepetition Credit Agreement, and <u>fourth</u>, to the Debtors for distribution in the manner required by the Bankruptcy Code and other applicable law.

(d)    Without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties or the Prepetition Agent or the Prepetition Secured Parties contained in this Final Order or the DIP Loan Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon seven calendar days' written notice, to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property, that a Termination Event has occurred and is continuing, the DIP Agent and upon the Payment in Full of the DIP Obligations, the Prepetition

46

Agent (on behalf of the Prepetition Secured Parties), (i) may, unless otherwise expressly provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent or Prepetition Agent, as applicable (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors, which are owned by or subject to a Lien of any third party and which are used by Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this Paragraph 15(d) without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; provided, however, that the DIP Agent (on behalf of the DIP Secured Parties) or upon the Payment in Full of the DIP Obligations, the Prepetition Agent (on behalf of the Prepetition Secured Parties), as applicable, shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent or Prepetition Agent, as applicable, and that accrue during the period of such occupancy or use by DIP Agent or Prepetition Agent, as applicable, calculated on a *per diem* basis.  Nothing herein shall require the Debtors, the DIP Agent, the other DIP Secured Parties, the Prepetition Agent or the other Prepetition Secured Parties to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in this Paragraph 15(d).

(e)    The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of this Final Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the First Lien Adequate Protection Liens and the DIP

47

Liens and to incur all liabilities and obligations to the Prepetition Secured Parties and the DIP

Secured Parties under the DIP Loan Documents, the DIP Facility, and this Final Order, (ii)

authorize the DIP Secured Parties and the Prepetition Secured Parties to retain and apply

payments made in accordance with the DIP Loan Documents and this Final Order, and (iii)

otherwise to the extent necessary to implement and effectuate the provisions of this Final Order.

For the avoidance of doubt, the Prepetition Secured Parties shall also have the benefit of the

automatic stay relief and other rights and remedies set forth in this Paragraph 15 upon the

Payment in Full of the DIP Obligations following any Termination Event, and shall obtain a

further order of this Court, as and to the extent required under subparagraph 15(c) hereof for the

application of proceeds as provided therein.

16.    **Restriction on Use of Proceeds**.    Notwithstanding anything herein to the

contrary, no loans and/or proceeds from the DIP Facility, DIP Collateral, Cash Collateral

(including any retainer held by any professionals for the below-referenced parties), Prepetition

First Lien Collateral, or any portion of the Carve-Out may be used by (a) any Debtor, Committee

or trustee or other estate representative appointed in the Cases or any Successor Cases, or any

other person, party, or entity (or to pay any professional fees and disbursements incurred in

connection therewith) to investigate (except as set forth below) or prosecute any Challenge or

any other litigation or other action in connection with the value of the Prepetition First Lien

Collateral or the DIP Collateral at any time, including with respect to allocating value between

and among unencumbered and encumbered assets; and (b) any of the Debtors, any Committee,

and any trustee or other estate representative appointed in the Cases or any Successor Cases, or

any other person, party, or entity to (or to pay any professional fees and disbursements incurred

in connection therewith): (i) request authorization to obtain postpetition loans or other financial

48

accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than

from the DIP Secured Parties; (ii) investigate (except as set forth below), assert, join, commence,

support, or prosecute any action for any claim, counter-claim, action, proceeding, application,

motion, objection, defense, or other contested matter seeking any order, judgment,

determination, or similar relief against, or adverse to the interests of, in any capacity, any or all

of the DIP Secured Parties, the Prepetition Secured Parties, and their respective officers,

directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any

transaction, occurrence, omission, action, or other matter (including formal or informal discovery

proceedings in anticipation thereof), including, without limitation, (A) any Challenges and any

Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code with respect

to the DIP Obligations, the Prepetition Credit Obligations, the DIP Liens, the Prepetition Liens,

and/or the First Lien Adequate Protection Liens; (B) except to contest in good faith the

occurrence or continuance of any Termination Event as permitted in Paragraph 15, any action

seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the

DIP Secured Parties' and, after the Payment in Full of the DIP Obligations the Prepetition

Secured Parties', assertion, enforcement, or realization on the Cash Collateral or the DIP

Collateral in accordance with the DIP Loan Documents or the Prepetition Loan Documents, as

applicable, or this Final Order; and/or (C) any action seeking to modify any of the rights,

remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured

Parties and the Prepetition Secured Parties hereunder or under the DIP Loan Documents or the

Prepetition Loan Documents, as applicable; provided, however, up to $25,000 in the aggregate of

the Carve-Out, any DIP Collateral, any Prepetition First Lien Collateral, any Cash Collateral and

proceeds of the DIP Facility may be used by the Committee to investigate (but not prosecute)

49

potential Challenges to the Prepetition Credit Obligations, the Prepetition Liens, or any other claims against the Prepetition Secured Parties so long as such investigation occurs within the Challenge Period; (iii) pay any fees or similar amounts to any person (other than the Prepetition Secured Parties) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Agent and Prepetition Agent; or (iv) use or seek to use Cash Collateral, other DIP Collateral proceeds or advances under the DIP Facility, or sell or otherwise dispose of DIP Collateral, in each case unless otherwise permitted hereby, without the consent of the DIP Agent and the Prepetition Agent, as applicable.

