**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL FROM, BUT HAS NOT BEEN APPROVED BY, THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| -------------------------------------------------------- | X | |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| LEGEND PARENT, INC., *et al.*, | : | Case No. 14-10701 (RG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| -------------------------------------------------------- | X | |

---

**DISCLOSURE STATEMENT WITH RESPECT TO JOINT PLAN OF REORGANIZATION OF MMODAL HOLDINGS, INC., AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

DECHERT LLP
1095 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 698-3500
Allan S. Brilliant
Shmuel Vasser
Jeffrey T. Mispagel

*Attorneys for the Debtors*
*and Debtors-in-Possession*

Dated: April 25, 2014
       New York, New York

19131656

# TABLE OF CONTENTS

**Page**

ARTICLE I. INTRODUCTION .................................................................................1
    1.1    General. .........................................................................................1
    1.2    The Confirmation Hearing. ..........................................................5
    1.3    Administrative and Priority Claims. .............................................5
    1.4    Classification of Claims and Interests...........................................8
    1.5    Voting; Holders of Claims Entitled to Vote. ..............................13
    1.6    Important Matters.......................................................................15

ARTICLE II. BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO
    THESE CHAPTER 11 CASES .........................................................15
    2.1    The Debtors' Prepetition Businesses. .........................................15
    2.2    Prepetition Capital Structure.......................................................17
    2.3    Events Leading to the Chapter 11 Cases.....................................19

ARTICLE III. DESCRIPTION OF THE DEBTORS' CHAPTER 11 CASES................20
    3.1    Continuation of the Businesses after the Petition Date...................20
    3.2    Case Administration...................................................................25

ARTICLE IV. THE PLAN ......................................................................................26
    4.1    Overview of Chapter 11..............................................................26
    4.2    Overview of the Plan. .................................................................27
    4.3    Means for Implementation of the Plan.........................................44
    4.4    Executory Contracts and Unexpired Leases. ..............................50
    4.5    Retention of Jurisdiction by the Bankruptcy Court. ....................53
    4.6    Miscellaneous Provisions...........................................................55

ARTICLE V. CONDITIONS PRECEDENT ...........................................................57
    5.1    Conditions Precedent to Confirmation........................................57
    5.2    Conditions Precedent to the Effective Date. ...............................57
    5.3    Effect of Failure of Conditions to Effective Date.........................58
    5.4    Waiver of Conditions.................................................................58

ARTICLE VI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE
    PLAN .............................................................................................59
    6.1    Modification and Amendments....................................................59
    6.2    Effect of Confirmation on Modifications. ...................................59
    6.3    Revocation, Withdrawal, or Non-Consummation of the Plan. .........59
    6.4    Severability. ...............................................................................60

ARTICLE VII. EFFECT OF CONFIRMATION .....................................................60
    7.1    Vesting of Assets. ......................................................................60
    7.2    Settlement of Certain Intercreditor Issues....................................60
    7.3    Discharge of Claims Against the Debtors and Termination of Interests. ..........61
    7.4    Term of Injunctions or Stays.......................................................62
    7.5    Injunction Against Interference with the Plan. .............................62
    7.6    Releases......................................................................................62

| | | |
|---|---|---|
| 7.7 | Exculpation. | 63 |
| 7.8 | Injunction Related to Releases and Exculpation. | 64 |
| 7.9 | Injunction Regarding Worthless Stock Deductions. | 64 |
| 7.10 | Setoff. | 64 |
| 7.11 | Exemption from Certain Transfer Taxes. | 64 |
| 7.12 | Issuance of New Securities and Plan-Related Documentation. | 65 |
| 7.13 | Other Exemptions. | 65 |
| 7.14 | Post-Effective Date Claims and Amendments to Claims. | 66 |

ARTICLE VIII. CONFIRMATION OF THE PLAN ............................................................66

| | | |
|---|---|---|
| 8.1 | Confirmation Hearing. | 66 |
| 8.2 | Confirmation. | 67 |
| 8.3 | Consummation. | 75 |

ARTICLE IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ............................................................................................75

| | | |
|---|---|---|
| 9.1 | Liquidation under Chapter 7 of the Bankruptcy Code. | 75 |
| 9.2 | Alternative Plan(s) of Liquidation or Reorganization. | 76 |

ARTICLE X. SUMMARY OF VOTING PROCEDURES ................................................76

ARTICLE XI. CERTAIN RISK FACTORS TO BE CONSIDERED .........................77

| | | |
|---|---|---|
| 11.1 | Certain Bankruptcy Considerations. | 78 |
| 11.2 | Actual recoveries may differ materially from the estimated recoveries set forth in this Disclosure Statement. | 79 |
| 11.3 | Risks Relating to the New Term Loan and the Reorganized Holdings Equity Interests | 79 |
| 11.4 | Risks Relating to Tax Consequences of the Plan. | 82 |
| 11.5 | Risks Associated with the Business. | 82 |

ARTICLE XII. SECURITIES LAW MATTERS ...............................................................84

| | | |
|---|---|---|
| 12.1 | General. | 84 |
| 12.2 | Issuance of Reorganized Holdings Equity Interests and New Warrants. | 84 |
| 12.3 | Shareholders' Agreement; New Warrant Agreements. | 84 |
| 12.4 | Resale of Reorganized Holdings Equity Interests. | 85 |

ARTICLE XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN ...................................................87

| | | |
|---|---|---|
| 13.1 | Federal Income Tax Consequences to the Debtors. | 88 |
| 13.2 | Federal Income Tax Consequences to Holders of Claims | 91 |

ARTICLE XIV. RECOMMENDATION AND CONCLUSION ......................................99

## INDEX OF EXHIBITS

EXHIBIT 1            The Plan

EXHIBIT 2            Liquidation Analysis

EXHIBIT 3            Historical Financial Statements

EXHIBIT 4            Prepetition Organizational Chart

EXHIBIT 5            Financial Projections

# ARTICLE I.

# INTRODUCTION

**1.1**    *General.*

Legend Parent, Inc., MModal Holdings, Inc., MModal Inc., Multimodal Technologies, LLC, MModal CB Inc., Poiesis Informatics, Inc., MModal MQ Inc., MModal Systems & Services Inc., Mirrus Systems Inc., MedQuist of Delaware, Inc., MModal IP LLC, MModal Services, Ltd., MedQuist CM LLC and All Type Medical Transcription Services, Inc. (collectively, the "**Debtors**"), as debtors and debtors-in-possession in chapter 11 cases pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), jointly administered under Case No.: 14-10701 (RG), submit this disclosure statement (this "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**"), in connection with the solicitation of votes on the Joint Plan of Reorganization of Legend Parent, Inc., and its Affiliated Debtors and Debtors in Possession Under Chapter 11 of the Bankruptcy Code (the "**Plan**"), dated April 25, 2014 proposed by the Debtors.  A copy of the Plan is attached as <u>Exhibit 1</u> to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition capital structure and business operations, significant events leading to the commencement of the Chapter 11 Cases, and significant events that have occurred during these Chapter 11 Cases.  This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors associated with the Plan, certain alternatives to the Plan, the manner in which distributions will be made under the Plan if the Plan is confirmed and becomes effective, and related matters.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.  To the extent the Plan is inconsistent with this Disclosure Statement, the provisions of the Plan will control.

On [_____], 2014 after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH, NOR REVIEWED BY, AND THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "**S.E.C.**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY OTHER SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS.  THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE S.E.C., ANY OTHER SECURITIES REGULATORY AUTHORITY, OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE S.E.C., NOR ANY OTHER SECURITIES REGULATORY AUTHORITY, NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a) OF THE BANKRUPTCY CODE OR OTHER APPLICABLE EXEMPTIONS, AND EXPECT THAT THE ISSUANCE OF THE SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF SECTIONS 1145(a)(1) AND (2) OF THE BANKRUPTCY CODE AND SECURITIES ACT SECTION 4(2), OR OTHER APPLICABLE EXEMPTIONS.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE

STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. ALTHOUGH THE DEBTORS WILL MAKE AVAILABLE TO ALL PARTIES ENTITLED TO VOTE ON THE PLAN SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES THEREOF. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' AND THE REORGANIZED DEBTORS' BUSINESSES. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE XI. IN LIGHT OF THESE RISKS AND

UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, THEIR ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN THE DEBTORS' CHAPTER 11 CASES, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS TO ANY PERSON OR ENTITY THAT MAY RESULT FROM CONSUMMATION OF THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN. AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN WILL NEITHER CONSTITUTE NOR BE CONSTRUED AS AN ADMISSION, STIPULATION, WAIVER, EVIDENCE OR FINDING OF FACT, BUT RATHER A STATEMENT OR STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED THEREBY.

All Exhibits to the Plan will be filed with the Bankruptcy Court and will be available for review, free of charge, at (http://cases.primeclerk.com/mmodal) (the "**Website**") not later than seven (7) days before the Voting Deadline (defined herein). Copies of all Exhibits to the Plan also may be obtained, free of charge, from Prime Clerk LLC. ("**Prime Clerk**" or the "**Voting Agent**") by calling (855)388-4575 or by emailing mmodalballots@primeclerk.com.

In addition, if you are a holder of a Claim entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions

4

concerning the procedures for voting on the Plan, please contact the Voting Agent by calling (855)388-4575 or by emailing mmodalballots@primeclerk.com.

**THE DEBTORS, THE FIRST LIEN AGENT, THE CONSENTING LENDERS AND THE CONSENTING NOTEHOLDERS SUPPORT CONFIRMATION OF THE PLAN. THE DEBTORS, THE FIRST LIEN AGENT, THE CONSENTING LENDERS AND THE CONSENTING NOTEHOLDERS RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 2 AND 4 VOTE TO ACCEPT THE PLAN, AS THE PLAN PROVIDES THE BEST AVAILABLE RECOVERY TO CREDITORS IN SUCH CLASSES.**

**1.2     *The Confirmation Hearing.***

In accordance with an order from the Bankruptcy Court approving this Disclosure Statement and section 1128 of the Bankruptcy Code, a hearing will be scheduled to be held before the Honorable Robert E. Grossman, United States Bankruptcy Judge, at Room 601 of the Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004, on **July 15, 2014 at 10:00 a.m. (Eastern Time)**, to consider confirmation of the Plan. The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they have reserved the right, with the consent of the First Lien Agent and the Required Consenting Holders, to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification. Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **July 3, 2014 at 4:00 p.m. (Eastern Time)**. The hearing on confirmation of the Plan may be adjourned from time to time without further notice, except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

**1.3     *Administrative and Priority Claims.***

In accordance with section 1123(a)(1) of the Bankruptcy Code, U.S. Trustee Fees, Administrative Claims, Professional Fee Claims, Priority Tax Claims and DIP Claims have not been classified.

| CLAIM | PROPOSED TREATMENT |
|---|---|
| **U.S. Trustee Fees** | On or before the Effective Date, the Debtors will pay all U.S. Trustee Fees in full in Cash. Any U.S. Trustee Fees due after the Effective Date will be paid by the Reorganized Debtors in the ordinary course until the earlier of the entry of a final decree closing the applicable Chapter 11 Case, or a Bankruptcy Court order converting or dismissing the applicable Chapter 11 Case. Any deadline for filing Administrative Claims or Professional Fee Claims will not apply to claims for U.S. Trustee Fees. |
| **Administrative Claims** | The Debtors estimate that there will be approximately $4 - $7 million of Allowed Administrative Claims (excluding Professional |

| CLAIM | PROPOSED TREATMENT |
|---|---|
| | Fee Claims). |
| | Except with respect to Administrative Claims that are Professional Fee Claims and except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable or equal, but different, treatment, each holder of an Allowed Administrative Claim will be paid, in full satisfaction, settlement and release of such Allowed Administrative Claim, Cash in an amount equal to the amount of such Allowed Administrative Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the date such Administrative Claim becomes Allowed or (iii) the date such Allowed Administrative Claim becomes due and payable or as soon thereafter as is practicable; provided, however, that Allowed Administrative Claims incurred in the ordinary course of business, at the option of the Reorganized Debtors, will be paid in full in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. |
| **Professional Fee Claims** | The Debtors estimate that there will be up to approximately $24.1 million of Allowed Professional Fee Claims. <br><br> The holders of Professional Fee Claims may file their respective final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred from and after the Petition Date through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date, or such other date that may be fixed by the Bankruptcy Court.  Allowed Professional Fee Claims will be paid in full in Cash by Reorganized Holdings either (a) within five (5) Business Days of the date such Professional Fee Claim is approved by a Final Order issued by the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon by such holder of an Allowed Professional Fee Claim and the Reorganized Debtors.  Professionals will not be required to seek Bankruptcy Court approval of any fees and expenses incurred after the Effective Date in connection with the Debtors, Reorganized Debtors or the Chapter 11 Cases.  Failure to file a final fee application by the deadline set forth above will result in the relevant Professional Fee Claim being forever barred and disallowed. Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the requesting party no later than 75 days after the Effective Date. |
| **Priority Tax Claims** | The Debtors estimate that there will be approximately $0.5 – $1 |

| CLAIM | PROPOSED TREATMENT |
|-------|--------------------|
| | million of Allowed Priority Tax Claims. Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, discharge and release of its Allowed Priority Tax Claim, at the election of the Debtors with the consent of the Required Consenting Holders, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the (a) Effective Date or (b) first Business Day after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the date of assessment of such Allowed Priority Tax Claim. The Reorganized Debtors will have the right to prepay an Allowed Priority Tax Claim at any time under this option.  All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due. No holder of an Allowed Priority Tax Claim will be entitled to receive any payment on account of any penalty not representing compensation of an actual pecuniary loss arising with respect to or in connection with such Allowed Priority Tax Claim.  Any such Claim or demand for any such penalty will be deemed disallowed and expunged.  The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors, or their property. |
| **DIP Claims** | Except as otherwise agreed to by the Debtors, the DIP Agent, the "Required Lenders" under, and as defined in, the DIP Credit Agreement and the Required Consenting Holders, on the Effective Date, all DIP Claims will be paid in full in Cash, and upon such payment, all of the Debtors' respective outstanding obligations, liabilities and indebtedness in respect of the DIP Facility and all liens and security interests securing the same will be satisfied, discharged, and terminated in full, and the Debtors will have no further obligations, liabilities or indebtedness under the DIP Facility or any documents relating thereto, in each case, other than any obligations that may survive termination or maturity of the DIP Facility in accordance with its terms. |

**1.4**     *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors, for all purposes, including voting, confirmation and Distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The following table specifies which of those Classes are (i) Impaired or Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan.  A Claim or Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class; provided, however, that any Claim classified in Class 6 will not be classified in any other Class.  A Claim or Interest is in a particular Class only to the extent that such Claim or Interest is Allowed in that Class and has not been paid or otherwise satisfied prior to the Effective Date.

| Class | Designation | Impairment | Recovery and Treatment | Entitled to Vote |
|-------|-------------|------------|------------------------|------------------|
| Class 1 | Priority Claims | No | 100%<br><br>The Debtors estimate that there will be up to approximately $300,000 of Allowed Priority Claims.<br><br>Except to the extent that a holder of an Allowed Priority Claim agrees to a less favorable treatment, each holder of an Allowed Priority Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such Priority Claim, Cash in the full amount of such Allowed Priority Claim on the Effective Date or, if later, the first Business Day after the date such Priority Claim becomes Allowed. | No (deemed to accept) |
| Class 2 | First Lien Claims | Yes | [_]%<br><br>The First Lien Claims as of the Petition Date will be Allowed in the aggregate amount of $507,680,532.71.<br><br>On the Effective Date, each holder of a First Lien Claim will receive in full satisfaction and release of such holder's First Lien Claim, such holder's Pro Rata share of (i) the New Term Loan; (ii) ninety-three (93) percent of | Yes |

| Class | Designation | Impairment | Recovery and Treatment | Entitled to Vote |
|-------|-------------|------------|------------------------|------------------|
| | | | Reorganized Holdings Equity Interests, subject to dilution solely on account of the New Warrants and Management Stock Option Plan; and (iii) $8,197,801 in Cash. | |
| Class 3 | Other Secured Claims | No | 100%<br><br>Unless a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, on the Effective Date, each Allowed Other Secured Claim will be Reinstated, or, at the option of the Debtors or the Reorganized Debtors with the consent of the Required Consenting Holders, each holder of an Allowed Other Secured Claim will receive, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest Allowed pursuant to section 506(b) of the Bankruptcy Code, (ii) the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (iii) the collateral securing such Allowed Other Secured Claim, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code on account of such Allowed Other Secured Claim. | No (deemed to accept) |
| Class 4 | General Unsecured Claims (including Noteholder Claims) | Yes | [_]%<br><br>The Debtors estimate approximately $267.5 - $271.2 million of Allowed General Unsecured Claims (including $265,975,694.44 of Allowed | Yes |

| Class | Designation | Impairment | Recovery and Treatment | Entitled to Vote |
|---|---|---|---|---|
| | | | Noteholder Claims).<br><br>On the Effective Date, each creditor holding an Allowed General Unsecured Claim and that has not elected to reduce its Claim to $100,000 and receive Distributions as if the Claim is a Class 6 Claim will receive in full satisfaction and release of such Claim, such holder's Pro Rata share of: (i) seven (7) percent of the Reorganized Holdings Equity Interests subject to dilution solely on account of the New Warrants and Management Stock Option Plan; (ii) the New A Warrants and New B Warrants; and (iii) $617,039 in Cash; provided, however, that holders of Allowed General Unsecured Claims other than a Noteholder Claim may elect to receive, in lieu of the foregoing consideration, Cash in an amount equal to a percentage of such creditor's General Unsecured Claim, which percentage will reflect the recovery percentage of the holders of Noteholder Claims and will be set forth in the Plan Supplement and be acceptable to the Required Consenting Holders in their good faith discretion.<br><br>Each holder of a Class 4 Claim that is not a Noteholder will be permitted to reduce its Claim to $100,000 and receive, in lieu of the Distribution provided to holders of Class 4 Claims, Distribution as if the Claim is a Class 6 Claim.<br><br>To the extent that aggregate amount of Claims in Class 4 includes, in addition to Noteholder Claims, Allowed General Unsecured Claims (for avoidance of doubt, Convenience Class Claims and/or Class 5 Claims that have not | |

| Class | Designation | Impairment | Recovery and Treatment | Entitled to Vote |
|-------|-------------|------------|------------------------|------------------|
| | | | been reclassified as Class 4 Claims will not constitute General Unsecured Claims) (any reclassified Class 5 Claims and other General Unsecured Claims in Class 4 that are not treated as Convenience Class Claims, the "**Excess Claims**"), the aggregate available Distribution to Allowed Class 4 Claims will be increased by a Cash amount such that the Distribution to holders of Allowed Class 4 Claims (calculated without giving effect to the inclusion of Excess Claims in Class 4) will not be diluted by the inclusion of the Excess Claims in Class 4 (such amount, the "**Cash True-Up Amount**"). | |
| Class 5 | Subordinated Claims | Yes | 0% <br><br> Each holder of a Subordinated Claim will receive no Distribution. To the extent that the Bankruptcy Court holds that any Subordinated Claim included by the Debtors in this Class is not subject to subordination pursuant to section 510(b) or 510(c) of the Bankruptcy Code, such Claim will automatically be deemed (i) a Class 4 Claim if the amount of such Claim is in excess of $100,000 or (ii) a Class 6 Claim if the amount of such Claim is equal to or less than $100,000 and will receive Distribution as such. | No (deemed to reject) |

| Class | Designation | Impairment | Recovery and Treatment | Entitled to Vote |
|---|---|---|---|---|
| Class 6 | Convenience Class Claims | No | 100%<br><br>The Debtors estimate approximately $3.7 million of Allowed Convenience Claims.<br><br>Each holder of a Convenience Class Claim will receive payment in full and in Cash on or as soon as reasonably practicable after the Effective Date in an amount not to exceed $100,000. | No (deemed to accept) |
| Class 7 | Intercompany Claims | Yes | 0%<br><br>On the Effective Date, at the Debtors' option, but in each case subject to the prior written consent of the First Lien Agent and the Required Consenting Holders, each Intercompany Claim will either be (i) cancelled (or otherwise eliminated) and receive no Distribution under the Plan or (ii) Reinstated. | No (deemed to reject) |
| Class 8 | Intercompany Interests | No | 100%<br><br>On the Effective Date, Class 8 Intercompany Interests will be Reinstated. | No (deemed to accept) |
| Class 9 | Holdings Equity Interests | Yes | 0%<br><br>All Holdings Equity Interests will be deemed cancelled as of the Effective Date. | No (deemed to reject) |

The table set forth above provides a brief summary of the classification and treatment of Claims and Interests and the estimated recovery distributable to the holders of such Claims and Interests under the Plan. The table also identifies which Classes are entitled to vote on the Plan based on provisions of the Bankruptcy Code. The information set forth in the table is for convenience of reference only. Each holder of a Claim or Interest should refer to Sections 2, 3 and 4 of the Plan and the Liquidation Analysis annexed as Exhibit 2 hereto (the "**Liquidation Analysis**") for a full understanding of the classification and treatment of Claims and Interests provided under the Plan.

THE ESTIMATES SET FORTH IN THE TABLE SET FORTH ABOVE MAY DIFFER FROM ACTUAL DISTRIBUTIONS BY REASON OF, AMONG OTHER THINGS, VARIATIONS IN THE ASSERTED OR ESTIMATED AMOUNTS OF ALLOWED CLAIMS AND THE EXISTENCE OF DISPUTED CLAIMS.    STATEMENTS REGARDING PROJECTED AMOUNTS OF CLAIMS OR DISTRIBUTIONS (OR THE VALUE OF SUCH DISTRIBUTIONS) ARE ESTIMATES BY THE DEBTORS BASED ON INFORMATION AS OF THE DATE HEREOF AND ARE NOT REPRESENTATIONS AS TO THE ACCURACY OF THESE AMOUNTS.  THE FINAL AMOUNTS OF ALLOWED CLAIMS MAY VARY SIGNIFICANTLY FROM THESE ESTIMATES.  FOR AN EXPLANATION OF THE BASIS FOR    THE    LIMITATIONS    AND    UNCERTAINTIES    REGARDING    THESE CALCULATIONS,    SEE    ARTICLE    XI    ("CERTAIN    RISK    FACTORS    TO    BE CONSIDERED"), BELOW.

**1.5**    *Voting; Holders of Claims Entitled to Vote.*

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are Impaired and not deemed to have rejected a plan are entitled to vote to accept or reject a plan.  Generally, a claim or interest is Impaired under the Plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are Unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.  In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims held by non-insiders that cast ballots for acceptance or rejection of a plan (such vote, the "**Requisite Acceptances**").  **Your vote on the Plan is important.**  The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is Impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors, subject to the prior written consent of the First Lien Agent and the Required Consenting Holders, reserve the right to amend the Plan and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.    Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance of a plan by one or more Impaired classes of Claims or Interests, so long as at least one Impaired class of Claims or Interests, excluding the votes of insiders, votes to accept the plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan (a "**Ballot**").  This Disclosure Statement, the Exhibits attached hereto, the Plan and the related documents are the only materials the Debtors are providing to

creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.  If you believe that you are entitled to vote to accept or reject the Plan and you did not receive a Ballot, please consult with your counsel and/or contact the Voting Agent by telephone at (855)388-4575, by email at mmodalballots@primeclerk.com or at the address listed below.

Please complete, execute and return your Ballot(s) to the Voting Agent (a) via electronic mail to mmodalballots@primeclerk.com or (b) by first class mail, overnight courier or hand delivery to:

> Legend Holdings, Inc. Balloting Processing Center
> c/o Prime Clerk LLC
> 830 3rd Avenue, 9th Floor
> New York, NY 10022

TO BE COUNTED, YOUR PROPERLY COMPLETED BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN **4:00 P.M., EASTERN TIME, ON JULY 3, 2014 (the "Voting Deadline")** UNLESS THE DEADLINE IS EXTENDED BY THE DEBTORS.  YOUR BALLOT MAY BE SENT VIA ELECTRONIC MAIL, FIRST CLASS MAIL, OVERNIGHT COURIER OR HAND DELIVERY.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto.  Accordingly, in voting on the Plan, please use only the Ballot(s) sent to you with this Disclosure Statement or provided by the Voting Agent.  If you require an additional Ballot, please contact the Voting Agent and request a replacement and/or supplemental Ballot.