17.    **Prepetition Agent Credit Bid.**  Subject to Paragraph 6 of this Final Order, the Prepetition Agent (on behalf of the Prepetition Secured Parties in accordance with the Prepetition Loan Documents) shall have the unqualified right to credit bid (with the consent of the requisite DIP Secured Parties under the DIP Loan Documents) up to the full amount of any Prepetition Credit Obligations in any sale or other disposition of the Prepetition First Lien Collateral and other DIP Collateral and shall automatically be deemed a "qualified bidder" and any credit bid by the Prepetition Agent shall automatically be deemed a "qualified bid" with respect to any disposition of Prepetition First Lien Collateral and/or DIP Collateral, under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.  The Prepetition Agent has the absolute right to assign, transfer, sell or otherwise dispose of its rights to credit bid, except as prohibited by the Prepetition Loan Documents.

18.    **DIP Credit Bid**.  The DIP Agent (on behalf of the DIP Secured Parties in accordance with the DIP Loan Documents) shall have the unqualified right to credit bid up to the

50

full amount of the DIP Obligations in any sale or other disposition of the Prepetition First Lien

Collateral and other DIP Collateral and shall automatically be deemed a "qualified bidder" and

any credit bid by the DIP Agent shall automatically be deemed a "qualified bid" with respect to

any disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code,

(b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or

(c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the

Bankruptcy Code.  The DIP Agent has the absolute right to assign, transfer, sell or otherwise

dispose of its rights to credit bid, except as prohibited by the DIP Loan Documents.

19.    **Proofs of Claim**.  The Prepetition Secured Parties are not required to file proofs

of claim in any of the Cases or Successor Cases for any claim allowed herein.  The Debtors'

Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition

Secured Parties.  Notwithstanding any order entered by the Court in relation to the establishment

of a bar date in any of the Cases or Successor Cases to the contrary, the Prepetition Agent, for

the benefit of itself and the other Prepetition Lenders, is hereby authorized and entitled, in its

sole discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of

claim and/or aggregate proofs of claim in each of the Cases or Successor Cases for any claim

allowed herein.

20.    **Preservation of Rights Granted Under the Final Order**.

(a)    No Non-Consensual Modification or Extension of Final Order.    The

Debtors irrevocably waive any right to seek any amendment, modification, or extension of this

Final Order without the prior written consent of the DIP Agent and the Prepetition Agent, and no

such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured

Parties or any of the Prepetition Secured Parties.  In the event any or all of the provisions of this

CH\1784396.21

Final Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances, payments, or use of cash whether previously or hereunder, or lien, claim, or priority authorized or created hereby. Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of this Court or any other court, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur, or stay shall affect (i) the validity, priority, or enforceability of any DIP Protections and the Prepetition Secured Parties' Adequate Protection granted or incurred prior to the effective date of such reversal, modification, vacatur, or stay or (ii) the validity, enforceability and non-avoidability of any lien or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligations and the Prepetition Secured Parties' Adequate Protection. Notwithstanding any such reversal, modification, vacatur, or stay, any use of Cash Collateral or any DIP Obligations or Prepetition Secured Parties' Adequate Protection incurred or granted by the Debtors prior to the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all of the DIP Protections and Prepetition Secured Parties' Adequate Protection, as the case may be, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order, and pursuant to the DIP Loan Documents with respect to all

52

uses of Cash Collateral and all DIP Obligations and Prepetition Secured Parties' Adequate Protection.

(b)      <u>Dismissal</u>.  If any order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) the DIP Protections and the Prepetition Secured Parties' Adequate Protection shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations have been Paid in Full, the Prepetition Credit Obligations have been Paid in Full (and that all DIP Protections and the Prepetition Secured Parties' Adequate Protection shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' Adequate Protection.

(d)      <u>Survival of Final Order</u>.  The provisions of this Final Order and the DIP Loan Documents and the Interim Cash Collateral Order (to the extent such provisions in the Interim Cash Collateral Order are not superseded by this Final Order), any actions taken pursuant hereto or thereto, and all of the DIP Protections, the Prepetition Secured Parties' Adequate Protection, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in any Case, converting any Case to a case under chapter 7, dismissing any of the Cases, withdrawing of the reference of any of the Cases or any Successor Cases or providing for abstention from handling or retaining of jurisdiction of any of the Cases in this Court, or terminating the joint administration of these Cases or by any other act

53

or omission.  The terms and provisions of the Interim Cash Collateral Order (to the extent such provisions are not amended or modified by this Final Order) and this Final Order, including all of the DIP Protections, the Prepetition Secured Parties' Adequate Protection, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to any or all of the DIP Secured Parties and the Prepetition Secured Parties, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections and Prepetition Secured Parties' Adequate Protection shall continue in these proceedings and in any Successor Cases, and shall maintain their respective priorities as provided by this Final Order.