The Debtors have fixed **June 3, 2014** (the "**Voting Record Date**"), as the date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept or reject the Plan.  Accordingly, only holders of record of Claims as of the Voting Record Date that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of Impaired Claims has accepted the Plan.  The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Classes entitled to vote.

**THE DEBTORS, THE FIRST LIEN AGENT, THE CONSENTING LENDERS AND THE CONSENTING NOTEHOLDERS BELIEVE THAT CONFIRMATION OF THE PLAN REPRESENTS THE BEST OPPORTUNITY TO MAXIMIZE VALUE FOR ALL OF THEIR STAKEHOLDERS AND STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

**1.6**    *Important Matters.*

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof. Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein. Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements.

## ARTICLE II.

## BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO THESE CHAPTER 11 CASES

**2.1**    *The Debtors' Prepetition Businesses.*

**(a)**    **Overview.**

Holdings -- through the Debtors and their non-Debtor affiliates (the "**Company**") which is headquartered in Franklin, Tennessee, is a leading provider of clinical documentation solutions for the U.S. healthcare industry and provides a comprehensive suite of products and services to its customers, including clinical narrative capture services, Speech and Language Understanding™ technology, and clinical documentation workflow solutions. The Company's cloud-based, end-to-end technology-enabled solutions convert physicians' dictation into a comprehensive patient story through high-quality clinical documentation with rich context that can be leveraged across a healthcare enterprise for reimbursement, clinical decision support, business intelligence, and distribution.

The Company has operations in six countries and employs more than 9,900 employees, most of whom are Medical Transcriptionists or Medical Editors. As of the Petition Date, the Debtors' workforce consisted of approximately 4,200 employees (largely home-based) with employees in all 50 states. The Debtors' workforce primarily consists of regular employees, but also includes temporary employees and independent contractors. None of the Debtors' employees are members of a union or a collective bargaining unit.

The Company's customer base includes over 3,800 hospitals, clinics, and physician practices, and is composed of a wide variety of healthcare providers, including integrated delivery networks, academic centers, and specialty hospitals. The Company has a particularly high presence in the large hospital market. The Company enjoys a high retention rate with its customers, and the average tenure of its top 50 customers has been more than 4 years.

On a consolidated basis, the Company generated approximately $411 million in revenue and $85.6 million in Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("**AEBITDA**") in 2013, representing a decrease from approximately $452.8

million in revenue and $96.9 million in AEBITDA in 2012 and approximately $443.9 million in revenue and $118.1 million in AEBITDA in 2011.

The Company's activities can be considered as three separate revenue streams:

- ***Core Transcription Outsource Services ("TOS")*** – this constitutes transcription outsource labor, speech understanding, and workflow technology. In 2013, TOS accounted for more than 80% of consolidated revenue.

- ***Other Technology & Services*** – this constitutes "legacy" products and services from past acquisitions. This category includes labor for outsourced medical coding, and third party licensing of products with clinical documentation, speech recognition, and natural language understanding technology.

- ***Products*** – the Company's third revenue category includes its newer products, which are marketed under the M*Modal Fluency™ and M*Modal Catalyst brands. Examples of such products include a specialized platform for radiologists for imaging documentation and workflow management, and products that use data-driven analytics to improve clinical documentation, revenue cycle management, and patient care.

TOS, the Company's largest source of revenue, involves processing physicians' dictation through medical transcribers and speech recognition technology. Over the last twenty years, the clinical documentation industry has evolved from almost exclusively in-house production to outsourced services and from labor-intensive services to technologically-enabled solutions. The outsourced percentage of the market is expected to grow to more than a third of the overall medical transcription market by 2014. The Company operates a scalable global delivery network of transcriptionists across the U.S., India and the Philippines.

Physicians generally use one of two methods to capture clinical data in a digital format: dictation or templated direct data entry through clinical documentation systems. Dictation allows physicians to use their voice to document patient interactions, which is converted into a text format for insertion into the Electronic Health Record ("**EHR**"). Direct data entry directly populates an EHR through templates or drop-down menus, typically with a laptop or other hardware device. The adoption of direct data entry with EHRs by the Company's customers has proven to be highly erosive to TOS volumes. The speed and extent to which the Company's current customers and its target market adopts direct data entry with EHRs is somewhat uncertain within its customer base and its target market. The foregoing makes it difficult to assess the erosion the Company will likely experience in the future.

The Company uses advanced automation technologies, such as automated speech recognition ("**ASR**") and workflow platforms, and low-cost offshore resources are available to drive substantial improvements in productivity and cost. ASR converts the physician narrative into a text form which is available for editing by a medical transcriptionist. Speech automation

and an increase in offshore production have substantially decreased the overall cost of production and have further differentiated the Company from many other outsourcing providers. As the industry's cost of production has declined, the average market price for medical transcription services has also declined.

The Company's speech and workflow products are marketed under the M*Modal Fluency™ umbrella brand and include a variety of different products. The M*Modal Fluency™ family of products captures the patient story through front-end speech, voice capture, and transcription services.

The Company's speech understanding and decision support products are marketed under the M*Modal Catalyst™ umbrella brand. The M*Modal Catalyst™ family of products enable the Company's customers and partners to monetize that captured story through coding, analytics, and integration of structured data into the EHR.

## 2.2    *Prepetition Capital Structure.*

The capital structure of the Debtors as of the Petition Date is set forth in the following table:

| *Debtors* | *Material Debt Obligations* | *Outstanding Principal as of the Petition Date* |
|---|---|---|
| MModal Inc. | - Borrower under the First Lien Facility | $499,600,000 |
| Legend Parent, Inc. All Type Medical Transcription Services, Inc. MedQuist of Delaware, Inc. Mirrus Systems, Inc. MModal CB Inc. MModal MQ Inc. MModal Services, Ltd. MModal Systems & Services Inc. Poiesis Informatics, Inc. MModal IP LLC MedQuist CM LLC Multimodal Technologies, LLC | - Guarantors of the First Lien Facility | |
| MModal Inc. | - Issuer under the Indenture | $250,000,000 |

17

| | | |
|---|---|---|
| Legend Parent, Inc.<br>All Type Medical Transcription Services, Inc.<br>MedQuist of Delaware, Inc.<br>Mirrus Systems, Inc.<br>MModal CB Inc.<br>MModal MQ Inc.<br>MModal Services, Ltd.<br>MModal Systems & Services Inc.<br>Poiesis Informatics, Inc.<br>MModal IP LLC<br>MedQuist CM LLC<br>Multimodal Technologies, LLC | - Guarantors under the Indenture | |

**(a)**    **First Lien Facility.**

MModal Inc. is the borrower under the First Lien Facility, which consists of a $75 million revolving facility and a $445 million term loan.  As of the Petition Date, the revolving facility was fully drawn, and approximately $424.6 million in principal amount was outstanding under the term loan.  The revolving commitments mature on August 17, 2017, and the term loan commitments mature on August 17, 2019.  Royal Bank of Canada is the administrative agent (the "**First Lien Agent**") under the First Lien Facility.  The First Lien Agent and the First Lien Lenders are referred to collectively herein as the "**First Lien Parties**."  To the best of the Debtors' knowledge, the First Lien Parties do not include any current or former directors, officers, shareholders or other "insiders" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code.

The obligations under the First Lien Facility are secured by a first lien on substantially all assets of the Debtors, including (i) accounts, (ii) equipment, goods, inventory, and fixtures, (iii) documents, instruments, and chattel paper, (iv) letters of credit and letter of credit rights, (v) securities collateral, (vi) investment property, (vii) intellectual property collateral, (viii) certain commercial torts claims, (ix) general intangibles, (x) money and deposit accounts, (xi) supporting obligations, (xii) books and records relating to the foregoing, (xiii) other personal property; and (xiv) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty, or guaranty payable from time to time with respect to any of the foregoing.  The Debtors have also pledged (a) 100% of the equity interests they hold in each domestic subsidiary and (b) (i) 100% of the non-voting equity interests they hold in each foreign non-Debtor subsidiary and (ii) 65% of the voting equity interests they hold in each foreign non-Debtor subsidiary, to the First Lien Agent.

**(b)**    **The Indenture.**

The Debtors are also indebted under the Indenture, by and among MModal, Inc., as issuer, Legend Parent, Inc., as guarantor, and U.S. Bank National Association (the "**Indenture Trustee**"), pursuant to which MModal Inc. issued $250 million in senior unsecured notes (the

"**Notes**").    The Notes bear interest at a rate of 10.75%, payable semi-annually, and become due in 2020.  Legend Parent, Inc. and all of the other Debtors, except for Holdings, are guarantors of the obligations under the Indenture.  As of the Petition Date, the outstanding principal balance due under the Notes was $250 million.

## 2.3    *Events Leading to the Chapter 11 Cases.*

In August 2012, the Company was acquired in a $1.14 billion going private transaction (the "**Transaction**") by One Equity Partners V, L.P. ("**OEP**").  The Transaction was financed by a combination of debt and equity, including an equity contribution from OEP of approximately $447 million.  The Debtors' prepetition funded indebtedness under the First Lien Facility and the Indenture was incurred in connection with the financing for the Transaction.

Since the Transaction, a number of factors have contributed to a decline in the Debtors' earnings and liquidity position ultimately making the Debtors' filing for bankruptcy a necessary step for the Company to deleverage its balance sheet.  These factors included:

> a.    Higher than planned, industry-wide TOS erosion, primarily from product substitution as clinical documentation is more frequently populated through direct data entry with EHR, and
>
> b.    Lower than anticipated market demand for capital purchases of front end speech solutions resulting in a shift in the Company's go-to-market strategy for its newer products from one-time revenue from capital sales to more stable, recurring revenue from subscription sales.

This decline in earnings resulted in an increase in the Company's net leverage ratio creating a risk that the Company would breach financial covenants under the First Lien Facility, which set declining maximum ratios for total net leverage.  The Company announced in April 2013 that it would likely breach the net leverage covenant for the first quarter of 2013, and, in May 2013, the Credit Agreement was amended to provide for relaxed net leverage ratios.  As part of the amendment process, OEP contributed $20 million in equity to pay down a portion of the debt under the First Lien Facility.

The increasing net leverage ratio was driven by a decline in the Company's volume of TOS business with a corresponding impact on revenue and AEBITDA. This decline in TOS volume and revenue was attributable to greater than planned industry-wide erosion, including product substitution and competitive pricing pressure.  The Company initiated efforts to improve its sales training and sales presence in parallel with the development and sale of software-based products and services with higher margins in addition to its core labor-based transcription services.  The Company also implemented cost-saving measures in the second quarter of 2013 that resulted in approximately $7 million in annual savings.  While the business' absolute revenue and adjusted EBITDA were declining, the Company's efforts resulted in a relatively steady adjusted EBITDA margin near 21%.

Despite the Company's efforts to outpace the erosive nature of TOS with high margin product sales paired with proactive cost reductions, it struggled to do so as the customer

market faced cost and capital constraints associated with regulatory changes, thereby extending the sales cycle and/or reducing the size of capital product sales. In the face of this market erosion and having identified the need to shift the go-to-market strategy in support of the financial constraints being faced by its current and future customer base, in its third quarter 2013 earnings call, the Company noted it would likely breach a financial covenant under its First Lien Facility in the first half of 2014 with the recognition of the Company's inability to sustain its significant debt obligations under the First Lien Facility and the Indenture.

Anticipating the need to restructure its balance sheet, the Company hired restructuring advisors in the fourth quarter of 2013. In addition, the Company began negotiating and exploring strategic alternatives with certain holders of Notes and certain lenders under the First Lien Facility. On February 18, 2014, MModal Inc. failed to make a scheduled interest payment as required by the Indenture. Such failure gave rise to a 30-day grace period, during which the Debtors failed to cure the missed payment. Although the parties were unable to finalize the terms of a consensual restructuring proposal prior to the Petition Date, negotiations continued after the commencement of the Chapter 11 Cases. As further described below, on April 1, 2014, the Debtors, Consenting Lenders and Consenting Noteholders entered into the Plan Support Agreement regarding the terms of a plan of reorganization and debtor in possession financing facility, terms of which have been incorporated into the Plan, DIP Facility and this Disclosure Statement, as applicable.

## ARTICLE III.

## DESCRIPTION OF THE DEBTORS' CHAPTER 11 CASES

**3.1**    *Continuation of the Businesses after the Petition Date.*

**(a)**    **General Case Background.**

On March 20, 2014, each of the Debtors filed voluntary petitions in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code. Pursuant to an order of the Bankruptcy Court dated March 21, 2014, the Chapter 11 Cases are being jointly administered for procedural purposes under Case Number 14-10701. The Honorable Robert E. Grossman is presiding over the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. As of the date hereof, no request has been made for the appointment of a trustee or examiner in these cases.

**(b)**    **Employment and Compensation of Professionals.**

To assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Chapter 11 Cases, the Debtors, subject to Bankruptcy Court approval, retained:

- Dechert LLP as bankruptcy counsel;

- Klestadt & Winters, LLP as conflicts counsel;

- Alvarez & Marsal North America, LLC ("**Alvarez & Marsal**") as restructuring advisor;

- Lazard Frères & Co. LLC ("**Lazard**") as investment banker; and

- Prime Clerk as claims and noticing agent and administrative advisor.

On April 22, 2014, the Debtors filed with the Bankruptcy Court a motion seeking an order authorizing the Debtors to employ and retain professionals utilized in the ordinary course of business to assist the Debtors in their day-to-day business operations [ECF No. 104].

A hearing on the motion to authorize employment of professionals utilized in the ordinary course of business and on the applications for retention of the above-listed professionals is scheduled to be held on May 6, 2014.

**(c)     Customary "First Day" Orders.**

To minimize the possible disruption to the Debtors upon the filing of these Chapter 11 Cases, among other reasons, on the Petition Date, the Debtors filed the following motions with the Bankruptcy Court:

- Debtors' Motion for Order Directing Joint Administration of Related Chapter 11 Cases [ECF No. 2]

- Debtors' Motion for Order Authorizing the Debtors to (I) Prepare A List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (II) File A Consolidated List of 30 Largest Unsecured Creditors and (III) Mail A Form of Notice to Creditors Notifying Them of Commencement of Chapter 11 Cases [ECF No. 4]

- Debtors' Motion for Authority to Limit Notice and to Establish Case Management Procedures [ECF No. 5]

- Debtors' Motion for Order Extending The Time to File Schedules and Statements and Reports of Financial Information [ECF No. 6]

- Debtors' Motion for Order (I) Establishing Bar Date for Filing Requests for Payment of Administrative Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, (II) Approving Procedures for Filing Requests for Payment, and (III) Approving the Form, Manner, and Sufficiency of Notice Thereof [ECF No. 7]

- Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Taxes [ECF No. 8]

- Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C.

21

§§ 361, 362, and 363, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(b) [ECF No. 9]

- Debtors' Motion for Entry of Interim and Final Orders Approving (I) The Debtors' Continued Use of Their Cash Management System, (II) The Continuation of the Intercompany Transactions, (III) Administrative Expense Status for Postpetition Intercompany Claims, and (IV) The Debtors' Continued Use of Existing Bank Accounts, Checks, and Business Forms [ECF No. 10]

- Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Perform and to Honor Certain Prepetition Customer Programs In the Ordinary Course of Business [ECF No. 11]

- Debtors' Motion for Interim and Final Orders Authorizing (I) The Payment of Prepetition Wages and Salaries, (II) The Payment and Honoring of Prepetition Employee Policies and Benefits, and (III) The Continuation of Workers' Compensation Insurance Programs [ECF No. 12]

- Debtors' Motion for Interim and Final Orders Authorizing the Debtors to (I) Maintain, Continue and Renew Their Property, Casualty, Liability and Other Insurance Policies and Agreements, and (II) Honor All Obligations in Respect Thereof [ECF No. 13]

- Debtors' Motion for Entry of an Order (I) Determining that Utility Companies Have Been Provided With Adequate Assurance of Payment, (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service on Account of Prepetition Invoices, (III) Approving Adequate Assurance Procedures, (IV) Establishing Procedures for Utility Companies to Seek to Opt Out of Adequate Assurance Procedures, and (V) Determining that Debtors Are Not Required to Provide Any Additional Adequate Assurance [ECF No. 15]

On March 21, 2014 and April 9, 2014, the Bankruptcy Court entered orders granting the relief requested in each of these motions (certain of which on an interim basis), with certain modifications.  On April 15, 2014, the Bankruptcy Court entered final orders granting the relief previously approved on an interim basis.

**(d)    Appointment of Committee.**

Pursuant to section 1102(a)(1) of the Bankruptcy Code, on March 27, 2014, the U.S. Trustee appointed an Official Committee of Unsecured Creditors [ECF No. 51].  The Committee retained Stroock & Stroock & Lavan LLP, as its legal advisor and FTI Consulting, as its financial advisor.  The current members of the Committee are:

1.    US Bank National Association, as Trustee

    2.   Advanced Media, Inc.

    3.   Astor Crowne Plaza Hotel

**(e)**  **Debtor in Possession Financing.**

    Pursuant to the terms of the Plan Support Agreement, on April 22, 2014, the Debtors filed with the Bankruptcy Court a motion seeking an order authorizing the Debtors to, among other things, obtain postpetition debtor in possession financing, grant adequate protection to the prepetition lenders and use cash collateral [ECF No. 107] (the "**DIP Motion**"). Pursuant to the DIP Motion, the Debtors seek, among other things, authorization for MModal Inc., as borrower, to obtain senior secured priming and superpriority postpetition debtor in possession financing, and for each of the other Debtors to unconditionally guaranty, jointly and severally MModal Inc.'s obligations in connection with such postpetition debtor in possession financing. Royal Bank of Canada will serve as DIP Agent and collateral agent under the DIP Facility.

    The terms of the DIP Facility were negotiated in concert with, and attached as an exhibit to, the Plan Support Agreement. The DIP Facility consists of a senior secured priming and superpriority debtor in possession term loan credit facility made available to MModal Inc. in an original principal amount of $30,000,000. Pursuant to the DIP Facility, MModal Inc. will have the ability to make up to two borrowings in an amount of no less than $5.0 million and up to $15.0 million each. Certain of the First Lien Lenders will, subject to certain conditions, be afforded the opportunity to subscribe to a commitment under the DIP Facility. All amounts outstanding under the DIP Facility will bear interest at rates specified therein.

    The obligations under the DIP Facility will be secured by security interests granted by the Debtors in, without limitation, all assets now or hereafter acquired, excluding causes of action of the Debtors or their estates under sections 502(d), 544, 545, and 547-550 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law and proceeds thereof; provided, however, that the debtor in possession liens on the equity interests of the Debtors and their direct or indirect subsidiaries will consist of (A) 100% of the equity interests of Holdings and each direct and indirect domestic Debtor subsidiary thereof, (B) 100% of the non-voting equity interests of each direct or indirect foreign subsidiary of any Debtor; and (C) 65% of the voting equity interests of each foreign subsidiary directly owned by any Debtor.

    As a condition of the DIP Facility, the Debtors will operate their business pursuant to an agreed upon budget (subject to certain enumerated variances), the terms of which have been agreed by the parties to the DIP Facility. In addition, the Debtors must maintain compliance with covenants regarding, without limitation, disposition of cash collateral and proceeds of the DIP Facility, incurrence of additional liens senior to pari passu with the liens under the DIP Facility, and provision of detailed financial deliverables. The DIP Facility incorporates customary events of default for debtor in possession facilities.

    The enhanced liquidity resulting from the DIP Facility constitutes a significant consideration that enhances the estates and the Debtors' going concern value. A hearing on the motion to approve debtor in possession financing is scheduled to be held on May 6, 2014. Under

the terms of the Plan Support Agreement, parties may terminate the Plan Support Agreement if the Bankruptcy Court has not entered a final order approving the DIP Facility by May 7, 2014.

**(f)      Plan Support Agreement**

After extensive good faith negotiations starting before and continuing after the Petition Date, on April 1, 2014, the Debtors, the Consenting Lenders and the Consenting Noteholders entered into the Plan Support Agreement.  The resolution embodied in the Plan Support Agreement has support from the Debtors' key creditor constituencies. The Plan Support Agreement has been agreed to by holders of more than 66% of the First Lien Claims in Class 2 and holders of more than 66% of the Noteholder Claims.  The Plan Support Agreement outlined terms of the Plan and the Plan is consistent with the terms thereof.

The Plan Support Agreement contains customary terms, including an agreement among the Debtors, the Consenting Lenders and the Consenting Noteholders to support a plan of reorganization that is consistent with the Plan Support Agreement, to negotiate in good faith regarding necessary documentation (including, but not limited to, a disclosure statement, an order approving the disclosure statement, an order confirming the Plan, corporate organizational documents and exit credit facility documents), and to refrain from supporting any alternative plans of reorganization.  In addition, the First Lien Lenders' agreement to provide the Debtors with the previously discussed $30 million DIP Facility and the consensual use of cash collateral is an integral part of the Plan Support Agreement.

The Plan Support Agreement also requires the Debtors to use commercially reasonable efforts to timely comply with each of the following milestones (the "**Milestones**"), as extended with the prior written consent of the Required Consenting Holders:

(i)      file a motion to approve the Plan Support  Agreement and obtain entry of an order, in form and substance reasonably acceptable to the Required Consenting Holders, approving the Plan Support Agreement on or before May 7, 2014;

(ii)      file a motion to approve the DIP Facility and obtain entry of the DIP Order on or before May 7, 2014;

(iii)      file the Plan and the Disclosure Statement on or before April 25, 2014;

(iv)      obtain entry of the order approving the Disclosure Statement on or before June 4, 2014;

(v)      obtain entry of the Confirmation Order on or before July 16, 2014; and

(vi)      cause the Effective Date to occur on or before August 15, 2014;

The Milestones may be further extended, if at all, with the prior written consent of the Required Consenting Lenders and the Required Consenting Noteholders.

On April 2, 2014, the Debtors filed the *Debtors' Motion for Order Authorizing the Debtors to Enter Into and Perform Under a Plan Support Agreement with Holders of the Majority of Claims Under the Debtors' First Lien Credit Agreement and the Majority of Claims Under the Indenture* [ECF No. 64] (the "**PSA Motion**").   A hearing on the PSA Motion is scheduled to be held on May 6, 2014.

**(g)    Key Employee Incentive Plan.**

The terms of a key employee incentive plan are being negotiated by the Debtors, the Consenting Lenders and the Consenting Noteholders, as required by the Plan Support Agreement, and are expected to be filed as part of the Plan Supplement.

**(h)    Protection of Tax Attributes.**

On April 1, 2014, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Notification and Hearing Procedures for Transfers of or Claims of Worthless Stock Deductions with Respect to Certain Equity Securities* [ECF No. 61] (the "**WSD Procedures Motion**").   The purpose of the WSD Procedures Motion was to preserve the flexibility to implement a balance sheet restructuring that maximizes the value of the Debtors' tax attributes by closely monitoring certain transfers of the equity securities of Holdings and claims of worthlessness with respect to the equity securities of Holdings.   A hearing on the WSD Procedures Motion is scheduled to be held on May 6, 2014.

**3.2    *Case Administration.***

**(a)    Exclusivity.**

Under the Bankruptcy Code, debtors have the exclusive right to file a plan or plans for an initial period of 120 days from the date on which the debtor filed its bankruptcy petition.   If debtors file a plan within this exclusive period, then the debtors have the exclusive right for 180 days from the filing date to solicit acceptances of their plan.   During these exclusive periods, no other party in interest may file a competing plan.   A court may extend these periods upon request of a party in interest and "for cause."

The Debtors' initial exclusive filing period expires on July 18, 2014, and the Debtors' initial exclusive solicitation period expires on September 16, 2014.