21.    **Insurance Policies**.  Upon entry of this Final Order, the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees, as applicable, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

22.    **Other Rights and Obligations**.

(a)    <u>Expenses</u>.  As provided in the DIP Loan Documents and this Final Order (and without limiting the Debtors' respective obligations thereunder or hereunder), the applicable Debtors will pay all reasonable expenses incurred by the DIP Agent (including, without limitation, the reasonable fees and disbursements of all counsel for the DIP Agent and any internal or third-party appraisers, consultants, advisors and auditors engaged by or for the benefit of the DIP Agent and/or its counsel) in connection with the preparation, execution, delivery, and administration of the DIP Loan Documents, the Interim Cash Collateral Order, this Final Order, and any other agreements, instruments, pleadings, or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated.

54

(b)    <u>Notice of Lender Professional Fees</u>.  Professionals for the DIP Agent, Prepetition Agent, and to the extent applicable the other DIP Secured Parties and Prepetition Secured Parties (including, without limitation, professionals engaged by counsel to the DIP Agent or Prepetition Agent, as applicable) (collectively, the "**Lender Professionals**"), shall not be required to comply with the United States Trustee fee guidelines or submit invoices to the Court, United States Trustee, the Committee or any other party-in-interest absent further court order.  Copies of summary invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the United States Trustee, counsel to the Consenting Noteholders and counsel for the Committee.  The summary invoices shall be sufficiently detailed to enable a determination as to the reasonableness of such fees and expenses; <u>provided</u>, <u>however</u>, that such summary invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such summary invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege.  If the Debtors, United States Trustee, counsel to the Consenting Noteholders or counsel for any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) days of receipt of such invoices, the Debtors, United States Trustee, counsel to the Consenting Noteholders or the Committee, as the case may be, shall file with the Court and serve on such Lender Professionals an objection (the "**Fee Objection**") limited to the issue of the reasonableness of such fees and expenses.  Any hearing on an objection to payment of any fees, costs, and expenses set forth in a professional fee invoice shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses which are the subject of such

55

objection.  The Debtors shall pay in accordance with the terms and conditions of this Final Order (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. Notwithstanding the foregoing, on the effective date of the Reorganization Plan, the Debtors shall pay to the respective Lender Professionals all then accrued unpaid reasonable fees, costs and expenses of such Lender Professionals that were incurred the month in which such effective date occurred without the need for such Lender Professionals to file any notices hereunder with respect to such fees, costs and expenses.  All unpaid fees, costs, expenses and charges of the DIP Agent, and to the extent applicable the other DIP Secured Parties, that have not been disallowed by this Court on the basis of an objection filed by the United States Trustee, the Consenting Noteholders or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral as specified in this Final Order.  Any and all indemnity obligations in favor of the DIP Secured Parties and other indemnified parties under the DIP Loan Documents shall also constitute DIP Obligations.  Any and all fees, commissions, costs, and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or the DIP Lenders in connection with or with respect to the DIP Facility, the DIP Credit Agreement, or the other DIP Loan Documents are hereby approved in full and non-refundable.

(c)    Binding Effect.  Subject to Paragraph 6 above, the provisions of this Final Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in these Cases, including, without limitation, the DIP Secured Parties, the Prepetition Secured Parties, any Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the

56

CH\1784396.21

estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Cases, in any Successor Cases, or upon dismissal of any such Case or Successor Case; provided, however, that the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estates of the Debtors in any Case or Successor Case.

(d)    No Waiver.  Neither the failure of the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Final Order, the Prepetition Loan Documents, or otherwise (or any delay in seeking or exercising same), nor the failure of the DIP Secured Parties to seek relief or otherwise exercise their respective rights and remedies under this Final Order, the DIP Loan Documents, or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Nothing contained in this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to any Prepetition Secured Party or any DIP Secured Party, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion). Except as prohibited by this Final Order, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, the ability of the Prepetition Secured Parties or the DIP Secured Parties under the Bankruptcy Code or under non-

57

CH\1784396.21

bankruptcy law to (i) request conversion of the Cases to cases under chapter 7, dismissal of the Cases, or the appointment of a trustee in the Cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any Chapter 11 plan or plans with respect to any of the Debtors, or (iii) except as expressly provided herein, exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties, respectively.  Except to the extent otherwise expressly provided in this Final Order, neither the commencement of the Cases nor the entry of this Final Order shall limit or otherwise modify the rights and remedies of the Prepetition Secured Parties with respect to non-Debtor entities or their respective assets, whether such rights and remedies arise under the Prepetition Secured Loan Documents, applicable law, or equity.