**(b)    Schedules and Establishment of Bar Date.**

By order of the Bankruptcy Court dated March 21, 2014, the Debtors obtained extensions of the time to file their schedules and statements (collectively, the "**Schedules**") and reports of financial information [ECF No. 36] (the "**Rule 2015.3 Report**").   The Debtors' time to file the Schedules is extended through and including April 28, 2014 and the Debtors' time to file the Rule 2015.3 Report is extended until thirty (30) days after the meeting of creditors to be held pursuant to section 341.

On April 21, 2014, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Deadline for Filing Proofs of Claim and Approving Form and Manner of Notice*

*Thereof* [ECF No. 101] (the "**Bar Date Motion**").  The Bar Date Motion seeks the entry of an order establishing (a) May 30, 2014 at 5:00 p.m. (Eastern Time) (the "**General Bar Date**") as the deadline by which all persons and entities must file proofs of Claim against the Debtors' estates and (b) the later of (i) the General Bar Date, or (ii) 5:00 p.m. (Eastern Time) on the date that is thirty (30) days after entry of an order approving the rejection of an executory contract or unexpired lease as the deadline for filing proofs of Claims based on rejection of such contracts or leases (the "**Rejection Bar Date**").  The order approving the Bar Date Motion is scheduled to be presented for approval by the Bankruptcy Court on April 28, 2014.

Pursuant to Rule 3003(c)(2) of the Bankruptcy Rules, any creditor whose applicable claim was not scheduled, or was scheduled as disputed, contingent, or unliquidated, and who failed to file a proof of claim on or before the applicable Bar Date, will not be treated as a creditor with respect to the Plan or receive a distribution under the Plan.

**(c)     Claims.**

As of April 24, 2014, approximately 56 proofs of Claim have been filed against the Debtors. The Debtors are in the preliminary stages of reviewing these proofs of Claim.  The Debtors have estimated the approximate amount of Allowed Claims and have set forth such estimates in the table set forth in Article I above.

THESE ESTIMATES ARE PRELIMINARY AND TENTATIVE GIVEN THE LIMITED REVIEW AND ANALYSIS UNDERTAKEN BY THE DEBTORS TO DATE. THESE AMOUNTS REPRESENT ESTIMATES BY THE DEBTORS BASED ON CURRENT INFORMATION ONLY.  THE DEBTORS MAKE NO REPRESENTATION AS TO THE EXTENT THESE ESTIMATES ULTIMATELY PROVE ACCURATE IN LIGHT OF ACTUAL CLAIMS AND THE RESOLUTION OF CLAIMS DISPUTES.  FOR INFORMATION REGARDING THE LIMITATIONS OF AND UNCERTAINTIES RELATING TO THESE ESTIMATES, SEE ARTICLE XI BELOW ("CERTAIN RISK FACTORS TO BE CONSIDERED").

## ARTICLE IV.

## THE PLAN[1]

**4.1     *Overview of Chapter 11.***

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the Debtors as of the Petition Date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of

---

[1]     This summary is qualified in its entirety by the Plan.  To the extent that any provision of this summary is inconsistent with the Plan, the Plan shall control.

a plan by the bankruptcy court makes the plan binding upon the debtor, any Person acquiring property under the plan and any creditor or equity interest holder of a debtor.

In general, a chapter 11 plan (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization or liquidation of the debtor and that are required or permitted by the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims is "Impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class, or (ii) provides, among other things, for the cure of existing defaults and reinstatement of the maturity of claims in such class.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of the chapter 11 cases until such time as the court has approved a disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are Impaired and not deemed to have rejected the Plan.

**4.2**   *Overview of the Plan.*

**(a)**   **General.**

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO. YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.

The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests will be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class. The Plan separates the various Claims (other than those that do not need to be classified) into seven (7) separate Classes and classifies the Interests into two (2) Classes. These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtors. Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtors.

This Section summarizes the treatment of each of the Classes of Claims and Interests under the Plan, and describes other provisions of the Plan. Only holders of Allowed Claims — Claims that are not disputed, contingent, or unliquidated in amount and are not subject to an objection or an estimation request — are entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed," see Section 1.3 of the Plan. Until

a Disputed Claim becomes Allowed, no distribution of Cash, securities and/or other instruments or property otherwise available to the holder of such Claim will be made.

The Debtors believe that they and the other parties appointed pursuant to the Plan will be able to perform their respective obligations under the Plan. Also, the Debtors believe that the Plan provides for an equitable treatment for the holders of Claims and Interests.

The Confirmation Date will be the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order. The Effective Date will be a day, as determined by the Debtors with the consent of the First Lien Agent and the Required Consenting Holders that is the Business Day on or after all conditions to substantial consummation of the Plan have been satisfied or waived in whole or in part by the Debtors, the First Lien Agent and the Required Consenting Holders, as applicable.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests. Except as otherwise provided in the Plan or the Confirmation Order, all consideration necessary for the Reorganized Debtors to make Cash payments pursuant to the Plan will be obtained from the existing Cash balances of the Debtors and new loans to be made to the Debtors upon emergence.

All Claims and Interests, except Administrative Claims, Professional Fee Claims, Priority Tax Claims and DIP Claims (if any) (the "**Unclassified Claims**"), are placed in the Classes described below and set forth in Section 3 of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, the holders of the Unclassified Claims are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

**(b)      Purpose and Effects of the Plan.**

The overall purpose of the Plan is to restructure the Debtors' Estates in a manner designed to efficiently maximize recovery to stakeholders. The Debtors have sought to achieve this purpose through a debt for equity restructuring of the Debtors' balance sheet.

**(c)      Time for Filing Administrative Claims and Professional Fee Claims.**

**1.      Administrative Claims.**

Except as otherwise provided in Section 2 of the Plan, unless it has previously filed, the holder of an Administrative Claim, other than the holder of:

(1)      a Professional Fee Claim;

(2)      an Administrative Claim that has been Allowed on or before the Effective Date;

(3)     an Administrative Claim for an expense or liability incurred and payable in the ordinary course of business by a Debtor;

(4)     an Administrative Claim on account of fees and expenses incurred on or after the Petition Date by ordinary course Professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

(5)     an Administrative Claim held by a current officer, director or employee of the Debtors for indemnification, contribution, or advancement of expenses pursuant to (A) any Debtor's operating agreement, certificate of incorporation, by-laws, or similar organizational document or (B) any indemnification or contribution agreement approved by the Bankruptcy Court;

(6)     an Administrative Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses;

(7)     a U.S. Trustee Fee Claim;

(8)     a DIP Claim;

(9)     an Intercompany Claim; or

(10)    an Administrative Claim subject to the *Order Establishing Bar Date for Filing Requests for Payment of Administrative Claims Arising Under Section 503(b)(9) of the Bankruptcy Code, Approving Procedures for Filing Requests for Payment, and Approving the Form, Manner, and Sufficiency of Notice Thereof,* entered by the Bankruptcy Court on March 21, 2014 [ECF No. 30],

will be required to file with the Bankruptcy Court and serve on the (i) Debtors or the Reorganized Debtors, as applicable, and (ii) the First Lien Agent, requests for payment of Administrative Claims pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than sixty (60) days after the Effective Date (the "**Administrative Bar Date**").  Such requests for payment of Administrative Claims will need to include at a minimum:  (A) the name of the applicable Debtor that is purported to be liable for the Administrative Claim, and if the Administrative Claim is asserted against more than one Debtor, the exact amount asserted to be owed by each such Debtor; (B) the name of the holder of the Administrative Claim; (C) the amount of the Administrative Claim; (D) the basis of the Administrative Claim; and (E) supporting documentation for the Administrative Claim. **HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY SUCH DATE WILL BE FOREVER BARRED, ESTOPPED AND**

**ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY AND SUCH ADMINISTRATIVE CLAIMS WILL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.** Objections to requests for payment of Administrative Claims, if any, must be filed and served on the Reorganized Debtors and the requesting party no later than ninety (90) days after the Effective Date.

Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim previously Allowed by Final Order, including, without limitation, all Claims held by the First Lien Secured Parties and the DIP Secured Parties pursuant to the DIP Order, by any party to an executory contract that is not rejected under the Plan or any other trade creditor or customer of the Debtors whose claim is on account of ordinary course of business goods or services provided to the Debtors in these Chapter 11 Cases and all Claims Allowed under the Plan.  For the avoidance of doubt, Administrative Claims related to breach of contract, tort or any other Claim not related to amount due and payable in the ordinary course of business and pursuant to ordinary trade terms held by any party, including, parties to any Executory Contract or Unexpired Lease that is not rejected by the Debtors, or any trade creditor or customer, must be filed by the Administrative Claims Bar Date set forth in Section 5.12 of the Plan.

### 2. Professional Fee Claims.

The Plan provides that holders of Professional Fee Claims may file their respective final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred from and after the Petition Date through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date, or such other date that may be fixed by the Bankruptcy Court.  **Any Person that fails to file such a proof of Claim or application on or before such date will be forever barred from asserting such Claim against the Debtors, the Reorganized Debtors or their property and the holder thereof will be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Claim.**

Objections to Professional Fee Claims, if any, will be required to be filed and served pursuant to the procedures set forth in the Confirmation Order no later than: sixty (60) days after the Effective Date; or (ii) twenty (20) days after the Professional Fee Claim is filed with the Bankruptcy Court, or on such other date as established by the Bankruptcy Court.

**(d)     Description and Treatment of Unclassified Claims.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, U.S. Trustee Fees, Administrative Claims, Professional Fee Claims, Priority Tax Claims and DIP Claims are not classified under the Plan.  To confirm the Plan, the Unclassified Claims must be paid in full or in a manner otherwise agreeable to the holders of those Claims.

### 1. U.S. Trustee Fees.

On or before the Effective Date, the Debtors will pay all U.S. Trustee Fees in full in Cash.  Any U.S. Trustee Fees due after the Effective Date will be paid by the Reorganized Debtors in the ordinary course until the earlier of the entry of a final decree closing the

applicable Chapter 11 Case, or a Bankruptcy Court order converting or dismissing the applicable Chapter 11 Case.  Any deadline for filing Administrative Claims or Professional Fee Claims will not apply to claims for U.S. Trustee Fees.

## 2.    Administrative Claims.

Except with respect to Administrative Claims that are Professional Fee Claims and except to the extent that a holder of an Allowed Administrative Claim has been paid by the Debtors prior to the Effective Date or agrees to a less favorable or equal, but different, treatment, each holder of an Allowed Administrative Claim will be paid, in full satisfaction, settlement and release of such Allowed Administrative Claim, Cash in an amount equal to the amount of such Allowed Administrative Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the date such Administrative Claim becomes Allowed or (iii) the date such Allowed Administrative Claim becomes due and payable or as soon thereafter as is practicable; provided, however, that Allowed Administrative Claims incurred in the ordinary course of business, at the option of the Reorganized Debtors, will be paid in full in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

## 3.    Professional Fee Claims.

The holders of Professional Fee Claims may file their respective final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred after the Petition Date through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date, or such other date that may be fixed by the Bankruptcy Court.  Allowed Professional Fee Claims will be paid in full in Cash by Reorganized Holdings either (a) within five (5) Business Days of the date such Professional Fee Claim is approved by a Final Order issued by the Bankruptcy Court, or (b) upon such other terms as may be mutually agreed upon by such holder of an Allowed Professional Fee Claim and the Reorganized Debtors.  Professionals will not be required to seek Bankruptcy Court approval of any fees and expenses incurred after the Effective Date in connection with the Debtors, Reorganized Debtors or the Chapter 11 Cases.  Failure to file a final fee application by the deadline set forth above will result in the relevant Professional Fee Claim being forever barred and disallowed.  Objections to any Professional Fee Claim must be filed and served on the Reorganized Debtors and the requesting party no later than 75 days after the Effective Date.

## 4.    Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim will receive, in full satisfaction, settlement, discharge and release of its Allowed Priority Tax Claim, at the election of the Debtors with the consent of the Required Consenting Holders, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the (a) Effective Date or (b) first Business Day after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with

31

interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the date of assessment of such Allowed Priority Tax Claim. The Reorganized Debtors will have the right to prepay an Allowed Priority Tax Claim at any time under this option. All Allowed Priority Tax Claims that are not due and payable on or before the Effective Date will be paid in the ordinary course of business as such obligations become due.

No holder of an Allowed Priority Tax Claim will be entitled to receive any payment on account of any penalty not representing compensation of an actual pecuniary loss arising with respect to or in connection with such Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be deemed disallowed and expunged. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors, or their property.

### 5.    DIP Claims.

Except as otherwise agreed to by the Debtors, the DIP Agent, the "Required Lenders" under, and as defined in, the DIP Credit Agreement and the Required Consenting Holders, on the Effective Date, all DIP Claims will be paid in full in Cash, and upon such payment, all of the Debtors' respective outstanding obligations, liabilities and indebtedness in respect of the DIP Facility and all liens and security interests securing the same will be satisfied, discharged, and terminated in full, and the Debtors will have no further obligations, liabilities or indebtedness under the DIP Facility or any documents relating thereto, in each case, other than any obligations that may survive termination or maturity of the DIP Facility in accordance with its terms.

### (e)    Description of Classification and Treatment of Claims and Interests Pursuant to the Plan.

This Section summarizes the treatment of each of the Classes of Claims against and Interests in the Debtors under the Plan. **For a more detailed description of the treatment of each Class of Claims and Interests, please refer to Section 3 of the Plan.**

### 1.    Class 1: Priority Claims.

Class 1 comprises the Priority Claims against the Debtors. Except to the extent that a holder of an Allowed Priority Claim agrees to a less favorable treatment, each holder of an Allowed Priority Claim will receive, in full satisfaction, settlement, release, and discharge of, and in exchange for such Priority Claim, Cash in the full amount of such Allowed Priority Claim on the Effective Date or, if later, the first Business Day after the date such Priority Claim becomes Allowed.

Class 1 is Unimpaired. Each holder of an Allowed Priority Claim in Class 1 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

### 2.    Class 2: First Lien Claims.

Class 2 comprises the First Lien Claims against the Debtors. The First Lien Claims as of the Petition Date will be Allowed in the aggregate amount of $507,680,532.71. On

the Effective Date, each holder of a First Lien Claim will receive in full satisfaction and release of such holder's First Lien Claim, such holder's Pro Rata share of (i) the New Term Loan; (ii) ninety-three (93) percent of Reorganized Holdings Equity Interests, subject to dilution solely on account of the New Warrants and Management Stock Option Plan; and (iii) $8,197,801 in Cash.

Class 2 is Impaired.  Each holder of an Allowed First Lien Claim in Class 2 is entitled to vote to accept or reject the Plan.

### 3.    Class 3: Other Secured Claims.

Class 3 comprises the Other Secured Claims against the Debtors.  Unless a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, on the Effective Date, each Allowed Other Secured Claim will be Reinstated, or, at the option of the Debtors or the Reorganized Debtors with the consent of the Required Consenting Holders, each holder of an Allowed Other Secured Claim will receive, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest Allowed pursuant to section 506(b) of the Bankruptcy Code, (ii) the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (iii) the collateral securing such Allowed Other Secured Claim, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code on account of such Allowed Other Secured Claim.

Class 3 is Unimpaired.  Each holder of an Allowed Other Secured Claim in Class 3 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

### 4.    Class 4: General Unsecured Claims.

Class 4 comprises the Allowed General Unsecured Claims against the Debtors, including Noteholder Claims.  The Debtors estimate approximately $267.5 - $271.2 million of Allowed General Unsecured Claims (including $265,975,694.44 of Allowed Noteholder Claims).  On the Effective Date, each creditor holding an Allowed General Unsecured Claim and that has not elected to reduce its Claim to $100,000 and receive Distributions as if the Claim is a Class 6 Claim will receive in full satisfaction and release of such Claim, such holder's Pro Rata share of: (i) seven (7) percent of Reorganized Holdings Equity Interests subject to dilution solely on account of the New Warrants and Management Stock Option Plan; (ii) the New A Warrants and New B Warrants; and (iii) $617,039 in Cash; provided, however, that holders of Allowed General Unsecured Claims other than a Noteholder Claim may elect to receive, in lieu of the foregoing consideration, Cash in an amount equal to a percentage of such creditor's General Unsecured Claim, which percentage will reflect the recovery percentage of the holders of Noteholder Claims and will be set forth in the Plan Supplement and be acceptable to the Required Consenting Holders in their good faith discretion.

Each holder of a Class 4 Claim that is not a Noteholder will be permitted to reduce its Claim to $100,000 and receive, in lieu of the Distribution provided to holders of Class 4 Claims, Distribution as if the Claim is a Class 6 Claim.

To the extent that aggregate amount of Claims in Class 4 includes, in addition to Noteholder Claims, Allowed General Unsecured Claims (for avoidance of doubt, Convenience Class Claims and/or Class 5 Claims that have not been reclassified as Class 4 Claims will not constitute General Unsecured Claims), the aggregate available Distribution to Allowed Class 4 Claims will be increased by the Cash True-Up Amount such that the Distribution to holders of Allowed Class 4 Claims (calculated without giving effect to the inclusion of Excess Claims in Class 4) will not be diluted by the inclusion of the Excess Claims in Class 4.

Class 4 is Impaired.  Each holder of an Allowed General Unsecured Claim in Class 4, including Allowed Noteholder Claims, is entitled to vote to accept or reject the Plan.

### 5.        Class 5: Subordinated Claims.

Class 5 comprises the Subordinated Claims against the Debtors.  Each holder of a Subordinated Claim will receive no Distribution.  To the extent that the Bankruptcy Court holds that any Subordinated Claim included by the Debtors in this Class is not subject to subordination pursuant to section 510(b) or 510(c) of the Bankruptcy Code, such Claim will automatically be deemed (i) a Class 4 Claim if the amount of such Claim is in excess of $100,000 or (ii) a Class 6 Claim if the amount of such Claim is equal to or less than $100,000 and will receive Distribution as such.

Class 5 is Impaired.   Each holder of a Subordinated Claim in Class 5 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

### 6.        Class 6:  Convenience Class Claims.

Class 6 comprises the Convenience Class Claims against the Debtors.   Each holder of a Convenience Class Claim will receive payment in full and in Cash on or as soon as reasonably practicable after the Effective Date in an amount not to exceed $100,000.

The Convenience Claims are Unimpaired.   Each holder of an Allowed Convenience Class Claim in Class 6 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

### 7.        Class 7: Intercompany Claims.[2]

Class 7 comprises the prepetition Intercompany Claims.  On the Effective Date, at the Debtors' option, but in each case subject to the prior written consent of the First Lien Agent and the Required Consenting Holders, each Intercompany Claim will either be (i) cancelled (or otherwise eliminated) and receive no Distribution under the Plan or (ii) Reinstated.

Class 7 is Impaired.   Each holder of an Intercompany Claim in Class 7 is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

---

[2]     To the best of the Debtors' knowledge, the amount of any Intercompany Claim as against any Debtor is not greater than the amount of the First Lien Claims as against any Debtor.  As a general matter, the Intercompany Claims were incurred by the Debtors in the ordinary course of the operation of their business.

**8.        Class 8: Intercompany Interests.**

Class 8 comprises the Intercompany Interests.  On the Effective Date, Class 8 Intercompany Interests will be Reinstated.

Class 8 is Unimpaired.  Each holder of an Allowed Intercompany Interest in Class 8 is conclusively presumed to accept the Plan and is not entitled to vote to accept or reject the Plan.

**9.        Class 9: Holdings Equity Interests.**

Class 9 comprises the Equity Interests in Holdings.  Each holder of a Holdings Equity Interest will receive no Distribution on account of such Equity Interest.  All Holdings Equity Interests will be deemed cancelled as of the Effective Date.

Class 9 is Impaired.  Each holder of a prepetition Holdings Equity Interest is conclusively presumed to reject the Plan and is not entitled to vote to accept or reject the Plan.

**(f)        Distributions.**

**1.        Distribution Record Date.**

On the Distribution Record Date,[3] the transfer ledgers for holders of Claims maintained by the Debtors will be closed, and there will be no further changes in the record holders of such Claims for purposes of Distributions hereunder.  The Debtors, the Reorganized Debtors, the First Lien Agent and the Indenture Trustee will have no obligation to recognize any transfer of any such Claims occurring after the Distribution Record Date and will be entitled instead to recognize and deal for all purposes under the Plan with only those record holders listed on the transfer ledgers as of the Distribution Record Date.

**2.        Date of Distributions.**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but will be deemed to have been completed as of the required date.

**3.        No Recourse.**

No holder of a Claim will have recourse to the Reorganized Debtors (or any property of the Reorganized Debtors), other than with regard to the enforcement of rights or Distributions under the Plan, and the transactions contemplated thereby and by the Definitive Documents.  If and to the extent that there are Disputed Claims, Distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in Section 7 of the Plan.

---

[3]    The "**Distribution Record Date**" means 5:00 p.m. (Eastern Time) on the date to be agreed among the Debtors and the Required Consenting Holders that is no later than two (2) Business Days before the Effective Date.

### 4.    Disputed Identity of Claim Holder.

If any dispute arises as to the identity of a holder of an Allowed Claim entitled to receive any Distribution, the Reorganized Debtors may, in lieu of making such Distribution to such Person, make such Distribution into a segregated account until the disposition thereof will be determined by an order of the Bankruptcy Court or by written agreement among the interested parties.

### 5.    Distributions on Account of Obligations of Multiple Debtors.

For all purposes associated with Distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, will be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor will result in a single Distribution under the Plan; provided, that, for the avoidance of doubt, this will not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as a particular case is closed, dismissed, or converted.

### 6.    Release of Liens.

Except as otherwise provided in the Plan, the Definitive Documents or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date, all mortgages, deeds of trust, liens or other security interests against the property of any Debtor's Estate will be fully released and discharged, and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens or other security interests, including any rights to any collateral thereunder, will revert to the applicable Reorganized Debtors and their successors and assigns. As of the Effective Date, the Reorganized Debtors will be authorized to execute and file on behalf of all applicable creditors who have had their liens released and discharged pursuant to the foregoing such Uniform Commercial Code termination statements, mortgage or deed of trust releases or such other forms, releases or terminations as may be necessary or appropriate to implement the Plan.

### 7.    Disbursing Agents.

All Distributions under the Plan other than Distributions to the holders of First Lien Claims and Noteholder Claims will be made by the applicable Reorganized Debtor as Disbursing Agent. The First Lien Agent and/or such other entity as it may designate will be the Disbursing Agent for the holders of First Lien Claims. The Indenture Trustee will be the Disbursing Agent for the holders of Noteholder Claims.

Each Disbursing Agent will be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan, (ii) make Distributions consistent with the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iii) exercise such other powers as may be vested in the Disbursing Agent by Order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

Except as provided otherwise in the Plan or ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by any Disbursing Agent (including without limitation, reasonable attorneys' fees and expenses) will be paid in Cash by Reorganized Holdings.

The First Lien Agent, as Disbursing Agent, will administer Distributions to the holders of First Lien Claims in accordance with the Plan and the First Lien Credit Agreement. The issuance and Distribution of the Reorganized Holdings Equity Interests and the delivery of the New Term Loan and Cash to the First Lien Agent will be deemed Distributions to the respective Holders of First Lien Claims.  Upon delivery of the Reorganized Holdings Equity Interests, the New Term Loan and Cash to the First Lien Agent in accordance with the Plan, the Reorganized Debtors will be released of all liability with respect to the delivery of such Distributions.

The Indenture Trustee, as Disbursing Agent, will administer Distributions to the holders of Noteholder Claims in accordance with the Plan and the Indenture.  The issuance and Distribution of the Reorganized Holdings Equity Interests and New Warrants and the delivery of the Cash to the Indenture Trustee will be deemed Distributions to the respective Holders of Noteholder Claims.  Upon delivery of the Reorganized Holdings Equity Interests, the New Warrants and Cash to the Indenture Trustee, the Reorganized Debtors will be released of all liability with respect to the delivery of such Distributions.

The First Lien Agent and Indenture Trustee will be exculpated by all Persons from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon it as Disbursing Agent under the Plan or any order of the Bankruptcy Court pursuant to or in furtherance of the Plan.  No holder of a Claim or an Interest or other party in interest will have or pursue any Claim or Cause of Action against the First Lien Agent, the Indenture Trustee or any of their respective representatives or advisors for making payments in accordance with the Plan or for implementing provisions of the Plan in its capacity as Disbursing Agent.