(e)    No Third Party Rights.  Except as explicitly provided for herein or in any DIP Loan Document, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.  In determining to make any loan (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Loan Documents, the DIP Secured Parties and the Prepetition Secured Parties shall not (i) be deemed to be in control of the operations of the Debtors or (ii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.

(f)    No Marshaling.  Neither the DIP Secured Parties nor the Prepetition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition First Lien Collateral, as applicable.

58

(g)    <u>Amendments</u>.  The Debtors, the DIP Agent and the DIP Lenders are authorized and empowered to implement, in accordance with the terms of the DIP Loan Documents, any nonmaterial modifications (including, without limitation, nonmaterial amendments, supplements, or waivers or any change to the number or composition of the DIP Lenders) of the DIP Loan Documents without further notice and hearing or approval of this Court.  No waiver, modification, or amendment of any of the provisions hereof or of the DIP Loan Documents shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of the requisite DIP Secured Parties under the DIP Credit Agreement) with the consent of the Required Consenting Holders (as defined in the Restructuring Term Sheet attached to the Plan Support Agreement) and, except as provided in the immediately preceding sentence, approved by this Court.  Notwithstanding the foregoing, (i) no waiver, modification or amendment of any of the provisions of this Final Order or the DIP Loan Documents that would directly and adversely affect the rights or interests of the Prepetition Secured Parties, as applicable, shall be effective unless also consented to in writing by the Prepetition Agent (with the consent of the requisite Prepetition Secured Parties as provided in the Prepetition Credit Agreement) and (ii) notice of any proposed material modification to the DIP Loan Documents shall be provided to counsel for the Committee, counsel to the Prepetition Agent, counsel to the Consenting Noteholders and the U.S. Trustee, each of whom shall have five (5) Business Days from the date of such notice within which to object, in writing, to such modification.  If no objections are timely received during the five Business Day notice period, the Debtors, the DIP Agent and the DIP Lenders are authorized and empowered to implement, in accordance with the terms of the DIP Loan Documents, such material modifications not subject to any such timely objection without further notice and

59

hearing or approval of this Court. Any proposed material modification to the DIP Loan Documents that is subject to a timely filed objection in accordance with this subparagraph (g) shall be subject to further order of this Court (which the Debtors may seek on an expedited basis).

(h)    Inconsistency. In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Final Order, the provisions of this Final Order shall govern and control. In the event of any inconsistency between the terms and conditions of the Interim Cash Collateral Order and of this Final Order, the provisions of this Final Order shall govern and control.

(i)    Rights Under the Plan Support Agreement. Nothing in this Final Order is intended to amend or otherwise modify any provision of the Plan Support Agreement, or impair or otherwise alter any of the rights of the respective parties under the Plan Support Agreement, including, without limitation, any rights to consent to various documents and actions of the Debtors referenced herein, in each case except with respect to the DIP Term Sheet (as defined in the Plan Support Agreement) and those provisions therein and in the Plan Support Agreement governing the DIP Facility; provided, that, nothing herein shall be construed to abrogate the consent rights of any party under the Plan Support Agreement with respect to the Definitive Documents (as defined in the Restructuring Term Sheet attached to the Plan Support Agreement).

(j)    Enforceability. This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other

60

Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

(k)    <u>Reservation of Rights</u>.    Nothing in this Final Order shall be deemed to constitute the consent of the DIP Secured Parties or the Prepetition Secured Parties, and each of the foregoing expressly reserve the right to object, to entry of any Order of the Bankruptcy Court that provides for the sale of all or substantially all of the assets of the Debtors to any party unless, in connection and concurrently with any such event, the proceeds of such sale are or will be sufficient to Pay in Full the DIP Obligations, the Prepetition Credit Obligations, the Prepetition Secured Parties' Adequate Protection and all of the foregoing are Paid in Full on the closing date of such sale.

(l)    <u>Headings</u>.    Paragraph headings used herein are for convenience only and are not to affect the construction of, or to be taken into consideration in, interpreting this Final Order.

23.    **<u>Retention of Jurisdiction</u>**.    The Bankruptcy Court has and will retain jurisdiction to enforce this Final Order according to its terms.

Dated:  _____, 2014
         New York, New York

_____
Honorable Robert E. Grossman
UNITED STATES BANKRUPTCY JUDGE

61

# EXHIBIT A

## Initial Approved Budget

(see attached)

# **EXHIBIT B**

## **DIP CREDIT AGREEMENT**

(see attached)