## 8.    Surrender of Securities or Instruments.

As a condition to receiving any Distribution or release under the Plan, if requested by the Debtors or the Reorganized Debtors, as applicable, each holder of a certificated instrument or note (other than the First Lien Agent or any First Lien Lender in its capacity as such) will be required to surrender such instrument or note held by it to the Reorganized Debtors and execute such documents and instruments as the Debtors or the Reorganized Debtors require to effectuate and further evidence the terms and conditions of the Plan.  Any holder of such instrument or note that fails to (i) surrender such instrument or note or execute such documents and instruments as the Debtors require, or (ii) execute and deliver an affidavit of loss and/or indemnity reasonably satisfactory to the Reorganized Debtors and furnish a bond in form, substance, and amount reasonably satisfactory to the Reorganized Debtors before the first anniversary of the Effective Date, will be deemed to have forfeited all rights, Claims or releases and may not participate in any Distribution or release hereunder.  Any Distribution so forfeited will become property of the Reorganized Debtors.

### 9.    Delivery of Distributions; Unclaimed Property.

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim will be made by the Reorganized Debtors, which will transmit such Distribution to the last known address of the applicable holders of Allowed Claims.  In the event that any Distribution to any holder is returned as undeliverable, the Reorganized Debtors may, but will not be required to, make efforts to determine the current address of such holder, but no Distribution to such holder will be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such Distribution will be made to such holder without interest.

The Reorganized Debtors will hold all Unclaimed Property for the benefit of the holders of Claims entitled thereto under the terms of the Plan.  At the end of six (6) months following the relevant date on which a Distribution was made, the holders of Allowed Claims theretofore entitled to Unclaimed Property held pursuant to Section 6.9(b) of the Plan will be deemed to have forfeited such property, whereupon all right, title and interest in and to such property will immediately and irrevocably revest in the Reorganized Debtors, such holders will cease to be entitled thereto and any such Unclaimed Property that is Cash will be property of the Reorganized Debtors, free and clear of any restrictions thereon.  Any non-Cash consideration not distributed on account of a Claim as provided in the Plan will be cancelled.

### 10.    Distributions on Account of Allowed Claims Only.

Notwithstanding anything to the contrary in the Plan, no Distribution will be made on account of a Disputed Claim until such Disputed Claim becomes an Allowed Claim.

### 11.    Distributions to Holders of General Unsecured Claims.

(a)    The Reorganized Debtors will set aside and reserve, for the benefit of each holder of a Disputed General Unsecured Claim, an amount of (1) such holder's share of Reorganized Holdings Equity Interests, the New Warrants, and Cash (collectively, the "**Class 4 Equity Distribution**"), or (2) to the extent such holder has elected to receive a Distribution solely in Cash (the "**Class 4 Cash Distribution**"), such holder's share of the Class 4 Cash Distribution.  The reserves described in provisions (1) and (2) herein will, in each case, be equal to the Distribution to which the holder of such Disputed Claim would be entitled if such Disputed Claim were an Allowed General Unsecured Claim, in an amount equal to (i) the amount of such Claim as estimated by the Bankruptcy Court pursuant to an Estimation Order, (ii) an amount mutually agreed between the Reorganized Debtors and the holder of such Disputed Claim, or (iii) if no agreement has been reached and no Estimation Order has been entered with respect to such Disputed Claim, the greater of (A) the amount listed in the Schedules and (B) the amount set forth in a proof of claim, or application for payment filed with the Bankruptcy Court, or pursuant to an order of the Bankruptcy Court entered in the Chapter 11 Cases, in each case with respect to such General Unsecured Claim.  The difference between (y) the amount so reserved for each such General Unsecured Claim and (z) the amount of federal, state and local taxes paid by the Reorganized Debtors with respect to such Claim will constitute the maximum Distribution amount to which the holder of such Claim may ultimately become entitled if such holder's Claim (or a portion thereof) becomes an Allowed General Unsecured Claim.

The Reorganized Debtors will set aside and reserve, in addition to the consideration constituting the Disputed Unsecured Reserve, for the benefit of each holder of an Allowed Class 4 Claim, Cash in an amount equal to the Cash True-Up Amount for all Disputed Claims comprising the Disputed Unsecured Reserve as if such Claims were Allowed Claims (the "**True-Up Reserve Cash**").

(b)       On or as soon as reasonably practicable after the Effective Date, the Reorganized Debtors will distribute to each holder of an Allowed General Unsecured Claim such holder's Pro Rata share of the Distributable Assets.

(c)       No Distributions will be made by the Reorganized Debtors with respect to a Disputed General Unsecured Claim until the resolution of such Claim by agreement with the Reorganized Debtors or a Final Order.  On each Periodic Unsecured Distribution Date after a Disputed General Unsecured Claim becomes an Allowed Claim, the Reorganized Debtors will distribute to (i) the holder thereof Reorganized Holdings Equity Interests, the New Warrants, and/or Cash, from the Disputed Unsecured Reserve, in an amount equal to the aggregate amount of Reorganized Holdings Equity Interests, the New Warrants, and/or Cash that would have been distributed to such holder in respect of such Claim had such Claim been an Allowed General Unsecured Claim, in the amount in which it is ultimately Allowed, on the Initial Unsecured Distribution Date and any previously occurring Periodic Unsecured Distribution Dates and (ii) the holders of Allowed Class 4 Claims, the applicable portion of the True-Up Reserve Cash. Any holder of a General Unsecured Claim whose Claim is so Allowed after the tenth (l0th) day prior to the next Periodic Unsecured Distribution Date will receive its initial Distribution on the next succeeding Periodic Unsecured Distribution Date following such Periodic Unsecured Distribution Date.

(d)       To the extent all or a portion of a Disputed General Unsecured Claim becomes disallowed or is reclassified pursuant to a Final Order or agreement of the Reorganized Debtors and the holder of such Disputed General Unsecured Claim, (i) the Class 4 Equity Distribution previously reserved for such Disputed General Unsecured Claim (or portion thereof) will be reallocated among the holders of Allowed General Unsecured Claims in Class 4, (ii) to the extent that the holder of a Disputed General Unsecured Claim elected to receive, in lieu of the Class 4 Equity Distribution, the Class 4 Cash Distribution, the Class 4 Cash Distribution previously reserved for such Disputed General Unsecured Claim (or portion thereof) will be reallocated among the holders of Allowed General Unsecured Claims in Class 4 and (iii) the portion of the True-Up Reserve Cash previously reserved for such Disputed General Unsecured Claim (or portion thereof) will be returned to the Reorganized Debtors.

(e)       Periodic Unsecured Distribution Dates will continue to occur until all Disputed General Unsecured Claims have been resolved.

**12.       Distributions to Holders of Convenience Class Claims.**

Each holder of an Allowed Convenience Class Claim will receive payment in full and in Cash as soon as practicable after the Effective Date but in no event later than 10 days of the Effective Date or, if later, within three (3) Business Days after the date such Convenience Class Claim becomes Allowed.

13.     **Manner of Payment under the Plan.**

Any Cash payment to be made under the Plan may be made by a check, wire transfer, or such other commercially reasonable manner as the payor will determine in its sole discretion, or as otherwise required or provided in applicable agreements.  Except as otherwise specified herein, Cash payments made pursuant to the Plan will be in U.S. currency; provided, however, that Cash payments to foreign holders of Allowed Claims may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

14.     **Calculation of Distribution Amounts of Reorganized Holdings Equity Interests and New Warrants.**

No fractional shares of Reorganized Holdings Equity Interests or New Warrants will be issued or distributed under the Plan.   Each Person entitled to receive a Holdings Reorganized Equity Interest or New Warrants will receive the total number of whole shares of Reorganized Holdings Equity Interests and New Warrants to which such Person is entitled. Whenever any Distribution to a particular Person would otherwise call for Distribution of a fraction of a share of Reorganized Holdings Equity Interests or of a New Warrant, such number of shares or New Warrants to be distributed will be rounded down to the nearest whole number.

15.     **Withholding and Reporting Requirements.**

In connection with the Plan and all Distributions thereunder, any Person making Distributions under the Plan, including the Reorganized Debtors will, to the extent applicable, as determined in its sole discretion, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions under the Plan will be subject to any such withholding and reporting requirements.  The Debtors and the Reorganized Debtors will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements.  All Persons holding Claims will be required to provide any information necessary to affect information reporting and the withholding of such taxes.  Notwithstanding any other provisions of the Plan to the contrary, (a) each holder of an Allowed Claim will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distributions, and (b) no Distribution will be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations. Any Cash and/or other consideration or property to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an Unclaimed Property pursuant to Section 6.9(b) of the Plan.  Any Person issuing any instruments or making any Distribution under the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or distributing Person for payment of, or compliance with, any such tax obligations. A failure to comply with a request to comply with reporting requirements for a period of one hundred eighty (180) days from the date of notice will result in an automatic disallowance of the Claim(s) held by the Person failing to comply. Any Cash not distributed on account of a Claim as provided in the Plan will be treated as Unclaimed Property in accordance with Section 6.9 of the Plan.  Any non-Cash consideration not distributed

on account of a Claim as provided in the Plan will be treated as Unclaimed Property in accordance with Section 6.9 of the Plan.

### 16.    Setoffs.

The Debtors and the Reorganized Debtors may, but will not be required to, set off or recoup against any Claim (for purposes of determining the Allowed amount of such Claim on which a Distribution will be made), any claims of any nature whatsoever that the Debtors and/or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.  Nothing in the Plan will be deemed to expand rights to setoff or recoup under applicable non-bankruptcy law.  Notwithstanding the foregoing, the Debtors and the Reorganized Debtors will be deemed to waive and will have no right of setoff or recoupment against the holders of the First Lien Claims, DIP Claims or the Noteholder Claims.

### 17.    Distributions After Effective Date.

Except as otherwise provided in the Plan, distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims will be deemed to have been made on the Effective Date, without any post-Effective Date interest thereon.

### 18.    Allocation of Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution will be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

### 19.    Postpetition Interest on Claims.

Except to the extent expressly contemplated in the Plan, no holder of an Allowed Claim will receive in respect of such Claim any Distribution in excess of the Allowed principal amount of such Claim.  Except for any First Lien Claims and Other Secured Claims on which postpetition interest is allowed under section 506 of the Bankruptcy Code or is otherwise authorized to be paid pursuant to Final of the Court, interest will not accrue on or after the Petition Date.

### 20.    Minimum Distributions.

The Reorganized Debtors will not be obligated to make a Distribution of less than $100.00 on account of an Allowed Claim to any holder of a Claim.  Any holder of an Allowed Claim entitled to an aggregate Distribution of less than $100.00 will have its Claim for such Distribution discharged and will be forever barred from asserting any such Claim against the Debtors, their Estates, the Reorganized Debtors or their respective property.  Any Cash not distributed in accordance with the terms of Section 6.20 of the Plan will be the property of the Reorganized Debtors free of any restrictions thereon.

**21.    Recharacterization of Payments made to Holders of First Lien Claim.**

The recharacterization as principal or otherwise of any Cash payments (including made as adequate protection) made to the holders of First Lien Claims during the pendency of the Chapter 11 Cases pursuant to the DIP Order will not affect any Distributions made under the Plan.

**(g)    Procedures for Resolving Disputed, Contingent, and Unliquidated Claims.**

**1.    Objections to Claims.**

After the Effective Date, only the Reorganized Debtors will be entitled to object to Claims that were not Allowed as of the Effective Date.  Further, after the Effective Date, only the Reorganized Debtors will have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to Claims.

Any objections to Claims will be served and filed on or before the later of (i) one hundred twenty (120) days after the Effective Date, or (ii) such date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) above.

**2.    Payments and Distributions with Respect to Disputed Claims.**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

**3.    Estimation of Claims.**

On request of a party in interest, the Bankruptcy Court may estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law by issuing an Estimation Order, regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim pursuant to an Estimation Order, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

**4.    Preservation of Rights to Pursue and Settle Claims.**

Except with respect to Causes of Action released by the Debtors and the Reorganized Debtors pursuant to Section 10.6(a) of the Plan, the applicable Reorganized

Debtors, in accordance with section 1123(b) of the Bankruptcy Code, will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, rights, Causes of Action, suits, and proceedings, whether in law or in equity, whether known or unknown, that they each may respectively hold against any Person without the approval of the Bankruptcy Court and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action will be preserved notwithstanding the occurrence of the Effective Date, subject to the terms of Section 7.1 of the Plan, the Confirmation Order and any contract, instrument, release, indenture, or other agreement entered into in connection therewith.  Except as otherwise provided in the Plan, nothing contained in the Plan or in the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by the Plan.    On and after the Effective Date, the Reorganized Debtors will have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  Except with respect to Causes of Action as to which the Debtors or Reorganized Debtors have released any Person on or before the Effective Date (including pursuant to the Releases by the Debtors or otherwise), the Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, will apply to such Causes of Action upon, after, or as a consequence of the Confirmation, or effectiveness of the Plan.

### 5.    Disallowed Claims.

All Claims held by Persons against whom or which a proceeding asserting an Avoidance Action has been commenced (whether before or after the Effective Date) will be deemed "disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code.  Claims that are deemed disallowed pursuant to Section 7.5 of the Plan will continue to be disallowed for all purposes until the Avoidance Action against such Person has been settled or resolved by Final Order and any sums due from such Person have been paid to the appropriate party.

**4.3**    *Means for Implementation of the Plan.*

**(a)**    **Restructuring Transactions.**

On or as of the Effective Date, the Distributions provided for under the Plan will be effectuated pursuant to the following transactions:

1. all Holdings Equity Interests will be cancelled, and, subject to Section 5.1(b) of the Plan, Reorganized Holdings will issue (i) ninety-three (93) percent of the Reorganized Holdings Equity Interests Pro Rata to the holders of Allowed First Lien Claims and (ii) seven (7) percent of the Reorganized Holdings Equity Interests Pro Rata to the holders of Allowed General Unsecured Claims, subject in each case to dilution by the New Warrants and Reorganized Holdings Equity Interests issued pursuant to the Management Stock Option Plan;

2. Reorganized Holdings will issue to the holders of the Allowed General Unsecured Claims the New Warrants in accordance with the terms and conditions of the New Warrant Agreements;

3. each certificate representing share(s) of Reorganized Holdings Equity Interests will bear a legend indicating that the Reorganized Holdings Equity Interests are subject to the terms and conditions of the New Corporate Governance Documents and/or the Shareholders' Agreement, as applicable;

4. subject to Section 5.1(b) of the Plan, (i) Reorganized Holdings will continue to own, directly or indirectly, the Interests in its remaining subsidiaries, and (ii) except as otherwise provided in the Plan, the property of each Debtor's Estate will vest in the applicable Reorganized Debtor free and clear of all liens, Claims, encumbrances and Interests;

5. Reorganized Debtors will incur the New Term Loan Obligations, including the funding of the New Exit Facility; and

6. the releases, exculpations and injunctions provided for in the Plan, which are an essential element of Debtors' restructuring transactions, will become effective.

In addition to, or instead of the foregoing transactions, the Debtors, subject to the prior written consent of the First Lien Agent and the Required Consenting Holders, may, and at the direction of the First Lien Agent and the Required Consenting Holders, will, cause any of the Debtors or the Reorganized Debtors to engage in additional corporate restructuring transactions necessary or appropriate for the purposes of implementing the Plan, including, without limitation, converting corporate entities into limited liability companies, forming new entities within the corporate organizational structure of the Debtors or Reorganized Debtors, cancelling the existing equity at another of the Debtor entities and issuing new equity therefrom, merging, dissolving or transferring assets between or among the Debtors and the Reorganized Debtors, including Reorganized Holdings.

**(b)     Corporate Governance.**

On the Effective Date, Reorganized Holdings will adopt the New Corporate Governance Documents in form and substance acceptable to the Required Consenting Holders. The certificates of incorporation and bylaws or other organizational documents of the subsidiaries of Reorganized Holdings, as of the Effective Date, will be amended and restated or otherwise modified to be consistent in substance with the New Corporate Governance Documents and otherwise reasonably acceptable to the Required Consenting Holders.

**(c)     Corporate Action.**

Upon the Effective Date, all matters provided for in the Plan that would otherwise require approval of the members, managers, stockholders or directors of one or more of the Debtors or Reorganized Debtors, including, without limitation, (i) adoption or assumption, as applicable, of any Executory Contracts or Unexpired Leases, (ii) selection of the managers, directors and officers, as appropriate, for the Reorganized Debtors, (iii) the Distribution of the Reorganized Holdings Equity Interests and the New Warrants, and (iv) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date) will be deemed to have occurred and will be in effect from and after the Effective Date pursuant to the applicable general corporation or other applicable law of the states in which the Debtors and the Reorganized Debtors are organized, including, without limitation, Section 303 of the Delaware General Corporation Law, without any requirement of further action by the members, managers, stockholders or directors of the Debtors or the Reorganized Debtors.

On or (as applicable) prior to the Effective Date, the appropriate officers of each respective Debtor or Reorganized Debtor (including, any vice-president, president, chief executive officer, treasurer or chief financial officer of any of the foregoing), as applicable, will be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the applicable Reorganized Debtor, including (i) the organizational documents of the applicable Debtor or Reorganized Debtor, which will include, to the extent required by section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, and (ii) any and all other agreements, documents, securities and instruments relating to the foregoing.  The secretary or assistant secretary of the appropriate Debtor or Reorganized Debtor, as applicable, will be authorized to certify or attest to any of the foregoing actions.

New organizational documents for each Reorganized Debtor will be filed as part of the Plan Supplement.

**(d)     Continued Corporate Existence of Reorganized Debtors.**

Except as provided for in the Plan (including with respect to the Debtors' right or obligation to cause any of the Debtors to engage in additional corporate restructuring transactions necessary or appropriate for the purposes of implementing the Plan pursuant to Section 5.1 of the Plan), each of the Reorganized Debtors will continue to exist after the Effective Date with all powers of a corporation or other legal entity, as applicable, under the

applicable state laws and without prejudice to any right to alter or terminate such existence (whether by merger or otherwise) under applicable law. The Reorganized Debtors may pay fees and expenses of their professionals incurred after the Effective Date in the ordinary course of business without the need for Bankruptcy Court approval.

The Reorganized Debtors will be responsible for all claims administration with respect to all Claims for which final Distributions are not made on the Effective Date. Except as otherwise set forth in the Plan, all Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Claims and Allowed Other Secured Claims (if paid in Cash) against any Debtor will be paid by the Reorganized Debtor that is the successor to the Debtor that is the obligor with respect to such Allowed Claim.

**(e)    New Term Loan**

The Plan provides that, upon the Debtors' emergence from chapter 11, holders of Allowed First Lien Claims will receive, among other things, their Pro Rata share of the new $320 million principal New Term Loan to be made pursuant to the New Term Loan Agreement, to be entered into on the Effective Date by and among MModal Inc. or any of the other Debtors, as borrower and certain of the post-Effective Date direct and indirect subsidiaries of Holdings, collectively as guarantors, the First Lien Agent, as administrative and collateral agent, and the Exit Facility Lenders, together with all amendments, supplements, ancillary agreements, notes, pledges, collateral agreements and other documents related thereto, which will be in form and substance reasonably satisfactory to the Debtors, the First Lien Agent and the Required Consenting Holders. The New Term Loan is subordinated only to the New Exit Facility and has a non-default interest rate of LIBOR + 775 bps (with a 125bps LIBOR floor), call protection at 101/101/100, 2.5% annual amortization and a 75% excess Cash flow sweep (sweep counts toward the 2.5% amortization).

**(f)    Payment of Certain Fees and Expenses.**

Notwithstanding any provision in the Plan to the contrary, on the Effective Date or as soon thereafter as agreed to by the Debtors, the First Lien Agent and the Required Consenting Holders, the Debtors will promptly pay in full in Cash (1) the reasonable, fees and out-of-pocket expenses incurred by the First Lien Agent, including payment of the accrued, unpaid reasonable, invoiced fees and out-of-pocket expenses incurred by the professionals retained by the First Lien Agent, Latham & Watkins and Houlihan Lokey, (2) up to $25,000 per Consenting Lender of the reasonable, invoiced fees and out-of-pocket expenses incurred by any other legal counsel to such First Lien Lender (other than Latham & Watkins LLP) in its respective capacity as such, (3) the accrued, unpaid, reasonable, invoiced fees and out-of-pocket expenses incurred by the professionals retained by the Consenting Noteholders, Blackstone Advisory Partners L.P., and Akin Gump Strauss Hauer & Feld LLP in their respective capacities as such through the Effective Date, (4) the reasonable, invoiced fees and out-of-pocket expenses incurred by the Indenture Trustee (including any unpaid trustee fees under the Indenture and the reasonable and invoiced fees and out-of-pocket expenses of counsel to the Indenture Trustee), in each case, without the need of such parties to file fee applications with the Bankruptcy Court; provided that each party and its counsel will provide the Debtors and Committee counsel with summary invoices (redacted for any potentially privileged material) (or such other documentation as the Debtors or another of such parties may reasonably request) for which it

seeks payment on or before the Effective Date and provided that the Debtors and the Committee have no objection to such fees, such fees will be paid within five business days following the Effective Date.  To the extent that the Debtors object to any of the fees and expenses of the parties listed in (1)-(4) above, the Debtors will not be required to pay any disputed portion of such fees and expenses until a resolution of such objection is agreed to by the Debtors and such party, or an order of the Bankruptcy Court upon a motion by such party.

**(g)**       **Cancellation of Agreements and Securities.**

Except (i) for purposes of evidencing a right to a Distribution under the Plan, (ii) with respect to Executory Contracts or Unexpired Leases assumed by the Debtors, or (iii) as otherwise provided in the Plan, all the agreements and other documents evidencing the Claims, Interests or rights of any holder of an Impaired Claim or prepetition Interest under the Plan will be cancelled on the Effective Date; provided, however, that notwithstanding Confirmation or the occurrence of the Effective Date any such indenture or agreement that governs the rights of the holder of a Claim, including the First Lien Credit Agreement and the Indenture which will continue in effect solely for the purposes of (a) with respect to the First Lien Credit Agreement, any obligations thereunder governing the relationship between the First Lien Agent and the First Lien Lenders (including, but not limited to those provisions relating to the First Lien Agent's rights to expense reimbursement, indemnification and similar amounts) or that may survive termination or maturity of the First Lien Facility in accordance with the terms thereof, and (b) with respect to the Indenture, any obligations governing the relationship between the Indenture Trustee and the Noteholders (including but not limited to those provisions relating to the Indenture Trustee's rights to expense reimbursement, indemnification and similar amounts) or that may survive termination or maturity of the Indenture, and with respect to both the First Lien Credit Agreement and the Indenture, (x) allowing holders of the First Lien Claims and Noteholder Claims, respectively to receive Distributions under the Plan, (y) allowing the First Lien Agent and the Indenture Trustee, respectively to make Distributions under the Plan to the extent provided therein, and (z) allowing the First Lien Agent and Indenture Trustee to seek compensation and/or reimbursement of reasonable fees and expenses in accordance with the terms of the First Lien Credit Agreement and the Indenture, respectively, and the Plan, including, without limitation, through the exercise of any charging lien; provided further, however, that the preceding proviso will not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order or the Plan, or result in any expense or liability to the Debtors, except to the extent set forth in or provided for under the Plan.  On and after the Effective Date, all duties and responsibilities of the First Lien Agent and the Indenture Trustee under the First Lien Credit Agreement and the Indenture, respectively, will be discharged except to the extent required in order to effectuate the Plan.

**(h)**       **Directors and Officers of the Reorganized Debtors.**

On the Effective Date, the term of each member of the current board of directors of each Debtor will automatically expire.  Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, the initial officers of each of the Reorganized Debtors will consist of the officers of such Debtor immediately prior to the Effective Date and the initial board of directors of each of the Reorganized Debtors will consist of Holdings' Chief Executive Officer, three (3) members selected by the "Required Lenders" (as defined in the First Lien Credit Agreement) (and a simple majority of the Reorganized Holdings'

shareholders will select these three (3) directors at any election occurring after the Effective Date or to fill any vacancy in these director positions) and one (1) member selected by Brigade (the "**Brigade Director**"). The Consenting Noteholders, to the extent they are also First Lien Lenders and in their capacity as First Lien Lenders, will be entitled to full participation in the process of selecting the three (3) members of the initial boards of each of the Reorganized Debtors to be chosen by the First Lien Lenders including, the right to nominate candidates for such board positions. For purposes of subsequent board elections following the Effective Date, the Parties will agree in the Shareholders' Agreement or a voting agreement to vote their shares of Reorganized Holdings Equity Interests to ensure that (a) the Brigade Director (or a replacement proposed by Brigade) is re-elected to the boards and (b) the Chief Executive Officer of Reorganized Holdings is re-elected to the boards of directors. Brigade's right to select the Brigade Director will not be assignable. If, at any time after the Effective Date, funds affiliated with, funds managed or otherwise controlled by, and accounts advised or sub-advised by, Brigade hold less than twenty percent (20%) of the Reorganized Holdings Equity Interests in the aggregate, Brigade will no longer have the right to select the Brigade Director, and the Brigade Director will be selected by a simple majority of Reorganized Holdings' shareholders.

**(i)** **Obligations to Insure and Indemnify Prepetition and Postpetition Directors, Officers and Employees.**

Any and all directors and officers liability and fiduciary (including ERISA) insurance or tail policies in existence as of the Effective Date will be reinstated and continued in accordance with their terms and, to the extent applicable, will be deemed assumed or assumed and assigned by the applicable Debtor or Reorganized Debtor, pursuant to section 365 of the Bankruptcy Code and the Plan. Each insurance carrier under such policies will continue to honor and administer the policies with respect to the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors prior to the Effective Date.

The obligations of each Debtor or Reorganized Debtor to indemnify any person who is serving or served as one of its directors, officers or employees on or as of the Petition Date by reason of such person's prior or future service in such capacity or as a director, officer or employee of another corporation, partnership or other legal entity, to the extent provided in the applicable certificates of incorporation, by-laws or similar constituent documents, by statutory law or by written agreement, policies or procedures of or with such Debtor, will be deemed and treated as executory contracts that are assumed by the applicable Debtor or Reorganized Debtor pursuant to the Plan and section 365 of the Bankruptcy Code as of the Effective Date. Accordingly, such indemnification obligations will survive and be unaffected by entry of the Confirmation Order, irrespective of whether such indemnification is owed for an act or event occurring before on or after the Petition Date.

**(j)** **Sources of Consideration for Plan Distributions.**

Except as otherwise provided in the Plan or the Confirmation Order, all funds necessary to make Distributions pursuant to the Plan will be obtained from the Cash balances of the Debtors or the Reorganized Debtors on the Effective Date or such subsequent dates on which Distributions are payable and loan proceeds from the New Exit Facility.

(k)      **Limited Substantive Consolidation for Voting and Distribution.**

The Debtors will be substantively consolidated for the limited purposes of voting on the Plan and Distributions provided for under the Plan as provided therein. The Debtors will not be substantively consolidated for any other purpose. The Plan will serve as, and will be deemed to be, a motion for the substantive consolidation to the extent provided for in the Plan. Consolidation pursuant to Section 5.11 of the Plan will not affect: (i) the legal and corporate structures of the Debtors; (ii) pre- and post-Effective Date guarantees, liens and security interests that are required to be maintained (a) in connection with contracts or leases that were entered into during the Chapter 11 Cases or Executory Contracts and Unexpired Leases that have been or will be assumed by the Debtors or (b) pursuant to the Plan (including with respect to Reinstated Claims); (iii) Intercompany Interests; (iv) distributions from any insurance policies or proceeds of such policies; or (v) the revesting of assets in the separate Reorganized Debtors. In addition, such consolidation will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.

In the event that the Bankruptcy Court does not order limited substantive consolidation of the Debtors, then except as specifically set forth in the Plan: (1) nothing in the Plan or this Disclosure Statement will constitute or be deemed to constitute an admission that one of the Debtors is subject to or liable for any Claim against any other Debtor; (2) Claims against multiple Debtors will be treated as separate Claims with respect to each Debtor's Estate for all purposes (including distributions and voting), and such Claims will be administered as provided in the Plan; (3) the Debtors will not be required to, re-solicit votes with respect to the Plan, nor will the failure of the Bankruptcy Court to approve limited substantive consolidation of the Debtors alter the distributions set forth in the Plan; and (4) the Debtors may File subplans with terms substantially consistent in all applicable respects with the terms of the Plan, and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each subplan; provided that a Holder's (a) vote to accept or reject the Plan; (b) presumed acceptance of the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (c) deemed rejection of the Plan pursuant to section 1126(g) may be deemed a vote to accept or reject an applicable subplan (as the case may be) to the extent that such subplan does not provide such holder with less favorable treatment than such holder would have received if the Bankruptcy Court had ordered limited substantive consolidation as set forth therein. The Debtors' inability to confirm any subplan or the Debtors' election to withdraw any subplan will not impair the confirmation of any other subplan or the consummation of any such subplan.

(l)      **Solicitation of Debtors.**

Notwithstanding anything to the contrary in the Plan, each Debtor that would otherwise be entitled to vote to accept or reject the Plan as a holder of a Claim against or Interest in another Debtor will not be solicited for voting purposes, and such Debtor will be deemed to have voted to accept the Plan.

**4.4**    *Executory Contracts and Unexpired Leases.*

**(a)**    **Debtors' Executory Contracts and Unexpired Leases.**

Pursuant to sections 365(a) and 1123(b) of the Bankruptcy Code, all Executory Contracts and Unexpired Leases will be deemed assumed as of the Effective Date, other than any Executory Contract or Unexpired Lease that: (i) has been rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date and for which the motion was filed prior to the Confirmation Date; (ii) as to which a motion for approval of the rejection of such Executory Contract or Unexpired Lease has been filed and served prior to the Confirmation Date and remains pending before the Bankruptcy Court on such date; or (iii) that is specifically designated as an Executory Contract or Unexpired Lease to be rejected on the Schedule of Rejected Executory Contracts and Unexpired Leases to be included in the Plan Supplement, which will be in form and substance acceptable to the Debtors, the First Lien Agent and the Required Consenting Holders, and for avoidance of doubt, will include all specific contracts or unexpired leases upon which the Deferred Acquisition Claims are based; provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, with the prior written consent of the First Lien Agent, the Required Consenting Holders, to amend the Schedule of Rejected Executory Contracts and Unexpired Leases to delete any Executory Contract or Unexpired Lease therefrom or add any Executory Contract or Unexpired Lease thereto, in which event such Executory Contract or Unexpired Lease will be deemed to be, respectively, assumed or rejected. The Debtors will provide notice of any amendments to the Schedule of Rejected Executory Contracts and Unexpired Leases to the parties to such contracts that are affected thereby. The listing of a document on the Schedule of Rejected Executory Contracts and Unexpired Leases will not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the Executory Contracts and Unexpired Leases rejected pursuant to Section 8.1 of the Plan; and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the Executory Contracts and Unexpired Leases assumed pursuant to Section 8.1 of the Plan.

**(b)**    **Cure of Defaults.**

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract or Unexpired Lease to be assumed or assumed and assigned pursuant to Section 8.1 of the Plan, the Debtors will, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, not later than sixteen (16) days before the Confirmation Hearing, File and serve a pleading with the Bankruptcy Court listing the cure amount of each Executory Contract and Unexpired Lease to be assumed or assumed and assigned under the Plan. The counterparties to such Executory Contracts and Unexpired Leases to be assumed will have until seven (7) days prior to the Confirmation Hearing to object to the cure amounts listed by the applicable Debtor seeking assumption or assumption and assignment. If there are any objections filed, the Bankruptcy Court may hold a hearing, which may be the Confirmation Hearing, to determine such cure amounts or other issues pertaining to the

assumption or assumption and assignment of such Executory Contract or Unexpired Lease. Until the Effective Date, the Debtors, subject to the prior written consent of the First Lien Agent and the Required Consenting Holders, will retain the right to reject any of the Executory Contracts or Unexpired Leases, including such contracts or leases that are subject to a dispute concerning amounts necessary to cure any defaults.

The Reorganized Debtors will be responsible for the payment of any cure amounts due under section 365 of the Bankruptcy Code with respect to the Executory Contracts or Unexpired Leases assumed by the Debtors.

**(c)      Bar Date for Rejection Claims and Turnover of Excess Security.**

Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan will be required to be filed with the Bankruptcy Court and served upon the Reorganized Debtors no later than thirty (30) days after: (i) in the case of an Executory Contract or Unexpired Lease that was terminated by its terms prior to the Confirmation Date, the Confirmation Date; (ii) in the case of an Executory Contract or Unexpired Lease rejected by any Debtor, the date of the entry of the order of the Bankruptcy Court authorizing such rejection (including the Confirmation Order with respect to Executory Contracts and Unexpired Leases that have not previously been assumed or rejected and that are rejected by operation of the Plan), or (iii) in the case of an Executory Contract or Unexpired Lease that is added to the Schedule of Rejected Executory Contracts and Unexpired Leases, the date that such amendment is served on the parties to the added Unexpired Lease or Executory Contract.  All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code will be treated as General Unsecured Claims and may be objected to in accordance with the provisions of Section 7.1 of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.  All such Claims not filed within such time will be (i) forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, and their property, (ii) not permitted to vote to accept or reject the Plan, and (iii) participate in any Distribution in the Chapter 11 Cases on account of such Claims, and such Claim will be deemed fully satisfied, released, settled, and compromised, and be subject to the permanent injunction set forth in Section 10.5 of the Plan, notwithstanding anything in the Schedule of Rejected Contracts and Unexpired Leases or a proof of claim to the contrary.

The Plan will provide that any counterparty to a rejected Executory Contract or Unexpired Lease holding any security for any of the Debtors' obligations thereunder (including but not limited to any security deposits, escrow funds, reserves, receivables or letter of credit proceeds) must, within five (5) days after filing any Claim arising out of the rejection, or such other time as agreed to by the Reorganized Debtors: (i) return to the Reorganized Debtors all security in excess of the amount of such Claim, together with a statement setting forth an accounting of any amounts not returned to the Reorganized Debtors and the basis for withholding such amounts; and (ii) if the counterparty asserts a right of setoff and/or other right to apply the security toward satisfaction of the counterparty's Claim, provide the Reorganized Debtors with a statement identifying with particularity the basis for the counterparty's right of setoff or other right to apply the security toward satisfaction of the counterparty's Claim.  In the event a dispute exists among the Reorganized Debtors and the counterparty as to any issue or matter set forth in Section 8.3 of the Plan, including the amount of or application of any security

to rejection damages, the Reorganized Debtors will be authorized to seek resolution of the dispute by the Bankruptcy Court and/or seek an Order of the Bankruptcy Court compelling turnover of any security, as applicable, at the option of the Reorganized Debtors, pursuant to any of: (i) a motion to compel turnover of such security, (ii) an objection to the Claim, or (iii) an adversary proceeding, including an adversary proceeding containing an objection to the Claim.

**(d)**      **Restrictions on Assignment Void.**

Any Executory Contract or Unexpired Lease assumed or assumed and assigned will remain in full force and effect to the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract or Unexpired Lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment, including based on any change of control provision.  Any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract or Unexpired Lease, terminates or modifies such Executory Contract or Unexpired Lease or allows the counterparty to such Executory Contract or Unexpired Lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition thereof (including on account of any change of control provision) on any such transfer or assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

No sections or provisions of any executory contract or unexpired lease that purport to provide for additional payments, penalties, charges, rent acceleration, or other financial accommodations in favor of the non-debtor third party thereto will have any force and effect with respect to the transactions contemplated hereunder, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

**(e)**      **Management Stock Option Plan; Severance Programs.**

The total reserve of Reorganized Holdings Equity Interests for issuance to management pursuant to the Management Stock Option Plan will be provided in the Plan Supplement.  The Reorganized Holdings' board of directors will be responsible for adopting and implementing the Management Stock Option Plan, and will determine individual equity awards thereunder at such times and on such terms as it will determine in its discretion.

On the Effective Date, the Reorganized Debtors will adopt an employee severance program in form and substance reasonably acceptable to the Required Consenting Holders, which will be filed with the Plan Supplement.

**(f)**      **Workers' Compensation Programs.**

All (i) applicable workers' compensation laws in states in which the Reorganized Debtors operate and (ii) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs and plans regarding or relating to workers' compensation and workers' compensation insurance are treated as executory contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, with a cure amount of zero dollars.

**4.5**    *Retention of Jurisdiction by the Bankruptcy Court.*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain jurisdiction over the Chapter 11 Cases and all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan for, among other things, the following purposes:

- to determine any motion, adversary proceeding, application, contested matter, other litigated matter, and any other matters, and grant or deny any applications involving a Debtor that may be pending on or commenced after the Confirmation Date;

- to ensure that Distributions to holders of Allowed Claims are accomplished as provided in the Plan and to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

- to allow, disallow, determine, subordinate, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the secured or unsecured status, priority, amount or allowance of Claims or Interests;

- to resolve any matters related to (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is party or with respect to which any Debtor or Reorganized Debtor may be liable in any manner, including, to hear, determine, and, if necessary, liquidate any Claims arising therefrom, including Claims arising from the rejection or cure Claims arising from the assumption of such agreements pursuant to section 365 of the Bankruptcy Code; (b) any matter relating to the terms and conditions of any such Executory Contract or Unexpired Lease as assumed or assumed and assigned, or the obligation of any party to perform thereunder, and any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date any Executory Contracts or Unexpired Leases to the Schedule of Rejected Executory Contracts and Unexpired Leases otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

- to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

- to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any

Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

- to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

- to hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Effective Date;

- resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

- to determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

- to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, release, indenture, or other document governing or relating to any of the foregoing;

- to take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

- to resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, Exculpations, and other provisions contained in Section 10 of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions, including to adjudicate any and all claims or Causes of Action (i) against any Person granted a release under Section 10.6 of the Plan or exculpation pursuant to Section 10.7 of the Plan, (ii) relating to the Debtors, the Plan, the Distributions, the Reorganized Holdings Equity Interests, the Chapter 11 Cases, the transactions contemplated by the Plan to effectuate the Plan, or any contract, instrument, release, agreement or document executed and delivered in connection with such transactions and the Plan, and (iii) brought by the Debtors (or any successor thereto) or any holder of a Claim or an Interest;

54

- to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

- to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

- to hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

- to enter a final decree closing any or all of the Chapter 11 Cases;

- to enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

- to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

- resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with or under the First Lien Credit Agreement and related documents and the Indenture and related documents, in each case, except for cases, controversies, suits, disputes or Causes of Action between or among holders of Claims under the First Lien Credit Agreement or Indenture and related documents and not involving any Debtor;

- to hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Confirmation Order, any other order of the Bankruptcy Court, the Bankruptcy Code, or any other federal statute or legal theory.

**4.6**    ***Miscellaneous Provisions.***

**(a)**    **Entire Agreement.**

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan on the Effective Date.

**(b)**    **Post-Confirmation Reporting.**

After the Confirmation Date, the Reorganized Debtors will file reports of its activities and financial affairs with the Bankruptcy Court on an annual basis, within thirty (30) days after the conclusion of each such annual period, until the earlier of the entry of a final

decree closing each of the Chapter 11 Cases, or a Bankruptcy Court order converting or dismissing each of the Chapter 11 Cases. Any such reports may be made on a consolidated basis, and will be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and Office of the United States Trustee guidelines for such matters.

**(c)      Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof. To the extent a rule of law or procedure is supplied by federal bankruptcy law, the Bankruptcy Code, the Bankruptcy Rules, and the decisions and standards of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the United States District Court for the Southern District of New York, and the Bankruptcy Court, as applicable, will govern and control.

**(d)      Reservation of Rights.**

Except as expressly set forth in the Plan, the Plan will have no force or effect until the Bankruptcy Court has entered the Confirmation Order and the Effective Date has occurred. Neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement will be or will be deemed to be an admission or waiver of any rights of the Debtors, the First Lien Agent, or the Consenting Noteholders with respect to the Holders of Claims or Interests prior to the Effective Date.

**(e)      Plan Supplement and Additional Documents.**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan which such agreements and documents will be in form and substance reasonably acceptable to the Required Consenting Holders; provided, however that notwithstanding anything to the contrary herein or in the Plan, the New Warrant Agreements and the Shareholders' Agreement will be in form and substance acceptable to the Required Consenting Holders in their respective good faith discretion. The Debtors and all holders of Claims or Interests receiving Distributions pursuant to the Plan and all other parties in interest will, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan. All documents included in the Plan Supplement will be filed with the Office of the Clerk of the Bankruptcy Court at least five (5) Business Days before the Voting Deadline. The Debtors, with the consent of the Required Consenting Holders, reserve their rights to amend the Plan Supplement from time to time and to file any such amendments with the Bankruptcy Court.

# ARTICLE V.

## CONDITIONS PRECEDENT

**5.1**     *Conditions Precedent to Confirmation.*

Confirmation of the Plan is subject to the satisfaction or waiver of the following conditions precedent:

- The terms and provisions of the Plan will be reasonably satisfactory in form and substance to the First Lien Agent and the Required Consenting Holders;

- the Bankruptcy Court will have entered a Final Order, in form and substance reasonably satisfactory to the Debtors, the First Lien Agent and the Required Consenting Holders approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code; and

- the Confirmation Order will be in form and substance reasonably acceptable to the Debtors, the First Lien Agent and the Required Consenting Holders.

**5.2**     *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date of the Plan, and the consummation of the Plan, is subject to the satisfaction or waiver in whole or in part by the Debtors, the First Lien Agent and the Required Consenting Holders, of the following conditions precedent:

- the Bankruptcy Court will have entered the Confirmation Order in form and substance acceptable to the Debtors, the First Lien Agent and the Required Consenting Holders, and the Confirmation Order will be a Final Order;

- all conditions precedent to the effectiveness of, and the initial borrowings under the New Exit Facility will be satisfied or waived, in each case in accordance with the terms and conditions of the New Exit Facility; and

- the OEP Entities will each provide a waiver and release, effective as of the Effective Date, substantially similar in all respects to the waiver and release of all Claims against the Debtors and their Affiliates set forth in Section 10.6(b) of the Plan;

- all conditions precedent to the effectiveness of the New Term Loan will be satisfied or waived, in each case in accordance with the terms and conditions of the New Term Loan;

- the Reorganized Holdings Equity Interests will have been issued and delivered, as applicable, and all conditions precedent to the consummation of the transactions contemplated therein will have been waived or satisfied in accordance with the terms thereof and the closing of the transactions contemplated by such agreements will have occurred;

- all Definitive Documents, including, but not limited to, the New Corporate Governance Documents and the Plan Supplement, will be in form and substance reasonably acceptable to the Debtors, First Lien Agent and the Required Consenting Holders, except that the New Warrant Agreements and the Shareholders' Agreement will be acceptable to the Required Consenting Holders in their respective good faith discretion, and will be deemed to be valid, binding and enforceable in accordance with their terms; and

- all documents and agreements necessary to implement the Plan will have (a) been tendered for delivery, and (b) been effected or executed by all Entities party thereto, or will be deemed executed and delivered by virtue of the effectiveness of the Plan as expressly set forth therein, and all conditions precedent to the effectiveness of such documents and agreements will have been satisfied or waived pursuant to the terms of such documents and agreements.

**5.3    *Effect of Failure of Conditions to Effective Date.***

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 9.4 of the Plan, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section 9.3 of the Plan, the Plan will be null and void in all respects.

**5.4    *Waiver of Conditions.***

Each of the conditions set forth in Sections 9.1 and 9.2 of the Plan may be waived in whole or in part by the Debtors, the First Lien Agent, and the Required Consenting Holders, without any notice to other parties in interest or the Bankruptcy Court and without a hearing.

## ARTICLE VI.

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

**6.1**     *Modification and Amendments.*

   Prior to the Confirmation Date, the Plan, including exhibits thereto and the Plan Supplement, may be amended, modified, or supplemented by the Debtors solely in accordance with the PSA, unless terminated by its terms, and subject to the prior written consent of the First Lien Agent and the Required Consenting Holders in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code.

   Subject to the prior written consent of the First Lien Agent and the Required Consenting Holders, and solely in accordance with the PSA, unless terminated by its terms, the Plan may be amended, modified or supplemented at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as amended, modified or supplemented, satisfies the requirements of section 1122 and 1123 of the Bankruptcy Code, and the Bankruptcy Court, after notice and hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such amendment, modification or supplement. Any holder of a Claim that has accepted the Plan prior to any amendment, modification or supplement will be deemed to have accepted the Plan, as amended, modified or supplemented, if the proposed amendment, modification or supplement does not materially and adversely change the treatment of such holder's Claim.  Prior to the Effective Date, the Debtors, with First Lien Agent and Required Consenting Holders' consent, which will not be unreasonably withheld, may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.  After the Effective Date, the Debtors, and the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

**6.2**     *Effect of Confirmation on Modifications.*

   Entry of a Confirmation Order will result in all modifications or amendments to the Plan occurring after the solicitation thereof being approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

**6.3**     *Revocation, Withdrawal, or Non-Consummation of the Plan.*

   The Debtors reserve the right to revoke or withdraw the Plan, solely in accordance with the PSA, unless terminated by its terms, and subject to the prior written consent of the First Lien Agent and Required Consenting Holders, at any time prior to the Confirmation Date and to file other plans of reorganization.  If the Debtors revoke or withdraw the Plan in accordance with the preceding sentence, or if the Confirmation Order is not entered or consummation of the Plan does not occur, then (i) the Plan will be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or

Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, will (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person, (b) prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors, or (c) constitute an admission of any sort by the Debtors or any other Person.

**6.4**    *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the reasonable consent of the Debtors, the First Lien Agent and the Required Consenting Holders; and (3) nonseverable and mutually dependent.

## ARTICLE VII.

## EFFECT OF CONFIRMATION

**7.1**    *Vesting of Assets.*

Except as otherwise provided in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates (including, subject to any release provided for in the Plan, any claim, right or Cause of Action, which may be asserted by or on behalf of the Debtors) will be vested in the Reorganized Debtors, free and clear of all Claims, liens, encumbrances, charges, and other interests.   After the Effective Date, the Reorganized Debtors will not have any liability to holders of Claims or Interests other than expressly provided for in the Plan.   As of the Effective Date, each of the Reorganized Debtors will be deemed to have incurred the New Term Loan Obligations pursuant to the New Term Loan Agreement.   As of the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

**7.2**    *Settlement of Certain Intercreditor Issues.*

Pursuant to Bankruptcy Rule 9019, and in consideration for the classification, Distribution and other benefits provided under the Plan, the provisions of the Plan will constitute

a good faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan, including, without limitation, all Claims arising prior to the Petition Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, by or against any Released Party, arising out of, relating to or in connection with the business or affairs of or transactions with the Debtors. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, the Estates, creditors and other parties in interest, and are fair, equitable and within the range of reasonableness. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

**7.3**   ***Discharge of Claims Against the Debtors and Termination of Interests.***

Except as otherwise provided in the Plan or the Confirmation Order, upon the Effective Date and in consideration of the rights afforded in the Plan and the payments and Distributions to be made hereunder, each holder (as well as any trustees and agents on behalf of each holder) of a Claim against the Debtors or an Interest in the Debtors will be deemed to have forever waived, released and discharged such Claim or Interest. On the Effective Date, all holders of such Claims and Interests will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim or Interest against the Debtors, their Estates, the Reorganized Debtors, the Released Parties or any of their assets or properties based on any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Interest.

Except as otherwise provided in the Plan or in the Confirmation Order, all Persons who have held, now hold or may hold Claims against any of the Debtors or Interests in any of the Debtors and all other parties in interest, along with their respective present and former Representatives, are permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to such Claim or Interest against the Debtors, their Estates, the Reorganized Debtors, or the Released Parties; (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Debtors, their Estates, the Reorganized Debtors or the Released Parties with respect to such Claim or Interest; (c) creating, perfecting or enforcing any encumbrance of any kind against the Debtors, their Estates, the Reorganized Debtors, the Released Parties, or against the property or interests in property of the Debtors, their Estates, the Reorganized Debtors or the Released Parties with respect to such Claim or Interest; or (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligations due from the Debtors, their Estates, the Reorganized Debtors, or the Released Parties with respect to such Claim or Interest. Such injunction will extend to any successors of the Debtors, their Estates, the Reorganized Debtors or the Released Parties and their respective properties and interest in properties.

For the avoidance of doubt, and subject in all respects to Section 10.6 of the Plan, Section 10.3 of the Plan will not release direct claims held by non-Debtor Persons against other non-Debtor Persons.

**7.4**    *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the closing of the respective Chapter 11 Cases.

**7.5**    *Injunction Against Interference with the Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, will be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**7.6**    *Releases.*

The Plan provides for the following parties to receive releases: (i) the Debtors, (ii) any past or present Representatives or equityholders of any of the Debtors, (iii) the Reorganized Debtors, (iv) the Committee and its members (solely in their capacity as such), (v) the First Lien Agent, (vi) the Consenting Lenders, (vii) the Indenture Trustee, (viii) the Consenting Noteholders, and (ix) the Representatives of each of the foregoing (solely in their capacities as such).

Effective as of the Confirmation Date, but subject to the occurrence of the Effective Date, for good and valuable consideration, including the Distributions to be made hereunder, the Debtors and the Reorganized Debtors, on behalf of themselves and their Affiliates, the Estates and their respective Representatives, successors, assigns and any and all entities who may purport to claim by, through, for or because of them will forever release, waive and discharge all Causes of Action that they have, or had against any Released Party except with respect to any obligations arising under the Plan, the Definitive Documents that by their terms survive the Effective Date and any applicable orders of the Bankruptcy Court or other court of competent jurisdiction in the Chapter 11 Cases; provided, however, that the foregoing provisions will have no effect on the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, theft or willful misconduct.

As of the Effective Date, in consideration for the obligations of the Debtors and the Reorganized Debtors under the Plan and the Cash, contracts, instruments, releases, agreements or documents to be entered into or delivered in connection with the Plan, each holder of a Claim (solely in its capacity as such) that is (i) Unimpaired by the Plan, (ii) have not voted to reject the Plan, or (iii) have voted to reject the Plan but have not checked the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan, provided however that the Consenting Lenders and Consenting Noteholders are and will be deemed to elect to grant the releases provided in the Plan, will be deemed to forever release, waive and discharge all Causes of Action in any way relating to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan, the Plan Supplement, the Disclosure Statement, the First Lien Facility, or the Indenture that such entity has, had or may have against any Released Party or any employees, agents or partners of the Debtors (which release will be in addition to the discharge

of Claims provided in the Plan and under the Confirmation Order and the Bankruptcy Code), except with respect to any obligations arising under the Plan, the New Term Loan Agreement, or any of the Definitive Documents that by their terms survive the Effective Date, or any act, event, injury, omission, transaction, or agreement arising after the Effective Date (other than Causes of Action relating to such act, event, injury, omission, transaction or agreement first arising or occurring prior to the Effective Date); provided, however, that the foregoing provisions will have no effect on the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, theft or willful misconduct.

Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the releases in Sections 10.6(a) and (b) of the Plan, which includes by reference each of the related provisions and definitions contained therein, and further, will constitute the Bankruptcy Court's finding that such releases are (i) in exchange for the good and valuable consideration provided by the Debtors and the other Released Parties, representing a good faith settlement and compromise of the Claims released therein, (ii) in the best interests of the Debtors and all holders of Claims, (iii) fair, equitable, and reasonable, (iv) approved after due notice and opportunity for hearing, and (v) a bar to any of the releasing parties asserting any Claim released by the releasing parties against any of the Debtors or the other Released Parties or their respective property.

Each Person to which Sections 10.6(a) and/or (b) of the Plan apply will be deemed to have granted the releases set forth in those Sections notwithstanding that such Person may hereafter discover facts in addition to, or different from, those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of the release.

**7.7**     *Exculpation.*

From and after the Effective Date, the Released Parties, will neither have nor incur any liability to any entity, and no holder of a Claim or Interest, no other party in interest and none of their respective Representatives, will have any right of action against any Released Party, for any act taken or omitted to be taken in connection with, related to or arising out of the Chapter 11 Cases or the consideration, formulation, preparation, dissemination, implementation, confirmation or consummation of the Plan, the exhibits to the Plan, the Plan Supplement, the Disclosure Statement, any transaction proposed in connection with the Chapter 11 Cases or any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken, in connection therewith; provided, however, that the foregoing provisions will have no effect on: (a) the liability of any entity that would otherwise result from the failure to perform or pay any obligation or liability under the Plan or any contract, instrument, release or other agreement or document to be entered into or delivered in connection with the Plan or (b) the liability of any entity that would otherwise result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

**7.8**     *Injunction Related to Releases and Exculpation.*

The Confirmation Order will permanently enjoin the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to Section 10.6 of the Plan or exculpated pursuant to Section 10.7 of the Plan.

**7.9**     *Injunction Regarding Worthless Stock Deductions.*

Unless otherwise ordered by the Bankruptcy Court or consented to by the Reorganized Debtors, and notwithstanding anything to the contrary contained in any order entered by the Bankruptcy Court as contemplated by the WSD Procedures Motion, on and after the Effective Date, each "50% Shareholder" (as such term is defined in WSD Procedures Order) will be enjoined from (i) filing any federal or state tax return, (ii) filing any amendment to such a return, or (iii) distribute any K-1 or other information statement, if any, to its partners or members, claiming or reflecting any deduction for worthlessness or abandonment of a Holdings Equity Interest, for a tax year ending on or before the Effective Date.  For the avoidance of doubt, Section 13.5 of the Plan will not be construed to enjoin any "50% Shareholder" from taking or causing to be taken any such action with respect to a tax year ending after the Effective Date.

To the extent any 50% Shareholder is a partnership or other pass-through entity for federal or state income tax purposes, prior to filing any federal or state tax return, or any amendment to such a return, then unless otherwise ordered by the Bankruptcy Court, each partner or other owner of such 50% Shareholder will be enjoined from filing a tax return claiming or otherwise reflecting any deduction for worthlessness of a Holdings Equity Interest for a tax year ending on or before the Effective Date.  For the avoidance of doubt, Section 13.5 of the Plan will not be construed to enjoin any partner or owner of such 50% Shareholder from taking or causing to be taken any such action with respect to a tax year ending after the Effective Date.

**7.10**    *Setoff.*

In no event will any holder of any Claim or Interest be entitled to set off any Claim or Interest against any Claim, right, or Cause of Action of the Debtors unless such holder obtains a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors or Reorganized Debtors, as applicable, and a holder of a Claim or Interest.

**7.11**    *Exemption from Certain Transfer Taxes.*

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange (or deemed issuance, transfer or exchange) of a security, including the issuance of the Reorganized Holdings Equity Interests and the New Warrants, (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest, including pursuant to the New Term Loan Facility or the New Exit Facility, (c) the

making or assignment of any lease or sublease, or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan (including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, dissolution, deeds, bills of sale and transfers of tangible property), including the restructuring transactions contemplated by the Plan, will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, transaction privilege tax (including, without limitation, such taxes on prime contracting and owner-builder sales), privilege taxes (including, without limitation, privilege taxes on construction contracting with regard to speculative builders and owner builders) or other similar taxes, and the appropriate state or local government officials or agents will, and will be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.   Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments (including, without limitation, any transfers or assignments for collateral purposes) of owned and leased property approved by the Bankruptcy Court on or prior to the Effective Date will be deemed to have been in furtherance of or in connection with the Plan.

**7.12**   *Issuance of New Securities and Plan-Related Documentation.*

The issuance under the Plan of the Reorganized Holdings Equity Interests to the First Lien Lenders and holders of General Unsecured Claims, the issuance of the New Warrants to the holders of General Unsecured Claims together with the issuance of the Reorganized Holdings Equity Interests upon any exercise of the New Warrants, and any subsequent sales, resales, transfers or other Distributions of such Reorganized Holdings Equity Interests or New Warrants (including Reorganized Holdings Equity Interests issuable upon exercise of any New Warrants) will be exempt from any federal or state securities law registration requirements (and all rules and regulations promulgated thereunder) to the fullest extent permitted by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law.

Upon the Effective Date, all documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, and any other agreements or documents related to or entered into in connection with same, will become, and will remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement).

**7.13**   *Other Exemptions.*

The issuance of the Reorganized Holdings Equity Interests to the First Lien Lenders and the issuance of the Reorganized Holdings Equity Interests and the New Warrants to the Noteholders will be exempt from the requirements of section 16(b) of the Securities and Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

**7.14    Post-Effective Date Claims and Amendments to Claims.**

On or after the Effective Date, a Claim may not be filed or amended without prior approval by the Bankruptcy Court or prior written authorization from the Reorganized Debtors. Any such new or amended Claim filed without prior written authorization or Bankruptcy Court approval will be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

## ARTICLE VIII.

## CONFIRMATION OF THE PLAN

**8.1    *Confirmation Hearing.***

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, hold a hearing on confirmation of a plan. The Bankruptcy Court has established July 15, 2014 at 10:00 a.m. (Eastern Time) as the date and time of the Confirmation Hearing. The Confirmation Hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon: (i) the Chambers of the Honorable Robert E. Grossman, One Bowling Green, New York, New York, 10004; (ii) counsel to the Debtors, Dechert LLP, 1095 Avenue of the Americas, New York, New York 10036, Attn: Allan S. Brilliant, Shmuel Vasser, and Jeffrey T. Mispagel; (iii) William K. Harrington, United States Trustee, U.S. Department of Justice, Office of the U.S. Trustee, U.S. Federal Office Building, 201 Varick Street, Rm 1006, New York, NY 10014, Attn: Andrea Schwartz and Richard Morrissey;  (iv) counsel to the Official Committee of Unsecured Creditors, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038, Attn: Kristopher M. Hansen, Frank A. Merola, and Matthew G. Garofalo, (v) counsel to the First Lien Agent, Latham & Watkins LLP, 233 South Wacker Drive, Suite 5800, Chicago, IL 60606, Attn: Richard A. Levy, (vi) the First Lien Agent, Royal Bank of Canada, 4th Floor, 20 King Street West, Toronto, Ontario M5H 1C4, Attn: Ann Hurley, Senior Manager, Agency Services Group, (vii) the Indenture Trustee, U.S. Bank National Association, 214 N. Tryon Street, 27th Floor, Charlotte, NC 28202, Attn: Corporate Trust Department, (xiii) counsel to the Indenture Trustee, Loeb & Loeb LLP, 345 Park Avenue, New York, NY 10154, Attn: Walter H. Curchack and Vadim J. Rubinstein, (ix) counsel to the Consenting Noteholders, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, NY 10036-6745, Attn: Michael Stamer and James Savin, and (x) all other parties who have filed a notice of appearance and request for service of documents.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**8.2**    *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

**(a)**    **Confirmation Requirements.**

Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each Impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not Impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that if a class of certain types of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims, regular installment payments in cash (i) of a total value, as of the effective date, equal to the allowed amount of such claim, (ii) over a period not exceeding five (5) years after the petition date, or (iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122 of the Bankruptcy Code);

- if a class of claims is Impaired, at least one (1) Impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class;

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan; and

- all fees payable to the applicable United States Trustee's office, pursuant to section 1930 of title 28, have been paid or the plan provides for payment of such fees on the effective date of the plan.

Subject to satisfying the standard for any potential "cramdown" of Classes deemed to reject the Plan, the Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied at the time of confirmation with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

1.        **Acceptance.**

A class is "Impaired" under a plan unless, with respect to each claim or interest of such class, the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law which entitles the holder of such claim or interest to demand or receive accelerated payment on account of a default, cures any default, reinstates the original maturity of the obligation, compensates the holder for any damages incurred as a result of reasonable reliance on such provision or law and does not otherwise alter the legal, equitable or contractual rights of such holder based upon such claim or interest. A class that is not Impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

Classes 2 and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. Classes 1, 3, 6 and 8 are Unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Classes 5, 7 and 9 are Impaired and not receiving any property under the Plan, and thus are deemed to have rejected the Plan.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right, with the consent of the Required Consenting Holders and subject to the Plan Support Agreement, to alter, amend, modify, revoke or withdraw the Plan or any Plan Exhibit, Schedule, or Plan Supplement, including amending or modifying it to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Classes 5, 7 and 9 which are deemed to reject the Plan and will set forth such arguments in a brief in support of confirmation filed in advance of the Confirmation Hearing.

2.        **Feasibility; Financial Projections.**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors unless such liquidation or reorganization is proposed in the Plan. If the Plan is confirmed, the Allowed Claims that will be paid in full in Cash are the Administrative Claims, Professional Fee Claims, Priority Tax Claims, DIP Claims (if any), Priority Claims and Other Secured Claims. The Debtors have estimated the total amount of such payments and expect sufficient liquidity from Cash on hand to fund these payments.

In addition, annexed as Exhibit 5 hereto are the Financial Projections (the "**Financial Projections**"), which were prepared by the Debtors and detail, among other things, the financial feasibility of the Plan and the Reorganized Debtors' ability to service their obligations, including under the New Term Loan. The Financial Projections indicate it is expected that the Reorganized Holdings' pro forma EBITDA ("**Pro Forma EBITDA**")[4] will be

---

[4]      Pro Forma EBITDA includes addbacks associated with income taxes, interest expenses, restructuring expenses and other charges and expenses that are currently permissible under the DIP Facility and anticipated to be permissible under the New Term Loan Agreement.

approximately $[_____] in 2014, $[_____] in 2015 and $[_____] in 2016, which earnings will be used, among other things, to service the New Term Loan.  Please see Article XI, "Certain Risk Factors to be Considered," for a discussion of some of the risks that could affect the Debtors' ability to pay its post-Effective Date indebtedness, including its ability to achieve its projected financial results as further described in the risk factor set forth in Section 10.3(a) of this Disclosure Statement.

The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur on or prior to August 15, 2014.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE THE DEBTORS BELIEVE THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS. THE FINANCIAL PROJECTIONS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW IN ARTICLE XI. IN THE LIGHT OF THESE RISKS AND UNCERTAINTIES, ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FINANCIAL PROJECTIONS.

The Debtors prepared the Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in notes to the Financial Projections. The Financial Projections have not been examined or compiled by independent accountants. The Debtors make no representation as to the accuracy of the projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management, and are subject to significant incremental uncertainty as a result of the scope and potential duration of the current economic recession underway both in the United States and abroad. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

### 3.    Creditors' Estimated Recovery Rates.

CREDITORS' ESTIMATED RECOVERY RATES SET FORTH IN THIS DISCLOSURE STATEMENT ARE BASED ON A HYPOTHETICAL ANALYSIS OF THE DEBTORS' BUSINESS PLAN, WHICH ASSUMES THAT THE REORGANIZED DEBTORS CONTINUE AS OPERATING BUSINESSES. THE ESTIMATED RECOVERY RATES SET FORTH IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO CONSTITUTE A

VALUATION OF THE DEBTORS OR AN APPRAISAL OF THE DEBTORS' ASSETS OR CLAIMS, AND THE ESTIMATED RECOVERY RATES SET FORTH HEREIN DO NOT REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTORS, THEIR SECURITIES OR ASSETS OR CLAIMS, WHICH VALUE MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN THE ESTIMATED RECOVERY RATES SET FORTH IN THE DISCLOSURE STATEMENT.

The Debtors have been advised by their financial advisor, Lazard with respect to the estimated ranges of recovery rates. Lazard assisted by estimating the range of value available for distribution to holders of Allowed Claims pursuant to the Plan. The estimated ranges of recovery rates for purposes of the Plan is based on the Financial Projections provided by the Debtors' management for the years 2014 through 2018 and takes into consideration the variability depending on the business strategy ultimately pursued.

Based on the Financial Projections and the Debtors' business plan subject to the disclaimers herein and solely for purposes of the Plan, Lazard estimates that the ranges recovery rates for creditors under the Plan are as presented in this Disclosure Statement.

THE ESTIMATED RECOVERIES WERE DERIVED FROM ANALYSIS PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF APRIL [ ], 2014. ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD, NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THE ESTIMATE.

The estimated recoveries assume that the Financial Projections were reasonably prepared by management of the Debtors in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtors, and assume the Reorganized Debtors will achieve their Financial Projections in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively. In conducting its analysis, Lazard: (a) reviewed certain historical financial information of the Debtors; (b) reviewed certain internal financial and operating data of the Debtors; (c) discussed the Debtors' operations and future prospects with the senior management team of the Debtors and third-party advisors; (d) reviewed certain publicly available financial data for public companies that Lazard deemed generally comparable to the operating business of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as third parties and publicly available information.

In addition, Lazard did not independently verify the Financial Projections in connection with preparing any analysis, and no independent valuations or appraisals of the Debtors were sought or obtained in connection herewith. The ranges of recovery estimates were developed solely for purposes of the formulation and negotiation of the Plan, and to provide "adequate information" pursuant to section 1125 of the Bankruptcy Code.

71

The estimated recovery ranges do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard and the Debtors' other advisors have not been asked to and do not express any view as to what the value of the Reorganized Debtors' securities would be on issuance at any time. The estimated recovery ranges do not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY THE DEBTORS OR LAZARD. THE PREPARATION OF RECOVERY RATES ESTIMATES INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY THE DEBTORS, LAZARD AND ANY OTHER ADVISOR ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

### 4.    Standards Applicable to Releases.

Article 10.6 of the Plan provides for releases of certain claims against non-Debtors in consideration of services provided to the Estates and valuable compromises made by the Released Parties. The non-Debtor released parties are, collectively and individually, any past or present Representatives or equityholders of any of the Debtors, the Reorganized Debtors, the Committee and its members (solely in their capacity as such), the First Lien Agent, the Consenting Lenders, the Indenture Trustee, the Consenting Noteholders, and the Representatives of each of the foregoing (solely in their capacities as such). As set forth in the Plan, the releases are given by each holder of a Claim (solely in its capacity as such) that is (i) Unimpaired by the Plan, (ii) have not voted to reject the Plan, or (iii) have voted to reject the Plan but have not checked the box on the applicable ballot indicating that they opt not to grant the releases provided in the Plan. The released claims are limited to those Causes of Action that relate to a Debtor, the Chapter 11 Cases, the Estates, the Plan, the exhibits to the Plan, the Plan Supplement, the Disclosure Statement, the First Lien Facility, or the Indenture.

The Debtors believe that the releases set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has afforded value to the Debtors, aided in the reorganization process, and facilitated the Debtors' ability to propose and pursue confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure.

The United States Court of Appeals for the Second Circuit has determined that releases of non-debtors may be approved as part of a chapter 11 plan of reorganization if there are "unusual circumstances" that render the release terms important to the success of the plan. *Deutsche Bank AG v. Metromedia Fiber Network Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005). Courts have approved releases of non-debtors when, for example, (a) the estate received substantial consideration; (b) the enjoined claims were channeled to a settlement fund rather than extinguished; (c) the enjoined claims would indirectly impact the reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consented to the release. *Id.* at 142. Before a determination can be made as to whether releases are appropriate as warranted by "unusual circumstances," the United States Court of Appeals for the Second Circuit has concluded that there is a threshold jurisdictional inquiry as to whether the Bankruptcy Court has subject matter jurisdiction to grant such releases. *In re Johns-Manville Corp.*, 517 F.3d 52, 65 (2d Cir. 2008); *see also In re Dreier LLP*, 429 B.R. 112, 132 (Bankr. S.D.N.Y. 2010) (finding no jurisdiction to approve releases of claims that did not affect the estate); *In re Metcalf & Mansfield Alternative Investments*, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010) (discussing and approving releases in a case under chapter 15 of the Bankruptcy Code). Courts have jurisdiction over a third party cause of action or claim if it will "directly and adversely impact the reorganization." *Dreier*, 429 B.R. at 132. Conversely, the court may lack jurisdiction if the releases claim is one that would "not affect the property of the estate or the administration of the estate." *Id.* at 133. Here, all of the released claims would "directly and adversely impact the reorganization" of the Debtors' Estates. Further, because the non-Debtor releases are purely consensual, the non-Debtor releases contained in the Plan satisfy the *Metromedia* requirements.

## 5.    Best Interests Test.

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. See the Liquidation Analysis annexed as Exhibit 2 hereto, which demonstrates that the Plan satisfies the "best interests" test.

In determining whether this test is satisfied, the first step is to determine the dollar amount that would be generated from the liquidation of each of the Debtors' assets and properties in a chapter 7 liquidation case. The gross amount of Cash available in such a liquidation would be the sum of the proceeds from the disposition of such Debtor's assets and the Cash held by such Debtor at the time of the commencement of the chapter 7 case. This gross amount would be reduced by the amount of any Allowed Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the applicable Debtor's business and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders of the applicable Debtor in strict accordance with the order of priority of claims contained in section 726 of the Bankruptcy Code.

As further described in Exhibit 2, underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the

Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a chapter 7 liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated under chapter 7. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

**The Debtors have determined, as discussed in the Liquidation Analysis attached as <u>Exhibit 2</u> hereto, that confirmation of the Plan will provide each holder of Claims and Interests with a recovery that is not less than it would receive pursuant to a liquidation of the applicable Debtor under chapter 7 of the Bankruptcy Code.** See the Liquidation Analysis annexed as <u>Exhibit 2</u> hereto for a further discussion of how the Plan satisfies the "best interests" test.

### 6.    Classification of Claims and Interests.

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code which require that a plan of reorganization place each claim or interest into a class with other claims or interests that are "substantially similar."

**(b)    Cramdown.**

THE DEBTORS RESERVE THE RIGHT TO CRAMDOWN THE PLAN ON HOLDERS OF IMPAIRED CLAIMS OR INTERESTS.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all Impaired classes, as long as at least one Impaired class of claims has accepted the Plan. The "cramdown" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code. Under the "cramdown" provisions, upon the request of a plan proponent, the bankruptcy court will confirm a plan despite the lack of acceptance by all Impaired classes if the bankruptcy court finds that (i) the plan does not discriminate unfairly with respect to each non-accepting Impaired class, (ii) the plan is fair and equitable with respect to each non-accepting Impaired class, and (iii) at least one Impaired class has accepted the plan. These standards ensure that holders of junior interests cannot retain any interest in the debtor under a plan that has been rejected by a senior class of Impaired claims or interests unless holders of such senior Impaired claims or interests are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the holders of each type of Claim and by treating each holder of a Claim in each

Class identically, the Plan has been structured so as to satisfy the "no unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims or interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation, notwithstanding non-acceptance by an Impaired class, if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan. Case law surrounding section 1129(b) of the Bankruptcy Code requires that no class senior to a non-accepting Impaired class receives more than payment in full on its claims. This will not occur here. Although the Intercompany Interests are preserved, this is done for administrative convenience only for the purpose of preserving the Debtors' corporate structure.

The Debtors intend to seek "cramdown" of the Plan on Classes 5, 7 and 9, which are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code by virtue of receiving no Plan distributions, and against any other Impaired Class which does not accept the Plan. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

**8.3**     *Consummation.*

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code. For a more detailed discussion of the conditions precedent to Plan consummation and the consequences of the failure to meet such conditions, see Section 9 of the Plan.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## ARTICLE IX.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors believe that much of the success reached by the parties to the Plan Support Agreement in their negotiations and their long-standing efforts to reach consensual resolutions could very well be squandered. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

**9.1**     *Liquidation under Chapter 7 of the Bankruptcy Code.*

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code. A discussion of the effect a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VIII of this Disclosure Statement. The Debtors believe that such a liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis described in Article VIII herein and attached as <u>Exhibit 2</u> to this Disclosure Statement.

**9.2**    *Alternative Plan(s) of Liquidation or Reorganization.*

The Debtors believe that failure to confirm the Plan would lead inevitably to even more expensive and protracted Chapter 11 Cases.  In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process with the First Lien Agent, the Consenting Lenders and the Consenting Noteholders.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Claims, but also that the Plan provides superior recoveries to Classes 2 and 4 over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling many stakeholders to maximize their returns.  Rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES AND ADDITIONAL ADMINISTRATIVE EXPENSES ASSOCIATED WITH LITIGATION. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## ARTICLE X.

## SUMMARY OF VOTING PROCEDURES

This Disclosure Statement, including all Exhibits hereto and the related materials included herewith, is being furnished to the holders of Claims in Classes 2 and 4, which are the only Classes entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with this Disclosure Statement.  No other votes will be counted.  Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed June 3, 2014 as the Voting Record Date. Ballots must be RECEIVED by the Voting Agent no later than 4:00 p.m. (Eastern Time) on July 3, 2014, unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice to the Voting Agent, in which event the period during which Ballots will be accepted will terminate at 4:00 p.m. (Eastern Time) on such extended date.  Notwithstanding the foregoing, each holder of a Claim in Classes 2 and 4 may revoke or amend such holder's Ballot in the event the Debtors modify the Allowed amount of such holder's Claim under the Plan.

Solely for purposes of voting to accept or reject the Plan and not for the purpose of the allowance of, or distribution on account of, a Claim, each holder of a Claim within a Class of Claims entitled to vote to accept or reject the Plan will be entitled to vote the amount of such Claim as set forth on the Schedules or, if such holder has timely filed a proof of claim, the amount of such Claim as set forth in such proof of claim.

If a Claim is listed on the Schedules as contingent, unliquidated, or disputed or in an amount equal to zero dollars and a proof of claim was not (i) filed by the Bar Date for the filing of proofs of claim, or (ii) deemed timely filed by an order of the Court prior to the Voting Deadline, such Claim is Disallowed for voting purposes and for purposes of allowance and distribution pursuant to Bankruptcy Rule 3003(c), unless the Debtors consent in writing. If a Claim for which a proof of Claim has been timely filed is, by its terms, contingent, unliquidated, or disputed, or if the Claim is deemed disputed under the Plan, such Claim is temporarily allowed for voting purposes only, and not for purposes of allowance or distribution, at $1.00.

If the Debtors have served an objection to a Claim at least twenty (20) days before the Voting Deadline, such Claim is temporarily Disallowed for voting purposes only and not for purposes of allowance or distribution, except to the extent and in the manner as may be set forth in such objection.

Any holder of a Claim who seeks to have its claim allowed for voting purposes in an amount different from that which is set forth in the Schedules, the Plan or the Disclosure Statement, must file a motion (a "**Claimant Voting Motion**") seeking a hearing to consider the estimation of such claim no later than ten (10) days prior to the Voting Deadline. Such Claimant Voting Motion must set forth with particularity the amount at which such claimant believes its claim should be allowed and the evidence in support thereof. If the Bankruptcy Court has not, on or before the Voting Deadline, temporarily or otherwise allowed all or a portion of a claim set forth in a claimant voting motion for voting purposes, pursuant to Bankruptcy Rule 3018(a), such claim will not be counted for voting purposes.

Ballots previously delivered may be withdrawn or revoked at any time prior to the Voting Deadline. Only the person or nominee who submits a Ballot can withdraw or revoke that Ballot. A Ballot may be revoked or withdrawn either by submitting a superseding Ballot or by providing written notice to the Voting Agent.

Acceptances or rejections may be withdrawn or revoked prior to the Voting Deadline by delivering a written notice of withdrawal or revocation to the Voting Agent. To be effective, notice of revocation or withdrawal must: (a) be received on or before the Voting Deadline by the Voting Agent at its address specified on page 14 herein; (b) specify the name of the holder of the Claim whose vote on the Plan is being withdrawn or revoked; (c) contain the description of the Claim as to which a vote on the Plan is withdrawn or revoked; and (d) be signed by the holder of the Claim who executed the Ballot reflecting the vote being withdrawn or revoked, in the same manner as the original signature on the Ballot. The foregoing procedures should also be followed with respect to a Person entitled to vote on the Plan who wishes to change (rather than revoke or withdraw) its vote.

## ARTICLE XI.

## <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE

DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**11.1**    *Certain Bankruptcy Considerations.*

**(a)**    **General.**

If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, the probability and the magnitude of the potentially adverse effects described herein would be increased.

**(b)**    **Failure to Receive Requisite Acceptances.**

Classes 2 and 4 are the only Classes that are entitled to vote to accept or reject the Plan. If the Requisite Acceptances for at least one Impaired Class are not received, the Debtors may seek to accomplish a liquidation and obtain acceptances to an alternative plan of reorganization or liquidation for one or more of the Debtors, or otherwise, which alternate plan may not have broad based support. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

**(c)**    **Failure to Confirm the Plan.**

Even if all Classes entitled to vote accept the Plan, the Plan might not be confirmed by the Bankruptcy Court. The Debtors believe that the Plan satisfies all of the requirements for confirmation of a plan under the Bankruptcy Code. There can be no assurance, however, that the Bankruptcy Court will also conclude that the requirements for confirmation of the Plan have been satisfied.

**(d)**    **Failure to Consummate the Plan.**

There can be no assurance that even if the Plan is confirmed, the other conditions to consummation will be satisfied or waived. Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can also be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in Section 9 of the Plan and those described in section 5.2 above have not occurred and have not been waived, the Confirmation Order will be vacated, in which event, no Plan distributions will be made.

Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will ultimately be consummated.

(e)     **Objections to Classification of Claims.**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is "substantially similar" to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**11.2    *Actual recoveries may differ materially from the estimated recoveries set forth in this Disclosure Statement.***

The recoveries listed in this Disclosure Statement are estimates based on assumptions made by the Debtors.  Such recoveries are dependent on a variety of factors, including the factors described below.

(a)     **Allowance of Unsecured Claims May Substantially Dilute the Recovery to Holders of Other Unsecured Claims under the Plan.**

The Debtors currently are in the process of reviewing, analyzing and reconciling the scheduled and filed Claims.  The aggregate amount of Claims that will ultimately be Allowed is not determinable at present, and the Debtors expect that the claims resolution process will not be completed until after the Effective Date.  The projected distributions and recoveries set forth in this Disclosure Statement and the Liquidation Analysis are based on the Debtors' estimates of Allowed Claims.  However, there can be no assurance that the Debtors' estimates will prove accurate.

Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any creditor whose Claim is subject to a successful objection.  Any such creditor may not receive the estimated Plan distributions set forth herein.

(b)     **Litigation Risks.**

There is, or may be in the future, certain litigation that could result in a material judgment against the Reorganized Debtors and/or their assets.  Such litigation and any judgment in connection therewith could have a material negative effect on the Reorganized Debtors and their respective values, assets, and future operations.

**11.3    *Risks Relating to the New Term Loan and the Reorganized Holdings Equity Interests***

(a)     **Variances From Financial Projections.**

The Financial Projections included as <u>Exhibit 5</u> to this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Reorganized Debtors and which may not materialize, particularly given the current difficult economic environment.  These assumptions may or may not prove accurate.

**(b)      Substantial Leverage.**

Although Reorganized Holdings will have less indebtedness than the Debtors, Reorganized Holdings will still have substantial indebtedness.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, certain of the Reorganized Debtors will, on a consolidated basis, have approximately $320 million in secured indebtedness under the New Term Loan and an additional secured indebtedness under the New Exit Facility.

The degree to which the Reorganized Debtors will be leveraged could have important consequences because it could affect Reorganized Holdings' ability to satisfy its obligations under the New Term Loan.

**(c)      Obligations Under the New Term Loan.**

The obligations of the New Term Loan Parties under the New Term Loan will be secured by a first lien on substantially all assets of the Debtors, including (i) accounts, (ii) equipment, goods, inventory, and fixtures, (iii) documents, instruments, and chattel paper, (iv) letters of credit and letter of credit rights, (v) securities collateral, (vi) investment property, (vii) intellectual property collateral, (viii) certain commercial torts claims, (ix) general intangibles, (x) money and deposit accounts, (xi) supporting obligations, (xii) books and records relating to the foregoing, (xiii) other personal property; and (xiv) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits, and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty, or guaranty payable from time to time with respect to any of the foregoing.  The Debtors have also pledged (a) 100% of the equity interests they hold in each domestic subsidiary and (b) (i) 100% of the non-voting equity interests they hold in each foreign non-Debtor subsidiary and (ii) 65% of the voting equity interests they hold in each foreign non-Debtor subsidiary, to the First Lien Agent.  If the there is a default under the New Term Loan, and payment on any obligation thereunder is accelerated, the lenders under the New Term Loan would be entitled to exercise the remedies available to a secured lender under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the New Term Loan.

**(d)      Restrictive Covenants.**

The New Term Loan will contain various covenants that may limit the discretion of certain Reorganized Debtors' management by restricting such Reorganized Debtors' ability to, among other things:  incur additional indebtedness; incur liens; merge, dissolve, liquidate and/or sell or dispose of all or substantially all of their assets; consummate certain asset sales; pay dividends or make certain restricted payments; amend material contracts; or enter into certain transactions with affiliates.  As a result of these covenants, the Reorganized Debtors will be limited in the manner in which it conducts business and may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the New Term Loan or any other subsequent financing agreements may result in an event of default.  An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-

acceleration or cross-default provision applies. If the New Term Loan is not repaid when due, the lenders thereunder could, subject to the terms of the New Term Loan, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

**(e)** **Lack of Trading Market; No Trading Value.**

It is anticipated that there will be no active trading market for the Reorganized Holdings Equity Interests. The Debtors have no present intention to register the Reorganized Holdings Equity Interests under the Securities Act, nor to apply to list the Reorganized Holdings Equity Interests on any national securities exchange. There can be no assurance as to the liquidity of any market that may develop for the Reorganized Holdings Equity Interests. The Reorganized Debtors will not be required to file periodic reports with the S.E.C. or otherwise provide any other financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations. Furthermore, the lack of liquidity may adversely affect the price at which Reorganized Holdings Equity Interests may be sold, if at all.

**(f)** **Restrictions on Transfer.**

Holders of Reorganized Holdings Equity Interests who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities. These Persons will be permitted to transfer or sell such securities only pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration statement under the Securities Act, or (c) following a holding period, the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act. The Reorganized Debtors have no current plans to register at a later date, post-emergence, any of their securities under the Securities Act or under equivalent state securities laws such that the recipients of the Reorganized Holdings Equity Interests would be able to resell their securities pursuant to an effective registration statement. Moreover, the Reorganized Debtors do not currently nor in the future intend to make publicly available the information required by Rule 144, thereby limiting the ability of holders of Reorganized Holdings Equity Interests to avail themselves of Rule 144 following the applicable holding period.

In addition, the Shareholders' Agreement and/or the New Corporate Governance Documents will contain certain restrictions on transfers, including with respect to compliance with applicable securities laws, and transfers the result of which would require the Company to become subject to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"). All certificates for shares of Reorganized Holdings Equity Interests will conspicuously bear legends with respect to the restrictions on transfer in respect thereof.

For additional information regarding restrictions on resale of the Reorganized Holdings Equity Interests, see Article XII ("Securities Law Matters") below.

81

**(g)     The Equity Value of Reorganized Holdings May Never Equal or Exceed the Strike Price Under the New Warrants.**

The equity value of Reorganized Holdings may never equal or exceed the strike price of $180 million, subject to certain adjustments, under the New A Warrants and $230 million, subject to certain adjustments, under the New B Warrants.

**(h)     Significant Stockholders.**

If holders of a significant number of shares of Reorganized Holdings Equity Interests were to act as a group, such holders could be in a position to control the outcome of actions requiring stockholders approval and could be in a position to cause a sale of the Reorganized Debtors.   This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the Reorganized Holdings Equity Interests.

**(i)     Dividend Policies.**

It is expected that the Reorganized Debtors' cash flow will be required to be used in the foreseeable future (a) to make payments under the New Term Loan, (b) to fund the Reorganized Debtors' other obligations under the Plan, and (c) for working capital and capital expenditure purposes.  Accordingly, the Reorganized Debtors do not anticipate paying dividends on the Reorganized Holdings Equity Interests in the foreseeable future.

**11.4     *Risks Relating to Tax Consequences of the Plan.***

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.   In addition, the alternate structures under consideration for consummating the Plan could have materially different tax consequences to the Debtors or a creditor.  The Debtors currently do not intend to seek any ruling from the IRS on the tax consequences of the Plan.  Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.   In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request.  **Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.**

For additional information regarding the federal income tax consequences of the Plan, see Article XIII ("Certain United States Federal Income Tax Consequences of the Plan"), below.

**11.5     *Risks Associated with the Business.***

**(a)     General Business Risks.**

The Debtors' business is subject to a variety of business risks.   The Debtors compete with many others in the market for clinical documentation solutions which may result in

lower prices for their services, reduced operating margins and an inability to maintain or increase their market share.  The Debtors' business is dependent upon the continued demand for transcription services.  If EHR companies produce alternatives to medical transcription that reduce the need for transcription, the demand for the Debtors' solutions could be reduced.

**(b)    Growth of the Business.**

The Debtors' growth and ability to remain competitive is dependent on the willingness of new customers to outsource and adopt the Debtors' technology platforms and the ability of the Debtors to support existing technologies, as well as to adopt and integrate new technology into the Debtors' workflow platforms.  Speech recognition and natural language understanding technologies may not achieve widespread acceptance, which could limit the Debtors' ability to grow their business.  In addition, technological innovations in the Debtors' markets may create alternatives to the Debtors' products and result in reduced sales.

**(c)    Customer Retention.**

Many of the Debtors' customer contracts are terminable at will by the customers, and the Debtors' ability to sustain and grow profitable operations is dependent upon the ability to retain customers.  If a significant number of customers were to cancel or materially change their commitments, the Debtors could have significantly decreased revenue, which would harm their business, operating results and financial condition. In addition, customer retention is largely dependent on providing quality service at competitive prices, and may be impacted by events outside of the control of the Debtors.

**(d)    Indian Operations.**

A significant portion of the Debtors' operations is located in India.  As a result, the Debtors' business, financial condition and results of operations could be adversely affected by the political and economic conditions in India.  In addition, the Debtors are exposed to fluctuations of the value of the Indian rupee against the U.S. dollar.

**(e)    Key Employees.**

The Debtors' operations and future success are dependent upon the existence and expertise of certain key employees. The loss of services of any of these individuals for any reason or inability to attract suitable replacements would have a material adverse effect on the financial condition of the Debtors' business and operations.  In addition, a number of key employees of the Debtors are entitled to future deferred acquisition payments from the Debtors relating to the acquisition by the Debtors of such employees' prior businesses.  In the event that these payments are not made, there is an increased risk of attrition of such key employees.  These key employees are entitled in the aggregate to approximately $5 million of deferred acquisition payments, with the vast majority of such amount owed to three key employees payable in August 2014.

# ARTICLE XII.

## SECURITIES LAW MATTERS

**12.1** *General.*

The Plan provides for Reorganized Holdings to issue Reorganized Holdings Equity Interests to (i) the First Lien Lenders on account of the Allowed First Lien Claims pursuant to Section 4.2 of the Plan and (ii) to holder of Allowed General Unsecured Claims (including Allowed Noteholder Claims) pursuant to Section 4.4 of the Plan.

The Debtors believe that the Reorganized Holdings Equity Interests constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and applicable state securities laws.

THE ISSUANCE OF REORGANIZED HOLDINGS EQUITY INTERESTS AND THE NEW WARRANTS UNDER THE PLAN RAISES CERTAIN SECURITIES LAW ISSUES UNDER THE BANKRUPTCY CODE AND FEDERAL AND STATE SECURITIES LAWS WHICH ARE DISCUSSED IN THIS ARTICLE.  THE INFORMATION CONTAINED IN THIS ARTICLE SHOULD NOT BE CONSIDERED APPLICABLE TO ALL SITUATIONS OR ALL CREDITORS RECEIVING HOLDINGS REORGANIZED EQUITY INTERESTS UNDER THE PLAN.  CREDITORS SHOULD CONSULT THEIR OWN LEGAL COUNSEL CONCERNING THE FACTS AND CIRCUMSTANCES WITH RESPECT TO THE TRANSFER OF SUCH STOCK OR WARRANTS IN EACH PARTICULAR CASE.

**12.2** *Issuance of Reorganized Holdings Equity Interests and New Warrants.*

The Debtors believe that the offer and sale of the Reorganized Holdings Equity Interests, the New Warrants and Reorganized Holdings Equity Interests issuable upon exercise of the New Warrants pursuant to the Plan will be exempt from federal and state securities registration requirements under various provisions of the Securities Act and the Bankruptcy Code.  Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange or partly for cash and property.  In reliance upon section 1145 of the Bankruptcy Code, the offering and issuance of the Reorganized Holdings Equity Interests, the New Warrants and Reorganized Holdings Equity Interests issuable upon exercise of the New Warrants will not be registered under the Securities Act or any state securities laws.

**12.3** *Shareholders' Agreement; New Warrant Agreements.*

The Required Consenting Holders, in their reasonable discretion, may determine to set forth certain rights and obligations concerning the Reorganized Holdings Equity Interests in the Shareholders' Agreement (which, for the avoidance of doubt, might be a limited company liability agreement), in lieu of providing such rights and obligations in the New Corporate

84

Governance Documents, in which case such Shareholders' Agreement, if any, will become effective by Reorganized Holdings as of the Effective Date and be binding on all holders of Reorganized Holdings Equity Interests; <u>provided</u> that each recipient of Reorganized Holdings Equity Interests must sign the Shareholders' Agreement prior to receiving any Reorganized Holdings Equity Interests.  Each holder of Reorganized Holdings Equity Interests will be deemed to be bound to the terms of the Shareholders' Agreement from and after the Effective Date even if not a signatory thereto.  To the extent that within six (6) months of the Effective Date, any Reorganized Holdings Equity Interests are not distributed to holders of Allowed Claims in Class 2 or Class 4 as a result of such holder failing to sign the Shareholders' Agreement, such Reorganized Holdings Equity Interests will be treated as Unclaimed Property in accordance with Section 6.9 of the Plan.

Each holder of the New Warrants will be required to sign the applicable New Warrant Agreement as a condition to the issuance of the New Warrants.  To the extent that within six (6) months of the Effective Date, any New Warrants are not issued to holders of Allowed Claims in Class 4 as a result of such holder failing to sign the applicable New Warrant Agreement, such New Warrants will be treated as Unclaimed Property in accordance with Section 6.9 of the Plan.

**12.4    *Resale of Reorganized Holdings Equity Interests.***

**(a)    Securities Law Restrictions.**

The Debtors further believe that subsequent transfers of the Reorganized Holdings Equity Interests by the holders thereof that are not "underwriters," as defined in Section 1145(b)(1) of the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, or (b) offers to sell securities offered or sold under a plan for the holders of such securities, or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (d) is an issuer of the securities as used in Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or

indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.   Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the Reorganized Holdings Equity Interests and New Warrants by Persons deemed to be "underwriters" as defined in section 1145(b)(i) of the Bankruptcy Code (which definition includes "controlling person") would not be exempted by section 1145(a) of the Bankruptcy Code from registration under the Securities Act or other applicable law.   Under certain circumstances, holders of Reorganized Holdings Equity Interests who are deemed to be such "underwriters" may, at a future time and subject to certain conditions, be entitled to resell their Reorganized Holdings Equity Interests pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act or pursuant to other applicable exemptions.  Generally, after a holding period, Rule 144 of the Securities Act permits the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met.  However, the Reorganized Debtors do not intend to make publicly available the requisite information regarding the Reorganized Debtors and, as a result, after the holding period, Rule 144 will not be available for resales of Reorganized Holdings Equity Interests and New Warrants by persons deemed to be underwriters.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the Reorganized Holdings Equity Interests and New Warrants would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Reorganized Holdings Equity Interests and New Warrants.  In view of the complex nature of the question of whether a particular Person may be an "underwriter," the Debtors make no representations concerning the right of any Person to freely resell Reorganized Holdings Equity Interests and New Warrants. **Accordingly, the Debtors recommend that potential recipients of Reorganized Holdings Equity Interests and New Warrants consult their own counsel concerning whether they may freely trade such securities without compliance with the federal and state securities laws.**

**(b)      Restrictions in the Shareholders' Agreement.**

The Shareholders' Agreement contains certain restrictions on transfers, including with respect to compliance with applicable securities laws, and prohibitions on transfers to competitors and transfers the result of which would require the Company to become subject to the reporting requirements of the Exchange Act.  All certificates for shares of Reorganized Holdings Equity Interests will conspicuously bear legends with respect to the restrictions on transfer in respect thereof.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE REORGANIZED HOLDINGS EQUITY INTERESTS, NEW WARRANTS OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH RECIPIENT OF REORGANIZED HOLDINGS EQUITY INTERESTS AND NEW WARRANTS AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISOR WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, THE DEBTORS MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE REORGANIZED HOLDINGS EQUITY INTERESTS OR NEW WARRANTS.

## ARTICLE XIII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes some of the more significant United States federal income tax consequences of the Plan to certain holders of Claims. The analysis contained herein is based upon the Tax Code, the Treasury Regulations promulgated and proposed thereunder (the "**Regulations**"), judicial decisions and published administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations hereafter enacted or promulgated could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. This summary does not generally address state, local gift, estate or non-U.S. tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations and investors in pass-through entities). Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of a Claim.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW. NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE INTERNAL REVENUE SERVICE (THE "**IRS**") WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN

REQUESTED OR OBTAINED WITH RESPECT THERETO. THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

**TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE TAX CODE; (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE SOLICITATION OF VOTES IN FAVOR OF THE PLAN AND IS WRITTEN IN CONNECTION WITH PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT; AND (3) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**13.1** *Federal Income Tax Consequences to the Debtors.*

The Debtors are Holdings, various corporate subsidiaries, and entities disregarded as separate from Holdings or its subsidiaries for United States federal income tax purposes. Holdings is the common parent of an affiliated group of corporations that files a consolidated tax return for federal income tax purposes (the "**MModal Group,**" which also include for purposes of this discussion, as the context may require, any similar group after the Effective Date of which MModal Inc. is a member). As discussed below, in connection with the implementation of the Plan, the amount of the MModal Group's currently existing net operating loss ("**NOL**") carryforwards and certain other attributes may be reduced or eliminated. In addition, the MModal Group's subsequent utilization of any NOL carryforwards remaining, and possibly certain other tax attributes, may be restricted following the consummation of the Plan. The determination of whether any of the MModal Group's NOL carryforwards (or other tax attributes) will be limited as a result of the consummation of the Plan is complex and depends on many different factors, including the precise nature of the transactions effected to implement the consummation of the Plan.

(a)    **Cancellation of Indebtedness and Reduction of Tax Attributes.**

As a result of the consummation of the Plan, Holdings will realize cancellation of debt ("**COD**") income for United States federal income tax purposes. Generally, gross income includes the amount of any such COD income. The amount of the COD income generally equals the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the

cancelled debt would have given rise to a tax deduction). Because the Debtors are in a Chapter 11 bankruptcy proceeding, however, Holdings will not be required to recognize COD income, but must instead reduce certain tax attributes of the MModal Group by the amount of unrecognized COD income in the manner prescribed by section 108(b) of the Tax Code. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. A debtor with COD income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the taxable income (or loss) for the year of the debt discharge has been determined. Generally, the reduction in the tax basis in assets cannot exceed the excess of the total basis of the debtors' property held immediately after the debt discharge over the total liabilities of the debtors immediately after the debt discharge (the "**Liability Cap Rule**"). If a debtor with excluded COD income is a member of a consolidated group, Treasury Regulations address the application of the rules for the reduction of tax attributes. If the debtor is a member of a consolidated group and is required to reduce its basis in the stock of another group member, a "look-through rule" generally requires a corresponding reduction in the tax attributes of the lower-tier member. If the amount of a debtor's excluded COD income exceeds the amount of attribute reduction resulting from the application of the foregoing rules, certain other tax attributes of the consolidated group may also be subject to reduction. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The determination of whether any of the MModal Group's tax basis in assets will be reduced as a result of the consummation of the Plan is complex and depends on many different factors, including the precise nature of the transactions effected to implement the consummation of the Plan. In the event of a taxable transfer of the MModal Group's assets, it is likely that all of the MModal Group's NOLs would be used to absorb gain recognized from the transfer, thus preventing the carryforward of any NOLs. It is expected that there will not be enough state NOLs to fully absorb the gain on such a transfer, so the MModal Group will likely have a state tax liability in the $0M-$10M range, and its total tax liability may be more, depending on the value of the transferred assets and the amount of taxable income or loss otherwise generated by the MModal Group in its tax year that includes the date of such transfer. Regardless of the amount of NOL absorbed in a taxable transfer of the MModal Group's assets, no NOLs will survive such taxable transfer. Alternatively, in the event that Reorganized Holdings Equity Interests are issued pursuant to the Plan, the tax attributes of the MModal Group likely would be reduced, as described in the preceding paragraph. Although there can be no assurances, it is estimated that the MModal Group would retain NOLs of approximately $200 million going forward with no reduction in asset basis due to the Liability Cap Rule.

(b)     **Section 382**

Under Section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change", the amount of its pre-change losses that may be utilized to offset future taxable income is subject to an annual limitation. Such limitation also may apply to certain losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change and that are subsequently recognized.

As discussed above, in the event of a taxable transfer of the MModal Group's assets, there is expected to be a gain recognized from the sale, and the MModal Group's NOLs may not fully offset the gain recognized from the sale, therefore resulting in a tax liability at the MModal Group.  Furthermore, none of the MModal Group's NOLs would survive the consummation of the Plan.  Alternatively, in the event that Reorganized Holdings Equity Interests are issued to creditors pursuant to the Plan, the MModal Group may be able to carryfoward NOLs, which would be subject to certain limitations under Section 382 of the Tax Code. The discussion below summarizes certain of the aforementioned limitations that could apply under such circumstances.

### 1.    General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation (or consolidated group) would be subject is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long term tax exempt rate" in effect for the month in which the ownership change occurs. For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change, after giving effect to the surrender of creditors' claims.  In the event of a taxable transfer of the MModal Group's assets, it is likely that none of the MModal Group's NOLs would survive the consummation of the Plan and that this limitation therefore would not apply to the MModal Group.  Alternatively, in the event that Reorganized Holdings Equity Interests are issued to creditors pursuant to the Plan, the MModal Group may be able to carryforward NOLs which likely would be subject to this limitation.

### 2.    Built-In Gains and Losses

If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as pre-change losses and similarly will be subject to the annual limitation. Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss. Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain. Thus, a consolidated group can be considered to have both a net unrealized built-in loss and a net unrealized built-in gain. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10,000,000 or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.

The determination of whether the MModal Group will, as a whole, be in a net unrealized built-in gain position on the Effective Date is complex and depends on many different factors. In the event of a taxable transfer of the MModal Group's assets, the assets held by Reorganized Holdings would have a basis equal to their fair market value and Reorganized Holdings would not be subject to the limitation under Section 382 of the Tax Code described herein. Alternatively, in the event that Reorganized Holdings Equity Interests were issued to creditors pursuant to the Plan, the MModal Group expects based upon current projections that it, or at least certain members of the MModal Group will, as a whole, be in a net unrealized built-in gain position on the Effective Date, although there can be no assurance in this regard. Furthermore, whether the MModal Group will, as a whole, be in a net unrealized built-in gain position on the Effective Date depends upon the precise nature of the transactions effected to implement the consummation of the Plan.

### 3.    Alternative Minimum Tax.

The Tax Code provides that, for any taxable year, a corporation's federal income tax liability equals the greater of (i) the regular tax computed at the regular 35% corporate tax rate on taxable income and (ii) the alternative minimum tax ("**AMT**") computed at a lower tax rate (20%) but on a broader income base (alternative minimum taxable income ("**AMTI**")). For purposes of computing a corporation's regular federal income tax liability, all of the income recognized in a taxable year may be offset by available NOLs and other tax carryovers (to the extent permitted under, *inter alia*, sections 382 and 383 of the Tax Code). In contrast, for purposes of computing AMTI, NOLs (as determined for AMT purposes) and other tax carryovers generally are taken into account, but typically do not offset more than 90% of the pre-NOL AMTI. Thus, a corporation that is currently profitable for AMT purposes generally will be required to pay federal income tax at an effective rate of at least 2% of its pre-NOL AMTI (10% of the 20% AMT tax rate), regardless of the amount of its NOLs. Notwithstanding the foregoing general rule, the MModal Group may be able to benefit from a special rule relating to NOLs that could allow the MModal Group to offset up to 100% of its AMTI with NOLs.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to the AMT. Any unused credit may be carried forward indefinitely.

### 13.2    *Federal Income Tax Consequences to Holders of Claims*

### (a)    **In General.**

Generally, a holder of a Claim will recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a holder's Claim. The tax basis of a holder in a Claim will generally be equal to the holder's cost therefore.

The character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim in the holder's hands, the purpose and circumstances of its acquisition, the holder's

holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  If the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim for more than one year.  There are limitations on the deduction of capital losses by both corporate and non-corporate taxpayers.

HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

(b)    **Allocation of Consideration to Accrued Interest.**

A portion of the consideration received by a holder in satisfaction of a Claim pursuant to the Plan may be allocated to the portion of such Claim (if any) that represents accrued but unpaid interest.  If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the holder as interest income, except to the extent the holder has previously reported such interest as income.  A holder will generally recognize a loss to the extent that any accrued interest was previously included in the holder's gross income and is not paid in full.

Pursuant to the Plan, all Plan distributions in respect of any Claim will be allocated first to the principal amount of such Claim, as determined for United States federal income tax purposes, and then, to the extent the consideration exceeds such amount, to any portion of such Claim representing accrued but unpaid interest.  However, there is no assurance that the IRS would respect such allocation for United States federal income tax purposes.

In the event that a portion of the consideration received by a holder of a Claim represents accrued but unpaid interest, only the balance of the distribution would be considered received by the holder in respect of the principal amount of the Claim.  Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the holder with respect to the Claim.  If any such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

To the extent that any portion of the distribution is treated as interest, non-U.S. holders may be required to provide certain tax information in order to avoid the withholding of taxes.

(c)    **Market Discount.**

A holder that acquires a debt instrument with market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the holder.  In general, a debt instrument is considered to have been acquired with market discount if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in such instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with "original

92

issue discount" ("**OID**"), its adjusted issue price, in each case, by at least a de minimis amount (equal to the product of 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, and the number of remaining whole years to maturity). To the extent that the debt instruments that were acquired with market discount are exchanged for other property in a corporate reorganization within the meaning of Section 368 of the Tax Code, any market discount that accrued on such debt instruments (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property is treated as ordinary income to the extent of such accrued, but not recognized, market discount.

(d)     **Treatment of First Lien Claim Holders.**

        Pursuant to one possible set of transactions that may be adopted as the Plan, the holders of the Allowed First Lien Claims would receive, in a transaction intended to preserve certain of the tax attributes of the MModal Group, ninety three (93) percent of Reorganized Holdings Equity Interests before dilution for the New Warrants and Management Stock Option Plan, the New Term Loan, and Cash (taken together, the "**Exchange**") in satisfaction of a portion of their Claims.  Depending upon the precise nature of the transactions effected to implement the consummation of the Plan, it is possible that, if each of the debt underlying the First Lien Claims and the New Term Loan is treated as a "security" for United States federal income tax purposes, the Exchange would be treated as a "recapitalization" (or, possibly, some other type of partially tax-free reorganization) and the holders of the First Lien Claims would generally only recognize any gain in respect thereof to the extent of the Cash received and would not recognize any loss. Alternatively, if only the debt underlying the First Lien Claims is treated as a "security" for United States federal income tax purposes, gain would be recognized (for purposes of Section 356 of the Tax Code) to the extent of the Cash and the fair market value of the New Term Loan received.  The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt constitutes a "security" depends on an overall evaluation of the nature of the debt. One of the most significant factors considered in determining whether a particular debt is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of five years or less do not constitute securities, whereas debt obligations with a weighted average of ten years or more constitute securities. The Company has not yet determined whether it will treat either debt arising from the First Lien Claims  or the New Term Loan as a "security" for United States federal income tax purposes.  Therefore, it is possible the Debtors may treat the Exchange as a partially or fully taxable exchange.  No ruling has been or will be applied for or obtained from the IRS with respect to this issue and no opinion of counsel has been or will be requested or obtained with respect thereto.   In addition, if the Exchange were deemed to be a contribution of property to a corporation governed by Section 351 of the Tax Code, holders of the First Lien Claims generally would not recognize loss, and would only recognize gain to the extent of the Cash and the fair market value of the New Term Loan received.

        If the Exchange is taxable, a holder of a Claim will generally recognize gain or loss equal to the difference between the "amount realized" by such holder in exchange for its Claim and such holder's adjusted tax basis in the Claim.  Any such gain would be treated as

ordinary income to the extent attributable to any market discount such holder had accrued with respect to its Claim, unless the holder has elected to include market discount in income currently as it accrues. To the extent a holder of a First Lien Claim is treated for tax purposes as transferring its Claim to a person that is deemed to be a related Person to such holder, any loss realized in respect of the transfer may be disallowed. Thus, if a holder of a Claim is related to Holdings or MModal Inc. for these purposes (including if they are treated as being related after consummation of the Plan), such holder may lose the ability to claim any loss if the Exchange were taxable.

A holder's amount realized will generally depend on whether the New Term Loan or the First Lien Claims being exchanged therefor are deemed to be "traded on an established market" within the meaning of Section 1273 of the Tax Code. The New Term Loan or the First Lien Claims will be treated as traded on an established market only if the debt is traded on an established market during the 31-day period ending 15 days after the exchange date. Pursuant to applicable Treasury regulations, an "established market" need not be a formal market. The New Term Loan or the First Lien Claims will be considered trade on established market if (i) there is a price for an executed purchase or sale of the New Term Loan or the debt underlying the First Lien Claims, as applicable, that is reasonably available within a reasonable period of time after the sale; (ii) there is at least one price quote for the New Term Loan or the debt underlying First Lien Claims, as applicable from at least one reasonably identifiable broker, dealer or pricing service, which price quote is substantially the same as the price for which the person receiving the quoted price could purchase or sell the New Term Loan or the debt underlying the First Lien Claims, as applicable (a "**Firm Quote**"); or (iii) there is at least one price quote for the New Term Loan or the debt underlying the First Lien Claims, as applicable, other than a Firm Quote, available from at least one such broker, dealer, or pricing service. Where the principal amount of a debt instrument underlying a First Lien Claim does not exceed $100 million on the date of the Exchange, such First Lien Claim will not be deemed to be traded on an established market on such date.

If neither the New Term Loan nor the First Lien Claims being exchanged therefore are deemed to be traded on an established market, then a holder's amount realized would generally be equal to the sum of any Cash received by the holder and the stated principal amount of the New Term Loan and the fair market value ("**New Equity FMV**") of the Reorganized Holdings Equity Interests issued to such holder in the Exchange. A holder's basis in the New Term Loan, and the issue price of such loan for purposes of determining the amount of any OID thereupon (discussed below), would generally be the stated principal amount of such loan, and a holder's basis in the Reorganized Holdings Equity Interests would generally be an amount equal to the New Equity FMV. However, the tax consequences to a holder could be materially different if either the New Term Loan or the First Lien Claims being exchanged therefor are deemed to be traded on an established market. If the First Lien Claims are deemed to be traded on an established market, but the New Term Loan is not so deemed, then (i) the holder's aggregate amount realized in the Exchange would generally be an amount equal to the fair market value of the First Lien Claims ("**Old Debt FMV**") and the amount of Cash received by the holder, (ii) a holder's basis in, and the issue price of, the New Term Loan would be an amount equal to the Old Debt FMV minus the New Equity FMV and (iii) a holder's basis in the Reorganized Holdings Equity Interests would be the New Equity FMV. If the New Term Loan is deemed to be traded on an established market for these purposes, then (i) the holder's aggregate

94

amount realized in the Exchange would generally be an amount equal to the sum of the amount of Cash received by the holder, the New Equity FMV and the fair market value of the New Term Loan (the "**New Loan FMV**"), (ii) a holder's basis in, and the issue price of, the New Term Loan would be an amount equal to the New Loan FMV and (iii) a holder's basis in the Reorganized Holdings Equity Interests would be the New Equity FMV.

The treatment of the Exchange is not free from doubt and depends on the application of complex rules to facts that are not clearly addressed by such rules. Holders should consult with their tax advisors regarding the tax consequences of the Exchange with respect to their particular circumstances.

Alternatively, if the consummation of the Plan involved the formation of a new acquisition vehicle or vehicles to acquire the Assets of the MModal Group in what would be intended to be a taxable transfer of the MModal Group's assets, the holders would be treated as engaging in a taxable exchange and the tax results to such holders generally would be similar to those described above under the scenario where the Exchange is taxable. The treatment of such an asset transfer as fully taxable is also not free from doubt and depends on the application of complex rules to facts that are not clearly addressed by such rules. Holders should consult with their tax advisors regarding the tax consequences of such an asset transfer with respect to their particular circumstances.

(e)      **Treatment of General Unsecured Claim Holders.**

As described above, each holder of a General Unsecured Claim (including Noteholder Claims) will receive such holder's pro rata share of: (i) seven (7) percent of Reorganized Holdings Equity Interests, before dilution solely on account of the New Warrants and Management Stock Option Plan; (ii) the New A Warrants and New B Warrants; and (iii) $617,039 in Cash. As is the case with the Allowed First Lien Claims, the Company has not yet determined whether it will treat the debt underlying the Noteholder Claims as a "security" for United States federal income tax purposes. Therefore, it is possible the Debtors may treat the exchange by holders of Noteholder Claims as a partially or fully taxable exchange. No ruling has been or will be applied for or obtained from the IRS with respect to this issue and no opinion of counsel has been or will be requested or obtained with respect thereto. In addition, if the exchange by holders of General Unsecured Claims were deemed to be a contribution of property to a corporation governed by Section 351 of the Tax Code, such holders generally would not recognize loss, and would only recognize gain to the extent of the Cash and the fair market value of the New A Warrants and New B Warrants received. As discussed above in "—Treatment of First Lien Claim Holders," if the debt underlying the Noteholder Claims were not treated as securities, or a fully taxable transaction were chosen for implementation of the Plan, all General Unsecured Claim holders would recognize gain or loss equal to the difference between the "amount realized" by such holders in exchange for their Claims and such holders adjusted tax basis in their Claims. The "amount realized" will equal the fair market value of the Reorganized Holdings Equity Interests and the New A Warrants and New B Warrants received plus $617,039. If the debt underlying the Noteholder Claims were treated as securities, then partially tax-free treatment would apply, with the same consequences described above in "—Treatment of First Lien Claim Holders."

(f)      **Ownership and Disposition of the New Term Loan.**

*Stated Interest*. The stated interest on the New Term Loan generally will be taxable as ordinary interest income in accordance with the holder's regular method of accounting at the time such payments are accrued or received.

*Original Issue Discount*. The amount of OID with respect to the New Term Loan, if any, will be equal to the excess of the "stated redemption price at maturity" of the note (i.e., generally, the face amount of the New Term Loan) over its "issue price" as described above.

For United States federal income tax purposes, each holder (regardless of its accounting method) generally must include in gross income a portion of any OID in each taxable year during which the New Term Loan is held in an amount equal to any such OID that accrues during such period, determined using a constant yield to maturity method that reflects compounding of interest. This means that each holder may be required to include amounts in gross income without a corresponding receipt of cash attributable to such income. A holder's tax basis in the New Term Loan will be increased by the amount of OID includible in the holder's gross income as it accrues.

*Acquisition Premium or Amortizable Bond Premium on the New Term Loan*. If a holder's initial tax basis in the New Term Loan is greater than its issue price and less than or equal to its stated redemption price at maturity, the New Term Loan will be considered to have been issued to such holder at an "acquisition premium." Under the acquisition premium rules, the amount of OID that a holder must include in income with respect to the New Term Loan for any taxable year will be reduced by the portion of the acquisition premium properly allocable to that year. If a holder's initial tax basis in its share of the New Term Loan is greater than its stated redemption price at maturity, a holder will be considered to have acquired the New Term Loan with "amortizable bond premium" and a holder will not be required to include any OID in income. A holder generally may elect to amortize the premium over the remaining term of the New Term Loan on a constant yield method as an offset to interest when includible in income under a holder's regular accounting method. If a holder does not elect to amortize the premium, that premium will decrease the gain or increase the loss a holder would otherwise recognize on disposition of the New Term Loan.

*Sale or Other Disposition of the New Term Loan*. When a holder sells or otherwise disposes of its share of the New Term Loan in a taxable transaction, the holder will generally recognize gain or loss for United States federal income tax purposes in an amount equal to the difference, if any, between (1) the amount realized on the disposition, less any amount attributable to accrued interest, which will be taxable as such; and (2) the holder's adjusted tax basis in the New Term Loan. The holder's adjusted tax basis in the New Term Loan generally equals the issue price of such holder's share of the New Term Loan, increased by accrued OID (if any) with respect to the New Term Loan, and decreased by payments on the New Term Loan other than payments of "qualified stated interest."  Such gain or loss will generally be capital gain or loss.

Holders should consult with their tax advisors regarding the tax consequences of the ownership and disposition of the New Term Loan with respect to their particular circumstances.

(g)     **Ownership and Disposition of the Reorganized Holdings Equity Interests.**

*Distributions*. A distribution paid in respect of the Reorganized Holdings Equity Interests will generally constitute a dividend for United States federal income tax purposes to the extent the distribution is paid out of current or accumulated earnings and profits, as determined under United States federal income tax principles.  The gross amount of any such dividend to a holder will be included in the income of the holder, as ordinary dividend income.  In general, distributions in excess of current or accumulated earnings and profits will not be taxable to a holder to the extent that such distributions to the holder do not exceed the holder's adjusted tax basis in the Reorganized Holdings Equity Interests with respect to which the distribution is paid, but rather will reduce the holder's adjusted tax basis in such Reorganized Holdings Equity Interests (but not below zero). To the extent that distributions exceed current and accumulated earnings and profits as well as the holder's adjusted tax basis in the Reorganized Holdings Equity Interests, such distributions generally will be taxable as capital gain realized in respect of the Reorganized Holdings Equity Interests.

Under current United States federal income tax law, dividends paid to certain non-corporate holders, including individuals, generally will constitute qualified dividend income eligible for preferential rates of United States federal income tax, with a maximum rate of twenty percent (20%), provided certain conditions and requirements are satisfied, such as minimum holding period requirements. Holders that are corporations may be eligible for a partial dividends-received deduction with respect to dividend distributions that are paid in respect of the Reorganized Holdings Equity Interests, subject to certain conditions and requirements, such as minimum holding period requirements. The earnings and profits of Reorganized Holdings will generally be increased by the amount of COD realized by Holdings pursuant to the Plan to the extent that such COD does not reduce basis in assets of the MModal Group.

*Sale or Other Disposition of Reorganized Holdings Equity Interests*. In general, a holder will recognize gain or loss upon the sale or other taxable disposition of the Reorganized Holdings Equity Interests in an amount equal to the difference between the sum of the fair market value of any property and the amount of cash received in such disposition and such holder's adjusted tax basis in the Reorganized Holdings Equity Interests at the time of the disposition. Such gain or loss will generally be capital gain or loss.

Holders should consult with their tax advisors regarding the tax consequences of the ownership and disposition of the Reorganized Holdings Equity Interests with respect to their particular circumstances.

(h)     **Ownership and Disposition of the New Warrants.**

Generally speaking, a holder will recognize capital gain or loss upon the sale, exchange, redemption or other taxable disposition of the New Warrants equal to the difference between the amount realized and the holder's basis in the New Warrants. Upon exercise of the

New Warrants, a holder exercising the New Warrants through a cash exercise should generally recognize no gain or loss on the exercise. However, the exercise of New Warrants through a cashless exercise may be treated as a taxable exchange of the New Warrants causing the exercising holder to recognize taxable gain. The holding period of a holder in Reorganized Holdings Equity Interests obtained through exercise of the New Warrants generally will begin on the date of exercise.

(i)     **Medicare Tax.**

        Certain Holders that are individuals, estates or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets generally for taxable years beginning after December 31, 2013. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their receipt, ownership and disposition of any consideration to be received under the Plan.

(j)     **Information Reporting and Backup Withholding.**

        In general, a holder (other than corporations and other exempt holders) will be subject to information reporting requirements with respect to (i) payments made in connection with the Plan, (ii) payments of principal, premium, and interest (including OID, if any) paid in respect of, and the proceeds from a sale, redemption or other disposition before maturity of, the New Term Loan, and (iii) dividends and other taxable distributions paid in respect of, and the proceeds from a sale or other disposition of, the Reorganized Holdings Equity Interests. In addition, such a holder may be subject to backup withholding on such payments if the holder (i) fails to provide an accurate taxpayer identification number to the payor; (ii) has been notified by the IRS of a failure to report all interest or dividends required to be shown on its United States federal income tax returns; or (iii) in certain circumstances, fails to comply with applicable certification requirements. Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

        In addition, Sections 1471 to 1474 of the Code ("**FATCA**") generally impose withholding of 30% on certain payments to certain foreign entities (including financial intermediaries), unless various U.S. information reporting, diligence, and certain other requirements have been satisfied. Such payments will ultimately include U.S.-source interest and dividends, as well as gross proceeds (including principal payments) from the sale or other disposition of debt or equity securities that can produce, respectively U.S.-source interest or dividends. FATCA withholding generally applies to payments of dividends and interest made after June 30, 2014, and payments of gross proceeds described above made after December 31, 2016. Withholding under FATCA generally will not be required on obligations outstanding on July 1, 2014, provided that such obligations are not significantly modified (within the meaning of Section 1001 of the Tax Code) after such date. If withholding is required under FATCA on payments made to a holder, the holder likely will not be entitled to receive any additional

98

amounts with respect to any amounts withheld. Foreign holders should consult their tax advisors regarding the possible implications of this legislation for their ownership of New Term Loans.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## ARTICLE XIV.

## RECOMMENDATION AND CONCLUSION

Chapter 11 of the Bankruptcy Code provides that, unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Plan as a consensual plan, the holders of Impaired Claims against the Debtors in each Class of Impaired Claims must accept the Plan by the Requisite Acceptances set forth in the Bankruptcy Code.

The Debtors, the First Lien Agent, the Consenting Lenders and the Consenting Noteholders recommend that all holders of Claims entitled to do so, vote to accept the Plan. The boards of directors of each of the Debtors (collectively, the "**Company Boards**"), the Debtors' officers, the First Lien Agent, the Consenting Lenders and the Consenting Noteholders have reached this decision after considering available alternatives to the Plan and their likely effect on the Debtors' creditors, such as liquidation of the Debtors under chapter 7 of the Bankruptcy Code. The Debtors, the First Lien Agent, the Consenting Lenders and the Consenting Noteholders determined, after consulting with their legal and financial advisors, that the Plan, if consummated, will maximize the value of these Debtors' estates for stakeholders, and such recovery will exceed any recovery under a hypothetical chapter 7. For all of these reasons, the Debtors' officers, the Company Boards and the First Lien Agent support the Plan and urge the holders of Claims entitled to vote on the Plan to accept and support it.

The Debtors, the First Lien Agent, the Consenting Lenders and the Consenting Noteholders believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims. The Debtors urge the holders of Impaired Claims in Classes 2 and 4 who are entitled to vote on the Plan, to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 4:00 p.m. (Eastern Time) on July 3, 2014. Please be reminded that the Voting Agent must have original signatures on all Ballots; and that the Voting Agent will not accept Ballots delivered by email or facsimile.

[Signature Page follows.]

Dated: April 25, 2014
      New York, New York

                        Respectfully submitted,

                        MMODAL INC., on behalf of itself and its
                        affiliated Debtors

By: _____
      David Woodworth
      Chief Financial Officer

DECHERT LLP

1095 Avenue of the Americas
New York, NY 10036
(212) 698-3500

*Attorneys for the Debtors and
Debtors in Possession*

[*Signature Page to Disclosure Statement*]